# 23-1675

## United States Court of Appeals
## for the
## First Circuit

UNIVERSITAS EDUCATION, LLC
*Plaintiff-Appellee.*

*v.*

LILLIAN GRADERSON, as successor to Jack E. Robinson III
*Defendant-Appellant,*

.JACK E. ROBINSON, III
*Third Party Plaintiff,*

v.

LOEB & LOEB LLP
*Third Party Defendant.*

On Appeal from the United States District Court for
the District of Massachusetts

**APPELLEE UNIVERSITAS EDUCATION, LLC'S SUPPLEMENTAL APPENDIX**

Joseph L. Manson III
LAW OFFICES OF JOSEPH L. MANSON III 600
Cameron St., 4th Floor, Alexandria, VA 22314
(202) 674-1450
jmanson@jmansonlaw.com
*Counsel for Plaintiff-Appellee*

# TABLE OF CONTENTS

Document:

Complaint, *Universitas Education, LLC v. Robinson*, No. 1:15-cv-11848-DPW (D. Mass.), dated May 14, 2015 (Doc. No. 1)*...........................................................1

Letter from Jack E. Robinson III, dated September 11, 2009 (Doc. No. 172-4).....71

Letter from Jack E. Robinson III, dated November 18, 2010, 2023 (Doc. No. 172-4)..................................................................................................................74

Declaration of Jack E. Robinson III, dated November 30, 2010 (Doc. No. 172-7)..................................................................................................................78

Status Report of the Parties, dated August 15, 2017 (Doc. No. 127)......................85

Deposition of Maxine Novak, dated July 25, 2019.................................................89

Deposition of Lillian Granderson, dated July 1, 2020...........................................120

Last Will and testament of Jack E. Robinson, dated November 15, 2010 (Doc. No. 176-7)..............................................................................................................143

Opposition to Default Judgment, dated May 26, 2023 (Doc. No. 202)................159

Docket Report, *Universitas Education, LLC v. Granderson*, No. :15-cv-11848-DPW (D. Mass.).............................................................................................161

*The Document Number refers to the Docket entry in which the Supplemental Appendix document may be found in the record of the proceedings before the District Court in the case captioned *Universitas Educ., LLC v. Granderson*, No. 1:15-cv-11848-DPW (D. Mass. 2023).

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

----------------------------------------------------------------X

UNIVERSITAS EDUCATION, LLC,                    :

               Plaintiff,                    :        Civil No. _____

        -against-                              :        **COMPLAINT AND**

JACK E. ROBINSON, III a/k/a JACK E.            :        **JURY DEMAND**
ROBINSON,
                                               :
             Defendant.
                                               :

----------------------------------------------------------------X

## NATURE OF THE CASE

1.    Plaintiff Universitas Education, LLC ("Universitas"), an unsatisfied judgment creditor, through its attorneys, brings this action against Defendant Jack E. Robinson III, a/k/a Jack E. Robinson ("Robinson"), for knowingly and intentionally facilitating and participating in the theft of over $30.6 million in life insurance proceeds belonging to Universitas by judgment debtor Daniel E. Carpenter—a business associate, former law partner, and client of Robinson who is currently serving prison time in connection with a conviction in federal court for nineteen (19) counts of mail and wire fraud, and who separately faces twenty-four (24) counts of fraud, money laundering, and engaging in illegal transactions relating to his usurpation and intentionally fraudulent transfer of such insurance proceeds. For aiding in this theft and in Carpenter's efforts to cover up evidence of the theft, Robinson also knowingly received $810,000.00 or more of the stolen insurance proceeds belonging to Universitas. As such, Universitas brings claims for violation of the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1961 et seq., aiding and abetting fraud, aiding and abetting breach of

fiduciary duty, civil conspiracy, conversion, unjust enrichment, statutory theft, negligent opinion, negligent misrepresentation, breach of fiduciary duty, and professional malpractice, and seeks compensatory damages, restitution, and treble damages.

## PARTIES

2.    Plaintiff Universitas is a limited liability company incorporated in Delaware with headquarters in New York, New York.  Universitas has two members, Donna Vassar and Sharon Siebert, each of whom lives and is domiciled in New York, New York.  Universitas is the beneficiary of the Charter Oak Trust Welfare Benefit Plan ("Charter Oak Trust") in relation to two life insurance policies placed into the Charter Oak Trust that, in May 2009, paid out approximately $30.6 million to the Charter Oak Trust for Universitas' benefit.   Robinson, however, facilitated and participated, either intentionally or negligently, in the fraudulent transfer of that money out of the Charter Oak Trust, and aided and abetted Carpenter (and others, such as his wife Molly Carpenter and his brother-in-law Wayne Bursey) in concealing the theft from Universitas and the arbitrator considering Universitas' claims and in preparing sham documents in an effort to cover up the defalcation, as detailed further below.  As a result, Universitas has received no money from the Charter Oak Trust, let alone the over $30 million it is currently entitled to.

3.    Defendant Robinson is an individual with a last known residence at 67 Bay Road, Duxbury, Plymouth County, Massachusetts.   Robinson is licensed to practice law in the Commonwealth of Massachusetts, and is actively engaged in the practice of law in Massachusetts as the sole Director, President, Treasurer, and Secretary of Leyden & Main Legal Group, Inc., which is located at 6 Main Street Extension, Post Office Square, Plymouth, Plymouth County, Massachusetts.

2

## JURISDICTION AND VENUE

4.      Personal jurisdiction exists over Robinson because his last known residence is in Massachusetts and, alternatively, because he is legally present in Massachusetts by virtue of the fact that he is actively operating his law business and engaged in the practice of law in Massachusetts.

5.      Subject matter jurisdiction exists under 28 U.S.C. § 1332, as the parties are diverse and the amount in controversy exceeds $75,000, as well as under 28 U.S.C. §1331, as one of the claims arises under 18 U.S.C. § 1961 et seq.

6.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1), as Robinson resides within this judicial district.

## FACTUAL STATEMENT APPLICABLE TO ALL CLAIMS

### I.      The Carpenter Criminal Enterprise

7.      The criminal enterprise that orchestrated and carried out the looting of over $30 million belonging to Universitas, and of which Robinson is a central figure, was created by longtime Robinson crony and convicted fraudster Daniel E. Carpenter ("Carpenter").  This enterprise (the "Carpenter Criminal Enterprise") includes of a host of individuals and entities that were employed by or associated with the Carpenter Criminal Enterprise and who together with Carpenter carried out a massive fraud against Universitas (and other victims), including, among others, Robinson, Wayne Bursey ("Bursey"), Molly Carpenter, Kathy Kehoe, Amanda Rossi, Donald Trudeau ("Trudeau"), J. Edward Waesche IV ("Waesche"), the Charter Oak Trust, Nova Group, Inc. ("Nova"), Nova Benefit Plans LLC ("Nova Benefit Plans"), Benistar Admin Services, Inc. ("BASI"), Grist Mill Capital, LLC ("Grist Mill Capital"), Grist Mill Holdings, LLC ("Grist Mill Holdings"), Avon Capital, LLC ("Avon Capital"), Caroline Financial Group, Inc. ("Caroline Financial"), Carpenter Financial Group Inc. ("Carpenter Financial Group"), the

3

Grist Mill Trust Welfare Benefit Plan ("Grist Mill Trust"), Hanover Trust Company ("Hanover"), Moonstone Partners, LLC ("Moonstone"), Phoenix Capital Management, LLC ("Phoenix"), Benistar Ltd., ("Benistar"), and Boston Property Exchange Transfer Company, formerly known as Benistar Property Exchange Trust Company, Inc. ("BPETCO").

8.     Many of the individuals and entities participating in this enterprise are, or have been, the targets of federal grand jury investigations. For example, the United States Attorney in Connecticut has conducted an investigation into, among other persons, Carpenter, Robinson, Trudeau, Waesche, Bursey, the Charter Oak Trust, Nova, BASI, Grist Mill Capital, Grist Mill Holdings, Avon Capital, Caroline Financial, and all employees and business associates of those organizations. Attached as **Exhibit 1** is a true and correct copy of a stipulation executed by the U.S. Attorneys' Office for the District of Connecticut listing those individuals and entities as targets of the grand jury investigation. Similarly, the Carpenter Criminal Enterprise has been the subject of a grand jury investigation by the United States Attorney in Wisconsin, which has subpoenaed records from Nova Benefit Plans regarding various welfare benefit plans, such as the Charter Oak Trust, that are controlled and operated by the Carpenter Criminal Enterprise. Attached as **Exhibit 2** is a true and correct copy of a grand jury subpoena dated April 13, 2010 issued out of the U.S. District Court for the Eastern District of Wisconsin to Nova Benefit Plans. On information and belief, both of the above referenced investigations are still open investigations.

9.     Carpenter is an insurance agent by profession. Although also trained as a lawyer, Carpenter has been unable to practice law since 2009, when he was disbarred. In January 2005, the Connecticut Statewide Grievance Committee found that Carpenter had committed fraud, deceit, and misrepresentation in connection with his handling of client funds. See Cahaly v.

4

Carpenter, Grievance Complaint No. 02-0600 (St. Grievance Cmte. Jan. 14, 2005). The misconduct described in that decision involved the unauthorized transfer and defalcation of client escrow funds from trust accounts into personal trading accounts. As a result, in January 2009, the Connecticut courts indefinitely suspended Carpenter's license to practice law.

10.    In 2004, Carpenter was indicted in the United States District Court for the District of Massachusetts for nineteen (19) counts of wire fraud and mail fraud in connection with his misappropriation and defalcation of millions of dollars in client escrow funds while offering, through a group of entities that he dominated and controlled, services as a qualified intermediary for tax-beneficial investment property exchanges, described in further detail below. Carpenter was found guilty in 2008, and was sentenced in 2014 to three (3) years in prison, and three (3) years' probation. See U.S. v. Carpenter, No. 04-CR-10029 (D. Mass.).

11.    Upon information and belief, Carpenter is currently an inmate at the high-security United States Penitentiary Canaan, in Waymart, Pennsylvania, where he is serving time in connection with his 2008 conviction.

12.    Carpenter has formed, or arranged for the formation of, scores, if not several hundred, companies, corporations and trusts, all of which he dominates and controls (with the help of his wife Molly Carpenter), most of which have been found to be his instrumentalities or to be shams, through which he has operated his criminal enterprise over the years, nearly all of which have operated out of, or have been closely connected to businesses that operated out of, an office complex located at 100 Grist Mill Road, Simsbury, Connecticut.

13.    Of particular relevance to this case, it has been judicially determined, in decisions issued by the United States District Court for the Southern District of New York, that Carpenter controls, directly or indirectly, the following businesses: the Charter Oak Trust, Nova, Avon

**Universitas Supplemental Appendix - 005**

Capital, Caroline Financial, Carpenter Financial Group, Grist Mill Capital, Grist Mill Holdings, Grist Mill Trust, Hanover, Moonstone, Nova Benefit Plans and Phoenix.

14.    Among the other entities that Carpenter has formed, or directed the formation of, are:  Audit Risk Indemnity Association, LLC, the Sickness Accident Disability Indemnity Plan & Trust ("SADI Trust"), the SADI Trust 2005, Capital City Partners, LLC,  Benefit Concepts, Inc., Benefit Concepts Advisors, LLC, Benefit Concepts New York, Benefit Plan Advisors, LLC, Benistar 419 Plan Services, Benistar Client Services, Inc., Benistar Insurance Group, Benistar Insurance Group Holdings, LLC, BCNY Litigation Group, LLC, BPETCO Litigation Group, Birch Hill Partners, the Charter Oak Trust 2009, Nova Group Holdings, LLC, Nova Partners, TPG Group, Inc., U.S. Benefits Group, Inc., and Worthy Investments, LLC.,

15.    Additional entities have been found, by other courts and in other cases, also to be dominated and controlled by, and, specifically, to be *alter egos* of, Carpenter.  In a suit commenced in the Commonwealth of Massachusetts Trial Court, a decision has been entered by that Court finding that the following entities are also the *alter egos* of Carpenter:  Benistar, BASI, Benistar Employer Services Trust Corporation, Carpenter Financial Group, LLC, U.S. Property Exchange, and BPETCO.

16.    These entities, and numerous other entities controlled by Carpenter, have confusingly interwoven chains of ownership, and the Courts which have addressed the issue of such entities' ownership have consistently found that Carpenter dominates and pervasively controls, for his own individual purposes, the numerous entities which he and his cronies have formed.  For instance, a limited liability company might have two members, both of which are themselves companies or corporations, and each of which is owned by other companies or corporations.  Carpenter, for example, controls Grist Mill Capital through his control of Grist

6

**Universitas Supplemental Appendix - 006**

Mill Capital's two members, Grist Mill Holdings and Caroline Financial Group; and he controls Avon Capital through his control of Grist Mill Capital, which manages Avon Capital. Similarly, Carpenter and the Carpenter Criminal Enterprise have endeavored to conceal these entities' chains of ownership. For example, Nova's own corporate designee has testified under oath that he does not know who owns Nova, and that no stock certificates ever issued for Nova, despite the entity having been operational and having conducted business through appointed corporate officers. As a further example, BASI is owned by an employee stock ownership plan, or "ESOP," but employees who participate in that plan have testified under oath that they have no idea who administers the plan or how the shares of BASI are valued. In short, virtually all of the companies operated by Carpenter and his cronies are formed and manipulated by them for their own personal interests and as part of the Carpenter Criminal Enterprise.

17.   Carpenter is not shy about his conduct. For instance, he has admitted under oath that Nova is a "shell corporation;" that Grist Mill Holdings is his "alter ego" for collecting insurance commissions; and that in an effort to avoid creditors, he arranged for one of his companies, Moonstone, to give a mortgage on property it owned to another one of his companies, Hanover, 15 months after the property was purchased.

18.   Carpenter has also admitted under oath that "anything that I invested in is either held in an LLC or it's held in a trust, you know, for either estate planning purposes or protection, you know, asset protection, you know, type purposes, so that if something happens on one property, people can only sue that property and they cannot sue other properties that are owned by different trusts or different LLCs."

Universitas Supplemental Appendix - 007

## II.    Robinson's Relationship with Carpenter

19.    Robinson's association with Carpenter and his participation in Carpenter's enterprise dates back to the mid-1990s.

20.    In or about 1995, Robinson and Carpenter became business partners in an LLC that owned shares in a Caribbean wireless telecom holding company (which has since gone defunct and filed for bankruptcy in Connecticut).  Robinson was the Managing Member of the LLC, while the other Member was Carpenter Financial Group, an entity controlled by Carpenter and from which Robinson later received a portion of the Universitas life insurance proceeds that Robinson helped steal, as detailed below.

21.    In or about 1996, Robinson and Carpenter became law partners and formed the Stamford, Connecticut-based law firm Carpenter & Robinson, LLP.

22.    In or about 1997, Robinson started working for BASI, an entity for which Carpenter's wife, Molly Carpenter, served as Chairman, and which provided administrative services for various employee welfare benefit plans and trusts controlled by Carpenter, including the Charter Oak Trust, discussed below.  As noted above, BASI, which was the administrator of the Charter Oak Trust, has been found to be an *alter ego* of Carpenter in litigation pending in the Massachusetts Trial Court.  At Molly Carpenter's direction, Robinson was appointed as General Counsel of BASI, and he actively served in that position from 1997 through at least 2012, during which time period Carpenter operated his criminal enterprise, with Robinson's assistance, as described herein.  Robinson certainly knew, or at the very least should have known, of Carpenter's pervasive control of BASI by no later than September 23, 2003, when the Massachusetts Trial Court found that BASI was Carpenter's *alter ego*.

23.     Robinson also served as Carpenter's personal attorney in the District of Massachusetts criminal prosecution commenced in 2004, discussed further herein, and thus knew or should have known of the Massachusetts Trial Court proceedings, since the criminal prosecution was based on the subject matter of those proceedings.

24.     Between 2003 and 2006, Carpenter appointed Robinson as Manager of Grist Mill Capital, another entity dominated by Carpenter, which was to later become heavily involved in the defalcation of funds belonging to Universitas, both as a recipient and fraudulent transferor of $30.6 million of those funds while Robinson was serving as Manager and counsel.

25.     Starting in or about 2006, Robinson also performed substantial legal work for the Charter Oak Trust—an entity that was controlled by Carpenter at all relevant times, and which was at the center of the misappropriation of the Universitas funds.  During all relevant times to this case, Robinson was part of Carpenter's inner circle for decision making, together with Carpenter cronies Wayne Bursey and Donald Trudeau.

26.     At various points from the mid-1990s through the present, and at Carpenter's behest, Robinson also worked for, represented, and/or acted on behalf of Wayne Bursey, Carpenter's brother-in-law and confederate, and on behalf of the numerous entities dominated and controlled by Carpenter.  As Robinson has stated under oath, as of 2012, approximately 75% of his legal work was for entities controlled by and affiliated with Carpenter.

III.    The Charter Oak Trust, Nova, and its Affiliates

27.     On or about October 1, 2006, Bursey executed a Declaration of Trust as President of Nova, thereby establishing the Charter Oak Trust.  Robinson represented Charter Oak Trust in the drafting of the Declaration of Trust and was thus intricately familiar with the terms of that Trust.

9

28.     Bursey, as noted above, is Carpenter's brother-in-law.  Bursey, who is recently deceased, acted not only as the President of Nova, but also acted as the individual Trustee to the Charter Oak Trust and as an officer and/or director of Nova Benefit Plans, another Carpenter-controlled entity.

29.     Nova purported to be the sponsor, co-administrator and corporate Trustee of the Charter Oak Trust and numerous other employee welfare benefit plans.  Nova, however, is not currently, nor was it ever, a *bona-fide* corporation, but rather a judicially determined shell entity that was dominated and controlled by Carpenter, who was Nova's Chairman and operated the Charter Oak Trust through Nova and other sham companies from the office complex located at 100 Grist Mill Road.  While Nova was designated as Plan Administrator, it had no employees, and all such administrative functions were in fact performed by BASI.  As such, BASI was the de facto Plan Administrator for Charter Oak Trust.

30.     The Charter Oak Trust was masterminded by Carpenter, as part of his wide-ranging and long-operating criminal enterprise described herein.   As Bursey has admitted in court proceedings, he and Carpenter co-managed the Charter Oak Trust and Carpenter created the Charter Oak Trust's structure, which Carpenter utilized to accomplish the theft of the insurance proceeds belonging to Universitas, as described herein.

31.     The Charter Oak Trust marketed and represented itself to be a multiple-employer welfare benefit plan under Section 419(e) of the Internal Revenue Code and was not subject to ERISA regulations.  Instead, it was another front for the Carpenter Criminal Enterprise, which relied on attracting investors through the offering of purported tax shelter programs.

32.     As discussed below, the criminal enterprise operated by Carpenter and his cronies also used the Charter Oak Trust, from 2006 into 2009, as a front for a scheme to defraud

10

**Universitas Supplemental Appendix - 010**

insurance companies, which led to an indictment by a Connecticut federal grand jury on thirty-two (32) counts of mail and wire fraud and one (1) count of conspiracy to commit mail and wire fraud.

33.    The Declaration of Trust for the Charter Oak Trust confirmed that "in no event shall any asset of the [Trust's] Fund be used for or diverted to purposes other than providing benefits ... for Participants and their dependents and beneficiaries and defraying reasonable expenses of administering the ... Trust."  As counsel for and an authorized representative of the Charter Oak Trust, and as a result of his participation in the drafting of the Declaration of Trust and other Charter Oak Trust documents, Robinson knew or should have known of the provisions of the Declaration of Trust.

34.    Starting at the time the Charter Oak Trust was created on or about October 1, 2006, Robinson was appointed as Nova's General Counsel and was therefore acting on behalf of the Charter Oak Trust.  Robinson has stated, under oath, that he was fully familiar with all of the Charter Oak Trust's operations, finances, bank accounts, assets and obligations, and thus was or should have been aware of all of the Charter Oak Trust's activities in connection with the Carpenter Criminal Enterprise.

35.    Nova, as the trustee and plan sponsor of the Charter Oak Trust, Bursey, as Nova's President, and Robinson, as Nova's general counsel, were all fiduciaries of the Trust.

36.    BASI, which Carpenter controlled, and for whom both Robinson and Molly Carpenter worked, provided all administrative services for the Charter Oak Trust and was, in fact, the Plan Administrator.  In that capacity, it too was a fiduciary of the Charter Oak Trust, as were Robinson and Ms. Carpenter.  As noted previously, BASI has been found by a court of competent jurisdiction to have been an *alter ego* of Carpenter.

**Universitas Supplemental Appendix - 011**

37.     Because the Charter Oak Trust was established for the benefit of its participants and beneficiaries, Nova, Bursey, BASI, and Robinson each owed a fiduciary duty to the participants and to the beneficiaries of the Charter Oak Trust.

**IV.     The Sash Spencer Life Insurance Policies**

38.     In or about late 2006, Bruce Mactas ("Mactas"), a licensed life insurance broker working on behalf of Sash A. Spencer ("Spencer"), then the CEO of Holding Capital Group, Inc., met with Trudeau, then-President of BASI (who was also the President of BASI when it was found to be Carpenter's *alter ego* in 2003), and Waesche, an insurance agent working on behalf of Carpenter and the Charter Oak Trust, to discuss Spencer's participation in the Trust.

39.     Upon information and belief, neither Waesche nor Trudeau disclosed Carpenter's connection to the Charter Oak Trust or his role in structuring and managing the Charter Oak Trust and its assets.

40.     On or about December 17, 2006, Spencer joined the Trust on behalf of Holding Capital Group, Inc.  Spencer named himself as the sole covered employee and indicated in the Trust documents that he would be acquiring a $10 million policy (the "2006 Plan Documents"). In his 2006 Plan Documents, Spencer named and designated Universitas as the sole beneficiary of his $10 million death benefit.

41.     The same day, Spencer, assisted by his broker Mactas, executed an application for a $10 million life insurance policy to be submitted to Lincoln National Life Insurance Company ("Lincoln Life").  In the life insurance application, Spencer was listed as the owner of the $10 million policy, Bursey signed the application as "Trustee" of the Trust, and the Trust was the policy's sole beneficiary.  Spencer indicated in his application that this designation was pursuant to the Charter Oak Trust, dated October 1, 2006.

12

42.    On or about December 29, 2006, Lincoln Life approved Spencer's application and issued a $10 million policy (Policy # 7305475), effective as of December 22, 2006.

43.    Around that time, Spencer decided to take out additional life insurance policies under the Charter Oak Trust with a $20 million corresponding death benefit.

44.    In or about March 2007, Lincoln Life issued a $20 million policy (#7320809), effective as of December 22, 2006 on Spencer's life.    Spencer executed additional documentation with the Charter Oak Trust for the new policy (the "2007 Plan Documents").    As he had done with the 2006 Plan Documents, Spencer designated Universitas as the sole beneficiary of any death benefit under the new policy.

45.    On or about April 4, 2008, Spencer decided that he wanted to amend his beneficiary designations to make Universitas the sole, **irrevocable** beneficiary of both the $10 million and $20 million policies.    To accomplish this, Mactas contacted Trudeau at BASI by email and advised him of Spencer's decision.

46.    On or about April 8, 2008, Trudeau provided Mactas with the appropriate documentation for Spencer to execute to make Universitas his sole, irrevocable beneficiary under the Charter Oak Trust.    On or about May 14, 2008, Mactas, on behalf of Spencer, submitted the new irrevocable designation forms to Trudeau, in which Spencer irrevocably designated Universitas as his sole beneficiary.

47.    Spencer died unexpectedly on June 10, 2008.

48.    Less than a week after Spencer's death, Mactas contacted BASI/Nova representatives regarding Spencer's death and the process for making a claim for benefits.    At Mactas' request, the Charter Oak Trust executed a claim for a total of $30 million in death benefits to be submitted to Lincoln Life with respect to the Spencer Policies, so that Lincoln Life

13

would pay the death benefit to the Charter Oak Trust, which in turn should have paid that death benefit over to the sole, irrevocable beneficiary—Universitas. Acknowledging that the claim had been filed, Trudeau sent an email to Mactas on June 18, 2008 with the subject line "COT claim"—or, Charter Oak Trust claim.

49.    To expedite the processing of Universitas' claim, on July 10, 2008, Mactas provided the Charter Oak Trust with a copy of Spencer's death certificate.

50.    In a letter dated July 23, 2008, in furthering Carpenter's scheme to deprive Universitas of the insurance proceeds belonging to it, Robinson wrote to Universitas and Spencer's widow, on behalf of each of Nova, the Charter Oak Trust, and Grist Mill Capital, claiming that the Charter Oak Trust was entitled to keep $6 million in "fees" from the $30 million in death benefits. Robinson claimed that certain purported amendments to the applicable Declaration of Trust permitted the exorbitant fee; however, neither the Charter Oak Trust nor anyone affiliated therewith had ever provided Spencer or Mactas with a copy of such purported amendments. Robinson knew or should have known that there were no such amendments and that the alleged agreement was a fabrication in order to assist Carpenter in his scheme to deprive Universitas of some or all of those insurance funds, for Carpenter's personal benefit.

51.    Both Universitas, through counsel, and Mactas continued to dispute the Trust's entitlement to the $6 million "fee" and from late 2008 through early 2009, the two sides continued to discuss the validity of the Trust's claim to the purported fee. Thus, Robinson knew full well, due to his involvement in the matter, that the fee was disputed by Universitas.

52.    On or about March 2, 2009, Robinson wrote to counsel for Universitas—on the letterhead of a company called Benistar, a company which is the 100% owner of BASI and which a Court has found to be Carpenter's *alter ego*—claiming that Universitas' dispute of the

Universitas Supplemental Appendix - 014

validity of the fees constituted a "threat of litigation," which, under the governing Declaration of Trust, would entitle the Charter Oak Trust to terminate Spencer's former company, Holding Capital, as an employer under the Trust, and would thereby entitle Nova to keep the entire $30 million death benefit. Thus, according to Robinson, unless Universitas agreed to pay those $6 million of fees (which were fictitious and bogus), Universitas would forfeit—to Carpenter-controlled entities, of course—the entire $30 million death benefit. While the Charter Oak Trust later retreated from Robinson's specious contention, Robinson's attempts to extract these funds demonstrate the depth of his involvement in the Carpenter Criminal Enterprise.

53.    On or about May 5, 2009, Bursey, as "Named Trustee" of the Charter Oak Trust, brought suit against Lincoln Life to recover the $30 million in death benefits on Spencer's life. In Bursey's Complaint, he acknowledged that Universitas was the sole beneficiary of the death benefits payable under the Spencer policies. See Bursey v. Lincoln Nat. Life Ins. Co., No. 09-cv-735-AWT (D. Conn. May 5, 2009), ECF No. 1. On information and belief, and as supported by his sworn declaration acknowledging full familiarity with all of the activities of the Charter Oak Trust, Robinson was aware of the Complaint and the allegations therein.

54.    Within several days of the filing of Bursey's Complaint, on or about May 15, 2009, Lincoln Life paid the death benefits to the Trust. Specifically, Lincoln Life issued two checks to Nova, designated "PAY TO THE ORDER OF CHARTER OAK Trust DTD 10/1/06 / WAYNE BURSEY TTEE / 100 GRIST MILL ROAD / SIMSBURY CT06070," totaling $30,677,276.85, representing $30 million in proceeds from the two life insurance policies issued on Spencer's life and for which Universitas was designated as the sole, irrevocable beneficiary, and $677,276.75 in interest from the date of Spencer's death (the "Universitas Insurance Proceeds"). Robinson knew or should have known of that payment.

15

55.     On May 18, 2009, Bursey deposited the two checks into the Charter Oak Trust's account with T.D. Bank, N.A. ("TD Bank") (Account No. xxx-xxx-4548).[1]  As of that date, the Universitas Insurance Proceeds were the only funds contained in the Charter Oak Trust's account.  From May to December, 2009, Carpenter was to siphon and steal the entirety of those funds, using his various companies, including Grist Mill Capital and Carpenter Financial Group, to accomplish that result.  And, as discussed below, through the unrelenting efforts and assistance of Robinson and other confederates to conceal the theft of those funds, Universitas did not become aware of the receipt and theft of those funds until 2012, in violation of the Charter Oak Trust's and Robinson's fiduciary duties to Universitas.

56.     Bursey was the only signatory on TD Bank Account No. xxx-xxx-4548.  Carpenter, however, helped arrange for that account to be opened.  Indeed, in an email exchange with representatives from U.S. Trust, Bank of America Private Wealth Management spanning May 11, 2009 to May 14, 2009, Carpenter—who failed in his attempt to open a Charter Oak Trust account at Bank of America upon refusing to provide Bank of America with an acceptable response to the bank's "Know Your Customer" inquiry—informed Bank of America that "we have" opened Charter Oak Trust accounts at two other banks.

57.     By letter dated July 8, 2009, Robinson again wrote to Universitas, this time claiming that Universitas was not entitled to the death benefits from the Spencer policies because Universitas had purportedly failed to file a timely claim with the Charter Oak Trust for such benefits.  By the date of that letter, Robinson was aware (but did not disclose to Universitas) or should have been aware that the Charter Oak Trust had received the insurance proceeds

---

[1] All references to account numbers herein contain only the final digits for such numbers, for the purpose of public filing.  Full account numbers are known to Universitas, and will be made available as appropriate throughout the course of this litigation.

**Universitas Supplemental Appendix - 016**

belonging to Universitas, and had already transferred over $10.8 million of the Universitas Insurance Proceeds to Grist Mill Capital, another Carpenter-controlled entity (for which Robinson was a Manager), and nearly $5.9 million of that amount had already been transferred out of Grist Mill Capital to various Carpenter controlled companies, as detailed below. In his letter, Robinson claimed, incredibly, that Grist Mill Capital was entitled to those death benefits. Robinson, pointing to the Declaration of Trust for the Charter Oak Trust, alleged that the deadline for filing a claim or claim application had been March 30, 2009.  As with prior (and subsequent) pretexts to deprive Universitas of the funds to which it was entitled, and in facilitation of the Carpenter Criminal Enterprise, Robinson knew or should have known (had he conducted even a limited due diligence to determine whether his claims had good grounds to support them) that such claim was a fabrication made to facilitate and conceal Carpenter's usurpation of the Universitas Insurance Proceeds.  Thus, Robinson's omission of and failure to disclose the information that the Lincoln Life insurance proceeds had been received, deposited and transferred by Charter Oak Trust to Grist Mill Capital, was a material omission that was necessary to be disclosed to render Robinson's statements not misleading.

58.    Robinson, in his letter, overlooked the fact that Universitas had already filed a claim, as Trudeau had acknowledged in his June 18, 2008 email.  As Robinson has sworn under oath that he was fully aware of and familiar with all the dealings, operations, assets and liabilities of the Charter Oak Trust, he was aware or should have been aware that Universitas had filed a claim.

59.    In that same July 8, 2009, letter, Robinson also claimed that Grist Mill Capital— not Universitas—was entitled to the Universitas Insurance Proceeds based upon an alleged 2008

**Universitas Supplemental Appendix - 017**

agreement between Spencer and Grist Mill Capital, pursuant to which Spencer purportedly assigned his beneficial interest in the Charter Oak Trust to Grist Mill Capital.

60.    Universitas responded with a written request that any such agreement which actually existed, as Robinson claimed on Nova's behalf, be produced to Universitas.  Not surprisingly, no contract between Spencer and Grist Mill Capital selling the policies or assigning a beneficial interest in Charter Oak Trust was ever produced.

61.    Also in his July 8, 2009 letter, on behalf of Nova, Robinson granted Universitas the right to file a "provisional claim" by July 15, 2009, which Universitas did.

62.    In a July 30, 2009, letter, Bursey as Trustee again alleged that Grist Mill Capital had a competing claim to the Universitas Insurance Proceeds, only this time he reversed Nova's position from Robinson's July 8, 2009 letter, and instead alleged that Grist Mill Capital had a "binding and enforceable agreement to purchase the Policies."   As with all its other claims and dilatory pretexts for concealing the misappropriation of the Universitas Insurance Proceeds, Nova's claim regarding Spencer's supposed sale of the policies was meritless and untrue and, in any event, Spencer had no authority to sell the policies to Grist Mill Capital because the policies were owned by the Charter Oak Trust, and no such agreement has ever been produced.

63.    By letter dated September 11, 2009, all the while continuing to conceal the defalcation of the Universitas Insurance Proceeds, Robinson inexplicably threatened to deny Universitas' claim in its entirety if there were any communications—written or otherwise— between Universitas (or its counsel) and Trudeau or Bursey.  Robinson claimed to be writing on behalf of and as counsel to the Charter Oak Trust, Nova, and BASI.  However, he demanded that all correspondence be directed to him at "Benistar, Clearwater House, 2187 Atlantic St., Stamford, CT 06902" or via email at "jrobinson@benistar.com" or robinsonesq@aol.com.

18

**Universitas Supplemental Appendix - 018**

(There are a number of companies formed by Carpenter and controlled by Carpenter which contain the name Benistar.) Robinson again failed to disclose the receipt and transfer of the Universitas Insurance Proceeds, which was a material omission by Robinson, which facts were necessary to disclose in order to render Robinson's statements not misleading.

64.    On or about October 2, 2009, Bursey wrote to Universitas and its counsel, this time alleging that Spencer had promised in early 2008 to designate Grist Mill Capital as beneficiary to his life insurance policies, in yet another attempt to conceal the receipt and misappropriation of the Universitas Insurance Proceeds. Neither Nova nor Bursey ever provided any evidence of such a promise—which promise was never made.

65.    As discussed in detail below, it was later determined at an arbitration proceeding that Universitas had timely submitted its claim for the Spencer death benefits and that Grist Mill Capital had no entitlement to those benefits.

## V.    Robinson Helps Carpenter Loot the Universitas Insurance Proceeds from the Charter Oak Trust

66.    Rather than fulfilling its fiduciary obligations to Spencer and Universitas, Nova improperly refused to pay the Universitas Insurance Proceeds to Universitas, improperly refused to disclose the location of those funds to Universitas, and wrongly misappropriated and defalcated the Universitas Insurance Proceeds.

### A.    Initial Fraudulent Transfers

67.    From May to December 2009, concurrent with Nova and Universitas' extended correspondence regarding the Universitas Insurance Proceeds, Carpenter—in concert with Robinson, Bursey, and several of the aforementioned Carpenter-controlled entities—transferred the Universitas Insurance Proceeds out of the Charter Oak Trust and to TD Bank accounts standing in the names of other entities in Carpenter's control, including Grist Mill Capital, Grist

19

**Universitas Supplemental Appendix - 019**

Mill Holdings, Avon Capital, Phoenix, Carpenter Financial Group, Hanover, and Moonstone—all while actively concealing those transfers. Thereafter, several transferees, all of whom were also controlled by Carpenter, either consumed or retransferred those funds to Carpenter cronies or Carpenter-controlled entities. Because of his position with those entities, and his close personal and professional relationship with Carpenter, Robinson knew or should have known of those transfers.

68.    In the short period of time following the Charter Oak Trust's receipt of the Universitas Insurance Proceeds on May 15, 2009 and the first fraudulent transfer out of the Charter Oak Trust on May 21, 2009 (described below), Carpenter opened up numerous bank accounts for the express purpose of misappropriating and defalcating the Universitas Insurance Proceeds.

69.    On May 21, 2009, three days after the Charter Oak Trust deposited the Universitas Insurance Proceeds in its bank account, Carpenter opened up the following seven TD Bank accounts (among others): Account Nos. xxx-xxx-4712 and xxx-xxx-4655 in the name of Grist Mill Capital; Account No. xxx-xxx-4663 in the name of Nova; Account No. xxx-xxx-4689 in the name of Avon Capital; Account No. xxx-xxx-4671 in the name of Phoenix; Account No. xxx-xxx-7136 in the name of Grist Mill Holdings; and Account No. xxx-xxx-4697 in the name of Carpenter Financial Group. Only Carpenter and Benistar employee Amanda Rossi were the signatories to those accounts.

70.    On May 22, 2009, Carpenter opened an eighth new TD Bank Account, No. xxx-xxx-5455 in the name of Moonstone. The only signatories to that account were Carpenter and his wife, Molly Carpenter.

**Universitas Supplemental Appendix - 020**

71.     These myriad accounts in the names of different companies allowed Carpenter to fraudulently transfer the Universitas Insurance Proceeds after the Charter Oak Trust received those funds.  The transfers of this money, from the Charter Oak Trust to entities that Carpenter controls or controlled, were made without consideration, and have no valid basis, particularly since Bursey and Carpenter were required, by the Declaration of Trust for the Charter Oak Trust, to hold this money in trust for Universitas.

72.     On or about May 21, 2009, Bursey transferred $8,677,276.75 from the Charter Oak Trust's TD Bank account (Account No. xxx-xxx-4548) into a TD Bank account standing in the name of Grist Mill Capital (Account No. xxx-xxx-4712).

73.     On or about May 26, 2009, Bursey transferred $2,186,566.00 from the Charter Oak Trust's TD Bank account (Account No. xxx-xxx-4548) into the same Grist Mill Capital account (Account No. xxx-xxx-4712).

74.     These two deposits, from the Charter Oak Trust account (which held only the Universitas Insurance Proceeds) to the Grist Mill Capital account, represent the only two sources and deposits of funds during May 2009 and June 2009, for the newly opened Grist Mill Capital account.

75.     On or about May 22, 2009, Carpenter transferred $2,100,000.00 from the Grist Mill Capital account (Account No. xxx-xxx-4712) to the newly opened Grist Mill Holdings account (Account No. xxx-xxx-7136).  This money, $2,100,000.00, originated with the Charter Oak Trust, since the only funds that Grist Mill Capital had on deposit in May and June 2009 are the result of the transfers it received from the Charter Oak Trust (of $8,677,276.75 and $2,186,566.00, respectively).

21

**Universitas Supplemental Appendix - 021**

76.     On or about June 9, 2009, Carpenter transferred $2,833,568.64 from the Grist Mill Capital account (Account No. xxx-xxx-4712) to a JP Morgan account standing in the name of the Grist Mill Trust (JP Morgan Account No. xxx-xxx-488).   This money, $2,833,568.64, originated with the Charter Oak Trust, since the only funds that Grist Mill Capital had on deposit in May and June 2009 are the result of the transfers it received from the Charter Oak Trust (of $8,677,276.75 and $2,186,566.00, respectively).

77.     Also on or about June 9, 2009, Carpenter transferred an additional $965,314.17 from the Grist Mill Capital account (Account No. xxx-xxx-4712) to a JP Morgan account standing in the name of the Grist Mill Trust (JP Morgan Account No. xxx-xxx-488).   This money, $965,314.17, originated with the Charter Oak Trust, since the only funds that Grist Mill Capital had on deposit in May and June 2009 are the result of the transfers it received from the Charter Oak Trust (of $8,677,276.75 and $2,186,566.00, respectively).

78.     When Grist Mill Capital transferred a total $3,798,882.81 to the Grist Mill Trust on or about June 9, 2009, it was transferring money that originated from Lincoln Life's payment of $30.7 million to the Charter Oak Trust, since the only money that Grist Mill Capital had in its account came from deposits of $8,677,276.75 and $2,186,566, respectively, from the Charter Oak Trust account at TD Bank (Account No. xxx-xxx-4548), which in turn held only the Universitas Insurance Proceeds.

79.     On or about July 15, 2009, Carpenter transferred $1,200,000.00 from the Grist Mill Holdings account (Account No. xxx-xxx-7136) to a TD Bank account in the name of Hanover (Account No. xxxx-xxx-940).   This account for Hanover was opened on July 13, 2009—two days prior to receiving a $1,200,000.00 deposit.   This money, $1,200,000.00, originated with the Charter Oak Trust, since all of the funds in Grist Mill Holdings' account

22

came from Grist Mill Capital, and all the funds in the Grist Mill Capital account were deposits by the Charter Oak Trust of the Universitas Insurance Proceeds.

80.    On or about July 15, 2009, Carpenter transferred $1,100,000.00 from the Hanover account (Account No. xxxx-xxx-940) to the Moonstone account (Account No. xxx-xxx-5455).

81.    On that same day, July 15, 2009, Carpenter withdrew $1,040,000 from the Moonstone account (Account No. xxx-xxx-5455) in the form of an official bank check made out to his name, and subsequently endorsed that check to a real estate attorney for the purpose of purchasing for his family an oceanfront vacation home located at 392B Cards Pond Road in South Kingstown, Rhode Island.

82.    Indeed, Moonstone appears to have been formed for the very purpose of using a portion of the Universitas Insurance Proceeds to purchase the Carpenters' vacation home. According to the records of the Delaware Secretary of State, Moonstone was formed on or about April 20, 2009.  Carpenter controlled Moonstone as the Chairman of Moonstone's managing member, while Molly Carpenter was Moonstone's secretary.  Even though Moonstone was not formed until April 20, 2009, Carpenter made a $1,200,000.00 offer on the vacation home property on April 8, 2009, writing on Grist Mill Capital letterhead and claiming to be acting on Moonstone's behalf.

83.    Each transfer or transaction referenced in paragraphs 72 to 81 has been found by the United States District Court for the Southern District of New York to be intentionally and constructively fraudulent, without consideration, and undertaken for the personal benefit of Carpenter and his affiliates.  Attached as **Exhibit 3** is a true and correct copy of the district court's November 20, 2013 opinion and order holding that such transfers were fraudulent.

23

### B.    The Robinson-Drafted Sham Agreement

84.    In late October 2009, Robinson assisted Carpenter's misappropriation and defalcation of the remaining $19.8 million of the Universitas Insurance Proceeds out of the Charter Oak Trust and into the Grist Mill Capital bank account.

85.    Robinson prepared a document entitled Confidential Settlement and Indemnification Agreement, dated October 26, 2009, purportedly to document a "settlement" between the Charter Oak Trust and Grist Mill Capital (the "Sham Agreement"), both of which were controlled by and the instrumentality of Carpenter, and both of which had already received and retransferred substantial portions of the Universitas Insurance Proceeds.  Robinson, as a fiduciary of the Charter Oak Trust who had a fiduciary duty to the beneficiaries of that Trust, had a conflict of interest in representing Grist Mill Capital in any such "settlement."

86.    In Robinson's Sham Agreement, Grist Mill Capital purported to hold a competing claim against the Universitas Insurance Proceeds, based on Spencer's supposed agreement, prior to his death, to permit Grist Mill Capital to purchase the Spencer policies from the Charter Oak Trust and become the sole beneficiary thereto, and to pay to Universitas $1.8 million to release it as a beneficiary to the policies.  Robinson knew or should have known that no such underlying agreement existed.

87.    The Sham Agreement further purported that Grist Mill Capital would forego its competing claim to the Universitas Insurance Proceeds in exchange for the Charter Oak Trust's immediate payment of the "net death benefit," and other mutual releases and lesser payments between the parties.  In other words, Grist Mill Capital was to receive all the remaining insurance proceeds, after having already received the first $10.8 million of the insurance proceeds, for no consideration, since even the bogus alleged agreement by Spencer required a payment of $1,800,000.00 to Universitas to purchase the policies.

24

88.     In fact, Spencer never agreed to any such transaction, and, as Robinson knew or should have known, there was no documentation of any such agreement by Spencer. Likewise, Universitas was the sole, irrevocable beneficiary of the Spencer policies, whose consent to such a transaction would have been required, and Robinson knew that Universitas never made any such agreement.

89.     Moreover, there were no legitimate competing claims to the Universitas Insurance Proceeds. Carpenter controlled the Charter Oak Trust and Grist Mill Capital, Robinson was counsel to both of them and a manager of Grist Mill Capital during all relevant times, and Spencer had designated Universitas as its sole, irrevocable beneficiary with the Charter Oak Trust's and Nova's full knowledge, thus precluding any subsequent designation of Grist Mill Capital as beneficiary to his life insurance policies without Universitas' consent.

90.     Upon information and belief, Robinson submitted drafts of the Sham Agreement to Carpenter for his approval. With Robinson's assistance, Carpenter ultimately approved the document on behalf of both parties to the Sham Agreement, Charter Oak Trust and Grist Mill Capital, and signed it on behalf of Grist Mill Capital as of October 26, 2009. Bursey signed on behalf of the Charter Oak Trust.

91.     Robinson knew or should have known that the Sham Agreement was a fraudulent agreement designed to assist Carpenter's misappropriation and defalcation of the balance of the Universitas Insurance Proceeds. Robinson also knew that Carpenter controlled both the Charter Oak Trust and Grist Mill Capital at the time the Sham Agreement was executed, which was little more than Carpenter's agreement with himself, prepared in conflict with Robinson's fiduciary duties to the beneficiaries of the Charter Oak Trust.

**Universitas Supplemental Appendix - 025**

## C.    Additional Fraudulent Transfers

92.    On October 27, 2009, the very next day after Carpenter and Bursey signed the Sham Agreement, Carpenter and Bursey commenced another series of transfers to misappropriate and defalcate the remaining $19.8 million of the Universitas Insurance Proceeds.

93.    On or about October 27, 2009, Bursey transferred $19,800,000.00 from the Charter Oak Trust's TD Bank account (Account No. xxx-xxx-4548) into the Grist Mill Capital account (Account No. xxx-xxx-4712).

94.    At the time of this transfer of $19,800,000.00, the Charter Oak Trust still had not received any other deposits from any source other than the Lincoln Life payments deposited into the Charter Oak Trust account on May 18, 2009.  This money, $19,800,000.00, was required by the Declaration of Trust of Charter Oak Trust to be held in trust for Universitas; instead it was wrongfully transferred to Grist Mill Capital.  Grist Mill Capital's corporate agent appears to have had no idea why the funds were transferred to Grist Mill Capital.  For this transfer of $19,800,000.00, Grist Mill Capital's general ledger described it as "unknown depo" (meaning, "unknown deposit").

95.    On October 28, 2009, the day after the transfer of $19,800,000.00 from the Charter Oak Trust to Grist Mill Capital, Carpenter transferred $19,000,000.00 from the Grist Mill Capital account (Account No. xxx-xxx-4712) to the Grist Mill Holdings account (Account No. xxx-xxx-7136).

96.    On or about November 12, 2009, Carpenter transferred $6,710,065.92 from the Grist Mill Capital account (Account No. xxx-xxx-4712) to the Avon Capital account at TD Bank (Account No. xxx-xxx-4689).

**Universitas Supplemental Appendix - 026**

97.     On or about November 12, 2009, Carpenter transferred $4,140,000.00 from the Grist Mill Holdings account (Account No. xxx-xxx-7136) to the Carpenter Financial Group account at TD Bank (Account No. xxx-xxx-4697).

98.     On or about December 3, 2009, Carpenter transferred $7,000,000.00 from the Grist Mill Holdings account (Account No. xxx-xxx-7136) to the Carpenter Financial Group account at TD Bank (Account No. xxx-xxx-4697).

99.     On or about December 3, 2009, Carpenter transferred $5,000,000.00 from the Carpenter Financial Group account (Account No. xxx-xxx-4697) to the Phoenix account at TD Bank (Account No. xxx-xxx-4671).

100.    On or about December 3, 2009, Carpenter transferred $510,000.00 from the Grist Mill Capital account (Account No. xxx-xxx-4712) to a JP Morgan account standing in the name of the Grist Mill Trust (JP Morgan Account No. xxx-xxx-488).

101.    Also on or about December 3, 2009, Carpenter transferred an additional $178,125.00 from the Grist Mill Capital account (Account No. xxx-xxx-4712) to a JP Morgan account standing in the name of the Grist Mill Trust (JP Morgan Account No. xxx-xxx-488).

102.    As with the transactions referenced in paragraphs 72 to 81 above, each transfer or transaction referenced in paragraphs 93 to 101 has been found by the United States District Court for the Southern District of New York to be fraudulent, without consideration, and undertaken for the personal benefit of Carpenter, entities that he directly or indirectly controlled, and his personal and professional affiliates.  Attached as **Exhibit 4** is a true and correct copy of the District Court's August 7, 2014 opinion and order holding that such transfers were fraudulent and with actual intent to defraud Universitas and holding Carpenter and the recipients of each transfer liable to Universitas.

27

## VI.    Robinson Is Paid Handsomely With Money Belonging to Universitas

103.    Robinson prepared the Sham Agreement in his capacity as the attorney for each of Charter Oak Trust, Nova and Grist Mill Capital.

104.    Robinson received $810,000.00 or more of the Universitas Insurance Proceeds out of the accounts of Grist Mill Capital and Carpenter Financial Group, into which portions of the Universitas Insurance Proceeds had previously been transferred.  Robinson knew or should have known that those funds rightfully belonged to Universitas.

105.    On September 23, 2009, Robinson received a wire transfer in the amount of $50,000.00 from the Grist Mill Capital TD Bank account (Account No. xxx-xxx-4712).  By that point, $10.8 million of the Universitas Insurance Proceeds had already been deposited into that Grist Mill Capital account.

106.    On October 9, 2009, Robinson received a wire transfer in the amount of $75,000.00 from the Carpenter Financial Group TD Bank account (Account No. xxx-xxx-4697).

107.    On November 9, 2009, Robinson received a wire transfer in the amount of $100,000.00 from the Carpenter Financial Group TD Bank account (Account No. xxx-xxx-4697).

108.    On November 25, 2009, Robinson received a wire transfer in the amount of $275,000.00 from the Carpenter Financial Group TD Bank account (Account No. xxx-xxx-4697).

109.    On December 3, 2009, Robinson received a wire transfer in the amount of $125,000.00 from the Carpenter Financial Group TD Bank account (Account No. xxx-xxx-4697).

Universitas Supplemental Appendix - 028

110.    On December 4, 2009, Robinson received a wire transfer in the amount of $125,000.00 from the Carpenter Financial Group TD Bank account (Account No. xxx-xxx-4697).

111.    On March 30, 2010, Robinson received a wire transfer in the amount of $60,000.00 from the Carpenter Financial Group TD Bank account (Account No. xxx-xxx-4697).

112.    The funds that Robinson received from Carpenter Financial Group were likewise directly linked to the Universitas Insurance Proceeds.  Carpenter had transferred over $11.1 million of the Universitas Insurance Proceeds to Carpenter Financial Group in November and December 2009, as described above—either just prior to the transfers to Robinson, or effectively replenishing funds that were just transferred to Robinson.

113.    Upon information and belief, each wire transfer was directed to Robinson in Stamford, Connecticut, where  Robinson maintained his law practice at that time, Robinson Law Offices, and/or maintained an office in connection with his work for BASI and other Carpenter-affiliated entities.

## VII. Robinson Actively Aids and Abets Carpenter's Theft by Concealing the Misappropriations and Delaying Universitas' Discovery of Carpenter's Theft

114.    In addition to facilitating and participating in the misappropriations and fraudulent transfers described above, Robinson also thereafter undertook to destroy, conceal, or otherwise block the dissemination of information regarding the transfers, and to thereby conceal Carpenter's theft and delay Universitas' discovery of the theft in order to enable Carpenter to dissipate all the Universitas Insurance Proceeds before his theft was discovered.

### A. Robinson's Misrepresentations, Half-Truths and Material Omissions in his Declaration Under Oath Submitted to the Arbitrator During Arbitration

115.    On June 17, 2010, in light of the refusal of the Charter Oak Trust to turn over the Universitas Insurance Proceeds, Universitas filed a demand for arbitration with the American

29

**Universitas Supplemental Appendix - 029**

Arbitration Association against Nova and others for recovery of the Universitas Insurance Proceeds (the "Arbitration"). Unknown to Universitas, that date was more than six months after Carpenter had completed his misappropriation of all of the Universitas Insurance Proceeds out of the Charter Oak Trust and Grist Mill Capital had re-transferred those proceeds to other Carpenter-controlled entities. Shortly after the demand for arbitration was filed, Peter L. Altieri (the "Arbitrator") was appointed as arbitrator for the Arbitration.

116.　On or about October 1, 2010, Universitas requested a preliminary injunction ordering Nova to remit the Universitas Insurance Proceeds into a neutral, interest-bearing account, and preventing Nova from using such funds pending the outcome of the Arbitration. As noted above, by that date, all the Universitas Insurance Proceeds had long since been misappropriated and defalcated by Carpenter.

117.　On or about October 28, 2010, the parties participated in a telephonic oral argument with the Arbitrator regarding the preliminary injunction application. During that argument, attorney Richard S. Order ("Order") of Updike, Kelley & Spellacy, PC, Nova's counsel in the arbitration, represented that Nova and the Charter Oak Trust had assets sufficient to satisfy an arbitration award in Universitas' favor of up to $35 million.

118.　On or about November 3, 2010, the Arbitrator denied Universitas' request for a preliminary injunction—in part based upon attorney Order's representations during the telephonic oral argument—but directed Nova to submit documentary proof of the Charter Oak Trust's ability to satisfy any award that might issue in the Arbitration.

119.　On or about November 12, 2010, Bursey, purportedly as Nova's President, submitted an affidavit in the Arbitration, swearing, under penalty of perjury, that the Charter Oak Trust's assets "exceed $35 million."

**Universitas Supplemental Appendix - 030**

120. On or about November 24, 2010, the Arbitrator found Bursey's affidavit regarding Trust "assets" to be insufficient (at least in part on the basis that the Trust's liabilities may exceed its purported assets) and directed Nova to provide an amended or supplemental affidavit indicating that the Charter Oak Trust has the ability to satisfy a judgment of $30 million. The Arbitrator ruled that if Nova could not provide such information, he would reconsider his denial of the preliminary injunction request.

121. On or about November 30, 2010, more than eighteen months after the Charter Oak Trust had received the Universitas Insurance Proceeds, and a full year after those proceeds had been misappropriated and fraudulently transferred out of the Charter Oak Trust by the Carpenter Criminal Enterprise, Robinson submitted a declaration under oath (the "Declaration") on behalf of Nova in the Arbitration, affirmatively swearing: (a) that he was "an authorized representative of Nova Group," (b) that he was "familiar with the [Charter Oak Trust's] operation, assets, liabilities and financial condition," and (c) that the Trust "has the current ability to satisfy a judgment of $30 million." Robinson's failure to disclose, in his Declaration, the 2009 transfers of the Universitas Insurance Proceeds out of the Charter Oak Trust, and the retransfer of those proceeds to different Carpenter-controlled entities, was an omission of material fact, the disclosure of which was necessary to render Robinson's Declaration under oath not misleading. Although Robinson was aware or should have been aware of the misappropriation, none of this critical information was disclosed in his Declaration under oath. As Robinson knew or should have known, the Arbitrator relied on Robinson's inaccurate Declaration in denying injunctive relief to Universitas, to the great damage and prejudice of Universitas. A true and correct copy of the Declaration is attached as **Exhibit 5** hereto.

**Universitas Supplemental Appendix - 031**

122.    At the time Robinson made these misrepresentations in his Declaration under

oath, (a) Robinson had already drafted the Sham Agreement to enable and assist the transfer of

the remaining portion of the Universitas Insurance Proceeds out of the Charter Oak Trust, which

proceeds were transferred out by December 2009, nearly a year prior to his Declaration; (b)

Robinson had already received a portion of the Universitas Insurance Proceeds from both Grist

Mill Capital and Carpenter Financial Group; (c) Robinson already knew that the Charter Oak

Trust was subject to a lien of approximately $35 million held by a third party called Ridgewood

Finance Inc., which provided most of the premium payments for life insurance policies owned by

the Charter Oak Trust; (d) Robinson already knew that the Charter Oak Trust had agreed, in

September 2010, to transfer its remaining assets—life insurance policies—to Ridgewood

Finance Inc. to discharge its debt to that entity, as he was involved with preparing the written

agreement to carry out those transfers; (e) Robinson had not performed adequate due diligence

regarding the Charter Oak Trust's assets and liabilities; and, therefore, (f) Robinson already

knew or should have known that Charter Oak Trust had absolutely no ability to satisfy a $30

million judgment.

123.    The Arbitration proceeded to a hearing on the merits on December 6 through 8,

2010.  Robinson was the sole witness who testified on behalf of Nova, and he identified himself

as an employee and Vice President of BASI, and as General Counsel of Nova and of BASI.

124.    By an arbitration award dated January 24, 2011, the Arbitrator found that each of

Nova, Bursey, and BASI owed fiduciary duties to Universitas and that they breached those

fiduciary duties.    Specifically, the Arbitrator stated, "I determine that the PHASE I

Respondents"—which included each of Nova, Bursey, and BASI—"violated their fiduciary

duties by denying the claim for benefits under the [Charter Oak Trust]."  The arbitrator held that

**Universitas Supplemental Appendix - 032**

Nova was liable to Universitas for a total of $26,525,535.98 (the "Arbitration Award"), and further directed that Nova deposit the amount of the Arbitration Award in escrow with Order's law firm, Updike Kelley & Spellacy, PC.

125.    Following the issuance of the arbitration award, counsel for Universitas contacted Order to confirm that the amount of the Arbitration Award had been deposited into escrow with his law firm. However, Order did not respond to the requests. Instead, Robinson—who was not counsel of record for Respondents in the Arbitration, but instead functioned as the sole fact witness at the Arbitration—transmitted a February 16, 2011 letter to the Arbitrator and a copy to counsel for Universitas, purporting to write on behalf of Nova and the other Respondents. Robinson, in that letter, continued to insist that nothing wrong had occurred, and continued to withhold and not disclose the critical information, of which he was certainly aware, that the Universitas Insurance Proceeds had been fraudulently transferred out of the Charter Oak Trust. Perhaps most egregious, in that same letter, Robinson sought to impugn the integrity of Arbitrator in conducting the Arbitration and personally attack the reputation of Universitas, its members, and its counsel in bringing the Arbitration. A true and correct copy of the February 16, 2011 letter is attached hereto as **Exhibit** 6.

126.    Of course, as of the dates of the January 2011 Arbitration Award and the February 2011 letter from Robinson, the Universitas Insurance Proceeds had long since been transferred out of the Charter Oak Trust bank account. None of the Charter Oak Trust, Nova, Robinson, nor any of the affiliated Carpenter entities to whom all the Universitas Insurance Proceeds had been fraudulently transferred, had disclosed those transfers to Universitas, its counsel, or the Arbitrator.

33

127.    In the months following Robinson's February 2011 letter, Universitas continued to attempt to secure the deposit of the amount of the Arbitration Award into escrow with attorney Order's law firm—to no avail.

**B.    Robinson's Dilatory Filings in the District Court to Conceal the Misappropriation of the Universitas Insurance Proceeds**

128.    On or about February 11, 2011, Universitas commenced a civil action in New York state court seeking confirmation of the January 24, 2011, Arbitration Award.

129.    On or about March 8, 2011, Nova removed the state court action to the United States District Court for the Southern District of New York (the "S.D.N.Y."), arguing that the district court had subject matter jurisdiction under both federal question and diversity jurisdiction in connection with that removal petition.

130.    Separately, Nova commenced an action in Connecticut state court seeking to vacate the Arbitration Award, which was subsequently removed to the United States District Court for the District of Connecticut.  In January 2012, both cases were consolidated in the S.D.N.Y. before Judge Laura Taylor Swain.

131.    On June 5, 2012, Judge Swain confirmed the Arbitration Award, awarding Universitas pre-judgment interest at an annual rate of ten percent (10%) and entering judgment on June 7, 2012 for Universitas in the amount of $30,181,880.30.

132.    On September 5, 2012, Nova's previous attorneys having withdrawn, Robinson entered a notice of appearance in the S.D.N.Y. on behalf of Nova and the Charter Oak Trust.

133.    Despite purporting to represent Nova and the Charter Oak Trust, Robinson's retainer (for $15,000) was paid by Grist Mill Capital, which had by then wrongfully received and further misappropriated and fraudulently transferred the Universitas Insurance Proceeds; which was controlled by Carpenter; for which Robinson served as Manager; and from which Robinson

34

had already received a portion of the Universitas Insurance Proceeds. When Robinson entered his notice of appearance for Nova and the Charter Oak Trust on September 5, 2012, the receipt and misappropriation of the Universitas Insurance Proceeds three years prior to that date still had not been disclosed to Universitas, to the Arbitrator, or to the Court.

134.    On September 11, 2012, in an effort to continue to conceal the theft of the Universitas Insurance Proceeds, Robinson filed a frivolous motion to dismiss the action on Nova's behalf—the third motion to dismiss filed in that action. Nova had previously filed, and then reinstated, two motions to dismiss, but subsequently withdrew those motions after the Court admonished Nova to consider its Rule 11 obligations and Universitas provided to Nova a draft Rule 11 motion it planned to file in connection with those motions.

135.    In Nova's third motion to dismiss, Robinson expressly contradicted earlier arguments advanced by Nova, arguing that the Court lacked both diversity and federal question jurisdiction, and advanced other frivolous arguments contradicted by long-standing controlling law, primarily in an effort to delay Universitas' discovery that the proceeds had been misappropriated and fraudulently transferred by Carpenter.

136.    The Court summarily denied the motion to dismiss on October 5, 2012. That decision was later affirmed on appeal by the U.S. Court of Appeals for the Second Circuit on March 4, 2013, an appeal that was also filed by Robinson for the dilatory purpose of delaying the discovery of the misappropriation and fraudulent transfer of the Universitas Insurance Proceeds.

137.    On November 8, 2012, Universitas moved for sanctions against Nova and Robinson, primarily on the basis of Robinson's frivolous September 11 motion to dismiss.

**Universitas Supplemental Appendix - 035**

138.    On September 13, 2013, Judge Swain granted the motion for sanctions, (a) ordering Nova to deposit the judgment amount with the clerk of court,[2] (b) ordering Nova to pay Universitas' legal fees in connection with the motion for sanctions, (c) prohibiting Nova from filing further motions without prior permission from the Court, (d) ordering Robinson to pay Universitas' legal fees in connection with litigating the motion to dismiss, and (e) issuing a written reprimand against Robinson.  As of the date of Judge Swain's Order, nearly three years after Carpenter had stolen the Universitas Insurance Proceeds, the fact that the proceeds had been transferred out of the Charter Oak Trust still had not been disclosed to either Universitas or the Court.

### C.    Robinson's Efforts to Further Conceal the Misappropriation By Blocking and Delaying Production of Banking Records Subpoenaed by Universitas

139.    From 2010 into 2012, in a further effort to conceal the misappropriation of the Universitas Insurance Proceeds, Robinson also supervised and orchestrated efforts by Nova to prevent Universitas from obtaining TD Bank's production of crucial bank records, knowing that the bank records demonstrate the theft of the Universitas Insurance Proceeds and the transfer of such proceeds into and out of the Charter Oak Trust.  Robinson successfully delayed Universitas until November 2012, from discovering the misappropriation of the Universitas Insurance Proceeds, by which time the funds were long gone.

140.    On or about November 19, 2010 (i.e., during the Arbitration proceedings), Universitas subpoenaed records from TD Bank in connection with accounts maintained by or in the name of Nova, the Charter Oak Trust, Bursey, BASI, and Nova Benefit Plans.

---

[2] This aspect of Judge Swain's decision has since been reversed.

141.    On November 29, 2010, attorney Order wrote to the Arbitrator purporting that Universitas had "no legitimate need" for the TD Bank documents in the Arbitration—despite the fact that those documents ultimately revealed the massive fraud that had occurred—and seeking both to quash the subpoena and impose sanctions upon Universitas and its counsel in connection with the service thereof.

142.    On or about April 13, 2011, Robinson wrote to TD Bank, purportedly on behalf of Nova, the Charter Oak Trust, Bursey, Nova Benefit Plans, and BASI, objecting to the disclosure of account records and threatened to seek criminal and civil sanctions against TD Bank if it complied with the subpoena.    Specifically, Robinson threatened that compliance with the subpoena would render TD Bank employees guilty of a class C misdemeanor under Connecticut law and would invite a lawsuit from Nova and others for $50 million in actual damages plus treble punitive damages.

143.    In that April 13, 2011 letter, Robinson further threatened that service of the subpoena by Universitas on TD Bank subjected Universitas' counsel, Paula K. Colbath, to criminal liability under Connecticut law.    Robinson purported that Universitas did not serve a certified copy of the subpoena on Nova and its affiliates at least 10 days prior to the date on which the records were due to be disclosed.    Robinson copied Ms. Colbath on that correspondence.    A true and correct copy of Robinson's April 13, 2011 letter is attached hereto as **Exhibit 7**.

144.    On April 19, 2011, yet another attorney, Joseph M. Pastore III, wrote to TD Bank, also purportedly on behalf of Nova, the Charter Oak Trust, Bursey, Nova Benefit Plans, and BASI, to object to its production of documents regarding those entities.    That letter contained substantially similar language to the letter which Robinson had previously transmitted to TD

37

Bank on April 13, 2011, and also threatened TD Bank that production of records regarding these entities would constitute a class C misdemeanor under Connecticut law.

145.    In or about September 2012, Universitas served additional subpoenas on TD Bank seeking account information for accounts maintained by or in the name of Nova, the Charter Oak Trust, Grist Mill Capital, Grist Mill Holdings, and Phoenix.

146.    Later that same month, on September 21, 2012, Mr. Pastore, who had sent the April 19, 2011 letter to TD Bank, sent yet another letter to TD Bank, copying Universitas' counsel and Robinson, this time purportedly on behalf of Nova and the Charter Oak Trust, containing substantially similar language to his previous letter and Robinson's letter of April 13, 2011.    The letter once again threatened TD Bank with civil sanctions, and threatened that Universitas' counsel and TD Bank were subject to criminal liability for, respectively, serving and complying with the subpoena.

147.    Upon information and belief, Robinson assisted those entities in their dilatory efforts to avoid producing the bank records in question.

148.    Upon information and belief, these letters were part of a coordinated letter-writing campaign organized by Robinson, in conjunction with Carpenter and his cronies, knowingly designed to conceal and prevent disclosure of information regarding the transfer of the Universitas Insurance Proceeds to and from the TD Bank accounts of various Carpenter-controlled entities.    Each of the letters in question was forwarded to TD Bank and to counsel for Universitas through the United States mails.

149.    On November 21, 2012, Magistrate Judge Henry Pitman ordered TD Bank to comply with Universitas' subpoenas.    Judge Pitman found the criminal and civil penalties threatened by Robinson to be entirely without basis in law, and suggested that the acts of

38

Robinson, Nova, and the rest of the Carpenter enterprise might constitute tampering with a witness under federal law. In his report, he noted as follows:

> I note that the efforts of Nova Group and individuals and entities associated with it to conceal the whereabouts of the insurance proceeds in issue here is extremely troubling. If it has a genuine, colorable issue with Judge Swain's decision confirming the arbitration award, one wonders why it simply hasn't deposited the funds into the Court, pending the outcome of its appeal. The disturbing nature of Nova's conduct is reinforced by the fact that in depositions conducted earlier this year, several individuals currently or formerly associated with Nova Group have invoked the Fifth Amendment in response to questions concerning the disposition of the insurance proceeds. **The baseless nature of the threats made to TD Bank lends further support to an inference of bad faith or worse. Universitas may want to consider consulting with the Federal Bureau of Investigation or the Department of Justice as to whether the conduct of Nova Group and the individuals associated with it rises to the level of a violation of 18 U.S.C. § 1512.** (emphasis added)

A true and correct copy of Judge Pittman's report and recommendation is attached as **Exhibit 8.**

150.    TD Bank finally complied with the Universitas subpoenas in November 2012.

151.    Upon TD Bank's production in November 2012, nearly three years after the Universitas Insurance Proceeds had been misappropriated, Universitas learned for the first time about Carpenter's above-described theft of those proceeds, the above-described numerous fraudulent transfers of the Universitas Insurance Proceeds among the various Carpenter controlled affiliates, and the transfer of $810,000.00 or more of those proceeds to Robinson.

**D.    Robinson's Destruction of Documents After Federal Government Raid**

152.    In or about May 2011, Robinson's office was raided by the U.S. Department of Labor in connection with a grand jury investigation into the Charter Oak Trust.

153.    As noted above, Robinson was listed as target in the search warrant, among other individuals and entities affiliated with Carpenter.

39

154.    As part of the raid, the federal government generated a copy of the computer in Robinson's office, which Robinson used during the course of his direct involvement in and/or representation of Carpenter-related entities for, among other things, creating electronic files concerning the Universitas Arbitration and litigation and the disposition of the Universitas Insurance Proceeds.

155.    In June 2011, following the raid, Robinson destroyed his computer and all electronic information on his computer relating to the Universitas Insurance Proceeds—despite the fact that, at that time, cases were pending in both New York and Connecticut regarding the disposition of those insurance proceeds.

### E.    Carpenter's Baseless Threats, with Robinson's Acquiescence and Support, to Inflict Reputational Harm Upon Counsel for Universitas

156.    In March 2013, Universitas moved in the S.D.N.Y, by order to show cause, for, among other things, the turnover of certain insurance proceeds that Carpenter sought from the insurance carrier United Services Automobile Association ("USAA") in connection with the Rhode Island vacation home that Carpenter had purchased with a portion of the Universitas Insurance Proceeds.

157.    On February 26, 2013, counsel for Universitas emailed to Carpenter, his counsel, his wife Molly Carpenter, and Robinson a copy of the order to show cause and supporting materials that Universitas planned to file with the Court.  Counsel had included Carpenter on the email exchange (along with his counsel) because at that point Moonstone—through which Carpenter had purchased the vacation home, and which was a subject of the turnover motion—was not then represented by counsel.  On February 27, 2013, Carpenter responded, with a copy to Robinson, by email threatening to inflict reputational harm on Universitas' counsel, Ms. Colbath and Bryan Reyhani.  Carpenter wrote:

**Universitas Supplemental Appendix - 040**

[I]f you file this baseless action tomorrow or at any time, we will be suing you, your firm, Ms. Colbath and Loeb [& Loeb LLP] for a very long time to come.

....

Not that you appear to care about your professional status, but we will be filing grievance claims against you and Ms. Colbath for your unconscionable conduct to date.

Therefore, please govern yourself accordingly. Filing this motion will be the single biggest mistake of your professional career, and since you have already commercially defamed us, you will need to apologize to us and USAA within the next 24 hours or face the consequences.

A true and correct copy of Carpenter's February 27, 2013 email, showing Robinson as a recipient, is attached hereto as **Exhibit** 9. Later that same day, Carpenter emailed counsel for Universitas yet again, also with a copy to Robinson, this time threatening to seek their disbarment. Carpenter stated: "I promise you that I will be personally seeking YOUR disbarment as well as Ms. Colbath's for your unprofessional conduct to date and clearly outrageous behavior in going after non-judgment debtors not involved with the Charter Oak Trust or subject to the soon to be vacated Universitas judgment." He added, ominously: "Please govern yourself accordingly before you find yourself in even more trouble." A true and correct copy of Carpenter's second February 27, 2013 email, showing Robinson as a recipient, is attached hereto as **Exhibit** 10.

158.     By that point, however, as Robinson knew or should have known, Carpenter had already knowingly and intentionally misappropriated and defalcated the Universitas Insurance Proceeds and used a portion of those funds to purchase his family's vacation home in Rhode Island through Moonstone. Based on Carpenter's close relationship with Robinson, Carpenter would not have written those emails without Robinson's knowledge and approval, as reflected by

41

Robinson's failure to correct or cause Carpenter to retract his clearly inappropriate and improper threatening emails.

159.　Contrary to what Carpenter represented in his February 27, 2013 emails, the Judgment that Universitas had obtained against Nova was never vacated. Moreover, Universitas ultimately obtained an additional judgment against Carpenter himself, as explained below.

160.　Notwithstanding Carpenter's wrongful threats of reputational harm, in an effort to intimidate Universitas from pursuing its rights, Universitas proceeded to move for turnover of the USAA insurance proceeds, and ultimately prevailed on that motion.

## VIII.　Universitas' Additional Judgments

161.　On or about August 12, 2014, Universitas obtained a $30.6 million judgment against Carpenter in the S.D.N.Y., Exhibit 4 hereto.

162.　In that same August 12, 2014 opinion and order (Exhibit 4), Universitas further obtained S.D.N.Y. judgments against the following Carpenter shell companies for the Universitas Insurance Proceeds fraudulently transferred to them:　Grist Mill Capital for $30,600,000.00; Grist Mill Holdings for $21,000,000.00; Carpenter Financial Group for $11,140,000.00; Avon for $6,710,065.92; Phoenix for $5,000,000.00; Hanover for $1,200,000.00; and Grist Mill Trust, and any trustees and plan sponsors thereof insofar as they hold Grist Mill Trust assets, for $4,487,007.81.

163.　As of the date of this Complaint, Universitas has collected only approximately $800,000.00—less than 4%—of the over $30.6 million that Robinson helped Carpenter steal from Universitas.

164.　Carpenter, in particular, has not satisfied the August 2014 Judgment, not even in part, and claims not to have any assets in his own name.

42

## IX.   Additional Criminal Conduct

165.   The long-running Carpenter Criminal Enterprise has been and is engaged in repeatedly diverting funds which were entrusted to a Carpenter-controlled entity designed to exploit tax benefits, and otherwise fleecing persons doing business with his entities.  It has inflicted harm on dozens of victims other than Universitas.  Indeed, Carpenter, in concert with Bursey, various other cronies, and his shell companies and sham businesses, several of which Robinson served as an officer or General Counsel, has defrauded other individuals and entities by converting for his personal use funds that were entrusted to him to be held in escrow or trust and has fleeced many other persons doing business with his enterprise.

### A.   Massachusetts Prosecution Stemming from Carpenter's Conversion of Client Funds Through BPETCO Entities Controlled by Carpenter

166.   Carpenter is currently serving time in federal prison in connection with his June 2008 conviction, in this Court, for nineteen (19) counts of wire fraud and mail fraud.  The latest appeal on his behalf was decided against Carpenter by the U.S. Court of Appeals for the First Circuit on March 30, 2015.  That conviction stems from Carpenter's operation of "§ 1031 exchanges" through his alter ego companies Benistar and its subsidiary BPETCO (together with Benistar, the "BPETCO Entities") in the late 1990s and early 2000s.

167.   The "§ 1031 exchanges" that Carpenter operated through the BPETCO Entities purported to allow owners of investment properties to defer paying capital gains taxes upon the sale of such properties if they were "exchanged" for properties "of like kind."  Under the Internal Revenue Code, 26 U.S.C. § 1031(a)(3), the funds from the initial sale of an investment property may be held temporarily in cash form with no tax penalty so long as they are used to purchase a new property within 180 days and so long as the investor designates the replacement property within 45 days.  However, federal regulations provide that the exchange or may not take

43

possession of the funds before purchasing the new property. See 26 C.F.R. § 1.1031(k)-1(a). As a result, exchangors typically rely on "qualified intermediaries" to hold and invest the funds until the exchange is completed.

168.    The BPETCO Entities, all of which were dominated and controlled by Carpenter as his *alter ego*, offered their services as qualified intermediaries, ostensibly agreeing to hold the exchangors' funds in escrow, in a safe and secure investment, until the § 1031 exchanges were completed. Carpenter executed, for the BPETCO Entities, many of the contracts which exchangors entered into with the companies.

169.    The BPETCO Entities advertised their services through marketing materials approved by Carpenter, to enable the Carpenter Criminal Enterprise to have access to § 1031 funds which were entrusted to him by unsuspecting exchangors. Those marketing materials promised that exchangors' funds would be kept safe and secure (much as the Charter Oak Trust promised that participant funds would be safe, secure, and held in trust), and assured them that the BPETCO Entities were trustworthy and would assist and protect them in obtaining § 1031 tax benefits.

170.    Once Carpenter had induced investors to entrust their funds in escrow to a BPETCO Entity, he would convert some or all of such funds and invest them for his own account and in the name of a BPETCO Entity. He then used those funds to trade in risky assets, including high-risk "put options" that were "uncovered" (meaning that Carpenter did not own the underlying shares or take an offsetting position—which further increased the high-risk quality of those investments).

171.    As a result of his risky investments, Carpenter lost millions of dollars which he had converted from exchangors who had invested their funds, supposedly to be held safely in

44

escrow. From late March to late May 2000, Carpenter lost approximately one million dollars from Benistar's Merrill Lynch trading account as various stocks fell significantly during the option periods. Carpenter's strategy ultimately failed completely when the NASDAQ stock market crashed in late 2000. By the end of September 2000, Carpenter had lost about four million dollars.

172. Even as Carpenter's losses mounted, the BPETCO Entities continued to solicit funds from § 1031 exchangors, using the same marketing materials and again assuring them that their funds would be safely held in an escrow account. Once the funds were received, Carpenter continued to convert exchangor funds and to employ the same trading strategy.

173. By the beginning of 2001, Carpenter had converted and lost approximately $9 million belonging to seven exchangors who had contracted with Benistar between August and December 2000. Specifically, from May 2000 to January 2001, Carpenter squandered the following amounts that had been entrusted to a BPETCO Entity to be held in escrow by the following exchangors, each of which was located either in Massachusetts or New Hampshire: $984,730.00 belonging to Gail A. Cahaly; $3,237,190.00 belonging to Massachusetts Lumber Co. and Eliot Snider; $3,428,141.00 belonging to Joseph Iantosca; $541,931.00 belonging to Jeffrey M. Johnston; $306,665.00 belonging to Byron Darling; $444,660.00 belonging to Bellemore Associates; and $97,369.00 belonging to R&B Enterprises and Brian Fitzgerald (collectively, the "Mass. Creditors").

174. On February 4, 2004, Carpenter was indicted for nineteen (19) counts of wire fraud and mail fraud in violation of 18 U.S.C. §§ 1343 and 1341, respectively, in connection with his defalcation of exchangor funds. The government alleged that Carpenter had fraudulently induced the exchangors to use his company to perform their exchanges in part

**Universitas Supplemental Appendix - 045**

through false promises that their money would be kept in safe, interest-bearing accounts. A superseding indictment was filed on September 24, 2004 ("Mass. Superseding Indictment"). Attached as **Exhibit 11** is a true and correct copy of the Mass. Superseding Indictment, which enumerates each instance of mail fraud and wire fraud that Carpenter committed, through the BPETCO Entities, with respect to the Mass. Creditors.

175.    Ultimately, Carpenter was found guilty on all nineteen (19) counts of mail fraud and wire fraud. Carpenter was first tried and convicted in July 2005, and again upon re-trial in June 2008. The June 2008 conviction was upheld by the U.S. Court of Appeals for the First Circuit on November 25, 2013, and this Court sentenced Carpenter on January 28, 2014, to three (3) years in prison and three (3) years' probation. Carpenter appealed again, and the sentence and conviction were upheld by the U.S. Court of Appeals for the First Circuit on March 30, 2015.

176.    Robinson knew or should have known of Carpenter's conduct, and the Carpenter Criminal Enterprise's involvement in misappropriating exchangors' escrow funds. Robinson not only was involved with the BPETCO Entities, he also served as Carpenter's attorney for both criminal trials, having entered a notice of appearance in the case in May 2005, and again in November 2007 and May 2008, after having previously withdrawn twice. As a result, when the Universitas Insurance Proceeds were received by the Charter Oak Trust in May, 2009, Robinson was fully familiar with Carpenter's criminal enterprise in connection with the defalcation of the Mass. Creditors' and other exchangors' funds.

**B.    Connecticut Indictment of Carpenter and Bursey Stemming from Fraudulent Origination of Insurance Policies with the Charter Oak Trust**

177.    Carpenter faces additional prison time in connection with a federal indictment in Connecticut in connection with the fraudulent origination of life insurance policies placed into

**Universitas Supplemental Appendix - 046**

the Charter Oak Trust for Carpenter and Bursey's exclusive benefit. Robinson was heavily involved in the entities in question, and either knew or should have known of Carpenter's fraudulent scheme and of Carpenter's criminal enterprise in connection therewith. As noted above, he was listed as a target of the grand jury investigation conducted by the United States Attorney in Connecticut.

178. From 2006 through 2013, Carpenter and Bursey, in concert with several Carpenter-controlled entities operating out of Simsbury, Connecticut, used the Charter Oak Trust to secure insurance policies on the lives of elderly individuals that could be held by Carpenter and Bursey as investments, or resold on the life settlement market (a secondary market for life insurance policies). Such use was prohibited by the insurance policies and the insurance companies.

179. Upon information and belief, the policies were not *bona fide* insurance policies; instead, Carpenter and Bursey used an insurance agent, Waesche—the very same insurance agent with whom the Spencer beneficiaries discussed their death benefit, as noted above—to entice individuals over the age of 70 to act as "straw insureds" and apply for policies, by promising to provide them with free life insurance for two years and, at the end of the two years, selling the policies on the life settlement market to make a profit for the Carpenter-controlled entities. Upon information and belief, to induce them to participate, Carpenter, Bursey, and/or their operatives promised the insureds an up-front cash inducement or a portion of the sale proceeds.

180. Upon information and belief, in order to effectuate their scheme, Waesche, Carpenter, and Bursey caused to be submitted to insurance providers policy applications that, among other misrepresentations, falsely denied that third parties would pay the premiums for the insurance, falsely denied discussions about the resale of the policies, falsely inflated the net

47

worth and/or income of the insureds, and falsely claimed that the insurance was being purchased for legitimate estate planning purposes.

181.    Upon information and belief, Bursey signed all such applications as individual Trustee of the Charter Oak Trust, and, as with the Spencer policies discussed above, the Charter Oak Trust was the owner of the policies procured and the applications purported that the Charter Oak Trust was a *bona fide* employee welfare benefit plan wherein employers would make contributions to the Trust to fund policies for the benefit of their employees.

182.    Upon information and belief, from 2006 through 2008, while Robinson served as General Counsel to the Charter Oak Trust, Nova and BASI, and served as an officer of BASI, Waesche enlisted twelve (12) elderly insureds to participate in Carpenter's scheme.    Upon information and belief, from May 2007 through January 2009, Carpenter, Bursey, and Waesche submitted, via mail and electronically, fraudulent applications to, and obtained insurance policies on the lives of those insureds from, Penn Mutual, Lincoln Life, the Phoenix Companies, Sun Life Assurance Company of Canada, AXA Equitable Life Insurance Company, American National Insurance Company, Jefferson Pilot Financial, Metropolitan Life Instance Company, and Trans America.

183.    Upon information and belief, from October 2008 to March 2010, Carpenter and Bursey wired funds to the Charter Oak Trust from private funding affiliates (like Ridgewood Finance Inc.)—rather than from *bona fide* employers, as represented in the life insurance applications—in order to fund policy premiums.    Upon information and belief, the Charter Oak Trust promoted its purported compliance with Section 419(e) of the Internal Revenue Code, to induce the insurance companies to approve the applications on the assumption that they were legitimate applications in furtherance of a Section 419(e) welfare benefit plan.

**Universitas Supplemental Appendix - 048**

184.    On December 12, 2013, Carpenter and Bursey were indicted by a Connecticut federal grand jury on thirty-two (32) counts of mail and wire fraud, and one (1) count of conspiracy to commit mail and wire fraud, in connection with the scheme. See U.S. v. Carpenter et al., Case No. 13-CR-226-RNC (D. Conn.).

185.    On May 12, 2014, a superseding indictment was filed in the same federal criminal action (the "Conn. Superseding Indictment").    The Conn. Superseding Indictment charges Carpenter and Bursey with an additional twenty-four (24) counts—on top of the previous thirty-three (33) counts—relating specifically to their misappropriation of the Universitas Insurance Proceeds, including one (1) count of conspiracy to commit money laundering, ten (10) counts of money laundering, and thirteen (13) counts of illegal monetary transactions.    Attached as **Exhibit 12** is a true and correct copy of the Conn. Superseding Indictment, which details each instance of mail fraud, wire fraud, money laundering, illegal monetary transaction, and conspiracy to commit same, discussed above.  Each of those counts remain pending.

186.    Robinson knew or should have known, in his official capacities at the Charter Oak Trust, Nova and BASI, of the Carpenter Criminal Enterprise's fraudulent origination of life insurance policies. Indeed, in the Declaration that he filed in the Arbitration proceedings, he specifically referred to (and accused Spencer of being a participant in) the insurance fraud scheme, and, in any event, Robinson participated, in concert with Carpenter, Bursey and others, in the operation of and decisions made by the Carpenter Criminal Enterprise.    Moreover, Robinson himself has acknowledged, in sworn testimony, that he is aware that such insurance practices are improper.

## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF (VIOLATION OF RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO"))

187.    Universitas repeats and re-alleges the allegations set forth in paragraphs 1 through 186 of this Complaint as if fully set forth herein.

188.    At all relevant times hereto, Robinson was employed by and associated with the Carpenter Criminal Enterprise, in the conduct of the Carpenter Criminal Enterprise's affairs through in a pattern of racketeering activity, in violation of 18 U.S.C. §§ 1962(c) from approximately 2000 through 2010.

189.    All at relevant times hereto, Robinson and the Carpenter Criminal Enterprise were engaged in, and/or their activities did affect, interstate commerce.   As described more fully above, the Carpenter Criminal Enterprise conducted its activities out of Simsbury, Connecticut, and was engaged in criminal conduct in, and affecting individuals and entities located in, New York, Massachusetts, and New Hampshire, among other places.

190.    The Carpenter Criminal Enterprise consisted of numerous individuals and entities who were associated in fact, employed by the entities participating in the enterprise, and/or acting in concert to advance the purposes of the enterprise, including, without limitation:  Daniel E. Carpenter, Jack E. Robinson, Wayne Bursey, Molly Carpenter, Kathy Kehoe, Amanda Rossi, Donald Trudeau, J. Edward Waesche IV, Avon Capital, BASI, Benistar, BPETCO, Caroline Financial, Carpenter Financial Group, the Charter Oak Trust, Grist Mill Capital, Grist Mill Holdings, Grist Mill Trust, Hanover, Moonstone, Nova Benefit Plans, Nova, and Phoenix.

191.    The purpose of this enterprise was to accumulate funds under its control by inducing individuals seeking to participate in tax-beneficial arrangements—such as employee

50

welfare benefit plans and property exchanges, which the enterprise at all relevant times represented qualified for tax-beneficial status—to entrust their funds to the enterprise so that individual members thereof could convert those funds for personal use and otherwise enrich themselves. Each of the acts described herein were taken in furtherance of this purpose.

192.    The means and methods that the enterprise employed to conduct its organized criminal activity included a pattern of, among other things, wire fraud, mail fraud, insurance fraud, conversion, intimidation, tampering, economic duress, extortion, money laundering, and destruction of evidence.

193.    The pattern of racketeering activity in which the enterprise has engaged occurred on a continuing basis from at least 2000 through 2010—if not over a longer period of time.

194.    As set forth in greater detail above, specific racketeering acts undertaken by the enterprise, and which qualify as racketeering acts under 18 U.S.C. § 1961, included, but were not limited to:

(a)    the sixteen (16) instances of wire fraud and illegal monetary transactions perpetrated with respect to Universitas, in violation of 18 U.S.C. §§ 1343 and 1957, as enumerated and further detailed in paragraphs 72 to 81 and 93 to 101 above and as further detailed on pages 56 to 61 of the Conn. Superseding Indictment, which is incorporated herein by reference (see Exhibit 12 hereto);

(b)    Robinson's and Bursey's transmission, through the U.S. mails of letters to Universitas and/or its counsel in July 2009, September 2009, and October 2009, to the Arbitrator and Universitas' counsel in February 2011, and to TD Bank and Universitas' counsel in April 2011, which contained material omissions by failing to make any reference to the fraudulent misappropriation and defalcation of the Universitas Insurance

51

**Universitas Supplemental Appendix - 051**

Proceeds (which had begun in May 2009), by which they sought to further conceal such misappropriation and defalcation and which constituted mail fraud in violation of 18 U.S.C. § 1341;

(c)     Robinson's submission of his November 30, 2010 Declaration in the Arbitration, in which he intentionally misrepresented that the Charter Oak Trust had the ability to satisfy a judgment against it—when in fact it did not—which permitted the Charter Oak Trust to avoid having to relinquish control over the $30.6 million that Carpenter looted by paying it into a neutral account pending the outcome of the Arbitration, and which constituted the obstruction and impeding of the administration of justice, in violation of 18 U.S.C. § 1503;

(d)     Robinson's coordination of a letter-writing campaign from 2010 to 2012, and his personal transmission of his April 13, 2011 letter, to TD Bank and counsel for Universitas in which Robinson, and others, through the threat of criminal and civil liability, attempted to delay or prevent the lawful production and disclosure to Universitas of account documents that would have revealed the misappropriation and defalcation of the Universitas Insurance Proceeds, which constituted tampering with a witness in violation of 18 U.S.C. § 1512 (a);

(e)     Carpenter's and Robinson's extortionate conduct, through the transmission of a letter on April 13, 2011, and emails on February 27, 2013, in threatening counsel for Universitas with reputational, professional, legal, and economic harm in an attempt to have Universitas abandon its recovery of the Universitas Insurance Proceeds, without a good faith belief either in the legitimacy of their threats or in the entitlement of Carpenter, the Charter Oak Trust, Nova, and/or other members of the Carpenter Criminal

52

Enterprise to those funds, which constituted a violation of the Hobbs Act, 18 U.S.C. § 1951;

(f)    Robinson's unlawful destruction of electronic records in June 2011, in violation of 18 U.S.C. § 1512(c), in an attempt to hinder federal investigations pending in both New York and Connecticut, and to conceal the misappropriation of the Universitas Insurance Proceeds;

(g)    the 19 instances of wire fraud and mail fraud, in violation of 18 U.S.C. §§ 1341 and 1343, perpetrated with respect to the Mass. Creditors, as enumerated and further detailed on pages 27 to 30 of the Mass. Superseding Indictment, Exhibit 11 hereto, which is incorporated herein by reference; and

(h)    the 32 instances of mail and wire fraud, in violation of 18 U.S.C. §§ 1341 and 1343, in connection with the Carpenter criminal enterprise's fraudulent origination of insurance policies for elderly "straw insureds," as enumerated and further detailed on pages 17 to 47 of the Conn. Superseding Indictment, Exhibit 12 hereto.

195.    Robinson was employed by, associated with, and participated in the conduct of the Carpenter Criminal Enterprise by and through, among other things (a) his outside legal representation of Carpenter, the Charter Oak Trust, Nova, BASI, Bursey, Grist Mill Capital, Avon and Benistar; (b) his work as General Counsel for Nova and BASI; (c) his work as Manager of Grist Mill Capital; and (d) his work as Vice President of BASI.

196.    In those various capacities, Robinson, among other things, (a) conducted an extensive letter-writing campaign in an effort to convince Universitas it was not entitled to the Universitas Insurance Proceeds; (b) drafted the Sham Agreement, which permitted at least a portion of the Universitas Insurance Proceeds to be transferred out of the Charter Oak Trust and,

53

in the first instance, to Grist Mill Capital; (c) personally accepted a portion of the Universitas Insurance Proceeds through Grist Mill Capital and Carpenter Financial Group; (d) intentionally misrepresented in a Declaration submitted in the Arbitration that the Charter Oak Trust had the ability to satisfy a judgment against it—when in fact it did not—which permitted the Charter Oak Trust to avoid having to relinquish control over the Universitas Insurance Proceeds; (e) initiated frivolous court proceedings in an effort to delay Universitas' judgment collection and discovery of the fraudulent transfers and provide the enterprise with additional time to transfer, conceal, or otherwise squander the Universitas Insurance Proceeds; (f) improperly destroyed documents potentially embodying additional evidence of the enterprise's fraud; (g) transmitted and coordinated the transmission of letters to TD Bank and counsel for Universitas frivolously threatening legal harm in a further effort to prevent discovery of the misappropriation and defalcation of the Universitas Insurance Proceeds; and (h) due to his position with and employment by the Carpenter entities in question, was a participant in Carpenter's fraudulent straw insurance policy scheme that is the subject of the Conn. Superseding Indictment.

197.    Universitas was harmed by the of wire fraud and illegal monetary transactions enumerated and further detailed paragraphs 72 to 81 and 93 to 101 above, as well as on pages 56 to 61 of the Conn. Superseding Indictment, in the amount of $30,677,276.85.

198.    Universitas did not discover that each of the elements of its civil RICO claim had been satisfied until, at the earliest, TD Bank's production of bank records in November 2012, at which time Universitas first learned about the aforementioned wire fraud and illegal monetary transactions.

199.    Pursuant to 18 U.S.C. § 1964(c), Universitas seeks to recover threefold damages, interest, costs of this litigation, and attorneys' fees.

54

Universitas Supplemental Appendix - 054

## SECOND CLAIM FOR RELIEF (AIDING AND ABETTING FRAUD)

200.    Universitas repeats and re-alleges the allegations set forth in paragraphs 1 through 199 of this Complaint as if fully set forth herein.

201.    Carpenter and his affiliates defrauded Universitas, as established (among other things) by several judicial decisions, including the November 20, 2013 decision (Exhibit 3 hereto) and the August 7, 2014 decision (Exhibit 4 hereto) from the S.D.N.Y., in Case No. 11-1590.

202.    Carpenter and his affiliates defrauded Universitas by misappropriating and fraudulently conveying the Universitas Insurance Proceeds.  Carpenter and his affiliates further defrauded Universitas by refusing to disclose the whereabouts of the Universitas Insurance Proceeds, by asserting a litany of bogus reasons why Universitas was not entitled to any money, and by forcing Universitas to undertake years of costly litigation, all the while knowing that Carpenter had misappropriated the Universitas Insurance Proceeds and used them to benefit himself, his family, Robinson, and others.

203.    Robinson knew about the fraud by virtue of, among other things, (a) his legal representation, at various points in time, of Carpenter, Nova, the Charter Oak Trust, BASI, Bursey, Grist Mill Capital, Avon, and Benistar, (b) his position as General Counsel for Nova and BASI, (c) his position as Manager of Grist Mill Capital, (d) his work as Vice President of BASI, and (e) his close personal and business relationship with Carpenter.

204.    Among other things, Robinson knew that (a) the Charter Oak Trust was set up to benefit the beneficiaries of Trust participants, (b) Spencer had died, (c) Lincoln Life had paid approximately $30.6 million in insurance proceeds to the Charter Oak Trust for Universitas' benefit, (d) Carpenter, Nova, Bursey, and/or BASI refused to pay those insurance proceeds to

**Universitas Supplemental Appendix - 055**

Universitas out of the Charter Oak Trust, (e) the reason for the refusal was for Carpenter and his affiliates to keep the Universitas Insurance Proceeds for themselves, (f) the Declaration of Trust of the Charter Oak Trust prohibited transferring the Universitas Insurance Proceeds out of the Charter Oak Trust, and (g) Carpenter directed the transfer of the Universitas Insurance Proceeds first into the Charter Oak Trust's account and then out of that account and through a series of shell companies and alter egos.

205.　Robinson substantially assisted Carpenter's fraud because, among other things, he drafted the Sham Agreement, which permitted at least a portion of the $30.6 in Spencer insurance proceeds to be transferred out of the Charter Oak Trust and, in the first instance, to Grist Mill Capital's bank account, and intentionally misrepresented in a Declaration submitted in the Arbitration that the Charter Oak Trust had the ability to satisfy a judgment against it—when in fact it did not—which permitted the Charter Oak Trust to avoid having to relinquish control over the $30.6 million that Carpenter looted by paying it into a neutral account pending the outcome of the Arbitration.

206.　Robinson further substantially assisted Carpenter in his efforts to conceal the misappropriation and fraud, as aforesaid.

207.　Robinson's misconduct was willful and in bad faith.

208.　Robinson's substantial assistance in the fraud was not known to Universitas until, at the earliest, TD Bank's production of bank records in November 2012, at which time Universitas first learned about Carpenter's theft of the Universitas Insurance Proceeds.

209.　As a result of Robinson's actions and failures to act, Universitas was harmed in an amount to be determined at trial, but not less than $30,677,276.85.

**Universitas Supplemental Appendix - 056**

## THIRD CLAIM FOR RELIEF (BREACH OF FIDUCIARY DUTY)

210.    Universitas repeats and re-alleges the allegations set forth in paragraphs 1 through 209 of this Complaint as if fully set forth herein.

211.    Robinson served as attorney and General Counsel to the Charter Oak Trust, Nova, and BASI, and served as Vice President of BASI and Manager of Grist Mill Capital.

212.    Robinson was familiar with the fiduciary responsibilities that Nova, BASI, and Bursey owed to Universitas by virtue of his legal representation of the Charter Oak Trust, Nova, and BASI, and due to his extensive familiarity with the Charter Oak Trust's operations and finances, which he admitted and specifically represented in the Declaration he submitted to the Arbitrator on or about November 30, 2010.

213.    As the Arbitrator held in his award of January 24, 2011—and as the S.D.N.Y. confirmed on June 5, 2012—Nova, Bursey, and BASI each breached their fiduciary duties to Universitas by denying Universitas' claim to the Universitas Insurance Proceeds under the Charter Oak Trust.

214.    As the attorney and General Counsel to the Charter Oak Trust, Nova, and BASI, and as an officer of BASI and Grist Mill Capital, Robinson was aware or should have been aware, that appropriate action on his part was necessary to prevent, mitigate, and/or rectify Nova's, Bursey's, and BASI's breaches of fiduciary duty with respect to Universitas.

215.    Instead, Robinson permitted Nova, Bursey, and BASI to breach their fiduciary duties to Universitas— and, in fact, facilitated and participated in such breaches.

216.    As a result of Robinson's breach of his fiduciary duty, Universitas was unable to protect its rights to collect the Universitas Insurance Proceeds.  Despite making a timely and proper claim for the death benefits from the Spencer policies and initiating arbitral proceedings

Universitas Supplemental Appendix - 057

in an attempt to recover the Universitas Insurance Proceeds, among other attempted remedial measures, Carpenter, Bursey, Robinson and others—through the Charter Oak Trust, Nova, and BASI—prevented Universitas from collecting the Universitas Insurance Proceeds and concealed the theft of those proceeds.

217.    Robinson therefore had a duty not to assist and to instead prevent Nova, Bursey, and BASI from breaching their fiduciary duties to Universitas.

218.    Such duty was not inconsistent with Robinson's obligations to zealously represent the interests of Nova, Bursey, and BASI within the bounds of the law.

219.    By assisting and by failing to act to prevent Nova, Bursey, and BASI from denying Universitas' claim to the Universitas Insurance Proceeds under the Charter Oak Trust, Robinson breached his fiduciary duty to Universitas.

220.    Robinson's breach of his fiduciary duty to Universitas was not known to Universitas until, at the earliest, TD Bank's production of bank records in November 2012, at which time Universitas first learned about Carpenter's theft of the Universitas Insurance Proceeds.

221.    As a result of Robinson's actions and failures to act, Universitas was harmed in an amount to be determined at trial, but not less than $30,677,276.85.

**FOURTH CLAIM FOR RELIEF (NEGLIGENT MISREPRESENTATION)**

222.    Universitas repeats and re-alleges the allegations set forth in Paragraphs 1 through 221 of this Complaint as if fully set forth herein.

223.    To the extent that Robinson claims that he did not knowingly and intentionally assist Carpenter's defalcation of the funds of Universitas, then Robinson negligently misrepresented, made material omissions, and failed to disclose the material facts necessary to

**Universitas Supplemental Appendix - 058**

render his statements not misleading and not actionable half-truths, particularly in light of his fiduciary duty to Universitas, through the following representations, each of which is actionable alone or in the aggregate:

    (a)    Stating, in his July 23, 2008 letter that Grist Mill Capital was entitled to fees of $6 million dollars, but failing to disclose that no documentation existed to support that claim;

    (b)    Stating in his July 8, 2009 letter that Grist Mill Capital was entitled to the funds, but failing to disclose that no documentation existed to support that claim; and

    (c)    Misrepresenting, in his Declaration dated June 7, 2010 that based on his full familiarity with all finances, assets and liabilities of the Charter Oak Trust, there were sufficient assets available to pay a $30,000,000.00 judgment for Universitas, and failing to disclose his material omissions that the Universitas Insurance Proceeds by that time had been fully transferred out of the Charter Oak Trust in breach of the Declaration of Trust, and failing to disclose that there were at most minimal liquid assets available to pay any judgment.

224.    Additionally, in light of the numerous contentions and statements made by Robinson on behalf of Charter Oak Trust, Nova and BASI, Robinson had a duty to speak honestly and to divulge all material facts and omissions necessary to assess the validity of his representations. However, Robinson however negligently failed to disclose:

    (a)    The Universitas Insurance Proceeds were received by the Charter Oak Trust on May 18, 2009;

**Universitas Supplemental Appendix - 059**

(b)     At various times from May 18, 2009 through December 2009, those funds were transferred to several additional entities, as aforesaid, which were controlled by Carpenter;

(c)     The Universitas Insurance Proceeds were taken out of trust and out of escrow by Carpenter and others; and

(d)     Robinson himself had received $810,000.00 or more from the Universitas Insurance Policy proceeds.

225.    Universitas, the Arbitrator, and other Courts relied on Robinson's negligent misrepresentations, and Robinson's material omissions and failures to make the above disclosures, throughout these proceedings, to the great damage of Universitas.

226.    If Robinson had disclosed the truth to Universitas or the Arbitrator, Universitas would have been able to act at an earlier date to better protect itself and to recover the proceeds transferred to the Universitas Insurance Proceeds before they were fully dissipated by Carpenter and put out of the reach of Universitas.

**FIFTH CLAIM FOR RELIEF (NEGLIGENT OPINION)**

227.    Universitas repeats and re-alleges the allegations set forth in paragraphs 1 through 226 of this Complaint as fully set forth herein.

228.    Robinson submitted his Declaration to the Arbitrator, in his capacity as counsel to Charter Oak Trust, Nova and BASI.

229.    Since Robinson was acting on behalf of Charter Oak Trust, which had a fiduciary duty to Universitas to safeguard the Universitas Insurance Proceeds, Robinson had a like fiduciary duty to Universitas, and a duty in his capacity as counsel to exercise reasonable care

60

**Universitas Supplemental Appendix - 060**

and due diligence in rendering professional opinions in his capacity as counsel and to the extent that said opinions concerned the Universitas Insurance Proceeds.

230.    To the extent that Robinson claims that he did not knowingly participate in the defalcation and fraudulent transfers of the Universitas Insurance Proceeds, he was negligent in the preparation of the opinions in his Declaration, in failing to conduct an appropriate due diligence, and in opining that Nova had the ability to pay to Universitas any judgment of up to $30,000,000.00.

231.    Indeed, in Paragraph 4 of his Declaration, Robinson stated as follows: "I am familiar with the [Charter Oak Trust] Plan's operations, assets, liabilities and financial condition, and state that the Plan has the current ability to satisfy a judgment of $30 million."

232.    If Robinson had exercised due care as counsel to the Charter Oak Trust, Nova and BASI, and had rendered his opinions after exercise of appropriate due diligence and professional expertise, he would have discovered and disclosed that the Charter Oak Trust did not have sufficient assets net of liabilities to pay a $30 judgment and would have disclosed that the Universitas Insurance Proceeds had been transferred out of the Charter Oak Trust by Carpenter.

233.    Universitas was caused significant damage by Robinson's negligent opinion contained in his Declaration.   If the Arbitrator had known the truth, Universitas and the Arbitrator could and would have better protected Universitas' ability to recover on its Judgment.

234.    Universitas has been damaged, in substantial amounts, by Robinson's aforesaid negligence.

### SIXTH CLAIM FOR RELIEF (PROFESSIONAL MALPRACTICE)

235.    Universitas repeats and re-alleges the allegations set forth in paragraphs 1 through 234 of this Complaint as fully set forth herein.

**Universitas Supplemental Appendix - 061**

236.    Robinson had a duty to Universitas, as a beneficiary of the Charter Oak Trust, to exercise a reasonable degree of skill and care in the performance of his legal duties for the Charter Oak Trust.  Robinson had a duty to prevent the Charter Oak Trust from violating the terms of the Declaration of Trust by misappropriating the Universitas Insurance Proceeds, and in any event to promptly disclose the misappropriation of those proceeds to Universitas.

237.    By virtue of his foregoing conduct, to the extent that Robinson was not knowingly participating in the misappropriation and defalcation of the Universitas Insurance Proceeds, Robinson committed professional malpractice by failing to exercise a reasonable degree of skill and care as an attorney.

238.    As a result of Robinson's professional malpractice, Universitas has sustained substantial damages.

### SEVENTH CLAIM FOR RELIEF (AIDING AND ABETTING BREACH OF FIDUCIARY DUTY)

239.    Universitas repeats and re-alleges the allegations set forth in paragraphs 1 through 238 of this Complaint as if fully set forth herein.

240.    Nova (as trustee and plan sponsor to the Charter Oak Trust), Bursey (as President of Nova), and BASI (as administrator and *de facto* Plan Administrator of the Charter Oak Trust) each owed a fiduciary duty to the participants and beneficiaries of the Charter Oak Trust—including Universitas.

241.    As the Arbitrator held in his award of January 24, 2011—and as the S.D.N.Y. confirmed on June 5, 2012—Nova, Bursey, and BASI each breached their fiduciary duties to Universitas by denying Universitas' claim to the Universitas Insurance Proceeds under the

Universitas Supplemental Appendix - 062

Charter Oak Trust. They also breached those duties by participating in or permitting the fraudulent transfer of those funds.

242.    Robinson knew that Nova, Bursey, and BASI owed and breached their fiduciary duties to Universitas, because, among other things, Robinson served as attorney and General Counsel to the Charter Oak Trust, Nova, and BASI, was an officer of BASI and Grist Mill Capital, and was therefore familiar with those entities' fiduciary responsibilities; and Robinson further was familiar with the Charter Oak Trust's operations and finances, as he represented in his November 30, 2010, Declaration.

243.    Among other things, Robinson knew that (a) the Charter Oak Trust was set up to benefit the beneficiaries of Trust participants, (b) Spencer had died, (c) Lincoln Life had paid approximately $30.6 million in insurance proceeds to the Charter Oak Trust for Universitas' benefit, (d) Carpenter, Nova, Bursey, and/or BASI refused to pay those insurance proceeds to Universitas out of the Charter Oak Trust, (e) the reason for the refusal was for Carpenter and his affiliates to keep the Universitas Insurance Proceeds for themselves, and (f) Carpenter directed the misappropriation and fraudulent transfer of the Universitas Insurance Proceeds first into the Charter Oak Trust's account and then out of that account and through a series of shell companies and alter egos.

244.    Robinson, moreover, substantially assisted Nova's, Bursey's, and BASI's breach of their fiduciary duties because, among other things, he actively participated in efforts to "deny" Universitas' claim; he drafted the Sham Agreement, which purportedly authorized and enabled at least a portion of the $30.6 million in Spencer insurance proceeds to be transferred out of the Charter Oak Trust and, in the first instance, to Grist Mill Capital; he intentionally misrepresented in his Declaration that the Charter Oak Trust had the ability to satisfy a judgment against it—

63

**Universitas Supplemental Appendix - 063**

when in fact it did not—which permitted the Charter Oak Trust to avoid having to relinquish control over the $30.6 million that Carpenter looted by paying it into a neutral account pending the outcome of the Arbitration.

245.    Robinson's misconduct was willful and in bad faith.

246.    Robinsons' substantial assistance in the breaches of fiduciary duty was not known to Universitas until, at the earliest, TD Bank's production of bank records in November 2012, at which time Universitas first learned that Robinson's representations in his affidavit to the AAA regarding the Charter Oak Trust's ability to pay the Universitas Insurance Proceeds were false.

247.    As a result of Robinson's actions and failures to act, Universitas was harmed in an amount to be determined at trial, but not less than $30,677,276.85.

## EIGHTH CLAIM FOR RELIEF (CIVIL CONSPIRACY TO COMMIT FRAUD AND BREACH OF FIDUCIARY DUTY)

248.    Universitas repeats and re-alleges the allegations set forth in paragraphs 1 through 247 of this Complaint as if fully set forth herein.

249.    As detailed above, (a) Carpenter defrauded Universitas by misappropriating and then fraudulently conveying the Universitas Insurance Proceeds, (b) Bursey, Nova, and BASI breached their fiduciary duties to Universitas by denying the Universitas' claim to the Universitas Insurance Proceeds, and (c) Robinson was aware or should have been aware of both the fraud and the breaches of fiduciary duty.

250.    Robinson entered into an agreement with Carpenter, Bursey, Nova, BASI, and others to deprive Universitas of the Universitas Insurance Proceeds.  Specifically, Robinson entered into the agreement to deprive Universitas of the Universitas Insurance Proceeds in or

Universitas Supplemental Appendix - 064

about June 2008, shortly after Universitas, through its agents, submitted a claim to Nova and BASI for the death benefits on the Spencer policies.

251.    Robinson undertook myriad overt acts in furtherance of this agreement, including: (a) writing various letters to Universitas, its agents, the Arbitrator, and TD Bank; (b) drafting the Sham Agreement; (c) submitting his intentionally misleading Declaration, which contained material omissions, to the Arbitrator; and (d) destroying documents potentially embodying additional evidence of Carpenter's fraud.

252.    Robinson intentionally participated in the agreement to deprive Universitas of the Universitas Insurance Proceeds.

253.    Such knowing participation is evidenced by his drafting of the Sham Agreement with full knowledge that Grist Mill Capital did not have a legitimate competing claim to the Universitas Insurance Proceeds.  Specifically, Robinson knew that Carpenter controlled both the Charter Oak Trust and Grist Mill Capital during all relevant times, and that Spencer had designated Universitas as its sole, irrevocable beneficiary with the Charter Oak Trust's and Nova's full knowledge, thus precluding any subsequent designation of Grist Mill Capital as beneficiary to his life insurance policies.

254.    Robinson's knowing participation is further evidenced by his submission of his Declaration to the Arbitrator in which he represented that the Charter Oak Trust had the ability to satisfy a judgment against it, with knowledge that Carpenter, in conjunction with Bursey, Nova, and BASI, had already directed transfer of the Universitas Insurance Proceeds out of the Charter Oak Trust.

255.    At all relevant times, Robinson had an independent, personal conspiratorial purpose to participate in the agreement to deprive Universitas of the Universitas Insurance

65

Proceeds—namely to secure a portion of the Universitas Insurance Proceeds for himself. Indeed, from approximately September 23, 2009 to approximately March 20, 2010, Robinson received $810,000.00 or more of the Universitas Insurance Proceeds through Grist Mill Capital and Carpenter Financial Group.

256.    As a result of the agreement to deprive Universitas of the Universitas Insurance Proceeds, and Robinson's knowing participation therein, Universitas has suffered the loss of over $30.6 million.

257.    Therefore, Robinson is liable for the torts committed by Carpenter, Bursey, Nova, and BASI in furtherance of the civil conspiracy in which Robinson participated.

## NINTH CLAIM FOR RELIEF (CONVERSION)

258.    Universitas repeats and re-alleges the allegations set forth in paragraphs 1 through 257 of this Complaint as if fully set forth herein.

259.    The Declaration of Trust for the Charter Oak Trust confirmed that "in no event shall any asset of the [Trust's] Fund be used for or diverted to purposes other than providing benefits … for Participants and their dependents and beneficiaries and defraying reasonable expenses of administering the … Trust."

260.    Spencer named Universitas as the sole, irrevocable beneficiary to two life insurance policies placed with the Charter Oak Trust.

261.    As a result, Universitas was entitled to the $30 million combined death benefit payable under those policies and any interest accrued thereupon.

262.    Universitas' legal entitlement to the Universitas Insurance Proceeds has been established by, among other things, the Arbitrator's January 24, 2011 Arbitration Award; Judge Swain's June 5, 2012 order confirming the Arbitration Award; Judge Swain's November 20,

66

2013 opinion and order granting Universitas' motion for turnover of insurance proceeds payable in connection with Carpenter's oceanfront vacation home in Rhode Island, which was purchased with a portion of the Universitas Insurance Proceeds; and Judge Swain's August 7, 2014 opinion and order finding that Carpenter fraudulently transferred the Universitas Insurance Proceeds out of the Charter Oak Trust.

263.    From approximately September 23, 2009 to approximately March 20, 2010, Robinson received $810,000.00 or more of the Universitas Insurance Proceeds through Grist Mill Capital and Carpenter Financial Group.

264.    Universitas did not discover that Robinson had received these funds until November 2012 at the earliest, at which time Universitas received documents from TD Bank— the production of which Robinson and others sought to block—evidencing wire transfers from Grist Mill Capital and Carpenter Financial Group to Robinson.

265.    At no time has Robinson returned or repaid any portion of those funds to Universitas.

### TENTH CLAIM FOR RELIEF (UNJUST ENRICHMENT)

266.    Universitas repeats and re-alleges the allegations set forth in paragraphs 1 through 265 of this Complaint as if fully set forth herein.

267.    As set forth above, Universitas, as the sole, irrevocable beneficiary of the two Spencer life insurance policies placed with the Charter Oak Trust, was legally and equitably entitled to receive the Universitas Insurance Proceeds.

268.    As a result of his participation in and facilitation of Carpenter's fraudulent scheme to transfer the Universitas Insurance Proceeds out of the Charter Oak Trust to prevent

Universitas from recovering any portion thereof, Robinson received $810,000.00 or more of the Universitas Insurance Proceeds through Grist Mill Capital and Carpenter Financial Group.

269.    Universitas did not discover that Robinson had received these funds until November 2012 at the earliest, at which time Universitas received documents from TD Bank—the production of which Robinson and others sought to block—evidencing wire transfers from Grist Mill Capital and Carpenter Financial Group to Robinson.

270.    Robinson has not returned or repaid any portion of those funds to Universitas.

271.    Accordingly, Robinson has been unjustly enriched at Universitas' expense, in the amount of $810,000.00 or more.

## ELEVENTH CLAIM FOR RELIEF (STATUTORY THEFT)

272.    Universitas repeats and re-alleges the allegations set forth in paragraphs 1 through 271 of this Complaint as if fully set forth herein.

273.    Connecticut General Statute § 52-564 provides that "[a]ny person who steals any property of another, or knowingly receives and conceals stolen property, shall pay the owner treble his damages."

274.    Robinson knew that the $810,000.00 or more that he received from Grist Mill Capital and Carpenter Financial Group was taken from the Universitas Insurance Proceeds that Carpenter fraudulently misappropriated and defalcated from Universitas.

275.    Robinson intentionally deprived Universitas of the $810,000.00 or more that he received from Grist Mill Capital and Carpenter Financial Group, in violation of Connecticut General Statute § 52-564.

Universitas Supplemental Appendix - 068

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Universitas Education, LLC respectfully demands judgment against Defendant Jack E. Robinson III, a/k/a Jack E. Robinson and an award of the following:

A.  Threefold damages in the amount of $92,031,830.55, including attorneys' fees and costs, pursuant to 18 U.S.C. § 1964(c), for Robinson's violation of 18 U.S.C. § 1962(c) in participating in the conduct of the Carpenter Criminal Enterprise, including the theft of $30,677,276.85 from Universitas;

B.  Compensatory damages, to be proven at trial, but in an amount no less than $30,677,276.85, representing the amount of life insurance proceeds and accrued interest that Robinson permitted and helped Carpenter and others steal, as well as the attorneys' fees Universitas has had to incur as a result of the theft;

C.  An order for restitution of $810,000.00 or more in stolen life insurance proceeds that Robinson received in connection with his involvement in the theft;

D.  Treble damages in the amount of $2,430,000.00, pursuant to Conn. Gen. Stat. § 52-564, for Robinson's knowing receipt and concealment of $810,000.00 or more in stolen life insurance proceeds;

E.  Attorneys' fees and costs;

F.  Prejudgment interest; and

69

**Universitas Supplemental Appendix - 069**

G.  Such other and further relief as the Court deems just and proper.

Dated: May 14, 2015
Boston, Massachusetts

UNIVERSITAS EDUCATION, LLC,

By its Attorneys,
RIEMER & BRAUNSTEIN LLP

By: /s/Paul S. Samson_____
Paul S. Samson, Esq., BBO No. 440160
Three Center Plaza
Boston, Massachusetts 02108
(617) 880-3555
psamson@riemerlaw.com

and

Paula K. Colbath, Esquire
LOEB & LOEB LLP
345 Park Avenue
New York, New York 10154
(212) 407 4905
pcolbath@loeb.com

*Attorneys for Universitas Education, LLC*

1836936.3

Universitas Supplemental Appendix - 070



# BENISTAR

CLEARWATER HOUSE
2187 ATLANTIC ST., STAMFORD, CT 06902

September 11, 2009

<u>VIA EMAIL ONLY</u>
<u>CONFIDENTIAL AND FOR SETTLEMENT PURPOSES ONLY</u>

Lanny A. Oppenheim, Esq.                    Mr. Alex T. Sgoutas
Loeb & Loeb LLP                              237 Range Road
345 Park Avenue                              Wilton, CT 06897
New York, NY 10154                           alex77@optonline.net
loppenheim@loeb.com

Re:   <u>Charter Oak Trust</u>

Dear Gentlemen:

I am writing on behalf of the Charter Oak Trust Welfare Benefit Plan (the "Plan" or "Trust"), Nova Group, Inc. ("Nova") as the Sponsor and Administrator of the Plan, and Benistar Admin Services, Inc. ("BASI") as a co-Administrator of the Plan. This letter is written to both of you as representatives of Universitas Education, LLC ("Universitas"), which is Mr. Sash A. Spencer's designated Beneficiary under the Plan. [*All other capitalized terms not expressly defined herein have the same meaning as defined in the Plan and related Plan documents.*]

Over the past several days, there has been a steady stream of emails between and among yourselves and myself, Don Trudeau, and/or Wayne Bursey regarding the claim for a Death Benefit filed by Universitas. In these emails, you attempt to purposefully mischaracterize informal discussions as a "business arrangement" regarding the payment of the Death Benefit. For the record, Messrs. Trudeau and Bursey both categorically deny each and every suggestion you make in regard to alleged telephone calls and meetings.

Let me be absolutely clear. At no time did Don Trudeau, Wayne Bursey, or anyone acting by or on behalf of the Plan ever "agree" to anything with respect to payment of the Death Benefit. In fact, Mr. Trudeau does not represent, and cannot speak for or act on behalf of, the Plan at all. Your ill-advised attempt to create an "agreement" where none exists not only violates the Plan's claims settlement procedures, but imperils the Universitas claim in its entirety. Universitas failed to file a timely claim and the Plan has been threatened with litigation by Universitas representatives numerous times since Mr. Spencer's death in June 2008. You should re-read Nova's July 30, 2009 letter. The Plan has numerous reasons to deny the claim in its entirety.

TEL: 203-969-6000  ·  WWW.BENISTAR.COM  ·  FAX: 203-969-6070
TOLL FREE  (800) BENISTAR

**Universitas Supplemental Appendix - 071**



Just so there are no further misunderstandings:

1)    All prior verbal and written communications (except for Nova's July 8, 2009 and July 30, 2009 letters to Universitas) are expressly disclaimed and nullified, and are of no further force or effect;

2)    Henceforth, **all** communications regarding this matter shall be directed solely to me at the address appearing at the top of the first page of this letter or via email at jrobinson@benistar.com and robinsonesq@aol.com;

3)    Any questions that you have regarding the claims settlement process or anything else regarding the Plan shall be submitted to me, and only me, and only in writing (either by mail or email); and

4)    Any further communications, telephonically or otherwise, between yourselves and Don Trudeau or Wayne Bursey (or anyone else purporting to act for or on behalf of the Plan other than myself) shall be deemed a violation of the Plan's provisions and will cause Nova to summarily reject and deny the Universitas claim in its entirety.

As I stated in my emails of today and yesterday, nothing further can occur with respect to processing the Universitas claim unless and until the information requested in Nova's July 30th letter is provided. If you have any questions regarding what needs to be provided or require further clarification, please submit such questions to me in writing, and I will respond to the best of my ability in a timely fashion.

Time is of the essence, however, because we are approaching the 90th day since Universitas filed its provisional claim in mid-July, and Nova has 90 days from the filing of the claim to make a decision. Thus, we must receive the information requested in the July 30th letter no later than close of business **Tuesday, September 22, 2009**. Failing that, Nova will summarily deny the claim in its entirety.

Please do not hesitate to contact me if you have any questions. However, there is to be no further contact with Messrs. Bursey or Trudeau by anyone representing you, Universitas or Holding Capital Group, Inc.

Sincerely,

Jack E. Robinson
General Counsel

**Universitas Supplemental Appendix - 072**



**BENISTAR**

Just so there are no further misunderstandings:

1)          All prior verbal and written communications (except for Nova's July 8, 2009 and July 30, 2009 letters to Universitas) are expressly disclaimed and nullified, and are of no further force or effect;

2)          Henceforth, **all** communications regarding this matter shall be directed solely to me at the address appearing at the top of the first page of this letter or via email at jrobinson@benistar.com and robinsonesq@aol.com;

3)          Any questions that you have regarding the claims settlement process or anything else regarding the Plan shall be submitted to me, and only me, and only in writing (either by mail or email); and

4)          Any further communications, telephonically or otherwise, between yourselves and Don Trudeau or Wayne Bursey (or anyone else purporting to act for or on behalf of the Plan other than myself) shall be deemed a violation of the Plan's provisions and will cause Nova to summarily reject and deny the Universitas claim in its entirety.

As I stated in my emails of today and yesterday, nothing further can occur with respect to processing the Universitas claim unless and until the information requested in Nova's July 30th letter is provided. If you have any questions regarding what needs to be provided or require further clarification, please submit such questions to me in writing, and I will respond to the best of my ability in a timely fashion.

Time is of the essence, however, because we are approaching the 90th day since Universitas filed its provisional claim in mid-July, and Nova has 90 days from the filing of the claim to make a decision. Thus, we must receive the information requested in the July 30th letter no later than close of business **Tuesday, September 22, 2009**. Failing that, Nova will summarily deny the claim in its entirety.

Please do not hesitate to contact me if you have any questions. However, there is to be no further contact with Messrs. Bursey or Trudeau by anyone representing you, Universitas or Holding Capital Group, Inc.

Sincerely,

Jack E. Robinson
General Counsel

**Universitas Supplemental Appendix - 073**



# BENISTAR

CLEARWATER HOUSE
2187 ATLANTIC ST., STAMFORD, CT 06902

November 18, 2009

<u>FOR SETTLEMENT PURPOSES ONLY</u>
<u>VIA EMAIL AND FIRST CLASS MAIL</u>

Paula K. Colbath, Esq.
LOEB & LOEB LLP
345 Park Avenue
New York, NY 10154

Re:    **Charter Oak Trust/Universitas**

Dear Ms. Colbath:

On behalf of the Charter Oak Trust Welfare Benefit Plan ("Plan") and its Plan Sponsor and Administrators, I hereby confirm receipt of your letters on behalf of Universitas Education, LLC ("Universitas") sent by certified mail and dated November 10, 2009 and November 12, 2009. The errors identified in your November 12th letter are not the only errors that appeared in your original letter.

The Plan will formally respond to the issues raised in your letter (as well as any other issues raised in an appeal) if Universitas files, and the Plan receives, a timely appeal of the denial of the Universitas claim by the <u>5:00 p.m., Tuesday, December 1, 2009 deadline</u>.

However, I am concerned with your demand that the Plan Sponsor provide you "with written assurances, no later than November 16, 2009, that the disputed benefits are being held in <u>a separate, interest-bearing account and will not be commingled with any other funds</u> until the matter is fully resolved between the parties." (Emphasis in original.)

Not only is the Plan not required to provide any such assurances to Universitas, but your demand in and of itself constitutes threatened litigation, which as you know results in the forfeiture of any and all benefits by Universitas pursuant to Plan §§ 8.02(d), 13.01 and 13.07. Just so we are clear, the Plan considers your November 10th and 12th letters to constitute threatened litigation against the Plan, and yet another example of your client's failure to exhaust administrative remedies.

With that said, allow me to address the numerous errors in your belligerent letter:

TEL: 203-969-6000 • WWW.BENISTAR.COM • FAX: 203-969-6070
TOLL FREE (800) BENISTAR



BENISTAR

The Plan was the applicant, owner, beneficiary and, most importantly, the **premium payer** of the insurance policies on Mr. Spencer's life. Neither Mr. Spencer, nor Universitas, nor Holding Capital Group contributed a dime to the Plan or the policies. Therefore, for you to accuse the Plan of "bad faith" rings as hollow as a bankrupt in a foreclosure proceeding accusing the bank of "bad faith" simply because it decided to foreclose on its mortgage.

Universitas and its numerous financial and legal advisors have so far failed to abide by the Plan documents. If there has been any "bad faith," it belongs to Universitas and its advisors for failing to follow the Plan's claims procedure.

I would also be remiss if I failed to point out to you that Mr. Spencer, on March 19, 2007, crossed out the request for a $30 million death benefit in the Plan's Adoption Agreement and changed it to $20 million – and initialed the change. You would be well advised to comply with the provisions of the Plan documents and the claims procedure, rather than sending threatening missives that only harm your client's position.

The math here is very simple. Mr. Spencer himself crossed out the $30,000,000 in the Adoption Agreement, so we start with $20,000,000. You already know, as you must by now, that the Plan pays 80% of the amount listed in the Adoption Agreement to the Participant's Designated Beneficiary, or in this case $16 million (less deductions).

You also know that the premiums plus the origination, placement and other fees must also be deducted from that number. Let us assume that the total amount of these fees and charges, all of which were expressly agreed to by Mr. Spencer, total approximately $4,200,000.

This would leave a specific death benefit payout of approximately $11,800,000 with no interest payable. We will wait until Universitas files its appeal on a timely basis to decide whether Universitas gets paid anything at all. However, if you continue on your present course, the math will be even simpler and Universitas' appeal will be summarily denied.

Now let me address some of the other reckless and baseless statements contained in your letter:

1. Of course the November 11, 2008 Settlement Agreement is illegal and improper. If it was not, Loeb would not have scrambled so quickly and so inefficiently to terminate it. And of course Loeb "must have lied" because you had to get people to sign by the October 2nd deadline. Who are you kidding? If you knew the Settlement Agreement was illegal, your client would not have entered into it in the first place. If you thought we were wrong, you would not have scrambled so quickly to revoke the agreement. If Loeb had not lied about the Settlement Agreement being revoked, you would not have been forced to scramble to have it notarized on the day of the Plan's October 2nd deadline which, by the way, you missed because the Plan did not receive the termination agreement until October 5, 2009.

2

**Universitas Supplemental Appendix - 075**



BENISTAR

6. Similarly, to your <u>second</u> point under paragraph 5 of your November 10 letter, you state that "the Trust is the sole owner and beneficiary of the policies; Universitas is the sole beneficiary under the Plan and Trust and absolutely entitled to the benefits." Have you already forgotten that Universitas has had its claim denied in full? And instead of filing a timely appeal as you should have done, you send an insulting letter in a vain attempt to threaten the Plan rather than exhaust your administrative remedies under the Plan, as is required by Connecticut law, the Second Circuit, and the Supreme Court.

7. Also, why would the Plan or Grist Mill Capital have any obligation to share anything with you, your firm, or Universitas?

8. Since you state that the fact that Grist Mill Capital has provided all of the funds to purchase and maintain the policies under the Plan is "irrelevant," and you end your letter with a demand for $30,000,000 plus interest, and that the money be set aside and held in "a separate, interest-bearing account and will not be commingled with any other funds until the matter is fully resolved between the parties" (emphasis in original), we consider that to be threatened litigation against the Plan and yet one more reason for not paying anything to your client.

9. In fact, you would be wise to contact your malpractice carrier and have them pay the $30,000,000 that you demand for your client, as Universitas will likely not receive a dime from the Plan due to Loeb's illegal, unethical, inappropriate, and unprofessional conduct.

10. And, of course, just as Universitas does not want to waive any of its rights or remedies, neither does the Plan. That being said, please explain to your client that just by sending this extremely insulting and inappropriate letter, instead of a well thought out and timely appeal of the denial of benefits, Loeb has given the Plan every reason to summarily reject the appeal just on the basis of your letter. Furthermore, if your client was to bring an arbitration claim and lose, it would owe the Plan all of its legal fees and expenses.

In light of the foregoing, please govern yourselves accordingly. If we do not receive a well thought out professional appeal by 5:00 p.m., Tuesday, December 1, 2009, we will assume that your client does not wish to follow the terms of the Plan and thereby forfeit all of its limited rights and claims to any benefits under the Plan.

4

**Universitas Supplemental Appendix - 076**



Of course, the Plan continues to expressly reserve all of its rights in this matter.

Sincerely,

Jack E. Robinson
General Counsel

5

AMERICAN ARBITRATION ASSOCIATION

| | | |
|---|---|---|
| UNIVERSITAS EDUCATION, LLC, | ) | NO. 13 195 Y 001558 10 |
| | ) | |
| Claimant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| NOVA GROUP, INC., | ) | |
| | ) | |
| Respondent. | ) | NOVEMBER 30, 2010 |

PLAINTIFF'S EXHIBIT Robinse 4

## DECLARATION OF JACK E. ROBINSON

JACK E. ROBINSON, being duly sworn, declares as follows:

1.      I am an authorized representative of respondent Nova Group, Inc. ("Nova"), am over the age of eighteen, and believe in the obligation of an oath.

2.      I submit this declaration on my personal knowledge and in response to the Order dated November 24, 2010.

3.      Nova is the Sponsor, Named Fiduciary, Named Trustee, and Administrator of the Charter Oak Trust Welfare Benefit Plan (the "Plan").

4.      I am familiar with the Plan's operations, assets, liabilities and financial condition, and state that the Plan has the current ability to satisfy a judgment of $30 million.

5.      However, I am also familiar with facts and documents which show that there is no need for the representation contained in Paragraph 4 above because claimant Universitas Education, LLC ("Universitas") is not entitled to **any** benefits under the Plan.

6.      In further support of the representation contained in Paragraph 5 above, I am familiar with and have personal knowledge of the following:

1

**Universitas Supplemental Appendix - 078**

(a)     the purpose, development, design and commencement of the Plan in October 2006;

(b)     the involvement of Grist Mill Capital, LLC ("GMC") with respect to funding premiums paid by the Plan;

(c)     the participation in the Plan by Mr. Sash A. Spencer ("Spencer") and his selection of a $20 million Death Benefit instead of a $50 million Death Benefit on the Plan Adoption Agreement that he signed on March 19, 2007;

(d)     Mr. Spencer's agreements with GMC regarding the funding of certain policies on his life for his participation in the Plan;

(e)     the erroneous and unauthorized distribution by insurance brokers of an early draft of a plan document in December 2006 and the completion of the official Plan document in January 2007;

(f)     Mr. Spencer's designation of Universitas first as his *revocable* and then later as his *irrevocable* beneficiary under the Plan;

(g)     Mr. Spencer's misrepresentations to the Plan and Lincoln National Life Insurance Company ("Lincoln") with respect to his intentions to use the Plan to engage in a prohibited life settlement transaction, the true nature of Universitas, and the use to which Universitas was to  put any benefits received from the Plan;

(h)     Mr. Spencer's unexpected death in June 2008;

(i)     the numerous communications and discussions (including threats of litigation), from literally a few days after Mr. Spencer's death in June 2008 until the commencement of this arbitration by Universitas two years later in June 2010, between and among Nova, the Plan, Mr. Spencer's widow, Universitas, Mr. Spencer's employer

**Universitas Supplemental Appendix - 079**

Holding Capital Group, Inc. ("Holding Capital"), insurance broker Bruce Mactas ("Mactas"), and their respective legal and financial advisors;

(j)      the facts that notwithstanding all of the aforementioned communications and discussions, that Universitas was represented by counsel at all relevant times, and that Universitas had a copy of the Plan document in its possession at all relevant times, Universitas did not file a claim for benefits under the Plan until **several months after** the claims deadline had expired, and only after it had been instructed several times to do so by Nova;

(k)      the draft July 2008 agreement whereby Universitas expressed its intention to disclaim **all** Plan benefits in return for a $5 million charitable contribution by Mr. Spencer's widow;

(l)      the illicit and unlawful November 2008 settlement agreement whereby Holding Capital and Mactas were to receive illegal distributions of Plan benefits;

(m)      the back-dated September 2009 "Termination Agreement" whereby the illegal distributions described in Paragraph 6(l) above were allegedly rescinded;

(n)      Nova's denial of Universitas' claim for benefits under the Plan;

(o)      the facts that Universitas filed an appeal of the denial of its claim for Plan benefits with the wrong person at the wrong address and, as a result, the appeal was not received by Nova until **two weeks after** the deadline for filing an appeal had expired;

(p)      Universitas' multiple threats of litigation against the Plan in violation of the Plan's provisions – both before and during this arbitration;

(q)      Nova's denial of Universitas' appeal of the denial of its claim for Plan benefits;

**Universitas Supplemental Appendix - 080**

(r)     Nova's discovery after the arbitration had commenced that Holding Capital had changed its structure and, notwithstanding the Termination Agreement, retains an expectancy to receive illegal distributions of Plan benefits; and

(s)     the facts that had Mr. Spencer not died unexpectedly but had lived to consummate his oral agreement with GMC later in 2008, Universitas would have received a total payment of $1.8 million and GMC would have received ownership of the Lincoln insurance policies on Mr. Spencer's life.

7.     Unbeknownst to Nova at the time, in December 2006, Mr. Spencer and Mactas planned to engage in a prohibited life settlement transaction by using the Plan to obtain **$50 million** in life insurance on Mr. Spencer's life and, after the two-year contestability period expired on the life insurance policies in December 2008, terminate Mr. Spencer's participation in the Plan, acquire ownership of the policies, and then sell the policies in the secondary market for a total profit to Mr. Spencer and Mactas of between $10 million and $14 million (see Exhibit 1).

8.     Although Mactas caused Mr. Spencer to execute various Plan documents in December 2006, the final Plan documents executed by Mr. Spencer on March 19, 2007 automatically superseded and replaced all prior Plan documents (not only because they were executed later in time but because the Plan Documents executed in December 2006 were drafts).  This is evidenced by the new Adoption Agreement executed by Mr. Spencer on March 19, 2007 whereby Mr. Spencer, **in his own handwriting**, crossed out the initial $50 million Death Benefit that he and Mactas had envisioned in December 2006 and, instead, selected a **$20 million Death Benefit** (see Exhibit 2).

4

**Universitas Supplemental Appendix - 081**

9.      Further evidence of Mr. Spencer selecting a $20 million Death Benefit instead of a $50 million (or $30 million) Death Benefit is found in Exhibit 3, where Mr. Spencer **again in his own handwriting** crossed out the $50 million Death Benefit and instead wrote "$20 MILION[sic]."

10.      Thus, the maximum potential Death Benefit in this case is not $30 million as claimed by Universitas but rather $20 million as chosen by Mr. Spencer, **in his own handwriting**, on two separate occasions.

11.      Although the total Death Benefit is $20 million, the Plan obtained insurance coverage on Mr. Spencer's life in the amount of $30 million by virtue of an earlier $10 million policy taken out by the Plan in December 2006.  It is not unusual for the Plan to "overfund" its contingent liability if, as and when it has the opportunity to do so in order to provide more funding to the Plan, and especially when there is no up-front "cost" to the insured to acquire the insurance coverage.

12.      Since GMC provided **all** of the money to obtain the insurance coverage on Mr. Spencer's life (a fact which Universitas concedes), Mr. Spencer, Mactas and Mr. Daniel E. Carpenter (on behalf of GMC) executed a Disclosure, Acknowledgement & Certification Agreement dated March 19, 2007 describing how the net Death Benefit would be calculated (see Exhibit 4).  The calculation according to that agreement, **using the draft version of the Plan document that does *NOT* include the 80% pay-out provision in Plan § 6.01**, is as follows:

5

**Universitas Supplemental Appendix - 082**

I have not been involved in any discussion about the possible sale or assignment of this policy as an inducement to purchase the life insurance policy for sale at a later date.

(see Exhibit 5).

17.     Clearly, Exhibit 1 shows that both Mr. Spencer and Mactas made material misrepresentations to the Plan and Lincoln with respect to their intention to defraud the Plan and Lincoln by engaging in a prohibited life settlement transaction. Due to these material misrepresentations (along with the other reasons made clear in Nova's denial of the Universitas claim and appeal), Universitas is entitled to nothing under the Plan.

18.     However, even assuming Universitas were entitled to something, Universitas itself expressed its intention in July 2008 to disclaim all benefits under the Plan in return for a $5 million charitable contribution from Mr. Spencer's widow (see Exhibit 6). Thus, rather than $30 million, $20 million, $15 million, or $11 million, Universitas is entitled to no more than $5 million – assuming it is entitled to anything at all.

19.     However, in May 2008, around the same time that he changed his designation of Universitas from being a revocable to an *irrevocable* beneficiary (see Exhibit 7), Mr. Spencer entered into an oral agreement with GMC whereby GMC would acquire the Lincoln policies from the Plan for six percent (6%) of their face value (6% of $30 million = $1.8 million), Mr. Spencer would terminate his participation in the Plan, and GMC would pay Universitas the $1.8 million. This oral agreement was consummated in April-May 2008, and the change in the beneficiary designation was a result of that agreement.

20.     In June 2008, one month after the oral agreement with GMC had been consummated and before it could be reduced to writing, Mr. Spencer unfortunately passed away.

21.     Thus, rather than $30 million, $20 million, $15 million, $11 million, or even $5 million, had Mr. Spencer not died in June 2008, the maximum that Universitas would have received is $1.8 million – assuming it is entitled to anything at all.

Pursuant to 28 U.S.C. § 1746(2), I declare under penalty of perjury that the foregoing is true and correct.  Executed on the 30th day of November, 2010.

_____
JACK E. ROBINSON

9

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNIVERSITAS EDUCATION, LLC, <br><br> Plaintiff, <br><br> v. <br><br> JACK E. ROBINSON, III a/k/a JACK E. ROBINSON, <br><br> Defendant, | Civil Action No. <br> 1:15-CV-11848 (DPW) |

## STATUS REPORT OF THE PARTIES

This Status Report is submitted in accordance with the Order of this Court dated April 7, 2017 [Docket No. 112], extending the fact discovery deadline to August 14, 2017, and instructing parties to file a Status Report on August 14, 2017.

### A.    Discovery Status

#### 1.    Universitas' Subpoenas to BASI

BASI provided administrative services to the Charter Oak Trust and Nova Group, Inc., in connection with the policies which were the subject of Universitas' claims against charter Oak Trust and Nova.  On March 7, 2017, Universitas served BASI with a subpoena *duces tecum*, for production of documents (Robinson had informed Universitas that he no longer has possession or control of many documents sought by Universitas from Robinson).   On March 20, 2017, Daniel Carpenter brought a proceeding in the United States District Court for the Southern District of New York ("**SDNY**"), the Rule 45 "Compliance Court," seeking to quash Universitas' Subpoena to BASI (the "**Carpenter Motion to Quash Action**").  The Motion to Quash claimed that documents in the possession of BASI were subject to Carpenter's claimed attorney-client privilege.  On April 12, 2017, the SDNY transferred the Carpenter action to this Court,[1] which

---

[1] The Carpenter Motion to Quash Action is case 1:17-mc-91110-DPW.

on May 25, 2017, referred the Motion to Quash to Magistrate Judge Boal.  After granting a

continuance to Robinson, Magistrate Judge Boal entered an Order on July 18, 2017 [Carpenter

Motion to Quash Action, Docket No. 28].  BASI refuses to produce documents until there has

been a ruling on Carpenter's Objection.

    **2.**       **<u>Ridgewood Finance, Inc</u>.**

Universitas served a subpoena *duces tecum* on Ridgewood Finance, Inc. and certain

affiliates ("**Ridgewood**"), which provided financing to Grist Mill Capital, a Carpenter controlled

entity, for payment of premiums due on life insurance policies held by the Charter Oak Trust,

which Ridgewood claimed to be in default.  Robinson, while representing, *inter alia*, Grist Mill

Capital, had various negotiations and communications with Ridgewood.  Ridgewood requested a

confidentiality agreement among Ridgewood, Universitas, and Robinson, prior to producing

documents.  Universitas agreed but Robinson declines to execute the proposed confidentiality

agreement. As such, Ridgewood has not yet produced the requested documents to Universitas.

    **3.**       **<u>Other Discovery Matters</u>.**

Universitas served subpoenas on several entities and persons who provided services to

members of the alleged "Carpenter Criminal Enterprise" (Complaint, ¶ 7).  Some documents

have been produced, as have privilege logs, which will likely be the subject of motion practice.

The parties have also consulted regarding the claimed inadequacies of their respective document

responses and interrogatory answers, but have not resolved their disagreements on those issues.

    **4.**       **<u>Robinson's Position on Discovery Pending Resolution of his Motion to Compel Arbitration</u>.**

On May 31, 2017, Robinson filed a Motion to Compel Arbitration (<u>see</u> item 6, below).

On June 14, 2017, Robinson moved to continue the hearings before Judge Boal in the Carpenter

Motion to Quash Action and a second miscellaneous case related to a Rule 45 subpoena in this

case, requesting an indefinite continuance due to the filing of his Motion to Compel Arbitration. Robinson has informed Universitas that he objects to any discovery until his Motion to Compel Arbitration has been resolved.

     5.     **Universitas' Requested Discovery Extension**.

     In the near future, Universitas will file a motion seeking to extend the fact discovery deadline to December 14, 2017. Robinson will oppose the Motion.

**B.**     **Motion Status**

     6.     **Pending Motions**.

     On May 31, 2017, Robinson filed a motion to dismiss for lack of subject matter jurisdiction, to compel arbitration and to stay all other proceedings and discovery [Docket No. 113]. On June 21, 2017, Robinson filed a motion to file a reply brief in support [Docket No. 120]. Universitas has opposed both motions [Docket Nos. 118, 119, 121].

     On August 4, 2017, Universitas filed a motion for Rule 11 sanctions against Robinson and Attorney Marcus for having filed the Motion to Compel Arbitration [Docket Nos. 123, 124, 125.] On August 11, 2017, Robinson and Attorney Marcus opposed the sanctions motion as being sanctionable itself [Docket No. 126].

JACK E. ROBINSON,

By his Attorneys,


/s/ Seth L. Marcus
Seth L. Marcus, Esq.
The Law Offices of Seth L. Marcus
777 Westchester Avenue, Suite 101
White Plains, NY 10604
(212) 686-2555
Seth@slmarcuslaw.com
Admitted *pro hac vice*

UNIVERSITAS EDUCATION, LLC,

By its Attorneys,
RIEMER & BRAUNSTEIN LLP

By: /s/ Paul S. Samson_____
     Paul S. Samson, Esq., BBO No. 440160
     Alissa A. Poynor, Esq., BBO No. 664077
     Three Center Plaza
     Boston, Massachusetts 02108
     (617) 880-3555
     psamson@riemerlaw.com
     apoynor@riemerlaw.com

**Universitas Supplemental Appendix - 087**

-and-

Paula K. Colbath, Esq. (admitted *pro hac vice*)
Leily Lashkari, Esq. (admitted *pro hac vice*)
LOEB & LOEB LLP
345 Park Avenue
New York, New York 10017
(212) 407-4905
pcolbath@loeb.com
llaskari@loeb.com
*Attorneys for Plaintiff Universitas Education, LLC*

## CERTIFICATE OF SERVICE

I, Paul S. Samson, hereby certify that the foregoing Status Report of the Parties filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and that paper copies will be sent by first-class mail to those indicated and non-registered participants, if any, on August 14, 2017.

*/s/ Paul S. Samson*
Paul S. Samson

2178031.2
2178229.1

1

2          UNITED STATES DISTRICT COURT

3        FOR THE DISTRICT OF MASSACHUSETTS

4    -----------------------------------x

5    UNIVERSITAS EDUCATION, LLC,

6                        Plaintiff,

7    v.                        Civil Action No.

                             1:15-cv-11848-DPW

8    JACK E. ROBINSON, III a/k/a

9    JACK E. ROBINSON,

10                       Defendant.

11   -----------------------------------x

12

13            DEPOSITION OF MAXINE NOVAK

14              Bonita Springs, Florida

15              Thursday, July 25, 2019

16

17

18

19

20

21

22   Reported by:

23   DONALD R. DePEW, RPR, CRR, FPR

24   JOB NO. 164779

25



**Page 2**

July 25, 2019
10:05 a.m.

Deposition of MAXINE NOVAK, held at the law offices of Henderson, Franklin, Starnes & Holt, P.A., 3451 Bonita Bay Boulevard, Bonita Springs, Florida, before Donald R. DePew, a Registered Professional Reporter, Certified Realtime Reporter, Florida Professional Reporter, and Notary Public of the State of Florida at Large.

**Page 3**

A P P E A R A N C E S:
LAW OFFICES OF JOSEPH L. MANSON III
Attorneys for Plaintiff
   600 Cameron Street
   Alexandria, Virginia 22314
BY:  JOSEPH MANSON III, ESQ.
   JOSEPH KARAM, ESQ.

LAW OFFICE OF LANA SULLIVAN
Attorney for Witness
   233 Needham Street
   Newton, Massachusetts 02464
BY:  LANA SULLIVAN, ESQ.

**Page 4**

Maxine Novak
M A X I N E  N O V A K,    called as a witness, having been duly sworn by the Notary Public, was examined and testified as follows:
EXAMINATION BY
MR. MANSON:
   Q.   Ms. Novak, my name is Joe Manson and I have my associate, Joe Karam, with me.
   We represent Universitas Education, LLC, which is the plaintiff in a lawsuit against Jack E. Robinson, III, also known as Jack E. Robinson, defendant, in the United States District Court for the District of Massachusetts, Case No. 1:15-cv-11848.
   And you are represented by counsel today?
   A.  I am.
   MR. MANSON:  And would you like to enter your appearance, please.
   MS. SULLIVAN:  Sure.  For the record, Lana Sullivan for Ms. Novak.
   And I just wanted to note that we delivered Bates numbered documents.  They're NOV 1 through NOV 1387 today in response to the subpoena that was served on Ms. Novak

**Page 5**

Maxine Novak
along with her response.
   And also there are about six, I believe, bound volumes for inspection and copying.
   And can we agree that Ms. Novak has 30 days from the date of receipt of the transcript to read and sign, waive the requirement to the notary?
   MR. MANSON:  Yes.
   MS. SULLIVAN:  Okay, great.  Thank you.
   Q.   Ms. Novak, have you had your deposition taken before?
   A.   Yes, as an expert witness.
   Q.   And how many times have you been deposed?
   A.   Just once.
   Q.   And what was that matter?
   A.   I don't remember the name of the matter.  I was -- I had done a title search on a commercial property and they just wanted me to back up what I had -- work I had done.
   Q.   Can you give me your educational background and the schools you attended starting

**Universitas Supplemental Appendix - 090**

Page 6

Maxine Novak

1
2  with high school.
3      A.  Darien High School, Darien,
4  Connecticut.  I did one year at UConn Stamford
5  branch.  I have an associate's degree from
6  Strayer Junior College in Washington, D.C. as a
7  legal secretary.  And I have an associate and
8  science degree as a paralegal at Norwalk
9  Community College, Norwalk, Connecticut.
10     Q.  I'd like you to trace your employment
11 history starting after you received your
12 associate degree at Strayer.
13     A.  I worked for Covington & Burling in
14 Washington, D.C.
15     Q.  And what was your position at
16 Covington?
17     A.  A legal secretary.
18     Q.  How long did you work for them?
19     A.  Maybe two years.
20     Q.  And after Covington?
21     A.  I moved back to Connecticut.  I worked
22 for Durey & Pierson, D-u-r-e-y, a law firm in
23 Stamford, Connecticut.
24     Q.  As a legal secretary?
25     A.  Yes.

Page 7

Maxine Novak

1
2      Q.  And how long did you work for them?
3      A.  A few years.  I'm not sure how long it
4  was.
5      Q.  Okay.  What was next?
6      A.  I worked as an administrative
7  assistant for a corporation in Greenwich I'm
8  trying to remember the name of.  They did like
9  inventions and stuff, venture capital.
10     Q.  And after that?
11     A.  After that I went to -- after that I
12 think I went to Cummings & Lockwood in Greenwich
13 as a legal secretary.
14     Q.  How long did you work for Cummings &
15 Lockwood?
16     A.  A couple of years.  I left for
17 maternity leaves.
18         MR. MANSON:  I couldn't hear it.
19         (Record read.)
20     Q.  Did you reenter the workforce after
21 maternity leave?
22     A.  I did.
23         I owned an exercise studio in
24 Westport, Connecticut, a franchise.
25     Q.  What year was that?

Page 8

Maxine Novak

1
2      A.  My daughter was born in '73 --
3  actually it was before I went to do that I typed
4  transcripts for depositions at home.  So she was
5  born in '73, so maybe a couple of years after
6  that I went to the -- and then I went back to
7  the legal field as a paralegal.
8      Q.  And for whom did you work as a
9  paralegal at that time?
10     A.  Herbert Blake, a single attorney.
11     Q.  Where was that?
12     A.  In Stamford.
13     Q.  And after Mr. Blake what was next?
14     A.  Self employment as a title searcher.
15     Q.  Was that also in Stamford?
16     A.  Yes.
17     Q.  And how long did you work as a title
18 searcher at that time?
19     A.  I still am, the present.
20     Q.  Do you have an office?
21     A.  In my house.
22     Q.  And what's the address of your house?
23     A.  28552 Longford, L-o-n-g-f-o-r-d,
24 Court, Bonita Springs, Florida.
25     Q.  Do you own any other real estate

Page 9

Maxine Novak

1
2  either directly or through any other entity that
3  you own?
4      A.  I do.
5      Q.  And please describe that real estate,
6  please.
7      A.  I own a condo in Bonita Springs.
8      Q.  What's the address of that?
9      A.  I know it's unit 4712 on Bridgetown
10 Court.  I don't remember the number of the
11 house.
12     Q.  Is that rented out now?
13     A.  For another couple of weeks, yeah.
14         They're leaving because the golf fees
15 went up.
16     Q.  And when it's vacated in a couple of
17 weeks will you attempt to rent it again?
18     A.  Yes.
19     Q.  Okay.  In addition to that property
20 are there any other properties that you own
21 either directly or through any other entity that
22 you have ownership interest in?
23     A.  I have an ownership interest in
24 Shadow Ridge Properties II, which at the moment
25 owns two units and one is being foreclosed on

Page 10

Maxine Novak

1
2  next week.
3      Q.   And what's the address of the unit
4  that you will continue to own that's not being
5  foreclosed on?
6      A.   I don't know the number it's at,
7  22nd Street in Naples.
8      Q.   Is it 4201 22nd Avenue Southwest?
9      A.   Yes.
10     Q.   Have you been married before?
11     A.   Yes, I have.
12     Q.   How many times?
13     A.   Just once.
14     Q.   What was the name of your spouse?
15     A.   William Novak.
16     Q.   Is he still living?
17     A.   No, he died 20 years ago.
18     Q.   He died 20 years ago?
19     A.   Uh-huh.
20     Q.   When did you meet Jack Robinson?
21     A.   2001.
22     Q.   And how did you meet him?
23     A.   Just out with friends.
24     Q.   Did Mr. Robinson ever use your
25  services professionally to search titles?

Page 11

Maxine Novak

1
2      A.   Yeah, actually he did a couple of
3  times.
4           He never paid, but...
5      Q.   Did he pay you or not?
6      A.   No, he didn't.
7      Q.   And where did you meet him the first
8  time?
9      A.   At a restaurant in Stamford.
10     Q.   Who introduced you?
11     A.   We just met.  We weren't introduced by
12  anybody.
13     Q.   You said you met him through friends,
14  what friends?
15     A.   Just girlfriends that I was out for
16  the evening with.
17     Q.   Oh, I see.
18          So you were out with a group of your
19  friends and you met him at that time?
20     A.   Right.  Yeah.
21          It was a waterfront restaurant and it
22  was the night before the Fourth of July so a
23  group of us went there to watch the fireworks.
24     Q.   All right.  After the initial meeting
25  when did you next have any contact with

Page 12

Maxine Novak

1
2  Mr. Robinson?
3      A.   We talked on the phone and, you know,
4  I was going away for a long weekend, he was away
5  somewhere.  So I think we maybe went to dinner a
6  couple of weeks after we met.
7      Q.   And was that also in Stamford?
8      A.   Uh-huh.
9      Q.   You have to say, yes.
10     A.   Yes, I'm sorry.  Yes.
11     Q.   When you first met Mr. Robinson did he
12  tell you where he worked?
13     A.   He may not have told me like right
14  away.  I knew he was an attorney.
15     Q.   So after you went out to dinner a
16  couple of weeks later when was the next time
17  that you saw Mr. Robinson, or did you begin to
18  start seeing each other?
19     A.   We probably starting seeing each
20  other, yeah.
21     Q.   And did there come a time when you and
22  Mr. Robinson started living together?
23     A.   He started staying with me, I don't
24  remember when.
25          My mother-in-law lived with me.

Page 13

Maxine Novak

1
2      Q.   And Mr. Robinson you said started
3  staying with you around what time?
4      A.   Maybe a -- I don't know.
5          My mother-in-law lived with me until
6  she ended up going to a nursing home.  So, you
7  know, that would have been several months at
8  least, yeah.
9      Q.   So did he not move in until she moved
10 to the nursing home?
11          I'm just trying to understand --
12     A.   He just used that -- yeah.  I mean he
13 didn't -- it's not like he had an apartment that
14 he moved out of, you know, he just --
15     Q.   Right.
16          He just started staying with you?
17     A.   He just started staying there, yeah,
18 when he was in Connecticut.
19     Q.   And what was the address of the place
20 where he was staying at that time with you?
21     A.   136 Shadow Ridge Road, Stamford.
22     Q.   Did there come a time when you and
23 Mr. Robinson did start living together as
24 opposed to just having him stay over?
25     A.   Well, he was away a lot.  He was away,

Page 14

Maxine Novak

1 you know, in Massachusetts a lot. So he just
2 stayed over with me when he was in, you know,
3 Connecticut.
4 Q. He actually had an office in
5 Connecticut, didn't he?
6 A. Yes.
7 Q. So when he was working out of the
8 offices in Connecticut would he normally stay
9 with you?
10 A. Yes.
11 Q. Did he have a place in Massachusetts?
12 A. When he went to Massachusetts that
13 time he stayed at his father's house in Boston.
14 Q. So the time period now would be what,
15 2003, '4, that time period?
16 A. Yeah, 2002, '3, you know, probably
17 2003, maybe.
18 Q. Did there come a time when he and his
19 father became estranged?
20 A. I don't know.
21 I mean I never met his father. He
22 stayed at his father's house and he helped his
23 father sell his house and then his father passed
24 away.
25

Page 15

Maxine Novak

1 Q. At the time of his father's death did
2 he and Jack have any type of relationship?
3 A. I don't really know.
4 I mean Jack doesn't talk -- didn't
5 talk about things.
6 Q. Are you aware of a business deal that
7 Jack was involved in with his father that led to
8 a problem between the two of them?
9 A. No, I don't. I don't know.
10 Q. Did Jack have a law firm in addition
11 to working for some companies?
12 A. No, not way back then.
13 Q. At any point did he have a law firm?
14 A. He formed one in Massachusetts a
15 couple of years ago.
16 Q. A couple of years ago?
17 A. Well, a couple of years before he died
18 or a year before he died, something like that.
19 Not too long.
20 Q. What was the name of that firm, do you
21 know?
22 A. Leyden and Main.
23 Q. There was no Mr. Leyden in the firm
24 was there?
25

Page 16

Maxine Novak

1 A. No.
2 Those were street names, I think.
3 Q. Was that where the office was located?
4 A. Yes, it was in an old post office that
5 had been redone for offices and stuff and it was
6 right on the street where -- when they have the
7 next centennial or something it will go through
8 there. And that was his big thing about having
9 the office where it was.
10 Q. Did you ever meet Dan Carpenter?
11 A. I met him at the funeral and many
12 years ago I met -- I was introduced to him in a
13 snowy parking lot up in Simsbury when I was
14 dropping Jack off and I was going to go
15 shopping.
16 Q. Other than those two times have you --
17 A. The only times.
18 Q. Have you spoken to him on the phone?
19 A. No.
20 Q. Have you ever e-mailed him or
21 corresponded with him?
22 A. No.
23 Q. Did Jack talk about him from time to
24 time?
25

Page 17

Maxine Novak

1 A. Maybe as friends, you know, when he
2 was going up to Simsbury.
3 Q. Did you know if they were ever law
4 partners?
5 A. I didn't know Dan was a lawyer.
6 Q. Did Jack ever advise you that
7 Mr. Carpenter was convicted of a crime and sent
8 to jail?
9 A. Yes, but no details.
10 Q. Well, tell me as best you can recall
11 what he told you, even if you don't recall any
12 specific details about the reason.
13 A. I think I knew that he was doing
14 something to help defend Dan, but I didn't know
15 any of the details of what he was being charged
16 with or by.
17 Q. Did Jack ever mention whether or not
18 it was difficult for him to work with
19 Mr. Carpenter?
20 A. No.
21 Q. Did you ever wonder if Jack was, in
22 fact, murdered as opposed to dying naturally?
23 MS. SULLIVAN: Objection.
24 A. He died naturally.
25

Page 18

Maxine Novak

1
2    Q.   Did you have any participation in the
3    decision as to whether or not to do an autopsy
4    of his body?
5        A.   They did.
6        Q.   They did an autopsy?
7        A.   Yes, because he was young enough to
8    not, you know, assume natural.
9        Q.   And did you see the results of that
10   autopsy?
11       A.   I did not see them.
12       Q.   Were you told about them?
13       A.   Yes.
14       Q.   And what were you told?
15       A.   He had an aortic dissection.
16       Q.   Did he have a history of any heart
17   problems before he died?
18       A.   No.
19       Q.   And you have never been contacted by
20   any U.S. attorney or prosecutor about the
21   potential death of Mr. Robinson; is that
22   correct?
23       A.   No.  No.
24       Q.   Where was Mr. Robinson when he died?
25       A.   He was in Duxbury, Massachusetts.

Page 19

Maxine Novak

1
2        Q.   And where were you?
3        A.   Here in Florida.
4        Q.   And how did you learn that he died?
5        A.   The day before he died I had -- he had
6    called me and told me that he was sick.  He
7    thought he had food poisoning maybe and that he
8    had pulled a muscle on his back or something.
9    So he had spent a rough night being sick and
10   being in pain.
11       And he was supposed to be in court --
12   that was on a Sunday, I think.  He was supposed
13   to be in court the next morning in Connecticut
14   and he was going to call and postpone his
15   hearing so he could see a -- you know, come
16   home, come back to Florida to see a doctor.
17       The next day, on Monday, his mother
18   called me and asked if I had heard from him,
19   that she had been trying to call him and was not
20   reaching him.  And she called a neighbor and
21   asked him to go next door and he said there was
22   a rental car in the driveway, but he rang the
23   bell and knocked on the door and there was no
24   answer.  So his mother called the local police
25   department and asked them -- gave them

Page 20

Maxine Novak

1
2    permission to break the lock or whatever in
3    order to get into the house to check on him.
4        Q.   Did you go to Massachusetts after you
5    heard the news?
6        A.   Yes, I went up with his mother and two
7    cousins.
8        Q.   And what were the names of the
9    cousins?
10       A.   Eileen Heathington and Cicely.
11   I'm not sure of Cicely's last name.
12       Q.   If I could focus your attention on the
13   time between 2008 and 2010, during that time
14   where were you living?
15       A.   In Connecticut.
16       Q.   Did you help Jack with any paralegal
17   or secretarial duties for his law firm?
18       A.   No.
19       Q.   In the time that you knew Jack --
20   let's start at around 2008 -- were you aware of
21   him taking any trips out of the country?
22       A.   No.
23       Q.   Were you aware of him having any
24   dealings with any banks in Panama?
25       A.   No.

Page 21

Maxine Novak

1
2        Q.   Were you aware of him having any
3    dealings with any banks in the British Virgin
4    Islands?
5        A.   No.
6        Q.   Did there come a time when you learned
7    that $30 million approximately was stolen from
8    Universitas?
9        A.   No.
10       Q.   What understanding, if any, did you
11   have about Mr. Carpenter's business?
12       A.   Nothing.
13       Q.   Do you know where Jack's business
14   records are kept -- were kept?
15       MS. SULLIVAN:  Objection.
16       MR. MANSON:  You may answer.
17       A.   Only what was in his will.
18       Q.   When did you see a copy of the will
19   for the first time?
20       A.   After he died.
21       Q.   Did you file an application or contact
22   the insurance company after he died with respect
23   to the policies that Shadow Ridge was
24   beneficiary of?
25       A.   Yes.

Page 22

Maxine Novak

1
2    Q.   And did you contact the insurance
3    company with respect to any policies that you
4    were the beneficiary of?
5    A.   There was -- there was nothing for me
6    individually.
7    Q.   And you gave several affidavits in
8    this proceeding, did you not?
9    A.   Uh-huh.  Yes.
10   Q.   And I believe in one of your
11   affidavits you said there were three insurance
12   policies on Jack's life where Shadow Ridge was a
13   beneficiary, is that so?
14   A.   Yes.
15   Q.   And what were the coverage amounts
16   that were paid for those three policies to
17   Shadow Ridge?
18   A.   There were two for 500,000 each and
19   one for a million.
20   Q.   So a total of 2 million was paid to
21   Shadow Ridge?
22   A.   Less, you know, he had a loan out on
23   one of them.
24   Q.   So what was the net amount that was
25   paid?

Page 23

Maxine Novak

1
2    A.   Approximately maybe a million 9.
3    Q.   A million 9?
4    A.   Yes.
5    Q.   When Shadow Ridge Properties -- I'll
6    call it I -- was formed did you have any
7    ownership interest in it at the beginning?
8    A.   Yes.  Yes.
9    Q.   And what was your ownership interest
10   at the beginning?
11   A.   Fifty percent.
12   Q.   At the time Shadow Ridge Properties
13   was founded how much capital did you invest in
14   Shadow Ridge Properties?
15   A.   I -- we founded it for the purpose of
16   buying a condominium to use in Florida.  And I
17   took out a home equity loan on my house and paid
18   for the condominium.
19   Q.   So I understand it you and Jack
20   founded Shadow Ridge Properties to acquire a
21   home for the two of you to live in in Florida;
22   is that correct?
23   A.   Just -- yeah.
24        Well, we'd just go on the weekends,
25   you know, long weekends.

Page 24

Maxine Novak

1
2    Q.   And what was the address of that
3    property?
4    A.   Trafalgar Square in Naples.
5    Q.   Was it unit 201, 1510 Trafalgar Lane?
6    A.   That's probably -- it sounds right.
7    Q.   How much was the home equity loan that
8    you took out in order to purchase that property
9    through Shadow Ridge?
10   A.   200,000.
11   Q.   And what was the address of your home
12   that was the security for the home equity loan
13   at that time?
14   A.   The Shadow Ridge property.
15   Q.   How much cash did Jack put into
16   Shadow Ridge at that time?
17   A.   He didn't.
18   Q.   So 200,000 was the total amount that
19   was used --
20   A.   No.
21        I just -- I took out a $200,000 home
22   equity, but the condo was 132,000.
23   Q.   And what happened to the excess?
24   A.   It stayed in my home equity -- I mean,
25   you know, just to draw on when I needed it.

Page 25

Maxine Novak

1
2    Q.   With respect to the $1.9 million of
3    insurance proceeds on Jack's life where Shadow
4    Ridge was the beneficiary, was that money paid
5    into a Shadow Ridge bank account by the
6    insurance company?
7    A.   Yes.  Yes.
8    Q.   And what bank was that?
9    A.   SunTrust.
10   Q.   Under the terms of Jack's will it
11   provides that the insurance proceeds in Shadow
12   Ridge would be divided 50/50 by you and his mom;
13   is that right?
14   A.   That's not the way...
15   Q.   Okay.  Tell me, show me the way it is.
16   A.   She would get his 50 percent interest.
17   Q.   In the company?
18   A.   Right.
19   Q.   But you paid --
20        Did you pay her 50 percent of the
21   1.9 million?
22   A.   After expenses, yes.
23   Q.   And what expenses were deducted?
24   A.   Well, there was no money in Shadow
25   Ridge Properties when Jack died and there were

Page 26

Maxine Novak

1
2  debts and expenses to pay.
3      Q.   How much were those debts and expenses
4  roughly?
5      A.   Roughly between 20, $25,000.
6      Q.   Okay.  So let's just say 20,000.
7           So each of you received roughly
8  940,000?
9      A.   Nine something, yeah, roughly.
10      Q.   And was there a check that you
11  prepared to Mrs. Granderson from the Shadow
12  Ridge bank account at SunTrust?
13      A.   Yes.
14      Q.   For her share of the insurance
15  proceeds?
16      A.   Yeah.  Yes.
17      Q.   And did you prepare a check to
18  yourself from Shadow Ridge for the remainder of
19  the insurance proceeds?
20      A.   Yes.
21      Q.   Your counsel described a group of
22  documents that she brought to us in response to
23  the subpoena.
24           Did you hear her when she did that?
25      A.   Yes.

Page 27

Maxine Novak

1
2      Q.   And would you tell me how those
3  documents were selected by you.
4           MS. SULLIVAN:  Objection.
5      Q.   Well, I want to know where --
6           Let me strike that.
7      A.   Okay.
8      Q.   From what files were these documents
9  produced?
10           MS. SULLIVAN:  Can you give them to
11  her so she can go through them.
12      Q.   I just wanted to know generally what
13  the process was that you went through in order
14  to comply with the subpoena.  That's all I'm
15  asking.
16      A.   Okay.
17           MS. SULLIVAN:  Do you need to see them
18  to --
19           THE WITNESS:  No.
20      A.   You asked for my bank statements and
21  my business bank statements?
22      Q.   Yes.
23      A.   I only could get them online back to
24  2014.  And rather than go through a whole thing
25  with the bank to get prior ones, I thought it

Page 28

Maxine Novak

1
2  was easier since I have Quicken to just print
3  out my check register from 2009 to 2013 for both
4  my personal and my business.
5           MS. SULLIVAN:  Clarify what your
6  business is, though, so they know.
7           THE WITNESS:  Okay.
8      A.   My business is Shadow Ridge Searching,
9  which is my title insurance -- yeah, title
10  searching business.
11      Q.   Ms. Novak, I'm going to put before you
12  a copy of your first affidavit in support of a
13  motion to quash the subpoena and for a
14  protective order, which we'll mark as Novak 1.
15           (Novak Exhibit 1, Four-page document
16           entitled Affidavit of Non-Party Maxine Novak
17           in Support of Motion to quash Subpoena and
18           for a Protective Order, marked for
19           identification, as of this date.)
20           (Witness looks at document.)
21      Q.   If you'll look at paragraph 4 of your
22  affidavit, which has been marked as Exhibit 1,
23  the second sentence says, "Upon Mr. Robinson's
24  death, his family did not probate his estate
25  because it was insolvent and there were no

Page 29

Maxine Novak

1
2  assets."
3           Do you see that?
4      A.   Yes.
5      Q.   And who told you that the family did
6  not probate the estate?
7      A.   I guess his mother.
8      Q.   Was his mother the personal
9  representative of his estate?
10      A.   In the will.
11      Q.   The answer is, yes?
12           MS. SULLIVAN:  Object to form.
13      A.   She was never...
14      Q.   Well, explain, you can explain.
15      A.   He appointed -- he specified in his
16  will that his mother would be a personal
17  representative, but since it wasn't probated she
18  was not appointed by the court.
19      Q.   Do you know if she filed the will with
20  the court?
21      A.   She filed the will with the court in
22  Florida.
23      Q.   And how did you know that, did you
24  help her?
25      A.   No.

Page 30

Maxine Novak

1
2     And I did not know that. I didn't
3  even think she was going to do that, and maybe
4  in something that I got.
5          MS. SULLIVAN: If you learned facts
6  from me, don't disclose them. If you
7  learned them independently, that's fine.
8          THE WITNESS: Okay.
9          MR. MANSON: I don't want to know
10  anything that you and your counsel talked
11  about.
12     Q.   But just if you learned it from --
13     A.   Yeah, I'm not sure how I learned that
14  she did that. I think she just sort of gave it
15  to them and said you do what you want.
16     Q.   Now was Ms. Granderson represented by
17  counsel to your knowledge at that time?
18     A.   Only at the time that she was served
19  with a subpoena.
20     Q.   Sorry. I'm talking about the time
21  that she filed the will with the probate court
22  in Florida.
23          Do you know if she had a lawyer at
24  that time that helped her do that?
25     A.   I don't know.

Page 31

Maxine Novak

1
2     Q.   Have you heard of a lawyer by the name
3  of Jeraldine Williams-Shaw?
4     A.   I've seen her name on papers.
5     Q.   Papers in this case?
6     A.   Right.
7     Q.   But other than seeing them in this
8  case did you have any knowledge of whether or
9  not she represented Ms. Granderson with respect
10  to the will of Mr. Robinson?
11     A.   No.
12          MR. MANSON: I neglected to say in the
13  beginning that if for any reason you need a
14  break, just let me know and we'll
15  accommodate you.
16     A.   Okay.
17     Q.   Did Shadow Ridge Properties I file an
18  income tax return for 2018?
19     A.   2018, yes.
20     Q.   And were the insurance proceeds
21  included in that income tax return?
22     A.   No.
23     Q.   Am I correct that you didn't receive
24  insurance proceeds until 2018?
25     A.   Right.

Page 32

Maxine Novak

1
2     Q.   Is that correct?
3     A.   Yes.
4     Q.   If you would look at paragraph 5 of
5  your affidavit where it says that you have "no
6  knowledge of or involvement in any of
7  Mr. Robinson's business or professional
8  affairs."
9          That statement should really say with
10  the exception of Shadow Ridge Properties, right,
11  because you had knowledge of his business
12  dealings at Shadow Ridge Properties?
13     A.   I did not have knowledge of the
14  financial aspect.
15          In other words, Jack was the managing
16  member, he did everything. I did not have any
17  involvement in the day-to-day financial affairs.
18     Q.   Well, but you were the 50 percent
19  owner, right?
20     A.   Yes.
21     Q.   And did you ever ask him for financial
22  reports, or tax returns, or anything?
23     A.   Well, I would get a K-1 at the end,
24  yeah, each year.
25     Q.   In paragraph 7 of your affidavit you

Page 33

Maxine Novak

1
2  mention that you met Don Trudeau once many years
3  ago.
4          Do you see that?
5     A.   Yes.
6     Q.   Could you tell me the circumstances
7  around that meeting.
8     A.   It wasn't a meeting. Jack and I had
9  dinner with Don and his wife.
10          Dan.
11     Q.   I'm sorry.
12     A.   I get it mixed up between Don and Dan.
13  Don, yes.
14     Q.   Well, you understood that Jack worked
15  with Don?
16     A.   Yes.
17     Q.   And aside from that dinner do you
18  recall any other times that you saw or met with
19  them?
20     A.   We bumped into them at the movies one
21  time.
22     Q.   And do you recall approximately what
23  year that would have been?
24     A.   No.
25     Q.   Did Jack ever mention Don Trudeau in

**Universitas Supplemental Appendix - 097**

Page 34

Maxine Novak

1
2  any conversations he had with you about his
3  work?
4      A.  No.
5      Q.  In paragraph 9 you say that you're
6  aware that "Mr. Robinson once worked for a
7  company that had Benistar in its name."  It's
8  paragraph 9 of Exhibit 1.
9          What do you recall Mr. Robinson
10  telling you about Benistar?
11     A.  He worked for them I think as general
12  counsel, that's all I know.
13     Q.  Now you testified you received a K-1
14  for Shadow Ridge Properties I for every year
15  that the entity filed its tax returns; is that
16  correct?
17     A.  Right.
18     Q.  And did you ever receive a K-1 that
19  showed income, a gain as opposed to a loss
20  during any of those years?
21     A.  No, they were all losses.
22     Q.  In paragraph 11 of your affidavit you
23  talk about your establishing Shadow Ridge
24  Properties II in order to wind down the business
25  and submit final tax returns.

Page 35

Maxine Novak

1
2  Do you see that?
3      A.  Yes, I do.
4      Q.  So has Shadow Ridge Properties, LLC
5  officially been wound down now?
6      A.  Yes.
7      Q.  It's out of existence now?
8      A.  Yes.
9      Q.  Are you the exclusive owner of Shadow
10  Ridge Properties II?
11     A.  Yes.
12     Q.  You are aware that Mr. Robinson ran
13  for the United States Senate in the Republican
14  primary in Massachusetts?
15     A.  Yes.
16     Q.  And I believe in one of your
17  affidavits you stated that you made a loan to
18  him for that campaign; is that correct?
19     A.  Yes.
20     Q.  How much did you loan him?
21     A.  22,000.
22     Q.  Ms. Novak, I'm going to show you now
23  your supplemental affidavit that was submitted
24  in support of your motion to quash the subpoena.
25         MR. MANSON:  And we'll ask the court

Page 36

Maxine Novak

1
2  reporter to mark this as Novak Exhibit 2.
3          (Novak Exhibit 2, Four-page document
4  entitled Supplemental Affidavit of Non-Party
5  Maxine Novak in Support of Motion to quash
6  Subpoena and for a Protective Order, marked
7  for identification, as of this date.)
8      Q.  If you look at the second page of the
9  affidavit, in the continuation of paragraph 3
10  you state that Ms. Granderson told you that "she
11  had chosen not to probate his estate because it
12  was insolvent and there were no assets."
13         Does that refresh your recollection
14  about a conversation you had with her about
15  whether or not she was going to probate the
16  estate?
17     A.  Yes.
18     Q.  And you believe you did have such a
19  conversation with her?
20     A.  Yes.
21     Q.  Now in the footnote of that same
22  paragraph, at the bottom of the page in
23  footnote 2 it provides that "Mr. Robinson did
24  not have any children when he died and he was
25  not married."

Page 37

Maxine Novak

1
2          Can you tell me what the basis is for
3  that statement, what your belief is.
4      A.  I believe that was because someone
5  asked about a child, whether or not he had any
6  children.
7      Q.  You saw a copy of an article from the
8  Boston Globe that I used in the deposition of
9  Mrs. Granderson, right?
10     A.  Yes.
11     Q.  In which he was quoted as saying he
12  had a 12-year-old son that was with the boy's
13  mother.
14     A.  Right.
15     Q.  But you have no basis of believing
16  that that was a true statement or an accurate
17  quote?
18     A.  When I read the article that statement
19  was right directly after he was talking about
20  his father, so I think he was talking about his
21  father.
22     Q.  He was talking about --
23     A.  His father having a child.
24     Q.  His father having a 12-year-old son?
25     A.  His father had an illegitimate child.

Page 38

Maxine Novak

1
2    Q.   His father had four children by four
3    different wives.  That's what the record in this
4    case shows, I'll just tell you that.
5         So you believe that there was
6    confusion in the quote and it was actually
7    talking about his dad, is that your testimony?
8    A.   Yes.
9    Q.   I don't know how to pronounce his name
10   so I'll ask you for help.
11        Who was the general manager of SRP?
12   A.   Ken?
13   Q.   Yeah.
14   A.   Tarczewski.
15   Q.   Can you spell Tarczewski for the
16   reporter or we can go to a break --
17   A.   T-a-r-c-z-e-w-s-k-i.  I believe that's
18   how it is spelled.
19   Q.   And when did he start working for
20   Shadow Ridge Properties?
21   A.   I don't know the year offhand, maybe
22   around 2011 or so.
23   Q.   Who made the decision to hire him?
24   A.   It was a fluke.
25   Q.   It was a fluke?

Page 39

Maxine Novak

1
2    A.   Yeah.
3    Q.   And what do you mean by that?
4    A.   We had a neighbor and Ken had worked
5    for her when he was younger.  And he moved to
6    Atlanta with his family and he was moving back
7    to Naples and they were staying with friends, he
8    and his wife.
9         And so they hadn't found a place to
10   live yet or a job and we had -- Shadow Ridge
11   Properties had a piece of property that was
12   vacant and needed some work done on it.  So it
13   was just one of those things where Jack said,
14   well, go live in the condo and do the work that
15   needs to be done.  And then it just sort of went
16   on from there.
17   Q.   How long did Ken work for Shadow Ridge
18   Properties?
19   A.   Probably till the end of maybe 2016
20   and then he -- as far as payroll.  And then I
21   think he went on as a sub because there was not
22   enough money to -- not enough properties and not
23   enough money to keep him on.
24   Q.   What was his salary before he was let
25   go?

Page 40

Maxine Novak

1
2    A.   I don't know.
3    Q.   You don't know?
4    A.   No.
5    Q.   In paragraph 4 of your supplemental
6    affidavit you mentioned that in checking
7    Collier County land records you found that
8    Jack had a large federal tax lien of some sort.
9         Do you see that?
10   A.   Yes.
11   Q.   How much was that lien?
12   A.   It was a couple hundred thousand
13   dollars.
14        Was it?
15        I can't see it here.
16   Q.   Oh, it's the fifth sentence.  It says,
17   "After Mr. Robinson's death, I discovered on the
18   Collier County land records that he had a large
19   federal tax lien of some sort."
20   A.   Yeah.  I think it was like 198.
21   Because I think when they do the lien they don't
22   add all the interest and penalties.  It's
23   probably just what, you know, the original
24   amount was.
25   Q.   To your knowledge has that lien ever

Page 41

Maxine Novak

1
2    been satisfied?
3    A.   It's never been satisfied.
4    Q.   A couple of sentences down in that
5    same paragraph where you state that Jack
6    borrowed money from you when he ran for office
7    in Massachusetts.  Then you go on to say that
8    you believe he may have also borrowed money from
9    his mother as well for that run or earlier runs.
10        Do you see that?
11   A.   Yes.
12   Q.   Do you have any specific knowledge of
13   any loans that she made to him?
14   A.   That was just a guess.
15   Q.   So you don't know how much, if any,
16   she loaned?
17   A.   Right, I have no idea.
18   Q.   How many cars did Jack have when he
19   died?
20   A.   He had two, but his mother used one of
21   them in Mass -- when she was in Massachusetts.
22   Q.   She is still driving?
23   A.   Yes, just not at night.
24        She had an accident at night so she
25   stopped driving at night, but she drives during

Page 42

Maxine Novak

1
2      the day.
3      Q.   At the end of paragraph 5 of your
4      supplemental affidavit -- it's actually on
5      page 3 in the affidavit -- you say that
6      "Mr. Robinson also paid some personal expenses
7      out of SRP income as payment for managing all of
8      SRP's" properties (sic).
9            What personal expenses did he pay out
10     of SRP?
11     A.   I probably was thinking about like car
12     expenses and credit card expenses.
13     Q.   Did he ask you for your agreement to
14     those payments or did he just make the payments
15     himself?
16     A.   He just made the payments.
17     Q.   Well, what happened to the property at
18     1344 Monarch Circle, Naples, Florida?
19     A.   It was foreclosed.
20     Q.   And when was that foreclosure?
21     A.   It was finalized in 2018.
22          It had been going on for a while.
23          MR. MANSON:  Why don't we take about a
24     ten or 15-minute break now and I'll take a
25     look at the documents.

Page 43

Maxine Novak

1
2      THE WITNESS:  Okay.
3      MS. SULLIVAN:  Okay.
4      (Recess taken.)
5      MR. MANSON:  The next document, which
6      I'll have marked as Novak Exhibit 3, is the
7      second supplemental affidavit that was
8      offered in this proceeding.
9            (Novak Exhibit 3, Three-page document
10     entitled Second Supplemental Affidavit of
11     Non-Party Maxine Novak in Support of Motion
12     to quash Subpoena and for a Protective
13     Order, marked for identification, as of this
14     date.)
15     Q.   Ms. Novak, how would you describe your
16     relationship with Mr. Robinson?
17          I mean were you boyfriend/girlfriend,
18     companion?
19          I don't know how exactly to state it.
20     A.   Probably over the years it probably
21     turned into more of a companionship.
22     Q.   But in the beginning you were dating?
23     A.   We were dating, yeah.
24     Q.   As it evolved into companionship are
25     you aware of any other women that he was dating?

Page 44

Maxine Novak

1
2      A.   No.
3      Q.   How often prior to his death would you
4      talk to or e-mail his mother?
5      A.   I never e-mailed his mother.  I don't
6      even know that --
7      Q.   She never had e-mail?
8      A.   I don't think she does e-mail.
9            I did not talk on the phone with her.
10     I met her back in the beginning.  And when we
11     were in Naples and she was in Sarasota we got
12     together a couple of times, like on Mother's
13     Day, to go out to dinner.
14     Q.   Are you aware if Ms. Granderson and/or
15     her husband filed for bankruptcy at any time?
16     A.   I don't know anything about their
17     personal affairs.
18     Q.   Are you aware if she was ever found to
19     have concealed assets from the collection of a
20     debt by a court?
21     A.   No.
22     Q.   During the time that you and
23     Mr. Robinson were partners in Shadow Ridge
24     Properties I, were you aware at all times of all
25     of the real estate holdings that were owned by

Page 45

Maxine Novak

1
2      the partnership?
3      A.   As he acquired them and little
4      anecdotes about them.  I never had, you know,
5      like a listing of what they were.
6      Q.   Okay.  And as a 50 percent owner of
7      the LLC you did not receive any regular updates
8      about the inventory of properties?
9      A.   No.
10          Just, you know, like I said, there
11     were just like an anecdote about what he, you
12     know, acquired, but I didn't have like a running
13     list of properties.
14     Q.   Explain to me what the general
15     business idea was behind Shadow Ridge
16     Properties.
17     A.   Actually when we bought the first
18     condo in 2004 and we were sitting there with the
19     real estate broker filling out the contract for
20     it and he wanted to know what name to put on the
21     title Jack thought it best that we put it in an
22     LLC.  And we didn't know what to name it, and I
23     lived on Shadow Ridge Road and so we decided to
24     call it Shadow Ridge Properties.
25     Q.   After you bought the first property

Page 46

Maxine Novak

1  did you then purchase other properties that were
2  in foreclosure?
3        A.   That one was not in foreclosure ever.
4        Q.   Right.  I understand.
5            But after that one, my question is
6  after that did you purchase some other
7  properties that were in foreclosure?
8        A.   Later on.
9        Q.   Okay.
10       A.   So it wasn't formed for the purpose of
11 doing that.
12       Q.   All right.  And what was the business
13 strategy of buying a property in foreclosure,
14 what was the idea in terms of how to make money
15 on that?
16       A.   I think the first time was just
17 somehow something he came across.  And he bought
18 a huge five bedroom house for $5,000 because it
19 was association -- it was only -- it was
20 association dues, HOA fees that were being
21 foreclosed, not mortgages.
22       Q.   So he got the house for 5,000?
23       A.   5,000, yeah.
24       Q.   It sounds like a good deal.

Page 47

Maxine Novak

1        A.   This and one of the other condos he
2  got for $100.
3        Q.   It also sounds like a good deal?
4        A.   It was a good deal.
5            We fixed -- you know, we fixed them up
6  to be -- because most of them were abandoned,
7  you know, and people take appliances and
8  lightbulbs and whatnot.
9            And then we rented them out and we
10 kept the HOA fees paid.  And the place -- I mean
11 one of the communities used to call him and ask
12 him to -- you know, this one is coming up for
13 foreclosure, you know, because we basically
14 cleaned up all of their delinquent HOA fees.
15       Q.   So then the idea would be you would
16 rent it out and the rent would service the
17 mortgage on the property?
18            I assume -- I shouldn't say that.
19            So would you assume the mortgage once
20 you bought it?
21       A.   No.  The mortgage was there, but it
22 was not assumed.
23       Q.   Okay.  So what about the rents that
24 were collected, did they go to pay the

Page 48

Maxine Novak

1  mortgage --
2        A.   No.
3        Q.   -- or did they go to you, Shadow
4  Ridge?
5        A.   No.  No, they went to --
6        Q.   Homeowners?
7        A.   The rent was paid to Shadow Ridge
8  Properties and out of that he paid, you know,
9  HOA fees and whatever fix-ups and whatever
10 repairs and stuff, you know, came in later.
11       Q.   Okay.  But I still don't understand
12 with respect to the mortgage what the effect
13 was of Shadow Ridge Properties buying property.
14            So you owe $5,000 -- the purposes are
15 all hypothetical -- the homeowner has failed to
16 pay the homeowners association, let's say $5,000
17 in the example you gave, so as a result of that
18 the homeowner is going to lose the title to the
19 property --
20       A.   Right.
21       Q.   -- and Shadow Ridge Properties will
22 get the title to the property.
23            Shadow Ridge Properties will pay off
24 the homeowner fees, that was part of the

Page 49

Maxine Novak

1  arrangement.
2        A.   That was the -- you know, that was his
3  bid, you know, at auction.
4        Q.   All right.  And then were these
5  properties vacant at the time or did they
6  normally have the former owners in them?
7        A.   The majority of them were vacant,
8  people had abandoned them.
9            The $100 one was tough because the
10 homeowner didn't even know he had been
11 foreclosed.  He was -- you know, it was back
12 when they were giving 100 percent mortgages, so,
13 you know, he had no equity in it.  And it wasn't
14 until, you know, Jack or whoever, you know,
15 knocked on the door and said I'm the new owner.
16            So he made, you know, an arrangement
17 for them to stay and he rented -- and then he
18 just collected rent from them, which they were
19 happy to do because the rent was less than they
20 were paying for the mortgage and the HOA fees
21 and real estate, et cetera.  So he was there for
22 years and when he finally moved out his cousin
23 moved in.  So that was, you know...
24       Q.   Okay.  So in that instance what

Page 50

Maxine Novak

1
2  happens to the mortgage?
3      A.  It just sits out there until the bank
4  decides to get around to foreclosing.
5      Q.  I see.
6      A.  And then when they were -- when all
7  this was -- you know, it was when the market had
8  gone down.
9      Q.  Yes.
10     A.  And at that time the banks didn't even
11 want to take title.  And we were maintaining the
12 house, we were paying the HOA fees, we were
13 taking care of it.
14         Then I would say maybe like around
15 2014 when the market got better then all of a
16 sudden the banks decided, okay, now we want the
17 house, then they would foreclose on the old
18 mortgage.
19     Q.  Okay.  I understand now.
20         I'm going to show you a copy of a 2016
21 partnership return for Shadow Ridge Properties,
22 LLC.
23         And when you get it in front of you
24 I'm going to direct your attention to a listing
25 of the eligible properties that are contained in

Page 51

Maxine Novak

1
2  the tax return that were shown as being marked
3  for safe harbor election.
4      A.  What is...
5          What do you mean?
6      Q.  Well, it doesn't matter what that
7  means for purposes of my questions.  I just want
8  to go through this list and see if you recognize
9  them as Shadow Ridge properties.
10     A.  Okay.
11     Q.  So the first one is of 1510 Trafalgar
12 Lane, unit 201, and that one we talked about
13 earlier today I think.
14     A.  Uh-huh.
15         MS. SULLIVAN:  Are you marking this?
16         MR. MANSON:  Yes, this will be Novak
17 Exhibit 4.
18         (Novak Exhibit 4, Multipage document
19 entitled 1065 U.S. Return of Partnership
20 Income, 2016, marked for identification, as
21 of this date.)
22         (Witness looks at document.)
23     Q.  So the first one listed is the
24 Trafalgar Lane property.
25         So what were the circumstances around

Page 52

Maxine Novak

1
2  the acquisition of that property, if you recall?
3      A.  That was one where I put up the cash
4  for it, which was actually a loan to Shadow
5  Ridge Properties.  We put a mortgage on the land
6  records, it's for Shadow Ridge Properties back
7  to me.
8      Q.  And who paid the loan?
9      A.  Jack refinanced the loan with the
10 bank.
11         He paid me back my initial 10 percent
12 deposit, but that's all.
13     Q.  The records show that in October of
14 2017 this property was transferred from Shadow
15 Ridge to Jack personally.
16         Why was that done?
17     A.  I don't know.  I know that he did it
18 because I notarized it, but I don't know his
19 reasoning behind that.
20         I think, you know, he might have been
21 trying to short sale it, but after I learned --
22 after he died and I learned that he had this big
23 federal tax lien I thought that was kind of
24 foolish to put it in his name, you know, but --
25 and that's -- when he refinanced it that's the

Page 53

Maxine Novak

1
2  mortgage that was being foreclosed.
3      Q.  All right.  What about the Houston,
4  Texas property?
5          It's the next one, 9547 Pagewood Lane,
6  Tanglewilde South.
7      A.  Jack worked for the airlines before --
8  I guess when he got out of law school and
9  business school down in Houston.  So I think
10 that was, you know, a condo that he bought to
11 live in while he was there.  And then when he
12 moved back north he kept it and rented it out.
13         And at some point -- because that was
14 in his name alone, but then at some point he put
15 it into Shadow Ridge Properties and then he sold
16 it in 2017.
17     Q.  And did that money come into Shadow
18 Ridge Properties, the proceeds of the sale?
19     A.  It came into Shadow Ridge and went out
20 to Jack.
21     Q.  Well, what about you?
22         Did you still have your loan
23 outstanding on the first property when that
24 happened?
25     A.  Yes.

Page 54

Maxine Novak

1
2  Q.   And was your loan ever paid back on
3  the first property?
4  A.   It was never paid back on the first
5  property.  So when the insurance proceeds came
6  back I talked to his mother and asked her, you
7  know, if it was okay to repay me that 119 from
8  the proceeds and she said that was okay.
9  Q.   Okay.  So that effectively was taken
10  out of the insurance money off the top?
11  A.   Right.
12  Q.   Before the split?
13  A.   Right.
14  Q.   And so you finally got paid back?
15  A.   Right.
16  Q.   How many years was that?
17  A.   Shocking, I know.  I never thought I
18  was going to get it.
19  Q.   Okay.  Let's look at the third one,
20  which is 15609 Marcello Circle, Milano, Naples.
21  What's the situation with that one?
22  A.   That is being foreclosed next week.
23  Q.   Okay.  And was that initially
24  purchased --
25  What were the circumstances of that

Page 55

Maxine Novak

1
2  original purchase?
3  A.   I don't recall.
4  Sometime -- when Jack was originally
5  bidding on the things, you know, at auction then
6  other investors sort of caught on to what he was
7  doing and then they were outbidding him.  So
8  some of the properties he would go to the owners
9  and say deed it over to me, you know, you're out
10  of it and he would pay the back dues to the
11  association.
12  But I don't know what the
13  circumstances were on that.
14  Q.   Okay.  The next one, 11499 Tanager
15  Court, Longshore, Naples, Florida.
16  What were the circumstances about that
17  acquisition?
18  A.   The same type of thing, you know,
19  either through bidding or purchasing on HOA and
20  then being foreclosed.
21  Q.   And how about 4201 22nd Avenue?
22  A.   That's the $100 one.
23  Q.   Yes.
24  A.   Okay.  That one I transferred to SRP
25  II in order to dissolve SRP.

Page 56

Maxine Novak

1
2  Q.   That's the one that still has some
3  value?
4  A.   It has no equity because of back
5  mortgages that haven't been paid in ten years,
6  so there's no way it can be sold.
7  Q.   Right.
8  But it's an income generating property
9  until the banks foreclose on the mortgage?
10  A.   Right.
11  Q.   Okay.  The next one, 1344 Monarch
12  Circle, that's...
13  A.   That's the one Jack purchased in his
14  name with 100 percent financing from the bank,
15  and that is the one that got foreclosed in early
16  2018.
17  Q.   Okay.  The next one, 10711 Fieldfair
18  Drive, Naples.
19  A.   The same thing.
20  Longshore was the one that we had it,
21  you know, he had purchased a bunch of them in
22  there since they were purchased the same way and
23  foreclosed.
24  Q.   These were all homeowner association
25  deals?

Page 57

Maxine Novak

1
2  A.   Yes.
3  Q.   And what about the rest of them, I
4  don't need to go one by one if they're all the
5  same.
6  A.   They're all the same.
7  Yes, and actually the accountant gave
8  me this list because she was going to be doing
9  the 2017 return.  And I went on Collier County
10  records to find out what their status was
11  because I really didn't know except for the two
12  properties were -- the two properties.
13  Q.   And that's where you found the tax
14  lien or was that a different --
15  A.   That's how I found the tax lien was
16  going through Collier County records.
17  So some of these had actually been
18  foreclosed by 2015.  So a couple of these
19  probably shouldn't have even been on the report
20  because they already had foreclosure.
21  But all of them -- the ones that I
22  just told you, all the rest of these are all
23  properties that were, you know, foreclosed by
24  the original banks.
25  Q.   If you turn over two pages in that tax

Page 58

Maxine Novak

1  report it shows that the beginning capital of
2  Shadow Ridge Properties was 451,324.
3       Do you see that?
4       A.   Uh-huh.
5       Q.   And how was that figure computed?
6       A.   I really don't know.  I mean I don't
7  know if that's the -- you know, the Monarch
8  property that Jack purchased by mortgages.
9  Other than that, I don't know.
10      Q.   And it says that there was -- well, it
11  says partner No. 1 and partner No. 2, which one
12  are you?
13      A.   I assume 2.
14      Q.   Okay.  So he is showing that his
15  capital was increased in 2016 by 191,906, and
16  how did that happen?
17      A.   I don't know.
18      Q.   And it shows yours was increased by
19  9500, but then it shows -- it had the
20  withdrawals.
21      The ending capital for you is 35,000,
22  do you see that?
23      A.   Right.
24      But I don't -- see I don't understand

Page 59

Maxine Novak

1  any of these figures.  I mean I did not draw a
2  check for $9,500.
3       Q.   No, I understand.
4       A.   So I don't know -- I'm at a loss as to
5  how this stuff was all figured out.
6       Q.   And then if you turn over to the next
7  page it shows "Non Deductible Life Insurance,
8  7,573."
9       Is that for the premiums on the
10  2 million insurance policies that we've talked
11  about, or do you know?
12      A.   And is this the page that...
13      Oh, it's the same one.
14      Q.   It's Schedule M-1.
15      A.   Oh, okay.  I see that at the top now.
16      So what was your question?
17      Q.   The question is what were those
18  premiums for?
19      A.   I assume the life insurance.
20      Q.   The life insurance -- the 2 million
21  that we've talked about?
22      A.   Right.
23      Q.   I don't think I need to make this as
24  an exhibit, but let me just show you.  This is a

Page 60

Maxine Novak

1  copy of the warranty deed made the 11th day of
2  August 2015 by Shadow Ridge Properties
3  transferring to Jack Berkshire Village -- a lot
4  in Berkshire Village and it shows you as being
5  the witness to that.
6       Is that your signature on the
7  document?
8       A.   Yes.
9       Q.   And do you recall that transaction?
10      A.   I don't recall it, but it was probably
11  one of the ones where he went back and forth.
12  So that's probably -- I don't know if that's
13  Monarch or Trafalgar, they were both in
14  Berkshire Village.
15      Q.   Okay.  And when you say back and
16  forth, transferring it from Shadow Ridge to him
17  personally and then back?
18      A.   Right.
19      Q.   Okay.  It just depended on certain
20  business ideas that he had that he didn't share
21  with you?
22      A.   Right.
23      Q.   Is that correct?
24      A.   Yes.

Page 61

Maxine Novak

1       Q.   And did you witness any other
2  transfers like this, do you recall?
3       A.   I may have if he was, you know, doing
4  those back and forth.
5       Q.   The residence on Shadow Ridge Road
6  in Stamford that you lived in, for at least a
7  time that was owned by Jennifer Cormier and
8  Victor Maso; is that right?
9       A.   I think those are the people I sold it
10  to.
11      Q.   Oh, those are the people you sold it
12  to.  Okay.
13      A.   Yes.
14      Q.   So you owned it and you sold it to
15  them?
16      A.   Yes.
17      Q.   And it says the purchase price was
18  $470,000.
19      Is that what you sold it for, do you
20  recall?
21      A.   That sounds right.
22      Q.   And you sold that in 2016, December of
23  2016?
24      A.   No.  I sold it in 2015, July of 2015.

Page 62

Maxine Novak

1
2  Q.  Okay.  Yeah, July 30 -- well, this
3  says purchase date July 30th, 2015.
4  A.  Yes.
5  Q.  Besides Shadow Ridge Properties were
6  you a partner in any other business ventures
7  with Jack?
8  A.  No.
9  Q.  Did you know his first cousin, Cissy?
10  A.  I met her when we went up for the
11  funeral.
12  Q.  Had you met her before that?
13  A.  No.
14  Q.  Do you remember what her job is for
15  work, who she works for or what she does?
16  A.  I'm not sure.
17  For some reason I think she works for
18  Pepsi, but I don't know that for sure.
19  Q.  And did you also meet his first
20  cousin, Eileen?
21  You mentioned her before,
22  Eileen Heathington.
23  A.  Yes.
24  Q.  Had you met her before the funeral?
25  A.  I may have met her many years ago with

Page 63

Maxine Novak

1
2  a family gathering that I went to in Sarasota.
3  Q.  But you didn't have any ongoing
4  relationship with her during that period?
5  A.  No, no.
6  Q.  Did you have any dealings with any
7  lawyers at the Naples or Fort Myers office of
8  Roetzel, R-o-e-t-z-e-l, and Andress?
9  A.  No.
10  Q.  Did Shadow Ridge Properties also own
11  some time shares?
12  A.  I don't know if they were in Shadow --
13  they're in his will so I assume they're in his
14  name.  At the time that he got them I thought
15  that he was buying them as Shadow Ridge, but I
16  don't know for sure.
17  Q.  Okay.
18  A.  Those were also HOA foreclosures.
19  MR. MANSON:  The next exhibit, which
20  will be Novak 5, is a copy of the "Last Will
21  and Testament of Jack E. Robinson," dated
22  November 15, 2010.
23  (Novak Exhibit 5, Multipage document
24  entitled Last Will and Testament of Jack E.
25  Robinson, dated 11/15/10, marked for

Page 64

Maxine Novak

1
2  identification, as of this date.)
3  Q.  I'm going to ask you to turn to
4  paragraph 7, which is entitled "Timeshares owned
5  by Shadow Ridge Properties."
6  MR. KARAM:  On page 8 of 16.
7  MR. MANSON:  Paragraph 7.
8  (Witness looks at document.)
9  Q.  So what was the idea of purchasing
10  these time shares?
11  A.  I think they were just when he went to
12  the auctions.
13  Q.  And would these have been delinquent
14  in terms of the maintenance fees like --
15  A.  HOA, like an HOA fee.
16  Q.  Just like an HOA?
17  A.  Yeah.
18  Q.  And if you look at the list in
19  paragraph 7, which is found on page 8, do you
20  know if any of those were actually owned by
21  Shadow Ridge Properties?
22  A.  I don't know what the title was.
23  Q.  So you don't know whether the title is
24  in Shadow Ridge or Jack?
25  A.  Right.

Page 65

Maxine Novak

1
2  Q.  Do you know how many if any of those
3  are still outstanding?
4  A.  None.
5  Q.  None.
6  So how do you know that all of them
7  have been foreclosed on?
8  A.  I don't know that they've been
9  foreclosed on.  I think that he may have sold,
10  you know, a couple of them.
11  He mentioned one time that he just
12  deeded it back to the time share company because
13  in Florida you pay real estate taxes on time
14  shares.  So you not only have HOA fees to pay,
15  you've got real estate fees to pay.  He wasn't
16  paying them and they were probably, you know,
17  going to foreclose on what he hadn't paid.
18  Q.  But in Shadow Ridge Properties II
19  there are no time share investments, is that
20  true?
21  A.  Right, yeah.
22  Q.  If you look at paragraph 9 of the
23  will, which is found on page 9, I'm going to
24  direct your attention to his stock in NatTel,
25  LLC.

Page 66

Maxine Novak

1
2     What, if anything, do you know about
3  that asset?
4        A.   Nothing.
5        Q.   Did he tell you that Dan Carpenter
6  went to jail at any point?
7        A.   Yes.
8        Q.   Did he tell you he went to jail --
9        Did he give a reason as to what he
10  went to jail for?
11        A.   No.
12        Q.   Did he have any communications with
13  Carpenter when he was in jail, to your
14  knowledge?
15        A.   I have no idea.
16        Q.   Do you know if there was ever any
17  resolution of the litigation filed by NatTel
18  against SAC Capital?
19        A.   I don't know.
20        Q.   If you look at paragraph 12 of his
21  will, which is also found on page 12, there's a
22  reference to a charitable bequest to Northfield
23  Mount Hermon school.
24        Do you see that?
25        A.   Yes.

Page 67

Maxine Novak

1
2        Q.   Do you know if that bequest was ever
3  made in whole or in part?
4        A.   No.
5        Q.   You don't know or it wasn't made, do
6  you know?
7        A.   Were they paid?
8        Q.   Were they paid anything?
9        A.   No.
10        Q.   So they were not paid?
11        A.   They were not paid.
12        Q.   Okay.  I'd like to direct your
13  attention next to page 14 of the will and
14  paragraph 18.
15        The first case listed is Robinson
16  versus Bank of New York Mellon Corp.
17        Do you know if that case was resolved?
18        A.   I don't know anything about it.
19        Q.   How about the second case, Deutsche
20  Bank National Trust versus Robinson?
21        That's a foreclosure case it says.
22        A.   I'm sort of -- you know, that might be
23  the Monarch, but I don't know that.
24        Q.   Okay.  The next document I'd like to
25  show you is a check from Shadow Ridge Properties

Page 68

Maxine Novak

1
2  LLC to Lillian Granderson E&L Realty.
3        MR. MANSON:  We'll mark this as Novak
4  Exhibit 6.
5        (Novak Exhibit 6, Copy of check from
6  Shadow Ridge Properties LLC to Lillian
7  Granderson E&L Realty, dated 12/11/17,
8  marked for identification, as of this date.)
9        (Witness looks at document.)
10        Q.   Have you seen this document before?
11        A.   I haven't seen the copy of the check.
12        Q.   Have you seen the real check?
13        A.   No, I haven't seen the real check.
14        Q.   Were you aware that this payment
15  was made by Shadow Ridge Properties to
16  Lillian Granderson E&L Realty?
17        A.   It wasn't made by Shadow Ridge
18  Properties.
19        After Jack died I was trying to find
20  out -- there were only two properties left and I
21  was trying to find out where the rent payments
22  were going.  And I think they got paid to a
23  company that took them in and then sent them --
24  transferred them to Shadow Ridge.
25        So I went to Chase -- because they

Page 69

Maxine Novak

1
2  hadn't come to SunTrust, so I went to Chase to
3  see if they had gone there.  And when I saw
4  someone at Chase and I asked what the balance of
5  the account was they told me it was $6.  So I
6  said, you know, I thought that an $800 check had
7  gone -- you know, transferred into the bank.
8  And the young man that was helping me told me
9  about this check for 2991 to Jack's mom or
10  the -- you know, her realty company.  And then
11  he got all upset that he told me about it, told
12  me he wasn't supposed to tell me, but anyway I
13  don't know...
14        I'm, you know, assuming that when his
15  mom went to Chase to check on his personal
16  accounts that maybe this account came up and for
17  some reason they gave her all the money in the
18  account.
19        Q.   Even though it was a Shadow Ridge
20  account?
21        A.   Uh-huh.
22        Q.   Yes?
23        A.   Yes.
24        Q.   And then this money would have been
25  monies collected on a Shadow Ridge property or

Page 70

Maxine Novak

2 properties?
3     A.   Well, he collected rental for her on a
4 piece of property she owned in Sarasota, a
5 family property.  And then he would send -- then
6 he would, you know -- apparently I'm only
7 learning from looking at the statement -- then
8 he would send her that money.  So maybe she told
9 him -- told Chase that the money was supposed to
10 go to her.
11     Q.   But it looks like the money was
12 supposed to go to Shadow Ridge Properties.
13     A.   It was in Shadow Ridge Properties, so
14 it was -- the money was in the Shadow Ridge
15 account and they drew it out as a bank check and
16 gave it to her.
17          MR. MANSON:  It might be a new case
18     for you against Chase.
19     Q.   Do you know if Lillian Granderson
20 has any kind of real estate company called
21 E&L Realty?
22     A.   You know, I don't know.
23          And when I looked at it I thought,
24 well, E and L could be Eileen or Lillian.  But,
25 you know, like I said she has a house in

Page 71

Maxine Novak

2 Sarasota that was a family owned -- or something
3 that she owned for a long time.  And Jack's
4 uncle lived in it until he died and then when
5 his uncle died they, you know, started renting
6 the house out.  So I think Jack was just helping
7 her by getting -- you know, collecting the rent
8 and then sending it to her.
9          MR. MANSON:  Off the record.
10          (Discussion off the record.)
11          (Recess taken.)
12          MR. MANSON:  Back on the record.
13          We've completed our examination of
14     Ms. Novak.  But based on her testimony and
15     our inspection of the documents that were
16     produced at the deposition there are a few
17     documents that we still need.  We don't
18     anticipate any need to recall Ms. Novak to
19     ask her questions about the documents.
20          Those documents would be the insurance
21     policies on the life of Jack Robinson where
22     the beneficiary was Shadow Ridge Properties.
23     The receipt of the bank receipt for the
24     funds of the proceeds paid by the insurance
25     company.  A copy of the check or checks

Page 72

Maxine Novak

2 issued by the insurance company paying the
3 proceeds to Shadow Ridge Properties.  And
4 the checks issued by Shadow Ridge Properties
5 to Ms. Novak and Ms. Granderson disbursing
6 the proceeds of the policy net of expenses.
7          MS. SULLIVAN:  Okay.  Yes, we didn't
8     understand any of those documents to the
9     extent they exist to be responsive to the
10     subpoena.
11          But if you wouldn't mind articulating
12     again and she can tell you if she has them.
13     She obviously has some of them, but I don't
14     know what she does and does not.
15          MR. MANSON:  Could you read it back,
16     please.
17          (Record read.)
18          MS. SULLIVAN:  What, if any, of those
19     documents do you have?
20          And I guess it would have been in
21     2018?
22          THE WITNESS:  2018.
23          I know I made copies of the
24     Transamerica checks.  I would imagine I
25     have the Mass Mutual, I have to just look

Page 73

2 for it.  And then copies of checks to
3 Mrs. Granderson and myself.
4          MS. SULLIVAN:  Okay.  We can get you
5     those items and then we'll be done.
6          MR. MANSON:  I guess there is one more
7     thing just to close the loop.  It would be
8     the submission of the claim, Ms. Novak said
9     she made the claim advising the carriers of
10     his death.  So if we can have a copy of
11     those documents, too, if you still have
12     them.
13          MS. SULLIVAN:  Okay.
14          MR. MANSON:  That's it.
15          MS. SULLIVAN:  Okay.  Great.
16          Well, thank you.
17          (Time noted:  1:15 p.m.)
18
19          _____
20          MAXINE NOVAK
21 Subscribed and sworn to before me
22 this _____ day of _____, 2019.
23
24 _____    _____
25 (Notary Public)       My Commission Expires:

**Universitas Supplemental Appendix - 107**

Page 74

```
 1
 2            C E R T I F I C A T E
 3   STATE OF FLORIDA  )
 4                     : ss.
 5   COUNTY OF LEE     )
 6
 7        I, DONALD R. DePEW, a Registered
 8   Professional Reporter, Certified Realtime
 9   Reporter, Florida Professional Reporter, and
10   Notary Public within and for the State of
11   Florida at Large, do hereby certify:
12        That MAXINE NOVAK, the witness whose
13   deposition is hereinbefore set forth, was duly
14   sworn by me and that such deposition is a true
15   record of the testimony given by the witness.
16        I further certify that I am not related
17   to any of the parties to this action by blood or
18   marriage, and that I am in no way interested in
19   the outcome of this matter.
20        IN WITNESS WHEREOF, I have hereunto set
21   my hand this 6th day of August, 2019.
22
23        _____
24        DONALD R. DePEW, RPR, CRR, FPR
25
```

Page 75

```
 1
 2   ---------------I N D E X--------------------
 3   WITNESS      EXAMINATION BY        PAGE
 4   MAXINE NOVAK      Mr. Manson        4
 5
     ------------------NOVAK EXHIBITS----------------
 6
     EXHIBIT               PAGE LINE
 7
 8   Exhibit 1
     Four-page document entitled Affidavit......28  15
 9   of Non-Party Maxine Novak in Support of
     Motion to quash Subpoena and for a
10   Protective Order
11   Exhibit 2
12   Four-page document entitled Supplemental...36   3
     Affidavit of Non-Party Maxine Novak in
13   Support of Motion to quash Subpoena and
     for a Protective Order
14
15   Exhibit 3
     Three-page document entitled Second........43   9
16   Supplemental Affidavit of Non-Party
     Maxine Novak in Support of Motion to
17   quash Subpoena and for a Protective Order
18   Exhibit 4
19   Multipage document entitled 1065 U.S.......51  19
     Return of Partnership Income, 2016
20
21   Exhibit 5
     Multipage document entitled Last Will......63  24
22   and Testament of Jack E. Robinson,
     dated 11/15/10
23
24   Exhibit 6
     Copy of check from Shadow Ridge............68   6
25   Properties LLC to Lillian Granderson
```

Page 76

```
 1   NAME OF CASE:
 2   DATE OF DEPOSITION:
 3   NAME OF WITNESS:
 4   Reason Codes:
 5     1. To clarify the record.
 6     2. To conform to the facts.
 7     3. To correct transcription errors.
 8   Page _____ Line _____ Reason _____
 9   From _____ to _____
10   Page _____ Line _____ Reason _____
11   From _____ to _____
12   Page _____ Line _____ Reason _____
13   From _____ to _____
14   Page _____ Line _____ Reason _____
15   From _____ to _____
16   Page _____ Line _____ Reason _____
17   From _____ to _____
18   Page _____ Line _____ Reason _____
19   From _____ to _____
20   Page _____ Line _____ Reason _____
21   From _____ to _____
22   Page _____ Line _____ Reason _____
23   From _____ to _____
24
25        _____
```

Page  1

**A**

**$1.9 (1)**
25:2
**$100 (3)**
47:3 49:10 55:22
**$200,000 (1)**
24:21
**$25,000 (1)**
26:5
**$30 (1)**
21:7
**$470,000 (1)**
61:19
**$5,000 (3)**
46:19 48:15,17
**$6 (1)**
69:5
**$800 (1)**
69:6
**$9,500 (1)**
59:3
**a.m (1)**
2:6
**a/k/a (1)**
1:8
**abandoned (2)**
47:7 49:9
**accident (1)**
41:24
**accommodate (1)**
31:15
**account (7)**
25:5 26:12 69:5,16,18
69:20 70:15
**accountant (1)**
57:7
**accounts (1)**
69:16
**accurate (1)**
37:16
**acquire (1)**
23:20
**acquired (2)**
45:3,12
**acquisition (2)**
52:2 55:17
**action (2)**
1:7 74:17
**add (1)**
40:22
**addition (2)**
9:19 15:11
**address (6)**
8:22 9:8 10:3 13:19
24:2,11
**administrative (1)**

7:6
**advise (1)**
17:7
**advising (1)**
73:9
**affairs (3)**
32:8,17 44:17
**affidavit (17)**
28:12,16,22 32:5,25
34:22 35:23 36:4,9
40:6 42:4,5 43:7,10
75:8,12,16
**affidavits (3)**
22:7,11 35:17
**ago (7)**
10:17,18 15:16,17
16:13 33:3 62:25
**agree (1)**
5:6
**agreement (1)**
42:13
**airlines (1)**
53:7
**Alexandria (1)**
3:6
**amount (3)**
22:24 24:18 40:24
**amounts (1)**
22:15
**and/or (1)**
44:14
**Andress (1)**
63:8
**anecdote (1)**
45:11
**anecdotes (1)**
45:4
**answer (3)**
19:24 21:16 29:11
**anticipate (1)**
71:18
**anybody (1)**
11:12
**anyway (1)**
69:12
**aortic (1)**
18:15
**apartment (1)**
13:13
**apparently (1)**
70:6
**appearance (1)**
4:19
**appliances (1)**
47:8
**application (1)**

21:21
**appointed (2)**
29:15,18
**approximately (3)**
21:7 23:2 33:22
**arrangement (2)**
49:2,17
**article (2)**
37:7,18
**articulating (1)**
72:11
**aside (1)**
33:17
**asked (7)**
19:18,21,25 27:20
37:5 54:6 69:4
**asking (1)**
27:15
**aspect (1)**
32:14
**asset (1)**
66:3
**assets (3)**
29:2 36:12 44:19
**assistant (1)**
7:7
**associate (3)**
4:8 6:7,12
**associate's (1)**
6:5
**association (5)**
46:20,21 48:17 55:11
56:24
**assume (6)**
18:8 47:19,20 58:14
59:20 63:13
**assumed (1)**
47:23
**assuming (1)**
69:14
**Atlanta (1)**
39:6
**attempt (1)**
9:17
**attended (1)**
5:25
**attention (4)**
20:12 50:24 65:24
67:13
**attorney (4)**
3:11 8:10 12:14 18:20
**Attorneys (1)**
3:4
**auction (2)**
49:4 55:5
**auctions (1)**

64:12
**August (2)**
60:3 74:21
**autopsy (3)**
18:3,6,10
**Avenue (2)**
10:8 55:21
**aware (11)**
15:7 20:20,23 21:2
34:6 35:12 43:25
44:14,18,24 68:14

**B**

**back (26)**
5:23 6:21 8:6 15:13
19:8,16 27:23 39:6
44:10 49:12 52:6,11
53:12 54:2,4,6,14
55:10 56:4 60:12,16
60:18 61:5 65:12
71:12 72:15
**background (1)**
5:25
**balance (1)**
69:4
**bank (14)**
25:5,8 26:12 27:20,21
27:25 50:3 52:10
56:14 67:16,20 69:7
70:15 71:23
**bankruptcy (1)**
44:15
**banks (6)**
20:24 21:3 50:10,16
56:9 57:24
**based (1)**
71:14
**basically (1)**
47:14
**basis (2)**
37:2,15
**Bates (1)**
4:23
**Bay (1)**
2:12
**bedroom (1)**
46:19
**beginning (6)**
23:7,10 31:13 43:22
44:10 58:2
**belief (1)**
37:3
**believe (8)**
5:4 22:10 35:16 36:18
37:4 38:5,17 41:8
**believing (1)**

37:15
**bell (1)**
19:23
**beneficiary (5)**
21:24 22:4,13 25:4
71:22
**Benistar (2)**
34:7,10
**bequest (2)**
66:22 67:2
**Berkshire (3)**
60:4,5,15
**best (2)**
17:11 45:21
**better (1)**
50:15
**bid (1)**
49:4
**bidding (2)**
55:5,19
**big (2)**
16:9 52:22
**Blake (2)**
8:10,13
**blood (1)**
74:17
**body (1)**
18:4
**Bonita (5)**
1:14 2:12,13 8:24 9:7
**born (2)**
8:2,5
**borrowed (2)**
41:6,8
**Boston (2)**
14:14 37:8
**bottom (1)**
36:22
**bought (5)**
45:17,25 46:18 47:21
53:10
**Boulevard (1)**
2:13
**bound (1)**
5:4
**boy's (1)**
37:12
**boyfriend/girlfrien...**
43:17
**branch (1)**
6:5
**break (4)**
20:2 31:14 38:16
42:24
**Bridgetown (1)**
9:9

**Universitas Supplemental Appendix - 109**

**British (1)**
21:3
**broker (1)**
45:19
**brought (1)**
26:22
**bumped (1)**
33:20
**bunch (1)**
56:21
**Burling (1)**
6:13
**business (16)**
15:7 21:11,13 27:21
28:4,6,8,10 32:7,11
34:24 45:15 46:13
53:9 60:21 62:6
**buying (4)**
23:16 46:14 48:14
63:15

**C**

**C (3)**
3:2 74:2,2
**call (5)**
19:14,19 23:6 45:24
47:12
**called (6)**
4:2 19:6,18,20,24
70:20
**Cameron (1)**
3:5
**campaign (1)**
35:18
**capital (6)**
7:9 23:13 58:2,16,22
66:18
**car (2)**
19:22 42:11
**card (1)**
42:12
**care (1)**
50:13
**Carpenter (5)**
16:11 17:8,20 66:5,13
**Carpenter's (1)**
21:11
**carriers (1)**
73:9
**cars (1)**
41:18
**case (10)**
4:14 31:5,8 38:4
67:15,17,19,21
70:17 76:1
**cash (2)**

24:15 52:3
**caught (1)**
55:6
**centennial (1)**
16:8
**certain (1)**
60:20
**Certified (2)**
2:15 74:8
**certify (2)**
74:11,16
**cetera (1)**
49:22
**charged (1)**
17:16
**charitable (1)**
66:22
**Chase (6)**
68:25 69:2,4,15 70:9
70:18
**check (16)**
20:3 26:10,17 28:3
59:3 67:25 68:5,11
68:12,13 69:6,9,15
70:15 71:25 75:24
**checking (1)**
40:6
**checks (4)**
71:25 72:4,24 73:2
**child (3)**
37:5,23,25
**children (3)**
36:24 37:6 38:2
**chosen (1)**
36:11
**Cicely (1)**
20:10
**Cicely's (1)**
20:11
**Circle (3)**
42:18 54:20 56:12
**circumstances (5)**
33:6 51:25 54:25
55:13,16
**Cissy (1)**
62:9
**Civil (1)**
1:7
**claim (2)**
73:8,9
**clarify (2)**
28:5 76:5
**cleaned (1)**
47:15
**close (1)**
73:7

**Codes (1)**
76:4
**collected (4)**
47:25 49:19 69:25
70:3
**collecting (1)**
71:7
**collection (1)**
44:19
**College (2)**
6:6,9
**Collier (4)**
40:7,18 57:9,16
**come (8)**
12:21 13:22 14:19
19:15,16 21:6 53:17
69:2
**coming (1)**
47:13
**commercial (1)**
5:22
**Commission (1)**
73:25
**communications (1)**
66:12
**communities (1)**
47:12
**Community (1)**
6:9
**companies (1)**
15:12
**companion (1)**
43:18
**companionship (2)**
43:21,24
**company (11)**
21:22 22:3 25:6,17
34:7 65:12 68:23
69:10 70:20 71:25
72:2
**completed (1)**
71:13
**comply (1)**
27:14
**computed (1)**
58:6
**concealed (1)**
44:19
**condo (5)**
9:7 24:22 39:14 45:18
53:10
**condominium (2)**
23:16,18
**condos (1)**
47:2
**conform (1)**

76:6
**confusion (1)**
38:6
**Connecticut (11)**
6:4,9,21,23 7:24
13:18 14:4,6,9
19:13 20:15
**contact (3)**
11:25 21:21 22:2
**contacted (1)**
18:19
**contained (1)**
50:25
**continuation (1)**
36:9
**continue (1)**
10:4
**contract (1)**
45:19
**conversation (2)**
36:14,19
**conversations (1)**
34:2
**convicted (1)**
17:8
**copies (2)**
72:23 73:2
**copy (11)**
21:18 28:12 37:7
50:20 60:2 63:20
68:5,11 71:25 73:10
75:24
**copying (1)**
5:5
**Cormier (1)**
61:8
**Corp (1)**
67:16
**corporation (1)**
7:7
**correct (8)**
18:22 23:22 31:23
32:2 34:16 35:18
60:24 76:7
**corresponded (1)**
16:22
**counsel (5)**
4:15 26:21 30:10,17
34:12
**country (1)**
20:21
**County (5)**
40:7,18 57:9,16 74:5
**couple (15)**
7:16 8:5 9:13,16 11:2
12:6,16 15:16,17,18

40:12 41:4 44:12
57:18 65:10
**court (13)**
1:2 4:13 8:24 9:10
19:11,13 29:18,20
29:21 30:21 35:25
44:20 55:15
**cousin (3)**
49:23 62:9,20
**cousins (2)**
20:7,9
**coverage (1)**
22:15
**Covington (3)**
6:13,16,20
**credit (1)**
42:12
**crime (1)**
17:8
**CRR (2)**
1:23 74:24
**Cummings (2)**
7:12,14

**D**

**D (1)**
75:2
**D-u-r-e-y (1)**
6:22
**D.C (2)**
6:6,14
**dad (1)**
38:7
**Dan (6)**
16:11 17:6,15 33:10
33:12 66:5
**Darien (2)**
6:3,3
**date (9)**
5:7 28:19 36:7 43:14
51:21 62:3 64:2
68:8 76:2
**dated (4)**
63:21,25 68:7 75:22
**dating (3)**
43:22,23,25
**daughter (1)**
8:2
**day (7)**
19:5,17 42:2 44:13
60:2 73:22 74:21
**day-to-day (1)**
32:17
**days (1)**
5:7
**deal (4)**

15:7 46:25 47:4,5
**dealings (4)**
20:24 21:3 32:12 63:6
**deals (1)**
56:25
**death (6)**
15:2 18:21 28:24
  40:17 44:3 73:10
**debt (1)**
44:20
**debts (2)**
26:2,3
**December (1)**
61:23
**decided (2)**
45:23 50:16
**decides (1)**
50:4
**decision (2)**
18:3 38:23
**deducted (1)**
25:23
**Deductible (1)**
59:8
**deed (2)**
55:9 60:2
**deeded (1)**
65:12
**defend (1)**
17:15
**defendant (2)**
1:10 4:12
**degree (3)**
6:5,8,12
**delinquent (2)**
47:15 64:13
**delivered (1)**
4:23
**department (1)**
19:25
**depended (1)**
60:20
**DePEW (4)**
1:23 2:14 74:7,24
**deposed (1)**
5:17
**deposit (1)**
52:12
**deposition (8)**
1:13 2:10 5:14 37:8
  71:16 74:13,14 76:2
**depositions (1)**
8:4
**describe (2)**
9:5 43:15
**described (1)**

26:21
**details (3)**
17:10,13,16
**Deutsche (1)**
67:19
**died (18)**
10:17,18 15:18,19
  17:25 18:17,24 19:4
  19:5 21:20,22 25:25
  36:24 41:19 52:22
  68:19 71:4,5
**different (2)**
38:3 57:14
**difficult (1)**
17:19
**dinner (5)**
12:5,15 33:9,17 44:13
**direct (3)**
50:24 65:24 67:12
**directly (3)**
9:2,21 37:19
**disbursing (1)**
72:5
**disclose (1)**
30:6
**discovered (1)**
40:17
**Discussion (1)**
71:10
**dissection (1)**
18:15
**dissolve (1)**
55:25
**District (4)**
1:2,3 4:13,13
**divided (1)**
25:12
**doctor (1)**
19:16
**document (18)**
28:15,20 36:3 43:5,9
  51:18,22 60:8 63:23
  64:8 67:24 68:9,10
  75:8,12,15,19,21
**documents (12)**
4:23 26:22 27:3,8
  42:25 71:15,17,19
  71:20 72:8,19 73:11
**doing (5)**
17:14 46:12 55:7 57:8
  61:4
**dollars (1)**
40:13
**Don (6)**
33:2,9,12,13,15,25
**Donald (4)**

1:23 2:14 74:7,24
**door (1)**
19:21,23 49:16
**draw (2)**
24:25 59:2
**drew (1)**
70:15
**Drive (1)**
56:18
**drives (1)**
41:25
**driveway (1)**
19:22
**driving (2)**
41:22,25
**dropping (1)**
16:15
**dues (2)**
46:21 55:10
**duly (2)**
4:3 74:13
**Durey (1)**
6:22
**duties (1)**
20:17
**Duxbury (1)**
18:25
**dying (1)**
17:23

—————————————
### E
**E (14)**
1:8,9 3:2,2 4:2,11,11
  63:21,24 70:24 74:2
  74:2 75:2,22
**e-mail (3)**
44:4,7,8
**e-mailed (2)**
16:21 44:5
**E&L (4)**
68:2,7,16 70:21
**earlier (2)**
41:9 51:13
**early (1)**
56:15
**easier (1)**
28:2
**Education (2)**
1:5 4:9
**educational (1)**
5:24
**effect (1)**
48:13
**effectively (1)**
54:9
**Eileen (4)**

20:10 62:20,22 70:24
**either (3)**
9:2,21 55:19
**election (1)**
51:3
**eligible (1)**
50:25
**employment (2)**
6:10 8:14
**ended (1)**
13:6
**enter (1)**
4:19
**entitled (11)**
28:16 36:4 43:10
  51:19 63:24 64:4
  75:8,12,15,19,21
**entity (3)**
9:2,21 34:15
**equity (7)**
23:17 24:7,12,22,24
  49:14 56:4
**errors (1)**
76:7
**ESQ (3)**
3:7,8,14
**establishing (1)**
34:23
**estate (13)**
8:25 9:5 28:24 29:6,9
  36:11,16 44:25
  45:19 49:22 65:13
  65:15 70:20
**estranged (1)**
14:20
**et (1)**
49:22
**evening (1)**
11:16
**evolved (1)**
43:24
**exactly (1)**
43:19
**examination (3)**
4:5 71:13 75:3
**examined (1)**
4:4
**example (1)**
48:18
**exception (1)**
32:10
**excess (1)**
24:23
**exclusive (1)**
35:9
**exercise (1)**

7:23
**exhibit (21)**
28:15,22 34:8 36:2,3
  43:6,9 51:17,18
  59:25 63:19,23 68:4
  68:5 75:6,8,11,15
  75:18,21,24
**EXHIBITS (1)**
75:5
**exist (1)**
72:9
**existence (1)**
35:7
**expenses (9)**
25:22,23 26:2,3 42:6
  42:9,12,12 72:6
**expert (1)**
5:15
**Expires (1)**
73:25
**explain (3)**
29:14,14 45:14
**extent (1)**
72:9

—————————————
### F
**F (1)**
74:2
**fact (1)**
17:23
**facts (2)**
30:5 76:6
**failed (1)**
48:16
**family (6)**
28:24 29:5 39:6 63:2
  70:5 71:2
**far (1)**
39:20
**father (11)**
14:20,22,24,24 15:8
  37:20,21,23,24,25
  38:2
**father's (3)**
14:14,23 15:2
**federal (3)**
40:8,19 52:23
**fee (1)**
64:15
**fees (11)**
9:14 46:21 47:11,15
  48:10,25 49:21
  50:12 64:14 65:14
  65:15
**field (1)**
8:7

**Universitas Supplemental Appendix - 111**

8:7
**Fieldfair (1)**
56:17
**fifth (1)**
40:16
**Fifty (1)**
23:11
**figure (1)**
58:6
**figured (1)**
59:6
**figures (1)**
59:2
**file (2)**
21:21 31:17
**filed (6)**
29:19,21 30:21 34:15
  44:15 66:17
**files (1)**
27:8
**filling (1)**
45:19
**final (1)**
34:25
**finalized (1)**
42:21
**finally (2)**
49:23 54:14
**financial (3)**
32:14,17,21
**financing (1)**
56:14
**find (3)**
57:10 68:19,21
**fine (1)**
30:7
**fireworks (1)**
11:23
**firm (6)**
6:22 15:11,14,21,24
  20:17
**first (15)**
11:7 12:11 21:19
  28:12 45:17,25
  46:17 51:11,23
  53:23 54:3,4 62:9
  62:19 67:15
**five (1)**
46:19
**fix-ups (1)**
48:10
**fixed (2)**
47:6,6
**Florida (17)**
1:14 2:13,16,17 8:24
  19:3,16 23:16,21

29:22 30:22 42:18
55:15 65:13 74:3,9
  74:11
**fluke (2)**
38:24,25
**focus (1)**
20:12
**follows (1)**
4:4
**food (1)**
19:7
**foolish (1)**
52:24
**footnote (2)**
36:21,23
**foreclose (3)**
50:17 56:9 65:17
**foreclosed (14)**
9:25 10:5 42:19 46:22
  49:12 53:2 54:22
  55:20 56:15,23
  57:18,23 65:7,9
**foreclosing (1)**
50:4
**foreclosure (8)**
42:20 46:3,4,8,14
  47:14 57:20 67:21
**foreclosures (1)**
63:18
**form (1)**
29:12
**formed (3)**
15:15 23:6 46:11
**former (1)**
49:7
**Fort (1)**
63:7
**forth (4)**
60:12,17 61:5 74:13
**found (8)**
39:9 40:7 44:18 57:13
  57:15 64:19 65:23
  66:21
**founded (3)**
23:13,15,20
**four (2)**
38:2,2
**Four-page (4)**
28:15 36:3 75:8,12
**Fourth (1)**
11:22
**FPR (1)**
1:23 74:24
**franchise (1)**
7:24
**Franklin (1)**

2:11
**friends (6)**
10:23 11:13,14,19
  17:2 39:7
**front (1)**
50:23
**funds (1)**
71:24
**funeral (3)**
16:12 62:11,24
**further (1)**
74:16

_____
**G**
_____
**gain (1)**
34:19
**gathering (1)**
63:2
**general (3)**
34:11 38:11 45:14
**generally (1)**
27:12
**generating (1)**
56:8
**getting (1)**
71:7
**girlfriends (1)**
11:15
**give (3)**
5:24 27:10 66:9
**given (1)**
74:15
**giving (1)**
49:13
**Globe (1)**
37:8
**go (19)**
16:8,15 19:21 20:4
  23:24 27:11,24
  38:16 39:14,25 41:7
  44:13 47:25 48:4
  51:8 55:8 57:4
  70:10,12
**going (20)**
12:4 13:6 16:15 17:3
  19:14 28:11 30:3
  35:22 36:15 42:22
  48:19 50:20,24
  54:18 57:8,16 64:3
  65:17,23 68:22
**golf (1)**
9:14
**good (3)**
46:25 47:4,5
**Granderson (13)**
26:11 30:16 31:9

36:10 37:9 44:14
68:2,7,16 70:19
  72:5 73:3 75:25
**great (2)**
5:11 73:15
**Greenwich (2)**
7:7,12
**group (3)**
11:18,23 26:21
**guess (5)**
29:7 41:14 53:8 72:20
  73:6

_____
**H**
_____
**hand (1)**
74:21
**happen (1)**
58:17
**happened (3)**
24:23 42:17 53:24
**happens (1)**
50:2
**happy (1)**
49:20
**harbor (1)**
51:3
**hear (2)**
7:18 26:24
**heard (3)**
19:18 20:5 31:2
**hearing (1)**
19:15
**heart (1)**
18:16
**Heathington (2)**
20:10 62:22
**held (1)**
2:10
**help (4)**
17:15 20:16 29:24
  38:10
**helped (2)**
14:23 30:24
**helping (2)**
69:8 71:6
**Henderson (1)**
2:11
**Herbert (1)**
8:10
**hereinbefore (1)**
74:13
**hereunto (1)**
74:20
**Hermon (1)**
66:23
**high (2)**

6:2,3
**hire (1)**
38:23
**history (2)**
6:11 18:16
**HOA (12)**
46:21 47:11,15 48:10
  49:21 50:12 55:19
  63:18 64:15,15,16
  65:14
**holdings (1)**
44:25
**Holt (1)**
2:12
**home (11)**
8:4 13:6,10 19:16
  23:17,21 24:7,11,12
  24:21,24
**homeowner (5)**
48:16,19,25 49:11
  56:24
**homeowners (2)**
48:7,17
**house (14)**
8:21,22 9:11 14:14,23
  14:24 20:3 23:17
  46:19,23 50:12,17
  70:25 71:6
**Houston (2)**
53:3,9
**huge (1)**
46:19
**hundred (1)**
40:12
**husband (1)**
44:15
**hypothetical (1)**
48:16

_____
**I**
_____
**idea (6)**
41:17 45:15 46:15
  47:16 64:9 66:15
**ideas (1)**
60:21
**identification (6)**
28:19 36:7 43:13
  51:20 64:2 68:8
**II (5)**
9:24 34:24 35:10
  55:25 65:18
**III (4)**
1:8 3:3,7 4:11
**illegitimate (1)**
37:25
**imagine (1)**

72:24
**included (1)**
31:21
**income (7)**
31:18,21 34:19 42:7
  51:20 56:8 75:19
**increased (2)**
58:16,19
**independently (1)**
30:7
**individually (1)**
22:6
**initial (2)**
11:24 52:11
**initially (1)**
54:23
**insolvent (2)**
28:25 36:12
**inspection (2)**
5:4 71:15
**instance (1)**
49:25
**insurance (20)**
21:22 22:2,11 25:3,6
  25:11 26:14,19 28:9
  31:20,24 54:5,10
  59:8,11,20,21 71:20
  71:24 72:2
**interest (6)**
9:22,23 23:7,9 25:16
  40:22
**interested (1)**
74:18
**introduced (3)**
11:10,11 16:13
**inventions (1)**
7:9
**inventory (1)**
45:8
**invest (1)**
23:13
**investments (1)**
65:19
**investors (1)**
55:6
**involved (1)**
15:8
**involvement (2)**
32:6,17
**Islands (1)**
21:4
**issued (2)**
72:2,4
**items (1)**
73:5

**J**

**Jack (45)**
1:8,9 4:11,11 10:20
  15:3,5,8,11 16:15
  16:24 17:7,18,22
  20:16,19 23:19
  24:15 25:25 32:15
  33:8,14,25 39:13
  40:8 41:5,18 45:21
  49:15 52:9,15 53:7
  53:20 55:4 56:13
  58:9 60:4 62:7
  63:21,24 64:24
  68:19 71:6,21 75:22
**Jack's (6)**
21:13 22:12 25:3,10
  69:9 71:3
**jail (5)**
17:9 66:6,8,10,13
**Jennifer (1)**
61:8
**Jeraldine (1)**
31:3
**job (3)**
1:24 39:10 62:14
**Joe (2)**
4:7,8
**JOSEPH (3)**
3:3,7,8
**July (6)**
1:15 2:5 11:22 61:25
  62:2,3
**Junior (1)**
6:6

**K**

**K (1)**
4:2
**K-1 (3)**
32:23 34:13,18
**Karam (3)**
3:8 4:8 64:6
**keep (1)**
39:23
**Ken (3)**
38:12 39:4,17
**kept (4)**
21:14,14 47:11 53:12
**kind (2)**
52:23 70:20
**knew (3)**
12:14 17:14 20:19
**knocked (2)**
19:23 49:16
**know (124)**
9:9 10:6 12:3 13:4,7

13:14 14:2,3,17,21
  15:4,10,22 17:2,4,6
  17:15 18:8 19:15
  21:13 22:22 23:25
  24:25 27:5,12 28:6
  29:19,23 30:2,9,23
  30:25 31:14 34:12
  38:9,21 40:2,3,23
  41:15 43:19 44:6,16
  45:4,10,12,20,22
  47:6,8,13,14 48:9
  48:11 49:3,4,11,12
  49:14,15,15,17,24
  50:7 52:17,17,18,20
  52:24 53:10 54:7,17
  55:5,9,12,18 56:21
  57:11,23 58:7,8,8
  58:10,18 59:5,17
  60:13 61:4 62:9,18
  63:12,16 64:20,22
  64:23 65:2,6,8,10
  65:16 66:2,16,19
  67:2,5,6,17,18,22
  67:23 69:6,7,10,13
  69:14 70:6,19,22,22
  70:25 71:5,7 72:14
  72:23
**knowledge (8)**
30:17 31:8 32:6,11,13
  40:25 41:12 66:14
**known (1)**
4:11

**L**

**L (2)**
3:3 70:24
**L-o-n-g-f-o-r-d (1)**
8:23
**Lana (3)**
3:10,14 4:21
**land (3)**
40:7,18 52:5
**Lane (4)**
24:5 51:12,24 53:5
**large (4)**
2:17 40:8,18 74:11
**law (9)**
2:11 3:3,10 6:22
  15:11,14 17:4 20:17
  53:8
**lawsuit (1)**
4:10
**lawyer (3)**
17:6 30:23 31:2
**lawyers (1)**
63:7

**learn (1)**
19:4
**learned (7)**
21:6 30:5,7,12,13
  52:21,22
**learning (1)**
70:7
**leave (1)**
7:21
**leaves (1)**
7:17
**leaving (1)**
9:14
**led (1)**
15:8
**LEE (1)**
74:5
**left (2)**
7:16 68:20
**legal (5)**
6:7,17,24 7:13 8:7
**let's (4)**
20:20 26:6 48:17
  54:19
**Leyden (2)**
15:23,24
**lien (8)**
40:8,11,19,21,25
  52:23 57:14,15
**life (6)**
22:12 25:3 59:8,20,21
  71:21
**lightbulbs (1)**
47:9
**Lillian (6)**
68:2,6,16 70:19,24
  75:25
**Line (9)**
75:6 76:8,10,12,14,16
  76:18,20,22
**list (4)**
45:13 51:8 57:8 64:18
**listed (2)**
51:23 67:15
**listing (2)**
45:5 50:24
**litigation (1)**
66:17
**little (1)**
45:3
**live (4)**
23:21 39:10,14 53:11
**lived (5)**
12:25 13:5 45:23 61:7
  71:4
**living (4)**

10:16 12:22 13:23
  20:14
**LLC (10)**
1:5 4:10 35:4 45:7,22
  50:22 65:25 68:2,6
  75:25
**loan (12)**
22:22 23:17 24:7,12
  35:17,20 52:4,8,9
  53:22 54:2
**loaned (1)**
41:16
**loans (1)**
41:13
**local (1)**
19:24
**located (1)**
16:4
**lock (1)**
20:2
**Lockwood (2)**
7:12,15
**long (10)**
6:18 7:2,3,14 8:17
  12:4 15:20 23:25
  39:17 71:3
**Longford (1)**
8:23
**Longshore (2)**
55:15 56:20
**look (9)**
28:21 32:4 36:8 42:25
  54:19 64:18 65:22
  66:20 72:25
**looked (1)**
70:23
**looking (1)**
70:7
**looks (5)**
28:20 51:22 64:8 68:9
  70:11
**loop (1)**
73:7
**lose (1)**
48:19
**loss (2)**
34:19 59:5
**losses (1)**
34:21
**lot (4)**
13:25 14:2 16:14 60:4

**M**

**M (1)**
4:2
**M-1 (1)**

59:15
**Main (1)**
15:23
**maintaining (1)**
50:11
**maintenance (1)**
64:14
**majority (1)**
49:8
**man (1)**
69:8
**manager (1)**
38:11
**managing (2)**
32:15 42:7
**Manson (24)**
3:3,7 4:6,7,18 5:10
7:18 21:16 30:9
31:12 35:25 42:23
43:5 51:16 63:19
64:7 68:3 70:17
71:9,12 72:15 73:6
73:14 75:4
**Marcello (1)**
54:20
**mark (3)**
28:14 36:2 68:3
**marked (9)**
28:18,22 36:6 43:6,13
51:2,20 63:25 68:8
**market (2)**
50:7,15
**marking (1)**
51:15
**marriage (1)**
74:18
**married (2)**
10:10 36:25
**Maso (1)**
61:9
**Mass (2)**
41:21 72:25
**Massachusetts (12)**
1:3 3:13 4:14 14:2,12
14:13 15:15 18:25
20:4 35:14 41:7,21
**maternity (2)**
7:17,21
**matter (4)**
5:19,21 51:6 74:19
**Maxine (80)**
1:13 2:10 4:1 5:1 6:1
7:1 8:1 9:1 10:1
11:1 12:1 13:1 14:1
15:1 16:1 17:1 18:1
19:1 20:1 21:1 22:1

23:1 24:1 25:1 26:1
27:1 28:1,16 29:1
30:1 31:1 32:1 33:1
34:1 35:1 36:1,5
37:1 38:1 39:1 40:1
41:1 42:1 43:1,11
44:1 45:1 46:1 47:1
48:1 49:1 50:1 51:1
52:1 53:1 54:1 55:1
56:1 57:1 58:1 59:1
60:1 61:1 62:1 63:1
64:1 65:1 66:1 67:1
68:1 69:1 70:1 71:1
72:1 73:20 74:12
75:4,9,12,16
**mean (10)**
13:12 14:22 15:5
24:24 39:3 43:17
47:11 51:5 58:7
59:2
**means (1)**
51:7
**meet (5)**
10:20,22 11:7 16:11
62:19
**meeting (3)**
11:24 33:7,8
**Mellon (1)**
67:16
**member (1)**
32:16
**mention (3)**
17:18 33:2,25
**mentioned (3)**
40:6 62:21 65:11
**met (15)**
11:11,13,19 12:6,11
14:22 16:12,13 33:2
33:18 44:10 62:10
62:12,24,25
**Milano (1)**
54:20
**million (9)**
21:7 22:19,20 23:2,3
25:2,21 59:11,21
**mind (1)**
72:11
**mixed (1)**
33:12
**mom (3)**
25:12 69:9,15
**moment (1)**
9:24
**Monarch (5)**
42:18 56:11 58:8
60:14 67:23

**Monday (1)**
19:17
**money (15)**
25:4,24 39:22,23 41:6
41:8 46:15 53:17
54:10 69:17,24 70:8
70:9,11,14
**monies (1)**
69:25
**months (1)**
13:7
**morning (1)**
19:13
**mortgage (11)**
47:18,20,22 48:2,13
49:21 50:2,18 52:5
53:2 56:9
**mortgages (4)**
46:22 49:13 56:5 58:9
**mother (12)**
19:17,24 20:6 29:7,8
29:16 37:13 41:9,20
44:4,5 54:6
**Mother's (1)**
44:12
**mother-in-law (2)**
12:25 13:5
**motion (8)**
28:13,17 35:24 36:5
43:11 75:9,13,16
**Mount (1)**
66:23
**move (1)**
13:9
**moved (7)**
6:21 13:9,14 39:5
49:23,24 53:12
**movies (1)**
33:20
**moving (1)**
39:6
**Multipage (4)**
51:18 63:23 75:19,21
**murdered (1)**
17:23
**muscle (1)**
19:8
**Mutual (1)**
72:25
**Myers (1)**
63:7

_____
**N**
**N (4)**
3:2 4:2,2 75:2
**name (18)**

4:7 5:20 7:8 10:14
15:21 20:11 31:2,4
34:7 38:9 45:20,22
52:24 53:14 56:14
63:14 76:1,3
**names (2)**
16:3 20:8
**Naples (9)**
10:7 24:4 39:7 42:18
44:11 54:20 55:15
56:18 63:7
**National (1)**
67:20
**NatTel (2)**
65:24 66:17
**natural (1)**
18:8
**naturally (2)**
17:23,25
**need (6)**
27:17 31:13 57:4
59:24 71:17,18
**needed (2)**
24:25 39:12
**Needham (1)**
3:12
**needs (1)**
39:15
**neglected (1)**
31:12
**neighbor (2)**
19:20 39:4
**net (2)**
22:24 72:6
**never (10)**
11:4 14:22 18:19
29:13 41:3 44:5,7
45:4 54:4,17
**new (3)**
49:16 67:16 70:17
**news (1)**
20:5
**Newton (1)**
3:13
**night (5)**
11:22 19:9 41:23,24
41:25
**Nine (1)**
26:9
**Non (1)**
59:8
**Non-Party (6)**
28:16 36:4 43:11 75:9
75:12,16
**normally (2)**
14:9 49:7

**north (1)**
53:12
**Northfield (1)**
66:22
**Norwalk (2)**
6:8,9
**notarized (1)**
52:18
**notary (5)**
2:16 4:3 5:9 73:25
74:10
**note (1)**
4:22
**noted (1)**
73:17
**NOV (2)**
4:24,24
**Novak (106)**
1:13 2:10 4:1,7,21,25
5:1,6,13 6:1 7:1 8:1
9:1 10:1,15 11:1
12:1 13:1 14:1 15:1
16:1 17:1 18:1 19:1
20:1 21:1 22:1 23:1
24:1 25:1 26:1 27:1
28:1,11,14,15,16
29:1 30:1 31:1 32:1
33:1 34:1 35:1,22
36:1,2,3,5 37:1 38:1
39:1 40:1 41:1 42:1
43:1,6,9,11,15 44:1
45:1 46:1 47:1 48:1
49:1 50:1 51:1,16
51:18 52:1 53:1
54:1 55:1 56:1 57:1
58:1 59:1 60:1 61:1
62:1 63:1,20,23
64:1 65:1 66:1 67:1
68:1,3,5 69:1 70:1
71:1,14,18 72:1,5
73:8,20 74:12 75:4
75:5,9,12,16
**November (1)**
63:22
**number (2)**
9:10 10:6
**numbered (1)**
4:23
**nursing (2)**
13:6,10

_____
**O**
**O (1)**
4:2
**Object (1)**
29:12

**Objection (3)**
17:24 21:15 27:4
**obviously (1)**
72:13
**October (1)**
52:13
**offered (1)**
43:8
**offhand (1)**
38:21
**office (8)**
3:10 8:20 14:5 16:4,5
16:10 41:6 63:7
**offices (4)**
2:11 3:3 14:9 16:6
**officially (1)**
35:5
**Oh (5)**
11:17 40:16 59:14,16
61:12
**okay (42)**
5:11 7:5 9:19 25:15
26:6 27:7,16 28:7
30:8 31:16 43:2,3
45:6 46:10 47:24
48:12 49:25 50:16
50:19 51:10 54:7,8
54:9,19,23 55:14,24
56:11,17 58:15
59:16 60:16,20
61:13 62:2 63:17
67:12,24 72:7 73:4
73:13,15
**old (2)**
16:5 50:17
**once (5)**
5:18 10:13 33:2 34:6
47:20
**ones (3)**
27:25 57:21 60:12
**ongoing (1)**
63:3
**online (1)**
27:23
**opposed (3)**
13:24 17:23 34:19
**order (12)**
20:3 24:8 27:13 28:14
28:18 34:24 36:6
43:13 55:25 75:10
75:13,17
**original (3)**
40:23 55:2 57:24
**originally (1)**
55:4
**outbidding (1)**

55:7
**outcome (1)**
74:19
**outstanding (2)**
53:23 65:3
**owe (1)**
48:15
**owned (9)**
7:23 44:25 61:8,15
64:4,20 70:4 71:2,3
**owner (4)**
32:19 35:9 45:6 49:16
**owners (2)**
49:7 55:8
**ownership (4)**
9:22,23 23:7,9
**owns (1)**
9:25

-------

**P**

**P (2)**
3:2,2
**P.A (1)**
2:12
**p.m (1)**
73:17
**page (20)**
36:8,22 42:5 59:8,13
64:6,19 65:23 66:21
67:13 75:3,6 76:8
76:10,12,14,16,18
76:20,22
**pages (1)**
57:25
**Pagewood (1)**
53:5
**paid (24)**
11:4 22:16,20,25
23:17 25:4,19 42:6
47:11 48:8,9 52:8
52:11 54:2,4,14
56:5 65:17 67:7,8
67:10,11 68:22
71:24
**pain (1)**
19:10
**Panama (1)**
20:24
**papers (2)**
31:4,5
**paragraph (17)**
28:21 32:4,25 34:5,8
34:22 36:9,22 40:5
41:5 42:3 64:4,7,19
65:22 66:20 67:14
**paralegal (4)**

6:8 8:7,9 20:16
**parking (1)**
16:14
**part (2)**
48:25 67:3
**participation (1)**
18:2
**parties (1)**
74:17
**partner (3)**
58:12,12 62:6
**partners (2)**
17:5 44:23
**partnership (4)**
45:2 50:21 51:19
75:19
**passed (1)**
14:24
**pay (11)**
11:5 25:20 26:2 42:9
47:25 48:17,24
55:10 65:13,14,15
**paying (4)**
49:21 50:12 65:16
72:2
**payment (2)**
42:7 68:14
**payments (4)**
42:14,14,16 68:21
**payroll (1)**
39:20
**penalties (1)**
40:22
**people (4)**
47:8 49:9 61:10,12
**Pepsi (1)**
62:18
**percent (8)**
23:11 25:16,20 32:18
45:6 49:13 52:11
56:14
**period (3)**
14:15,16 63:4
**permission (1)**
20:2
**personal (7)**
28:4 29:8,16 42:6,9
44:17 69:15
**personally (2)**
52:15 60:18
**phone (3)**
12:3 16:19 44:9
**piece (2)**
39:11 70:4
**Pierson (1)**
6:22

**place (4)**
13:19 14:12 39:9
47:11
**plaintiff (3)**
1:6 3:4 4:10
**please (4)**
4:19 9:5,6 72:16
**point (4)**
15:14 53:13,14 66:6
**poisoning (1)**
19:7
**police (1)**
19:24
**policies (6)**
21:23 22:3,12,16
59:11 71:21
**policy (1)**
72:6
**position (1)**
6:15
**post (1)**
16:5
**postpone (1)**
19:14
**potential (1)**
18:21
**premiums (2)**
59:10,19
**prepare (1)**
26:17
**prepared (1)**
26:11
**present (1)**
8:19
**price (1)**
61:18
**primary (1)**
35:14
**print (1)**
28:2
**prior (2)**
27:25 44:3
**probably (12)**
12:19 14:17 24:6
39:19 40:23 42:11
43:20,20 57:19
60:11,13 65:16
**probate (5)**
28:24 29:6 30:21
36:11,15
**probated (1)**
29:17
**problem (1)**
15:9
**problems (1)**
18:17

**proceeding (2)**
22:8 43:8
**proceeds (12)**
25:3,11 26:15,19
31:20,24 53:18 54:5
54:8 71:24 72:3,6
**process (1)**
27:13
**produced (2)**
27:9 71:16
**professional (5)**
2:14,16 32:7 74:8,9
**professionally (1)**
10:25
**pronounce (1)**
38:9
**properties (61)**
9:20,24 23:5,12,14,20
25:25 31:17 32:10
32:12 34:14,24 35:4
35:10 38:20 39:11
39:18,22 42:8 44:24
45:8,13,16,24 46:2
46:8 48:9,14,22,24
49:6 50:21,25 51:9
52:5,6 53:15,18
55:8 57:12,12,23
58:3 60:3 62:5
63:10 64:5,21 65:18
67:25 68:6,15,18,20
70:2,12,13 71:22
72:3,4 75:25
**property (25)**
5:22 9:19 24:3,8,14
39:11 42:17 45:25
46:14 47:18 48:14
48:20,23 51:24 52:2
52:14 53:4,23 54:3
54:5 56:8 58:9
69:25 70:4,5
**prosecutor (1)**
18:20
**protective (7)**
28:14,18 36:6 43:12
75:10,13,17
**provides (2)**
25:11 36:23
**Public (4)**
2:17 4:3 73:25 74:10
**pulled (1)**
19:8
**purchase (6)**
24:8 46:2,7 55:2
61:18 62:3
**purchased (5)**
54:24 56:13,21,22

58:9
**purchasing (2)**
55:19 64:9
**purpose (2)**
23:15 46:11
**purposes (2)**
48:15 51:7
**put (8)**
24:15 28:11 45:20,21
52:3,5,24 53:14

**Q**

**quash (8)**
28:13,17 35:24 36:5
43:12 75:9,13,17
**question (3)**
46:6 59:17,18
**questions (2)**
51:7 71:19
**Quicken (1)**
28:2
**quote (2)**
37:17 38:6
**quoted (1)**
37:11

**R**

**R (6)**
1:23 2:14 3:2 74:2,7
74:24
**R-o-e-t-z-e-l (1)**
63:8
**ran (2)**
35:12 41:6
**rang (1)**
19:22
**reaching (1)**
19:20
**read (5)**
5:8 7:19 37:18 72:15
72:17
**real (10)**
8:25 9:5 44:25 45:19
49:22 65:13,15
68:12,13 70:20
**really (4)**
15:4 32:9 57:11 58:7
**Realtime (2)**
2:15 74:8
**realty (5)**
68:2,7,16 69:10 70:21
**reason (14)**
17:13 31:13 62:17
66:9 69:17 76:4,8
76:10,12,14,16,18
76:20,22

**reasoning (1)**
52:19
**recall (12)**
17:11,12 33:18,22
34:9 52:2 55:3
60:10,11 61:3,21
71:18
**receipt (3)**
5:7 71:23,23
**receive (3)**
31:23 34:18 45:7
**received (3)**
6:11 26:7 34:13
**Recess (2)**
43:4 71:11
**recognize (1)**
51:8
**recollection (1)**
36:13
**record (9)**
4:20 7:19 38:3 71:9
71:10,12 72:17
74:15 76:5
**records (7)**
21:14 40:7,18 52:6,13
57:10,16
**redone (1)**
16:6
**reenter (1)**
7:20
**reference (1)**
66:22
**refinanced (2)**
52:9,25
**refresh (1)**
36:13
**register (1)**
28:3
**Registered (2)**
2:14 74:7
**regular (1)**
45:7
**related (1)**
74:16
**relationship (3)**
15:3 43:16 63:4
**remainder (1)**
26:18
**remember (5)**
5:20 7:8 9:10 12:24
62:14
**rent (8)**
9:17 47:17,17 48:8
49:19,20 68:21 71:7
**rental (2)**
19:22 70:3

**rented (4)**
9:12 47:10 49:18
53:12
**renting (1)**
71:5
**rents (1)**
47:24
**repairs (1)**
48:11
**repay (1)**
54:7
**report (2)**
57:19 58:2
**Reported (1)**
1:22
**reporter (8)**
2:15,15,16 36:2 38:16
74:8,9,9
**reports (1)**
32:22
**represent (1)**
4:9
**representative (2)**
29:9,17
**represented (3)**
4:15 30:16 31:9
**Republican (1)**
35:13
**requirement (1)**
5:9
**residence (1)**
61:6
**resolution (1)**
66:17
**resolved (1)**
67:17
**respect (5)**
21:22 22:3 25:2 31:9
48:13
**response (3)**
4:24 5:2 26:22
**responsive (1)**
72:9
**rest (2)**
57:3,22
**restaurant (2)**
11:9,21
**result (1)**
48:18
**results (1)**
18:9
**return (7)**
31:18,21 50:21 51:2
51:19 57:9 75:19
**returns (3)**
32:22 34:15,25

**Ridge (72)**
9:24 13:21 21:23
22:12,17,21 23:5,12
23:14,20 24:9,14,16
25:4,5,12,25 26:12
26:18 28:8 31:17
32:10,12 34:14,23
35:4,10 38:20 39:10
39:17 44:23 45:15
45:23,24 48:5,8,14
48:22,24 50:21 51:9
52:5,6,15 53:15,18
53:19 58:3 60:3,17
61:6 62:5 63:10,15
64:5,21,24 65:18
67:25 68:6,15,17,24
69:19,25 70:12,13
70:14 71:22 72:3,4
75:24
**right (35)**
11:20,24 12:13 13:15
16:7 24:6 25:13,18
31:6,25 32:10,19
34:17 37:9,14,19
41:17 46:5,13 48:21
49:5 53:3 54:11,13
54:15 56:7,10 58:24
59:23 60:19,23 61:9
61:22 64:25 65:21
**Road (3)**
13:21 45:23 61:6
**Robinson (28)**
1:8,9 4:11,12 10:20
10:24 12:2,11,17,22
13:2,23 18:21,24
31:10 34:6,9 35:12
36:23 42:6 43:16
44:23 63:21,25
67:15,20 71:21
75:22
**Robinson's (3)**
28:23 32:7 40:17
**Roetzel (1)**
63:8
**rough (1)**
19:9
**roughly (4)**
26:4,5,7,9
**RPR (2)**
1:23 74:24
**run (1)**
41:9
**running (1)**
45:12
**runs (1)**
41:9

**S**

**S (1)**
3:2
**SAC (1)**
66:18
**safe (1)**
51:3
**salary (1)**
39:24
**sale (2)**
52:21 53:18
**Sarasota (4)**
44:11 63:2 70:4 71:2
**satisfied (2)**
41:2,3
**saw (4)**
12:17 33:18 37:7 69:3
**saying (1)**
37:11
**says (8)**
28:23 32:5 40:16
58:11,12 61:18 62:3
67:21
**Schedule (1)**
59:15
**school (5)**
6:2,3 53:8,9 66:23
**schools (1)**
5:25
**science (1)**
6:8
**search (2)**
5:21 10:25
**searcher (2)**
8:14,18
**searching (2)**
28:8,10
**second (6)**
28:23 36:8 43:7,10
67:19 75:15
**secretarial (1)**
20:17
**secretary (4)**
6:7,17,24 7:13
**security (1)**
24:12
**see (21)**
11:17 18:9,11 19:15
19:16 21:18 27:17
29:3 33:4 35:2 40:9
40:15 41:10 50:5
51:8 58:4,23,25
59:16 66:24 69:3
**seeing (3)**
12:18,19 31:7
**seen (5)**

**selected (1)**
31:4 68:10,11,12,13
27:3
**Self (1)**
8:14
**sell (1)**
14:24
**Senate (1)**
35:13
**send (2)**
70:5,8
**sending (1)**
71:8
**sent (2)**
17:8 68:23
**sentence (2)**
28:23 40:16
**sentences (1)**
41:4
**served (2)**
4:25 30:18
**service (1)**
47:17
**services (1)**
10:25
**set (2)**
74:13,20
**Shadow (73)**
9:24 13:21 21:23
22:12,17,21 23:5,12
23:14,20 24:9,14,16
25:3,5,11,24 26:11
26:18 28:8 31:17
32:10,12 34:14,23
35:4,9 38:20 39:10
39:17 44:23 45:15
45:23,24 48:4,8,14
48:22,24 50:21 51:9
52:4,6,14 53:15,17
53:19 58:3 60:3,17
61:6 62:5 63:10,12
63:15 64:5,21,24
65:18 67:25 68:6,15
68:17,24 69:19,25
70:12,13,14 71:22
72:3,4 75:24
**share (4)**
26:14 60:21 65:12,19
**shares (3)**
63:11 64:10 65:14
**Shocking (1)**
54:17
**shopping (1)**
16:16
**short (1)**
52:21

**show (6)**
25:15 35:22 50:20
52:13 59:25 67:25
**showed (1)**
34:19
**showing (1)**
58:15
**shown (1)**
51:2
**shows (6)**
38:4 58:2,19,20 59:8
60:5
**sic (1)**
42:8
**sick (2)**
19:6,9
**sign (1)**
5:8
**signature (1)**
60:7
**Simsbury (2)**
16:14 17:3
**single (1)**
8:10
**sits (1)**
50:3
**sitting (1)**
45:18
**situation (1)**
54:21
**six (1)**
5:3
**snowy (1)**
16:14
**sold (9)**
53:15 56:6 61:10,12
61:15,20,23,25 65:9
**son (2)**
37:12,24
**sorry (3)**
12:10 30:20 33:11
**sort (6)**
30:14 39:15 40:8,19
55:6 67:22
**sounds (1)**
24:6 46:25 47:4 61:22
**South (1)**
53:6
**Southwest (1)**
10:8
**specific (2)**
17:13 41:12
**specified (1)**
29:15
**spell (1)**
38:15

**spelled (1)**
38:18
**spent (1)**
19:9
**split (1)**
54:12
**spoken (1)**
16:19
**spouse (1)**
10:14
**Springs (4)**
1:14 2:13 8:24 9:7
**Square (1)**
24:4
**SRP (5)**
38:11 42:7,10 55:24
55:25
**SRP's (1)**
42:8
**ss (1)**
74:4
**Stamford (8)**
6:4,23 8:12,15 11:9
12:7 13:21 61:7
**Starnes (1)**
2:12
**start (4)**
12:18 13:23 20:20
38:19
**started (6)**
12:22,23 13:2,16,17
71:5
**starting (3)**
5:25 6:11 12:19
**state (6)**
2:17 36:10 41:5 43:19
74:3,10
**stated (1)**
35:17
**statement (5)**
32:9 37:3,16,18 70:7
**statements (2)**
27:20,21
**States (3)**
1:2 4:12 35:13
**status (1)**
57:10
**stay (3)**
13:24 14:9 49:18
**stayed (4)**
14:3,14,23 24:24
**staying (6)**
12:23 13:3,16,17,20
39:7
**stock (1)**
65:24

**stolen (1)**
21:7
**stopped (1)**
41:25
**strategy (1)**
46:14
**Strayer (2)**
6:6,12
**street (5)**
3:5,12 10:7 16:3,7
**strike (1)**
27:6
**studio (1)**
7:23
**stuff (4)**
7:9 16:6 48:11 59:6
**sub (1)**
39:21
**submission (1)**
73:8
**submit (1)**
34:25
**submitted (1)**
35:23
**subpoena (13)**
4:25 26:23 27:14
28:13,17 30:19
35:24 36:6 43:12
72:10 75:9,13,17
**Subscribed (1)**
73:21
**sudden (1)**
50:16
**Sullivan (20)**
3:10,14 4:20,21 5:11
17:24 21:15 27:4,10
27:17 28:5 29:12
30:5 43:3 51:15
72:7,18 73:4,13,15
**Sunday (1)**
19:12
**SunTrust (3)**
25:9 26:12 69:2
**supplemental (8)**
35:23 36:4 40:5 42:4
43:7,10 75:12,16
**support (8)**
28:12,17 35:24 36:5
43:11 75:9,13,16
**supposed (5)**
19:11,12 69:12 70:9
70:12
**sure (7)**
4:20 7:3 20:11 30:13
62:16,18 63:16
**sworn (3)**

4:3 73:21 74:14

**T**

**T (2)**
74:2,2
**T-a-r-c-z-e-w-s-k-i ...**
38:17
**take (4)**
42:23,24 47:8 50:11
**taken (4)**
5:14 43:4 54:9 71:11
**talk (6)**
15:5,6 16:24 34:23
44:4,9
**talked (6)**
12:3 30:10 51:12 54:6
59:11,22
**talking (5)**
30:20 37:19,20,22
38:7
**Tanager (1)**
55:14
**Tanglewilde (1)**
53:6
**Tarczewski (2)**
38:14,15
**tax (12)**
31:18,21 32:22 34:15
34:25 40:8,19 51:2
52:23 57:13,15,25
**taxes (1)**
65:13
**tell (11)**
12:12 17:11 25:15
27:2 33:6 37:2 38:4
66:5,8 69:12 72:12
**telling (1)**
34:10
**ten (2)**
42:24 56:5
**terms (3)**
25:10 46:15 64:14
**Testament (3)**
63:21,24 75:22
**testified (2)**
4:4 34:13
**testimony (3)**
38:7 71:14 74:15
**Texas (1)**
53:4
**thank (2)**
5:11 73:16
**thing (5)**
16:9 27:24 55:18
56:19 73:7
**things (3)**

15:6 39:13 55:5
**think (24)**
7:12 12:5 16:3 17:14
19:12 30:3,14 34:11
37:20 39:21 40:20
40:21 44:8 46:17
51:13 52:20 53:9
59:24 61:10 62:17
64:11 65:9 68:22
71:6
**thinking (1)**
42:11
**third (1)**
54:19
**thought (8)**
19:7 27:25 45:21
52:23 54:17 63:14
69:6 70:23
**thousand (1)**
40:12
**three (2)**
22:11,16
**Three-page (2)**
43:9 75:15
**Thursday (1)**
1:15
**till (1)**
39:19
**time (44)**
8:9,18 11:8,19 12:16
12:21 13:3,20,22
14:14,15,16,19 15:2
16:24,25 20:13,13
20:19 21:6,19 23:12
24:13,16 30:17,18
30:20,24 33:21
44:15,22 46:17 49:6
50:10 61:8 63:11,14
64:10 65:11,12,13
65:19 71:3 73:17
**times (8)**
5:16 10:12 11:3 16:17
16:18 33:18 44:12
44:24
**Timeshares (1)**
64:4
**title (11)**
5:21 8:14,17 28:9,9
45:21 48:19,23
50:11 64:22,23
**titles (1)**
10:25
**today (3)**
4:16,24 51:13
**told (14)**
12:13 17:12 18:12,14

19:6 29:5 36:10
57:22 69:5,8,11,11
70:8,9
**top (2)**
54:10 59:16
**total (2)**
22:20 24:18
**tough (1)**
49:10
**trace (1)**
6:10
**Trafalgar (5)**
24:4,5 51:11,24 60:14
**transaction (1)**
60:10
**Transamerica (1)**
72:24
**transcript (1)**
5:8
**transcription (1)**
76:7
**transcripts (1)**
8:4
**transferred (4)**
52:14 55:24 68:24
69:7
**transferring (2)**
60:4,17
**transfers (1)**
61:3
**trips (1)**
20:21
**Trudeau (2)**
33:2,25
**true (3)**
37:16 65:20 74:14
**Trust (1)**
67:20
**trying (6)**
7:8 13:11 19:19 52:21
68:19,21
**turn (3)**
57:25 59:7 64:3
**turned (1)**
43:21
**two (12)**
6:19 9:25 15:9 16:17
20:6 22:18 23:21
41:20 57:11,12,25
68:20
**type (2)**
15:3 55:18
**typed (1)**
8:3

U

**U.S (3)**
18:20 51:19 75:19
**UConn (1)**
6:4
**Uh-huh (6)**
10:19 12:8 22:9 51:14
58:5 69:21
**uncle (2)**
71:4,5
**understand (8)**
13:11 23:19 46:5
48:12 50:19 58:25
59:4 72:8
**understanding (1)**
21:10
**understood (1)**
33:14
**unit (4)**
9:9 10:3 24:5 51:12
**United (3)**
1:2 4:12 35:13
**units (1)**
9:25
**Universitas (3)**
1:5 4:9 21:8
**updates (1)**
45:7
**upset (1)**
69:11
**use (2)**
10:24 23:16

V

**v (2)**
1:7 4:2
**vacant (3)**
39:12 49:6,8
**vacated (1)**
9:16
**value (1)**
56:3
**venture (1)**
7:9
**ventures (1)**
62:6
**versus (2)**
67:16,20
**Victor (1)**
61:9
**Village (3)**
60:4,5,15
**Virgin (1)**
21:3
**Virginia (1)**
3:6
**volumes (1)**

5:4

W

**waive (1)**
5:8
**want (6)**
27:5 30:9,15 50:11,16
51:7
**wanted (4)**
4:22 5:22 27:12 45:20
**warranty (1)**
60:2
**Washington (2)**
6:6,14
**wasn't (8)**
29:17 33:8 46:11
49:14 65:15 67:5
68:17 69:12
**watch (1)**
11:23
**waterfront (1)**
11:21
**way (6)**
15:13 25:14,15 56:6
56:22 74:18
**we'll (5)**
28:14 31:14 35:25
68:3 73:5
**we've (5)**
59:11,22 71:13
**week (2)**
10:2 54:22
**weekend (1)**
12:4
**weekends (2)**
23:24,25
**weeks (4)**
9:13,17 12:6,16
**went (27)**
7:11,12 8:3,6,6 9:15
11:23 12:5,15 14:13
20:6 27:13 39:15,21
48:6 53:19 57:9
60:12 62:10 63:2
64:11 66:6,8,10
68:25 69:2,15
**weren't (1)**
11:11
**Westport (1)**
7:24
**whatnot (1)**
47:9
**WHEREOF (1)**
74:20
**wife (2)**
33:9 39:8

**William (1)**
10:15
**Williams-Shaw (1)**
31:3
**wind (1)**
34:24
**withdrawals (1)**
58:21
**witness (19)**
3:11 4:2 5:15 27:19
28:7,20 30:8 43:2
51:22 60:6 61:2
64:8 68:9 72:22
74:12,15,20 75:3
76:3
**wives (1)**
38:3
**women (1)**
43:25
**wonder (1)**
17:22
**words (1)**
32:15
**work (12)**
5:23 6:18 7:2,14 8:8
8:17 17:19 34:3
39:12,14,17 62:15
**worked (9)**
6:13,21 7:6 12:12
33:14 34:6,11 39:4
53:7
**workforce (1)**
7:20
**working (3)**
14:8 15:12 38:19
**works (2)**
62:15,17
**wouldn't (1)**
72:11
**wound (1)**
35:5

X

**x (4)**
1:4,11 4:2 75:2

Y

**yeah (22)**
9:13 11:2,20 12:20
13:8,12,17 14:17
23:23 26:9,16 28:9
30:13 32:24 38:13
39:2 40:20 43:23
46:24 62:2 64:17
65:21
**year (7)**

6:4 7:25 15:19
32:24 33:23 34:14
38:21
**years (17)**
6:19 7:3,16 8:5 10:17
10:18 15:16,17,18
16:13 33:2 34:20
43:20 49:23 54:16
56:5 62:25
**York (1)**
67:16
**young (2)**
18:7 69:8
**younger (1)**
39:5

**Z**

**0**

**02464 (1)**
3:13

**1**

**1 (8)**
4:24 28:14,15,22 34:8
58:12 75:8 76:5
**1.9 (1)**
25:21
**1:15 (1)**
73:17
**1:15-cv-11848 (1)**
4:14
**1:15-cv-11848-DP... (1)**
1:7
**10 (1)**
52:11
**10:05 (1)**
2:6
**100 (2)**
49:13 56:14
**1065 (2)**
51:19 75:19
**10711 (1)**
56:17
**11 (1)**
34:22
**11/15/10 (2)**
63:25 75:22
**11499 (1)**
55:14
**119 (1)**
54:7
**11th (1)**
60:2
**12 (2)**
66:20,21

**12-year-old (2)**
37:12,24
**12/11/17 (1)**
68:7
**132,000 (1)**
24:22
**1344 (2)**
42:18 56:11
**136 (1)**
13:21
**1387 (1)**
4:24
**14 (1)**
67:13
**15 (2)**
63:22 75:8
**15-minute (1)**
42:24
**1510 (2)**
24:5 51:11
**15609 (1)**
54:20
**16 (1)**
64:6
**164779 (1)**
1:24
**18 (1)**
67:14
**19 (1)**
75:19
**191,906 (1)**
58:16
**198 (1)**
40:20

**2**

**2 (10)**
22:20 36:2,3,23 58:12
58:14 59:11,21
75:11 76:6
**20 (3)**
10:17,18 26:5
**20,000 (1)**
26:6
**200,000 (2)**
24:10,18
**2001 (1)**
10:21
**2002 (1)**
14:17
**2003 (2)**
14:16,18
**2004 (1)**
45:18
**2008 (2)**
20:13,20

**2009 (1)**
28:3
**201 (2)**
24:5 51:12
**2010 (2)**
20:13 63:22
**2011 (1)**
38:22
**2013 (1)**
28:3
**2014 (2)**
27:24 50:15
**2015 (5)**
57:18 60:3 61:25,25
62:3
**2016 (7)**
39:19 50:20 51:20
58:16 61:23,24
75:19
**2017 (3)**
52:14 53:16 57:9
**2018 (7)**
31:18,19,24 42:21
56:16 72:21,22
**2019 (4)**
1:15 2:5 73:22 74:21
**22,000 (1)**
35:21
**22314 (1)**
3:6
**22nd (3)**
10:7,8 55:21
**233 (1)**
3:12
**24 (1)**
75:21
**25 (2)**
1:15 2:5
**28 (1)**
75:8
**28552 (1)**
8:23
**2991 (1)**
69:9

**3**

**3 (8)**
14:17 36:9 42:5 43:6
43:9 75:12,15 76:7
**30 (2)**
5:7 62:2
**30th (1)**
62:3
**3451 (1)**
2:12
**35,000 (1)**

58:22
**36 (1)**
75:12

**4**

**4 (7)**
14:16 28:21 40:5
51:17,18 75:4,18
**4201 (2)**
10:8 55:21
**43 (1)**
75:15
**451,324 (1)**
58:3
**4712 (1)**
9:9

**5**

**5 (5)**
32:4 42:3 63:20,23
75:21
**5,000 (2)**
46:23,24
**50 (4)**
25:16,20 32:18 45:6
**50/50 (1)**
25:12
**500,000 (1)**
22:18
**51 (1)**
75:19

**6**

**6 (4)**
68:4,5 75:24,24
**600 (1)**
3:5
**63 (1)**
75:21
**68 (1)**
75:24
**6th (1)**
74:21

**7**

**7 (4)**
32:25 64:4,7,19
**7,573 (1)**
59:9
**73 (2)**
8:2,5

**8**

**8 (2)**
64:6,19

**9**

**9 (7)**
23:2,3 34:5,8 65:22
65:23 75:15
**940,000 (1)**
26:8
**9500 (1)**
58:20
**9547 (1)**
53:5

```
 1
 2                   UNITED STATES DISTRICT COURT
 3                    MIDDLE DISTRICT OF FLORIDA
 4                          TAMPA DIVISION
 5                   Case No.:  8:19-mc-30-T-02JSS
 6
 7
 8   UNIVERSITAS EDUCATION, LLC,
 9            Plaintiff,
10   v.
11   JACK E. ROBINSON, III,
12            Defendant.
13   _____/
14
15
16      TELEPHONIC DEPOSITION OF LILLIAN B. GRANDERSON
17                  11:08 a.m. - 12:25 p.m.
18                   Monday, July 13, 2020
19
20          (Witness located in Sarasota, Florida)
21
22
23   Reported By:
24   Janet Hamilton, RPR, CRC, FPR
25   Job No: 181675
```

Page 2

```
1
2
3
4
5                          11:08 a.m.
6                          July 13, 2020
7
8
9          The telephonic deposition of
10  LILLIAN B. GRANDERSON was conducted with the witness
11  and Attorney Williams-Shaw together in Sarasota,
12  Florida; with Attorneys Karam and Manson, Plaintiff's
13  counsel, together in Alexandria, Virginia; and with
14  Janet Hamilton, a Registered Professional Reporter and
15  Florida Notary Public, attending from Tampa, Florida.
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
1
2                    A P P E A R A N C E S:
3
4   LAW OFFICE OF JOSEPH L. MANSON, III
5   Attorneys for Plaintiff
6       600 Cameron Street
7       Alexandria, VA 22314
8   BY:  JOSEPH KARAM, ESQ.
9
10  LAW OFFICE OF JERALDINE WILLIAMS
11  Attorney for Witness
12      P.O. Box 3322
13      Plant City, FL 33563
14  BY:  JERALDINE WILLIAMS-SHAW, ESQ.
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
1
2                        INDEX
3                                              PAGE
4   TESTIMONY OF LILLIAN B.. GRANDERSON
5   Direct Examination by Mr. Karam                 5
6   Certificate of Oath and Reporter               62
7
8                      *  *  *
9                     EXHIBITS
10  NUMBER      DESCRIPTION                      PAGE
11  Exhibit 1   6/24/20 Order                      10
12  Exhibit 2   10/18/19 Order                     11
13  Exhibit 3   7/23/19 Order                      12
14  Exhibit 4   Last Will and Testament,          15
15              Jack E. Robinson, III
16  Exhibit 5   6/1/20 Motion to Dismiss          18
17  Exhibit 6   Transamerica correspondence and   33
18              checks
19  Exhibit 7   MassMutual documents              36
20  Exhibit 8   SunTrust bank statements          39
21  Exhibit W1  6/25/20 Motion                    58
22  Exhibit W2  6/24/20, Order                    59
23
24  (NOTE:  All exhibits electronically marked by
25  reporter.)
```

Page 5

```
1              L. GRANDERSON - 7/13/20
2              P R O C E E D I N G S
3              *    *    *    *    *
4          THE REPORTER:  Do you swear or affirm the
5       testimony you are about to give will be the
6       truth, the whole truth, and nothing but the
7       truth?
8          THE WITNESS:  Yes.
9   THEREUPON,
10             LILLIAN B. GRANDERSON,
11  having been first duly sworn or affirmed, was examined
12  and testified as follows:
13             DIRECT EXAMINATION
14  BY MR. KARAM:
15     Q.  All right.  So, Ms. Granderson, my name is
16  Joe Karam.  We met last year in Sarasota.  I was at the
17  deposition with Mr. Manson.  And I'll be conducting the
18  deposition today.
19         So, first, can you please state your name
20  for the record?
21         MS. WILLIAMS-SHAW:  Before we get going, I'd
22      like to make a preliminary statement.  Do you
23      want me to make my preliminary statement after
24      she has stated her name?
25         MR. KARAM:  Yes.
```

Page 6

L. GRANDERSON - 7/13/20

2  Q.   (By Mr. Karam) Please state your name for
3  the record first.
4       MR. KARAM:  And then, Ms.  Williams, you can
5  make those preliminary statements.
6  A.   My name is Lillian B. Granderson.
7       MS. WILLIAMS-SHAW:  That's
8  G-r-a-n-d-e-r-s-o-n.
9       MR. KARAM:  Okay.  And if you would like,
10 you can give the preliminary statement now.
11      MS. WILLIAMS-SHAW:  For the record, I am
12 saying that there is at this time no estate that
13 has been open in this cause of action.  No
14 substitute defendant has been named to replace
15 the defendant who is now deceased, who was
16 deceased as of November 2017.  November 17, 2017.
17      And I am asking you, Mr. Karam, to please
18 show some civility.
19      There were some insulting references to
20 Mrs. Granderson.  She was highly incensed by
21 them.  And I'm asking you, please, do not insult
22 her or malign her character as you ask the
23 questions.  Please don't.
24      I'm good.
25      MR. KARAM:  Okay.  Thank you, Ms. Williams.

Page 7

L. GRANDERSON - 7/13/20

2       I don't think that will be an issue.  But let's
3  continue.
4  Q.   (By Mr. Karam) So, Ms. Granderson, what is
5  your address?
6  A.   My address 770 South Palm Avenue,
7  Apartment 402, Sarasota, Florida 34236.
8  Q.   Great.  And are you appearing today because
9  of an order from the Middle District of Florida dated
10 June 24, 2020?
11 A.   Yes.
12 Q.   Now I understand that you participated in a
13 deposition before with us.  But I'd like to remind you
14 that, particularly because we are on the phone, you
15 need to speak audibly and you need to answer questions
16 verbally so that the court reporter can record the
17 answers.
18      Do you understand that?
19 A.   Yes, I do.
20 Q.   And even if your counsel objects today, you
21 should still answer the question, unless your counsel
22 explicitly directs you not to answer it.
23      Do you understand that?
24 A.   Yes.
25 Q.   And if any question I ask you is confusing

Page 8

L. GRANDERSON - 7/13/20

1  or you don't understand it, please let me know so that
2  I can reask the question in a way that you can
3  understand and to which you can respond.
4       Do you understand that?
5  A.   I do.
6  Q.   Okay.  Now, Ms. Granderson, I understand
7  that you have health issues.  And I do understand that
8  you are 93 years old.  So I need to ask -- I assume
9  that you are taking some sorts of medication because
10 you have had an operation recently.  But are you on any
11 medication that would impair your ability to understand
12 or answer my questions?
13 A.   Not that I know of.
14 Q.   Okay.  And so -- I'm sorry.  Please
15 continue.
16      MS. WILLIAMS-SHAW:  She's good.  She really
17      wanted to say that she -- she doesn't know that
18      the medication that she's on will impair her.
19      She doesn't think it will.
20      MR. KARAM:  Okay.
21 Q.   (By Mr. Karam) So to the best of your
22 knowledge, you think that you can answer these
23 questions truthfully?
24 A.   I will answer all questions truthfully.

Page 9

L. GRANDERSON - 7/13/20

2  Q.   Thank you, Ms. Granderson.
3  A.   As best as I can.  As best as I can recall.
4  Q.   Thank you, Ms. Granderson.  So, once again,
5  we've scheduled the deposition for two hours in
6  consideration of your problem with health and age.  We
7  don't anticipate that it will take that long, but it is
8  dependent on you answering the questions.  And, once
9  again -- I've already said it, but I want to say it on
10 the record.  If at any point you need a break, let me
11 know and we can take a brief recess.
12      Is that okay with you?
13 A.   Yes, it is.
14 Q.   All right.  So you and your counsel have
15 available before you a copy of the Middle District of
16 Florida order signed by Magistrate Judge Sneed dated
17 June 24, 2020.  Is that correct?
18      It should be labeled as Exhibit 1 of the
19 evidence packet that I sent you.
20 A.   What was that last --
21      MS. WILLIAMS-SHAW:  Exhibit -- Exhibit 1.
22 A.   Yes, I did see it.
23 Q.   (By Mr. Karam) So you have that before you?
24 A.   Yes, I do.
25      MR. KARAM:  For the court reporter, I would

Page 10

L. GRANDERSON - 7/13/20

1    like to mark as Exhibit 1 this June 24, 2020,
2    order.
3
4              (Exhibit 1 identified for the record.)
5         Q.   (By Mr. Karam) Now, Ms. Granderson, could
6    you and Ms. Williams please turn to Page 5 of the
7    order?  And please let me know once you're there.
8         A.   I'm here.
9         Q.   So does this appear to be a true and
10   accurate copy of the Court's order dated June 24, 2020,
11   that the Court sent to you and which Universitas also
12   sent to you as a courtesy copy with our letter
13   scheduling this deposition?
14        A.   Yes.
15        Q.   Great.
16        A.   I have a copy.
17        Q.   Great.  And so, looking at this order, you
18   do understand that you have been ordered by this Court
19   to attend a deposition and answer our questions.
20   Right?
21        A.   Yes.
22        Q.   Okay.  So moving on.
23             Next I would like to turn your attention to
24   a Middle District order -- Middle District of Florida
25   order signed by Magistrate Judge Sneed, which should

Page 11

L. GRANDERSON - 7/13/20

1    also be in front of you, dated October 18, 2019.  This
2    is Exhibit 2 in the exhibit packet that I sent to you.
3         Do you have that in front of you?
4         MS. WILLIAMS-SHAW:  Yes.
5         A.   Yes.
6         Q.   (By Mr. Karam) Great.
7              MR. KARAM:  So for the court reporter, I
8    would like to mark the October 18, 2019, order as
9    Exhibit 2.
10             (Exhibit 2 identified for the record.)
11        Q.   (By Mr. Karam) So I would like to turn your
12   attention, Ms. Granderson, to Page 3.  And to the one
13   full paragraph there.  It begins "However,
14   Ms. Granderson..."
15        Do you see that?
16        A.   Yes, I do.
17        Q.   And I would like to take your attention to
18   the fifth line with the sentence starting, "The Court
19   will deny the Motion and allow Universitas to serve
20   Ms. Granderson with a subpoena for telephonic
21   deposition within Universitas's date range."
22        Do you see that?
23        A.   Yeah.  Yes.
24        Q.   So, Ms. Granderson, it is clear to you that

Page 12

L. GRANDERSON - 7/13/20

1    the Court has ordered that this deposition be conducted
2    telephonically.  Right?
3         A.   Yes.
4         Q.   Thank you.
5              Next I'd like to turn your attention to a
6    Middle District of Florida order signed by
7    Magistrate Judge Sneed on July 23, 2019.  This should
8    be in front of you as Exhibit 3 in the exhibit packet
9    that I sent you.
10        Do you see that?
11             MS. WILLIAMS-SHAW:  This is where, Joe?
12   This is Exhibit 3, you said?
13        A.   Which exhibit is that?
14        Q.   (By Mr. Karam) That would be Exhibit 3.
15   It's an order dated July 23, 2019.
16        A.   Yes.
17             MR. KARAM:  For the court reporter, I would
18   like to mark this as Exhibit 3.
19             (Exhibit 3 identified for the record.)
20        Q.   (By Mr. Karam) So, Ms. Granderson, if you
21   could, can you please direct your attention to Page 2
22   and the second paragraph, which begins with "As
23   discussed at the hearing..."
24        Do you see that?

Page 13

L. GRANDERSON - 7/13/20

1         A.   "As discussed at the hearing..."  Yes.
2         Q.   All right.  And so to read that into the
3    record:  "As discussed at the hearing, the Court finds
4    that the information sought by Universitas is relevant
5    to the issues raised in the underlying Complaint, which
6    alleges that Mr. Robinson was involved in entities
7    responsible for the 'defalcation of funds belonging to
8    Universitas' as early as 2003."
9         Is that an accurate restatement of the
10   language?
11        A.   Is this the first -- the first line?  This
12   is the second paragraph?
13             MS. WILLIAMS-SHAW:  Yes.
14        Q.   (By Mr. Karam) Yes, ma'am.
15        A.   Yes.
16        Q.   Okay.  So it's clear to you that the Court
17   has held that Mr. Robinson -- that the complaint, I'm
18   sorry, alleges that Mr. Robinson was involved -- was
19   potentially involved in entities as early as 2003.  Is
20   that correct?
21        A.   That's what it states here.
22        Q.   And now I'd like to turn --
23             MS. WILLIAMS-SHAW:  Just a moment.  Just a
24   moment.

Page 14

L. GRANDERSON - 7/13/20

2   He's saying that -- (garbled).
3   A.   Yes.  Uh-hum.
4   Q.   (By Mr. Karam) Is that clear to you,
5   Ms. Granderson?
6   A.   Yes.
7   Q.   Okay.  So if you could turn to Page 3 and
8   look at Bullet Point 2.
9        Are you there?
10  A.   Yes.
11  Q.   And so do you see the language that states:
12  "Universitas Education may issue a subpoena duces tecum
13  for a continued deposition of Lillian Granderson on the
14  topic of Jack E. Robinson's last will and testament and
15  any money Lillian Granderson received from life
16  insurance policies owned by Jack E. Robinson, III,
17  obtained during the time periods referenced in the
18  Complaint"?
19       Do you see that language?
20  A.   I see that.
21  Q.   So you understand that Universitas can ask
22  you questions about any insurance policy that was taken
23  out on Jackson E. Robinson, III, dating back to 2003?
24  A.   Yes, I do.
25  Q.   Thank you.

Page 15

L. GRANDERSON - 7/13/20

2        So next I'd like to turn your attention to
3   what has been marked as Exhibit 4.  And that is the
4   Last Will and Testament of Jack E. Robinson, III, which
5   you provided to us in discovery on April 2, 2019.  And,
6   once again, that's Exhibit 4.
7        Do you have that in front of you?
8   A.   I see.  Yes.
9        MR. KARAM:  So for the court reporter I
10       would like mark the Last Will and Testament of
11       Jack E. Robinson, III, as Exhibit 4.
12       (Exhibit 4 identified for the record.)
13  Q.   (By Mr. Karam) Now, Ms. Granderson, if you
14  would look through this and let me know if this appears
15  to be a true and accurate copy of the will you provided
16  us last year.
17  A.   Yes.  I didn't provide it, though.  This was
18  sent to me.
19  Q.   That you --
20  A.   I have not read through it, the second part.
21  Q.   Okay.
22  A.   The first one --
23  Q.   Right.  So let me clarify.
24       MS. WILLIAMS-SHAW:  Did you understand her?
25  Q.   (By Mr. Karam) You informed us --

Page 16

L. GRANDERSON - 7/13/20

2   A.   I will accept this as a copy of the will.
3   But I have not read through it, this copy, to see that
4   it matches my copy.  But I will accept it.
5   Q.   (By Mr. Karam) Okay.  Yes, Ms. Granderson.
6   And you are correct.  You informed us of the existence
7   of the will at that time but did not provide us a copy.
8   So I will clear that up for the record.
9        But you do accept that this is a true and
10  accurate representation of the will that you had
11  initially seen.  Right?
12  A.   This seems to be.  Yes.
13  Q.   Okay.
14  A.   As best as I can recall.  Because I don't
15  have the other will with me.
16  Q.   Okay.  Thank you.
17       So I will represent that this is a true and
18  accurate copy of the will that we received from the
19  court in Florida after you informed us of its
20  existence.  And I will say that for the record.
21       So if you could, Ms. Granderson, could you
22  please turn to Page 11 of the will?
23  A.   Yes.  I have it.
24  Q.   Okay.  So you're at Page 11?
25  A.   I'm at Page 11.

Page 17

L. GRANDERSON - 7/13/20

2   Q.   All right.  So do you see under Number 11 a
3   section labeled "Life Insurance"?
4   A.   I do.
5   Q.   Okay.  So we're going to talk about a few of
6   those policies that are listed there.
7        But first, can you please take a look at the
8   second policy listed there, under the carrier
9   Prudential?  Do you see to what I am referring?
10  A.   Yes.
11  Q.   Okay.  And do you see the face amount of the
12  policy?
13  A.   I do.
14  Q.   And what is that amount?
15  A.   And what was that question?
16       MS. WILLIAMS-SHAW:  "What is that amount?"
17  A.   What does that mean?
18       MS. WILLIAMS-SHAW:  What is that amount?
19  A.   I'm sorry.  $1 million.
20  Q.   (By Mr. Karam) Okay.  And do you see who the
21  beneficiary is listed as?
22  A.   I do.
23  Q.   And what does it say there?
24  A.   "Mother."  I am -- it says "Mother."
25  Q.   And are you the mother, as listed in that

Page 18

```
 1              L. GRANDERSON - 7/13/20
 2  will, under the policy?
 3      A.   I am.
 4      Q.   So do you see the effective date of the
 5  policy?
 6      A.   The effective date?  It says May -- yes.
 7      Q.   And what date is that?
 8      A.   Yes.
 9      Q.   So is that May 11, 2007?
10      A.   May 11, 2007.
11      Q.   Okay.  Now, Ms. Granderson, first and
12  foremost, after the death of your son did you receive
13  insurance proceeds from this insurance policy?
14      A.   I did.
15      Q.   Okay.
16      A.   Yes.
17      Q.   And so I would like to turn your attention
18  to what has been previously marked as Exhibit 5, which
19  is the Motion to Dismiss that you filed on June 1,
20  2020, in the Middle District of Florida.
21           Do you have that in front of you?
22      A.   Exhibit 5.  I do.
23           MR. KARAM:  And for the court reporter, can
24      you please mark this as Exhibit 5?
25           (Exhibit 5 identified for the record.)
```

Page 19

```
 1              L. GRANDERSON - 7/13/20
 2      Q.   (By Mr. Karam)  Now, Ms. Granderson, if you
 3  could flip through this.  Could you please tell me if
 4  this is a true and accurate copy of the motion that you
 5  filed in the Middle District of Florida on June 1,
 6  2020?
 7      A.   Yes.
 8      Q.   Okay.  And if I could turn your attention to
 9  Page 7.
10      A.   Page 7.  Right here.  Okay.  Yes.
11      Q.   Okay.  And do you see the heading
12  "Prudential life insurance benefits are outside the
13  estate"?
14      A.   I do.
15      Q.   Okay.  So if you can just look at the
16  sentence directly below that.  Which, for the record,
17  is:  "This is what I have been able to piece together
18  about the insurance proceeds paid directly to me."
19           Do you see that sentence?
20      A.   Yes, I do.
21      Q.   Okay.
22      A.   Yes.
23      Q.   And so this is the policy with the effective
24  date of May 11, 2007.  Correct?  This is what this
25  section refers to?
```

Page 20

```
 1              L. GRANDERSON - 7/13/20
 2      A.   Yes.
 3      Q.   And those policy proceeds were paid directly
 4  to you.  Correct?
 5      A.   Yes.
 6      Q.   Okay.  And so I have a couple questions
 7  about this.  The first is:  After the death of your
 8  son, did you file a claim form for this policy?
 9      A.   I guess.  Yes.
10      Q.   To the best of your recollection, did you?
11      A.   The best of my recollection, yes.
12      Q.   Now after that claim form was filed, did you
13  receive a check for the amount of the proceeds?
14      A.   I did.  Yes.
15      Q.   And then do you remember when you received
16  that check?
17      A.   No, I don't.
18      Q.   Do you remember generally when you received
19  that check?  For example, did you receive it at the end
20  of 2017?  Early 2018?  Again, to the best of your
21  recollection.
22      A.   2018?  2019?  I guess 2018.  I'm not sure.
23           No.  I can't recall.
24           No.  Not the exact date.  I do not remember
25  the exact date.
```

Page 21

```
 1              L. GRANDERSON - 7/13/20
 2      Q.   So you don't remember the exact date that
 3  you received those proceeds?
 4      A.   No.
 5      Q.   Okay.  So the next question is:  When you
 6  received the check, did you deposit it into your bank
 7  account?
 8      A.   Yes.
 9      Q.   And was this a bank account that you keep
10  other money in?
11      A.   Yes.
12      Q.   And so we're going to talk a little bit
13  about the disposition of the proceeds; basically, what
14  you did with them, what you spent them on.
15           So my first question is:  Have you used the
16  proceeds from the money for living expenses?  Sorry.
17  The proceeds from the insurance policy for living
18  expenses?
19      A.   I told you before:  I do not know.
20      Q.   So you don't know.
21           Do you recall how much you received exactly
22  in insurance proceeds from the Prudential life
23  insurance policy?
24      A.   $1 million.
25      Q.   $1 million?
```

Page 22

L. GRANDERSON - 7/13/20

2    A.    Yes.  Yes.

3    Q.    Now do you know if you've used the proceeds

4  from that policy for any kind of medical expenses?

5    A.    I don't know.  I do not know.

6    Q.    You don't know.

7          Did you purchase any real estate with those

8  proceeds?

9    A.    No.  I do not know.  It was commingled.

10   Q.    You do not know?

11   A.    No.

12   Q.    So did you purchase any real estate in the

13  month following the death of your son?

14   A.    No.  I'd remember that.

15   Q.    You did not purchase any kind of real

16  estate?

17          MS. WILLIAMS-SHAW:  You said in the month

18          following.  What month are you referring to?

19   Q.    (By Mr. Karam) Did you purchase any real

20  estate in 2017 or 2018?

21   A.    2018.  Yes.

22   Q.    You purchased real estate in 2018?

23   A.    Yes.

24   Q.    And what kind of real estate did you

25  purchase?

Page 23

L. GRANDERSON - 7/13/20

2          MS. WILLIAMS-SHAW:  What -- (inaudible)

3    A.    No.

4    Q.    (By Mr. Karam) All right.  Let me repeat

5  that.

6    A.    You're asking -- you're asking what did I

7  purchase in 2018?

8    Q.    Just what real estate -- what real estate

9  did you purchase in 2018?

10   A.    Residential.

11   Q.    Residential.  And is that the condominium in

12  which you are living now?

13   A.    It is.  Yes.

14   Q.    And that is the apartment at -- or, sorry --

15  the condo at 770 South Palm Avenue, Unit 402, in

16  Sarasota, Florida.  Correct?

17   A.    Yes.

18   Q.    Did you purchase any automobiles with the

19  insurance proceeds?

20   A.    No.

21   Q.    Did you purchase any automobiles in late

22  2017 or throughout 2018?

23   A.    No.

24   Q.    Did you purchase any stocks in late 2017 or

25  2018?

Page 24

L. GRANDERSON - 7/13/20

2    A.    No.

3    Q.    Did you purchase any other kinds of

4  securities?  Bonds?  Anything of that nature?

5    A.    No.

6    Q.    Did you specifically transfer any of the

7  policy proceeds to offshore accounts?

8    A.    No.

9    Q.    Did you transfer any of the policy proceeds

10  to any of your friends?

11   A.    No.  Did I transfer them?  No.

12   Q.    Okay.  We'll get to other points, but did

13  you specifically transfer any of the policy proceeds to

14  family?

15   A.    No.

16   Q.    Did you specifically transfer any of the

17  policy proceeds to any corporations or LLCs?  Limited

18  liability company.

19   A.    No.

20   Q.    And once again for the record, those

21  proceeds were placed in the same bank account as other

22  funds that you had.  Correct?

23   A.    Yes.

24   Q.    Now do you know how much of those

25  policies -- of the policy proceeds from that Prudential

Page 25

L. GRANDERSON - 7/13/20

2  policy still remain?

3    A.    No.

4    Q.    So you haven't tracked spending on that

5  policy specifically?

6    A.    No.

7    Q.    Okay.

8          MR. KARAM:  I just need one second.

9          (Pause)

10   Q.    (By Mr. Karam) Okay.  So now,

11  Mrs. Granderson, are you feeling okay?  Are you good to

12  continue for a little while longer?

13   A.    Yes.

14   Q.    So, Ms. Granderson, you are good to

15  continue.

16          And so, once again, I would like to turn

17  your attention to Exhibit 4, which is the Last Will and

18  Testament of Jack E. Robinson.  Page 11.

19          You're there.  Correct?

20   A.    Yes.

21   Q.    And do you see the last two insurance

22  policies that are listed that have a carrier named

23  Transamerica?  Is that right?

24   A.    Yes.

25   Q.    And let me turn your attention to the first

Page 26

L. GRANDERSON - 7/13/20

1    one that has a face amount of $1 million.
2         Do you see that?
3    A.   Yes.
4    Q.   And the listed beneficiary for that policy
5    is SRP.  Is that correct?
6    A.   Yes.
7    Q.   And do you know what "SRP" stands for?
8    A.   Now I do.  Yes.  I did not, though.
9    Q.   And what does it stand for?
10   A.   Now?
11   Q.   Yes.
12   A.   I guess, Shadow Ridge Properties.  I did not
13   know that --
14   Q.   Okay.
15   A.   -- in 2017.
16   Q.   Okay.  So when you first saw it, you did not
17   know that it was referring to Shadow Ridge Properties?
18   A.   No.
19   Q.   Okay.  And you have since come to learn that
20   it does refer to Shadow Ridge Properties.  And to the
21   best of your understanding, what is Shadow Ridge
22   Properties?
23   A.   I have no idea.
24   Q.   Okay.  Would you accept a representation

Page 27

L. GRANDERSON - 7/13/20

1    that Shadow Ridge Properties was a company that was 50%
2    owned by your son, Jack E. Robinson, III?
3    A.   Now I know that.  Yes.
4    Q.   And so now you know that that is true?
5    A.   Yes.
6    Q.   And in the will did his ownership interest
7    in Shadow Ridge Properties pass on to you after his
8    death?
9    A.   I do not know.
10   Q.   Okay.  So if you would please turn your
11   attention to Page 7.  And it's the last sentence in
12   Page 7 of Exhibit 4, which is the will.
13   A.   Yes.
14   Q.   And so if you could please just take a look
15   at that while I read it aloud.  And it just says:  "My
16   50% ownership interest in SRP" -- which is Shadow Ridge
17   Properties -- "shall be given to Mother."
18        And you are Mother.  Correct?
19        MS. WILLIAMS-SHAW:  Which exhibit are you
20   looking at?
21        MR. KARAM:  Page 7, Exhibit 4.
22   A.   Page 4, Line 7.
23        Page 4?  I thought you said Page 7.
24   Q.   (By Mr. Karam)  No.  Page 7 of Exhibit 4.

Page 28

L. GRANDERSON - 7/13/20

1    A.   Yes.  I do see it now.  Yes.
2    Q.   Okay.  And it states that Mr. Robinson's 50%
3    ownership interest in SRP, which is Shadow Ridge
4    Properties, shall be given to Mother, which is you.  Is
5    that correct?
6    A.   That's what it states.  Yes.
7    Q.   So is it your understanding that his 50%
8    ownership in Shadow Ridge transferred to you upon his
9    death?
10   A.   I do not know.
11   Q.   You don't know.  Okay.  So we can continue
12   then.
13        So going back to Page 11.  The first
14   Transamerica policy for $1 million.  Let me know when
15   you're back to Page 11.
16        MS. WILLIAMS-SHAW:  I got it.
17   A.   Going back to Page 11 now?
18   Q.   (By Mr. Karam) Yes, ma'am.
19   A.   Yes.  Okay.
20        What was the question?
21   Q.   So for the first Transamerica policy --
22   A.   Was there a question?
23   Q.   Yes.  So the first Transamerica policy with
24   the face amount of $1 million, what is the policy date

Page 29

L. GRANDERSON - 7/13/20

1    listed for it?
2        MS. WILLIAMS-SHAW:  What's your question?
3    What is the policy what?
4        MR. KARAM:  What is the policy date?  I'm
5    sorry.
6        MS. WILLIAMS-SHAW:  The second one?
7    Q.   (By Mr. Karam) The one for $1 million.
8    A.   July 28.  The million dollars?  July 28.
9    Q.   Of 2010.  Okay.
10        Now for the second policy, which has a face
11   amount of $500,000, who is the beneficiary?
12   A.   SRP.
13   Q.   And that's Shadow Ridge Properties.
14   Correct?
15   A.   Yes.
16   Q.   And the policy date there is August 6, 2010.
17   Correct?
18   A.   August 6, 2010.  The second policy?
19   Q.   And both of those -- sorry?
20   A.   That last question.  You asked the date?
21   Q.   Yes.  I just asked for the date.
22   A.   The date was August 6, 2010.
23   Q.   Great.  And so both of these dates are after
24   2003.  Correct?

Page 30

L. GRANDERSON - 7/13/20

2    A.    Yes.
3    Q.    Okay.  So next I would like to turn your
4   attention to Exhibit 6, which is a --
5         MS. WILLIAMS-SHAW:  Just a moment.
6    Mr. Karam?
7         MR. KARAM:  Yes?
8         MS. WILLIAMS-SHAW:  Just a moment.  Just a
9    moment.
10    A.    I called -- I called each one of these
11   insurance companies.  They were called.  And we were
12   told that all of the policies had lapsed, with the
13   exception of the Prudential.  So -- and that's all.
14   And that was the policy, $1 million, Mother, May 11,
15   2007.
16         And I can save you a lot of trouble.  I also
17   called every property listed.  And it was insane.
18   Nothing was in them.  Nothing was in the estate.
19         So we could solve a lot of problems by
20   stopping this now.  Because I was told by every piece
21   of property held that all was underwater or -- what was
22   the other word? -- or foreclosed.
23         So I did not probate the will because there
24   was nothing to probate.  All of the insurance companies
25   in late 2017 told me that there was no -- the policies

Page 31

L. GRANDERSON - 7/13/20

1   had lapsed.  And all of the property was underwater or
2   foreclosed.  There was nothing to probate.  That's why
3   I did not probate.
4
5         And you're driving me crazy with all of
6   this.  I'm losing my hair.  I'm going through
7   operations.  Oh, God.  Oh, God.
8    Q.    (By Mr. Karam) I understand this is
9   stressful.
10    A.    Okay.
11         MS. WILLIAMS-SHAW:  Hold up.  Wait a minute,
12   Joe.
13         MR. KARAM:  Yes?
14         MS. WILLIAMS-SHAW:  Do you want a drink of
15   water?
16         MR. KARAM:  Ms.  Williams, we can take a
17   break.  But I do want to say on the record for
18   Ms. Granderson that we're not going to ask about
19   any of those properties.  Because we are aware of
20   the disposition.  But I do appreciate that she,
21   on the record, has explained it.
22         And the only other questions that I have are
23   about the Transamerica policies and one more
24   policy that was given to Shadow Ridge.  And it's
25   going to be a relatively short line of

Page 32

L. GRANDERSON - 7/13/20

1   questioning.
2
3         This deposition isn't going to last much
4   longer.  And I only have one other question,
5   which Ms. Granderson also answered, about whether
6   or not she knew if any of those other policies
7   listed in the will had not lapsed.  And she
8   answered that question as well.
9         So Ms. Williams and Ms. Granderson, I just
10   want to ask a couple questions about the
11   Transamerica policies as well as another
12   MassMutual policy, your receipt of the proceeds,
13   and their disposition.  And we will be
14   substantially done.
15         So if you would like to take a break, I'm
16   okay with that.  We can call a recess for the
17   court reporter.
18         MS. WILLIAMS-SHAW:  No.  No.  She wants to
19   continue.
20         MR. KARAM:  She wants to continue.
21         But I will represent to you right now that
22   we are not going to discuss every single one of
23   the policies.  And we are also not going to
24   discuss any of the property or the other aspects
25   of the will.

Page 33

L. GRANDERSON - 7/13/20

1
2         MS. WILLIAMS-SHAW:  Okay.  She's ready.
3         MR. KARAM:  We're trying to get through this
4   as quickly as possible.  Okay.
5              CONTINUED DIRECT EXAMINATION
6   BY MR. KARAM:
7    Q.    So can you please just go to what has been
8   previously marked as Exhibit 6?  And that's
9   Transamerica Life Insurance Company Claimant's
10   Statement.
11         Do you see that?
12    A.    Yes.
13    Q.    Okay.
14         MR. KARAM:  And I would like to enter these
15   into the record as Exhibit 6.
16         (Exhibit 6 identified for the record.)
17    Q.    (By Mr. Karam) Now, Ms. Granderson, do you
18   recognize these at all?
19    A.    No.
20    Q.    You don't recognize them?
21         MS. WILLIAMS-SHAW:  What is it you're
22   asking?  What does she recognize in Exhibit 6?
23         MR. KARAM:  Just simply does she recognize
24   the document?
25         There is a claimant's statement, a letter

L. GRANDERSON - 7/13/20

1    to --
2        MS. WILLIAMS-SHAW:  No.
3        MR. KARAM:  -- Ms. Novak dated March 14th,
4    and the two checks that are present there.
5        Q.    (By Mr. Karam) Do you recognize them?
6        MS. WILLIAMS-SHAW:  Wait a minute.  Wait.
7    No.
8        A.    The first page.  Are we talking about the
9    first page?  I don't recognize it.
10       Q.    (By Mr. Karam) Yes.  We will go through them
11   one at a time, but do you recognize the first page?
12       A.    No, I don't.
13       Q.    Okay.
14       A.    I really don't.
15       Q.    No, that's fine.  So you didn't help prepare
16   this?
17       A.    No.
18       Q.    Okay.  Do you know who Ms. Maxine Novak is?
19       A.    I do.  Yes.
20       Q.    Okay.  Did she ask you for any help
21   preparing claim forms, to the best of your
22   recollection --
23       A.    No.
24       Q.    -- for insurance policies from Shadow Ridge?

L. GRANDERSON - 7/13/20

1        A.    No.
2        Q.    No?
3        A.    No.
4        Q.    Okay.  And so if you look at the second page
5    of this exhibit, which is a brief letter to Ms. Novak,
6    you're also not familiar with this.  Right?
7        A.    No.
8        Q.    Okay.  And so you did not receive any of the
9    decs directly from the following pages.  Would that be
10   correct?
11       A.    Yes.
12       Q.    Okay.  In that case, even though you're
13   unfamiliar with it, if you take a look at the second
14   page of this exhibit, which is a letter to Ms. Novak in
15   which the claims examiner states that "Our checks for
16   $500,985.36 and $1,003,563.84 are enclosed."
17       A.    Right.
18       Q.    Do you see that?
19       A.    Yes.
20       Q.    So I understand that you have not seen these
21   documents.  But will you accept the representation that
22   a total of $1,505,549.20 was paid to Shadow Ridge
23   Properties on the policies that we have discussed from
24   Transamerica?

L. GRANDERSON - 7/13/20

1        A.    I cannot tell.  I cannot.  No.
2        Q.    So you don't -- you do not know how it was
3    paid out to Shadow Ridge?
4        A.    I do not.  No.
5        Q.    Okay.  That's fine.  So I'm going to turn
6    your attention then to Exhibit 7, which is a MassMutual
7    life insurance claim form.
8        MR. KARAM:  And for the court reporter, I
9    would like to mark this as Exhibit 7.
10       (Exhibit 7 identified for the record.)
11       Q.    (By Mr. Karam) Do you see this?
12       A.    I see -- what page?  Are you talking about
13   the first page?
14       Q.    Yes.  Just the first page of Exhibit 7.  And
15   if you could flip through it, it should be five pages.
16   Okay.  You can just take a look at it.
17       A.    Exhibit --
18       No.  I've never seen this.
19       Q.    So do you recognize --
20       A.    No.
21       Q.    -- this document at all?  You do not?
22       A.    No.
23       Q.    And you did not help prepare it?
24       A.    No.

L. GRANDERSON - 7/13/20

1        Q.    Okay.  So on the record I'm going to
2    represent to you that these were prepared by
3    Maxine Novak on behalf of Shadow Ridge Properties to
4    get the life insurance proceeds from MassMutual, which
5    was a policy that was not listed in the last will and
6    testament.
7        But, once again, to be clear for the record,
8    you had no part in the preparation of these documents,
9    and you don't know how that check was sent to Shadow
10   Ridge.  Correct?
11       A.    I don't -- I don't know.
12       Q.    So you don't know?
13       MS. WILLIAMS-SHAW:  She's saying --
14       MR. KARAM:  That's fine.
15       MS. WILLIAMS-SHAW:  You asked two questions.
16   Ask a single question.  You asked a double
17   question there.
18       MR. KARAM:  Yes.  Sorry.  Objection noted.
19       I will rephrase.
20       Q.    (By Mr. Karam) So again, to be clear for the
21   record, you do not recognize these documents.  Correct?
22       A.    Correct.
23       MS. WILLIAMS-SHAW:  Correct.  You do not.
24       Correct.

Page 38

L. GRANDERSON - 7/13/20

1    Q.   (By Mr. Karam) Right.  And you had no part
2    in their preparation?
3        A.   I had no part in the preparation.
4        Q.   Okay.  And Ms. Novak did not contact you
5    about the preparation of these documents?
6        A.   What was the question?
7        Q.   To the best of your recollection.
8            MS. WILLIAMS-SHAW:  Ask her again.  She
9    didn't clearly hear you.
10           MR. KARAM:  Yes.
11       Q.   (By Mr. Karam) So Ms. Novak, Maxine Novak,
12   did not call you or contact you about the preparation
13   of these documents, to the best of your recollection.
14   Correct?
15       A.   Correct.  Yes.
16           MS. WILLIAMS-SHAW:  Yeah.  You asked a
17           positive and then you did a negative.  But you're
18           saying -- she's going to answer whether it's
19           correct or not.  Is that correct?
20           MR. KARAM:  That's correct.
21       Q.   (By Mr. Karam) Yes.  So to be clear for the
22   record, Ms. Granderson answered that she was not
23   contacted by Ms. Novak to prepare these.
24           Is that a fair representation of what you

Page 39

L. GRANDERSON - 7/13/20

1    have just said?
2        A.   Yes.
3        Q.   Okay.  So now I'd like to please direct your
4    attention to Exhibit 8, which is a copy of SunTrust's
5    bank statements as well as checks.
6            MR. KARAM:  And once again, for the court
7            reporter, I would like to mark this as Exhibit 8.
8            (Exhibit 8 identified for the record.)
9        Q.   (By Mr. Karam) Do you see this exhibit in
10   front of you?
11       A.   Yes.
12       Q.   Okay.  And, unfortunately, on the PDF the
13   page numbers in the bottom corner are cut off.  But if
14   you could flip to Page 3 of 4, where you should see a
15   page full of checks -- could you please do that?
16           MS. WILLIAMS-SHAW:  Page 3 of 4.
17       A.   Okay.  Yes.
18       Q.   (By Mr. Karam) And so before you do you see
19   a page full of checks?
20       A.   Yes.
21       Q.   These images of checks.
22       A.   The what?
23           MS. WILLIAMS-SHAW:  Images.  Images of
24   checks.

Page 40

L. GRANDERSON - 7/13/20

1        A.   Yes.
2        Q.   (By Mr. Karam) Okay.  So now I'd like to
3    direct your attention to three of the checks that are
4    circled on this page, the first of which is in the
5    top-left corner.  And the number of that check is 5353.
6            Do you see that check?
7        A.   5353?
8            MS. WILLIAMS-SHAW:  No.
9        A.   535?
10           MS. WILLIAMS-SHAW:  No.  5353?  No.  There's
11   a 5350 on the top right.
12           MR. KARAM:  I said top left.
13           MS. WILLIAMS-SHAW:  Oh.  Do you see at top
14   left?  Okay.  The top left of Page 3?
15           MR. KARAM:  Yes, ma'am.  And the check
16   should be for $125,000.
17           MS. WILLIAMS-SHAW:  The top left of Page 3
18   of 4 shows 5345.
19       A.   54.  5354.
20           MS. WILLIAMS-SHAW:  The top left?
21           MR. KARAM:  Oh.  That is my mistake.  That
22   is my mistake.  You are correct.  You are
23   correct.
24           MS. WILLIAMS-SHAW:  Okay.

Page 41

L. GRANDERSON - 7/13/20

1            MR. KARAM:  That is my mistake.
2        Q.   (By Mr. Karam) If you could turn two more
3    pages over.
4            Both of these have Page 3 of 4 at the top.
5            MS. WILLIAMS-SHAW:  What page number?
6            MR. KARAM:  It's also Page 3 of 4.  The
7    Bates-stamped number should be NOB1399.  But it's
8    cut off.  But there should be a page of checks.
9    And four of those checks should be circled.
10       Q.   (By Mr. Karam) Do you see that page?
11       A.   Yes.
12           MS. WILLIAMS-SHAW:  Yes.  But...
13       Q.   (By Mr. Karam) Okay.  Now let me repeat.
14           Do you see the check circled in the top-left
15   corner, Number 3 -- sorry -- 5353?
16       A.   Yes.
17       Q.   Okay.
18       A.   5353.  Yes.
19       Q.   Yes.  And do you see that the check is made
20   out for $125,000?
21       A.   I do.  Yes.
22       Q.   And do you see who the -- to whom the check
23   is being paid?
24       A.   Yes.

Page 42

L. GRANDERSON - 7/13/20

2  Q.  And who is that?
3  A.  Lillian B. Granderson.
4  Q.  And is that you?
5      THE WITNESS:  Could I please tell -- could I
6  tell him about these checks so we won't have to
7  go through each one of them?
8      I received four checks.
9  Q.  (By Mr. Karam) Yes, you can.
10  A.  I received four checks from Maxine Novak
11  accompanied by a note.
12      MS. WILLIAMS-SHAW:  From Shadow Ridge.
13  A.  The insurance.  But -- it was from
14  Shadow Ridge.  But I never wrote a check to myself.  I
15  received these checks in the mail.  I was in a state of
16  shock.
17      To be fair, I didn't even look at the
18  checks.  I just deposited them.  I didn't notice they
19  were from the same checkbook.  All of the checks
20  said -- did not say they were from Transamerica.  They
21  just said insurance.  All of them.
22  Q.  (By Mr. Karam) Okay.  Now --
23  A.  So going forth I agreed to these four
24  checks.  I wanted to let you know.
25  Q.  Okay.  So you do agree that you received

Page 43

L. GRANDERSON - 7/13/20

2  four checks.  I will represent to you that they were in
3  the amounts of $125,000, $50,000, $743,274.60.  And
4  finally, $5,500.  And you received these checks with a
5  note and a memorandum that they were for the payout of
6  life insurance policy proceeds from Shadow Ridge.
7  A.  No.  They was checks made payable to me.
8  Q.  Right.
9  A.  It did not say -- if they did say
10  Shadow Ridge, I did not notice it in the state that I
11  was in.
12  Q.  Okay.
13  A.  I just took the checks and deposited them.
14  Q.  Okay.  I understand that.
15      So -- but -- I will --
16      If you take a look just at one of the
17  checks -- and we can agree that it's the same for all
18  four of the checks.  If you look at the top --
19  A.  What's on the checks?
20  A.  It says Shadow Ridge Properties.  Is that
21  correct?  The top of the check?
22      MS. WILLIAMS-SHAW:  At the top of the check.
23      THE WITNESS:  On the top?
24  A.  I will state that I remember two of them,
25  actually.  The others I'll accept.

Page 44

L. GRANDERSON - 7/13/20

2      MS. WILLIAMS-SHAW:  What's at the top?
3  A.  At the top they just say Shadow Ridge.
4  Q.  (By Mr. Karam) Okay.
5  A.  But I'm explaining to you.  In late -- in
6  early 2018 I was in no physical or mental state to
7  check.  I just received the checks and deposited them.
8  That's all.
9  Q.  All right.  I understand that.  I understand
10  that, Ms. Granderson.
11  A.  I do not -- I have not checked to see did I
12  cash all of them.
13  Q.  Okay.  But you do acknowledge that you
14  received the four checks and that you deposited them?
15  A.  Yes.
16  Q.  Okay.  And if I represent to you that the
17  total amount of the four checks was $923,747.60 --
18  A.  Yes.  Yes.
19  Q.  So does that -- is that the correct amount?
20  To the best of your recollection.
21      MS. WILLIAMS-SHAW:  How much did you say?
22  Restate it.
23      MR. KARAM:  $923,747.60.
24  A.  Yes.
25  Q.  (By Mr. Karam) Okay.

Page 45

L. GRANDERSON - 7/13/20

2  A.  Now what was the question?
3  Q.  Yeah.  So you've already told me that you
4  don't really remember getting them or depositing them.
5  Right?
6      Oh.  I'm sorry.  I'm sorry.  Strike that.
7  Strike that.
8      You remember receiving the checks and you
9  remember depositing them.  But you don't remember much
10  else because you were suffering from trauma?
11  A.  Yes.
12  Q.  Okay.  Now you deposited them into your bank
13  account.  Correct?
14  A.  Yes.
15  Q.  And was this the same bank account that you
16  deposited the Prudential check into?  To the best of
17  your recollection.
18  A.  Oh.  I don't know.
19  Q.  You don't know?
20  A.  No.
21      Did I say the wrong thing?
22      I don't know.
23  Q.  No.  If you don't remember -- if you don't
24  remember, that's fine.  You don't remember.
25      So, Ms. Granderson, just for the court

Page 46

L. GRANDERSON - 7/13/20

1  reporter, you don't remember if you deposited it in the
2  same bank account as the Prudential checks.  Correct?
3      A.   Yes.
4      Q.   Okay.  So once again, generally speaking,
5  did you use the money from those proceeds from
6  Shadow Ridge Properties for your living expenses?  To
7  the best of your recollection.
8      A.   I don't know.  I don't know.  It was
9  commingled.
10     Q.   Okay.
11     A.   I keep telling you that.
12     Q.   Okay.
13          MS. WILLIAMS-SHAW:  Did you understand?  She
14     said it was commingled with other money.
15          MR. KARAM:  Right.  Right.  Right.  So --
16     and that's what I'm just trying to clarify.
17          If it was commingled, then we can assume
18     that it was all together and spending has been
19     done.  Which is why I wanted to clarify it was in
20     the same bank account or not.
21          But Ms. Granderson stated she didn't
22     remember.
23     Q.   (By Mr. Karam) And so we've already
24  discussed that you purchased your condominium in the

Page 47

L. GRANDERSON - 7/13/20

1  year after you received these proceeds.  So is it
2  possible that some of these proceeds were used to make
3  that purchase?
4      A.   But -- it was 2018 when I purchased the
5  property.
6          MS. WILLIAMS-SHAW:  Now what's your
7     question?
8      Q.   (By Mr. Karam) So is it possible that some
9  of the proceeds from the Shadow Ridge Properties'
10 insurance that you received were used to purchase your
11 condo?
12     A.   I do not know.
13     Q.   You don't know.
14          And so is it possible that the proceeds of
15 those specific --
16          MS. WILLIAMS-SHAW:  Asked and answered.
17     Objection.  Asked and answered.
18          She's answered you as much as she knows.  Is
19     there another question that's different from what
20     you've already asked?
21          MR. KARAM:  I mean, there will be.  But I
22     needed to have a clear on-the-record answer if
23     there was any possibility whether these were
24     commingled with her other assets.

Page 48

L. GRANDERSON - 7/13/20

1          MS. WILLIAMS-SHAW:  She's already --
2      A.   I said yes.
3      Q.   (By Mr. Karam) Yes.  Okay.
4          And then in regard to these policies
5  specifically, did you transfer them to anyone else?
6      A.   No.
7      Q.   No.  And did you transfer them to any
8  corporation?
9      A.   No.
10     Q.   And did you transfer these specific policies
11 into any offshore accounts?
12     A.   No.
13     Q.   Okay.  And do you know separately in regards
14 to these policies how much of them still remain?
15     A.   No.
16          MR. KARAM:  So give me one second.  We're
17     almost done.
18     Q.   (By Mr. Karam) And so you explained this to
19 me a little bit earlier.  But it's your recollection
20 that you did not probate the estate because, after your
21 research into the things in the last will and
22 testament, you determined that the estate was
23 insolvent.  Correct?
24     A.   Yes.

Page 49

L. GRANDERSON - 7/13/20

1          MR. KARAM:  Give me one second.
2      Q.   (By Mr. Karam) And as a result of that, you
3  did not probate the estate?
4          MS. WILLIAMS-SHAW:  Asked and answered.
5      She -- the witness answered.
6      Q.   (By Mr. Karam) But you did send the will to
7  a court.  Is that correct?
8      A.   Yes.
9      Q.   Okay.  And was it your understanding that
10 the $923,747.60 that you received from Shadow Ridge
11 Properties was not a part of the estate?
12     A.   I don't know.
13     Q.   So you didn't know if it was a part of the
14 estate?
15     A.   No.
16     Q.   Okay.
17          MR. KARAM:  So we are nearly done.  So
18 now --
19          MS. WILLIAMS-SHAW:  Mr. Karam?
20          MR. KARAM:  Yes?
21          MS. WILLIAMS-SHAW:  Mr. Karam?  Mr. Karam?
22          MR. KARAM:  Yes, ma'am?
23          MS. WILLIAMS-SHAW:  Can you hear me?
24          MR. KARAM:  Yes, Jeraldine, I can.

L. GRANDERSON - 7/13/20

1                  L. GRANDERSON - 7/13/20

2      MS. WILLIAMS-SHAW: Okay. What she has

3   said -- and I want to be sure that you understand

4   what she was saying. She said that she was told

5   that all of the insurance policies, which

6   included the insurance policies paid out to

7   Shadow Ridge, she didn't know anything about

8   them. But she was told all of them had lapsed,

9   except Prudential. 2007. That's all she knows.

10     She did check. And anything else, what she

11   was told, they had lapsed.

12     MR. KARAM: That's fine. And like I said,

13   Ms. Granderson did testify to that. That is in

14   the record. And I do understand that.

15     Ladies, I still have to ask a few more

16   questions just to make sure.

17   Q.  (By Mr. Karam) And so my final question is:

18   How much, between all of the insurance proceeds that

19   you received, do you still have?

20   A.  I don't know.

21   Q.  How much money of the insurance proceeds?

22   A.  I don't know.

23   Q.  You don't know?

24   A.  Because the commingling of funds.

25   Q.  Okay. So because the funds commingle, you

L. GRANDERSON - 7/13/20

1                  L. GRANDERSON - 7/13/20

2   don't know the exact number from the policies

3   themselves?

4   A.  No.

5   Q.  To the best of your knowledge then, would

6   you say --

7     THE WITNESS: I'm sorry. Could you hold?

8   Hold one second. I can't hear you, because the

9   phone is breaking up.

10     Just take off the phone.

11     (Garbled)

12     MR. KARAM: Can you-all hear me?

13     THE WITNESS: Let me hang this phone up. So

14   it won't --

15     MR. KARAM: Sure.

16   A.  What was your question again?

17   Q.  (By Mr. Karam) Yes. So my question is that,

18   to the best of your recollection or to the best of your

19   knowledge, do you have any estimate of how much of the

20   insurance policy proceeds you have spent?

21   A.  I don't know.

22   Q.  Okay.

23   A.  I really don't know. I do not know.

24   Q.  I understand. I understand.

25     MR. KARAM: And then give me -- give me a

L. GRANDERSON - 7/13/20

1                  L. GRANDERSON - 7/13/20

2   five-minute recess, if you could. Let's take a

3   very quick break.

4     THE WITNESS: Has there been a court case?

5   Has there been a court case that my son has been

6   charged and brought to court and found guilty?

7   And so then I must suffer. He's dead. They

8   can't try him. He hasn't been tried.

9     All of this is supposition. What they're

10   supposing. And they're blaming me of -- the man

11   who committed the crime. He stole the money. He

12   was -- he was prosecuted and found guilty, as he

13   should have been. And sent to jail.

14     Go get him. His office workers.

15     I know nothing about Shadow Ridge. I never

16   knew anything about Shadow Ridge.

17     Oh, God.

18     MR. KARAM: Ms. Granderson --

19   Ms. Granderson, I understand that. I understand

20   that. But as we told you in the first

21   deposition, the Judge gave us the ability to look

22   into assets that Mr. Robinson had.

23     THE WITNESS: Yes. But why? Why? He has

24   not been convicted. He's not convicted of a

25   crime.

L. GRANDERSON - 7/13/20

1                  L. GRANDERSON - 7/13/20

2     Where is the law? Where's the truth of

3   this? The law of this? It's all supposition.

4   Where is the proof?

5     MR. KARAM: Well, Ms. Granderson --

6   Ms. Granderson, I'm going to represent to you

7   that there is a motion for summary judgment

8   pending in Massachusetts where there is evidence

9   that has been put on in that judgment that your

10   son, Mr. Robinson, was civilly liable for damages

11   to Universitas. But that's not important right

12   now.

13     THE WITNESS: It's not?

14     MR. KARAM: Court Reporter, if we could --

15   could we please go off the record for a few

16   minutes and take a brief recess? Five minutes.

17   And then I'll return. And the questioning will

18   be substantially over. And we should be done

19   within the next ten minutes.

20     Is that acceptable to you, Ms. Williams and

21   Ms. Granderson?

22     MS. WILLIAMS-SHAW: Yes.

23     THE WITNESS: He wants to take a break.

24     MS. WILLIAMS-SHAW: Okay. Yes.

25     Do we have to call back in, Joe?

Page 54

```
                L. GRANDERSON - 7/13/20
 1
 2        MR. KARAM:  I think if we just -- yes.
 3    Ms. Williams, I think if we just kind of keep
 4    the phone line open, that might be the best.
 5        If you want to hang up and call back in, I
 6    don't think that there should be anything wrong
 7    with that, unless the court reporter says
 8    otherwise.  But I plan on just leaving the phone
 9    line open and on mute.
10        MS. WILLIAMS-SHAW:  Okay.
11        THE REPORTER:  Same here.  I'll just keep it
12    on mute.
13        (Recess, 12:10 p.m. to 12:17 p.m.)
14        MR. KARAM:  So, Ms. Granderson, I have a few
15    more questions to ask you.  It won't take more
16    than two or three minutes.  And then we can end
17    the deposition.
18             CONTINUED DIRECT EXAMINATION
19    BY MR. KARAM:
20        Q.  So the first question I have is the best of
21    your recollection.
22            Since the death of your son, have you given
23    any gifts in excess of $5,000 to anyone?
24        A.  I'm trying to recall.  I'm trying to
25    remember.
```

Page 55

```
                L. GRANDERSON - 7/13/20
 1
 2        Q.  You don't remember?
 3        A.  I do not remember.  At the moment I do not.
 4        Q.  Okay.
 5        A.  At the moment, I don't recall.
 6        Q.  That's fine.  That's fine.
 7            Just one last question.
 8            So my understanding is that
 9    Eileen Heathington, who is your niece, has been working
10    as your caretaker over the past few years.  Is that
11    correct?
12        A.  Who?
13        Q.  Eileen --
14            (Garbled.)
15        MR. KARAM:  I'm sorry?
16        MS. WILLIAMS-SHAW:  Just listen to the
17    question.
18        Now what's the question?
19        Q.  (By Mr. Karam) So the question is:  Has
20    Eileen --
21        MR. KARAM:  And that's spelled E-i-l-e-e-n.
22    And then Heathington is H-e-a-t-h-i-n-g-t-o-n.
23        Q.  (By Mr. Karam) -- who is your niece, has she
24    been providing you with caretaker services over the
25    past few years?
```

Page 56

```
                L. GRANDERSON - 7/13/20
 1
 2        A.  This is her mother and father.  She was the
 3    caretaker for her mother and father.  Both died within
 4    one week of each other in January, when I returned to
 5    Florida from Massachusetts.
 6        Q.  Okay.
 7        A.  And I have been here since January 1st of
 8    this year.
 9        Q.  Okay.
10        A.  I receive nothing -- I receive nothing from
11    no --
12        Q.  Okay.  That's fine.
13        A.  -- since October --
14        Q.  Okay.
15        A.  -- of 2019.
16        Q.  Okay.  And my only question is:  Have you
17    ever paid Ms. Heathington for caretaker services or
18    cause her to get paid for such services?
19        A.  No.  She didn't give me services.  She
20    served her mother and father.  She was with her mother
21    and father.  They are the ones who --
22        Q.  Okay.
23        A.  She was caretaker for them.
24        Q.  Okay.  No.  That's good.  I just wanted to
25    clarify.
```

Page 57

```
                L. GRANDERSON - 7/13/20
 1
 2        A.  They both died within one week of each
 3    other, is when I returned to Florida from
 4    Massachusetts, where I had been staying for an
 5    operation.
 6        Q.  Okay.  I understand, Ms. Granderson.  And my
 7    condolences for your loss.
 8        MR. KARAM:  With that -- that's all the
 9    questions that I have.  So with that, we can end
10    the deposition.  And I will say the following --
11        MS. WILLIAMS-SHAW:  Just a moment.  Joseph?
12    Joseph?
13        MR. KARAM:  Yes, Ms. Williams?
14        MS. WILLIAMS-SHAW:  Hello?
15        MR. KARAM:  Yes.  I'm here.
16        MS. WILLIAMS-SHAW:  I here two exhibits that
17    I'd like to enter.
18        MR. KARAM:  Okay.
19        MS. WILLIAMS-SHAW:  Logistically, how do I
20    get that to you?
21        MR. KARAM:  I think -- and the court
22    reporter can chime in -- if you can email those
23    to me.
24        MS. WILLIAMS-SHAW:  Uh-hum.
25        MR. KARAM:  And if you could email a copy to
```

Page 58

1          L. GRANDERSON - 7/13/20
2   the court reporter as well?  I can send you her
3   email address or she can give it to you right
4   now.  I think that would be the best way to do
5   it.
6          MS. WILLIAMS-SHAW:  Okay.  And for the
7   record, the first witness exhibit would be --
8   Number 1 -- would be a motion to the Middle
9   District Court dated June 25, 2020.  Page 8.  It
10  starts on 7, but on Page 8.  This is from the
11  plaintiff.
12         (Exhibit W1 identified for the record.)
13         MS. WILLIAMS-SHAW:  It says:
14  "Mr. Robinson" -- no.
15         Let me start with:  "While Universitas
16  acknowledges there is insufficient evidence to
17  prove any entitlement at this time, an
18  examination of Mr. Robinson's bank records and
19  payments to insurance companies can make it clear
20  whether Universitas is entitled to at least the
21  premium payments made with stolen funds."
22         That's Exhibit Number 1.
23         Exhibit Number 2 is an order from the Middle
24  District Court dated June 24, 2020.  Page 4.
25  Footnote 1.

Page 59

1          L. GRANDERSON - 7/13/20
2          (Exhibit W2 identified for the record.)
3          MS. WILLIAMS-SHAW:  "To the extent
4   Ms. Granderson is arguing that the District of
5   Massachusetts lacks jurisdiction over the
6   underlying action due to the death of the
7   defendant, that argument is without merit as the
8   'question whether subject matter jurisdiction
9   exists is measured as of the time the Complaint
10  was filed.'"  And then the citation.
11         And Mrs. Granderson, for the record, is
12  stating that she is not and was not a party to
13  this action.  So when the complaint was filed,
14  she was unaware of it.  And as a non-party
15  witness, she has stated that this Court has no
16  jurisdiction.
17         And I will send that to you.
18         MR. KARAM:  Okay, Ms. Williams.  So is that
19  all that you wanted to get on the record?
20         MS. WILLIAMS-SHAW:  Let me be sure.  Hold
21  on.
22         That's it.
23         MR. KARAM:  Okay.  Well, if that's the case,
24  it would appear to me as though the deposition is
25  concluded.

Page 60

1          L. GRANDERSON - 7/13/20
2          I would like to say on the record,
3   Ms. Granderson, I understand that this is very
4   difficult for you.  And I really don't enjoy
5   having to bring back these traumatic memories for
6   you.  But, unfortunately, it is my job and it was
7   something that I had to do.
8          And like I said, I tried to make this
9   deposition as quick and painless as possible.
10  But I appreciate that you took the time and that
11  you answered the questions honestly and
12  truthfully and was able to help me do that.
13         The second thing is we will promptly file a
14  letter or some kind of notice to the Court in the
15  Middle District of Florida informing them that
16  you've complied with your obligations and you've
17  done what the Court has ordered you to do.  And
18  that should close out the case.
19         Is that acceptable to you, Ms. Williams and
20  Ms. Granderson?
21         THE WITNESS:  Yes.
22         MS. WILLIAMS-SHAW:  Yes.
23         MR. KARAM:  Okay.  So we will make sure to
24  do that promptly.  And I will send a copy of it
25  to Ms. Williams before doing so.
0018

Page 61

1          L. GRANDERSON - 7/13/20
2          So if there is nothing else, I think that we
3   are done.
4          MS. WILLIAMS-SHAW:  Okay.  Thank you.
5          MR. KARAM:  So we can go off the record now.
6          (Concluded at 12:25 p.m.)
7                    o0o
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
0019

Page 62

```
 1
 2              CERTIFICATE OF OATH AND REPORTER
 3    STATE OF FLORIDA        :
                               : SS
 4    COUNTY OF HILLSBOROUGH   :
 5         I, JANET HAMILTON, certify that I was
 6    authorized to and did stenographically report the
 7    foregoing telephonic deposition, and that the
 8    transcript is a true and complete record of my
 9    stenographic notes.
10         I FURTHER CERTIFY that, under the current
11    National Emergency, pursuant to Section 319 of the
12    Public Health Service Act, counsel stipulated agreement
13    that I, the deposition officer, could administer a
14    binding oath to the witness via telephone.
15         I FURTHER CERTIFY that on July 13, 2020,
16    LILLIAN B. GRANDERSON was so sworn by me before giving
17    her testimony.
18         I FURTHER CERTIFY that I am not a relative,
19    employee, attorney, or counsel of any of the parties
20    connected with the action, nor am I financially
21    interested in the action.
22         Dated this 25th day of July, 2020.
23                    Janet Hamilton
                      JANET HAMILTON, RPR, FPR
24                    Florida Notary Public
                      Commission GG 278367
25                    Expires 2/17/23
```

Page 63

```
 1                         ERRATA SHEET
 2    Case Name:
 3    Deposition Date:
 4    Deponent:
 5    Pg.  No. Now Reads      Should Read  Reason
 6    ___  ___ _____     _____   _____
 7    ___  ___ _____     _____   _____
 8    ___  ___ _____     _____   _____
 9    ___  ___ _____     _____   _____
10    ___  ___ _____     _____   _____
11    ___  ___ _____     _____   _____
12    ___  ___ _____     _____   _____
13    ___  ___ _____     _____   _____
14    ___  ___ _____     _____   _____
15    ___  ___ _____     _____   _____
16    ___  ___ _____     _____   _____
17    ___  ___ _____     _____   _____
18    ___  ___ _____     _____   _____
19    ___  ___ _____     _____   _____
20
21                            _____
22
23                            Signature of Deponent
      SUBSCRIBED AND SWORN BEFORE ME
23    THIS ____ DAY OF _____, 2020.
24    _____
25    (Notary Public)   MY COMMISSION EXPIRES:_____
```

Index: $1..case

## $

**$1** 17:19 21:24,25 26:2 28:15,25 29:8 30:14

**$1,003,563.84** 35:17

**$1,505,549.20** 35:23

**$125,000** 40:17 41:21 43:3

**$5,000** 54:23

**$5,500** 43:4

**$50,000** 43:3

**$500,000** 29:12

**$500,985.36** 35:17

**$743,274.60** 43:3

**$923,747.60** 44:17, 23 49:11

## 1

**1** 9:18,21 10:2,4 18:19 19:5 58:8,22,25

**11** 16:22,24,25 17:2 18:9,10 19:24 25:18 28:14,16,18 30:14

**12:10** 54:13

**12:17** 54:13

**12:25** 61:6

**14th** 34:4

**17** 6:16

**18** 11:2,9

**1st** 56:7

## 2

**2** 11:3,10,11 12:22 14:8 15:5 58:23

**2003** 13:9,20 14:23 29:25

**2007** 18:9,10 19:24 30:15 50:9

**2010** 29:10,17,19,23

**2017** 6:16 20:20 22:20 23:22,24 26:16 30:25

**2018** 20:20,22 22:20, 21,22 23:7,9,22,25 44:6 47:5

**2019** 11:2,9 12:8,16 15:5 20:22 56:15

**2020** 7:10 9:17 10:2, 10 18:20 19:6 58:9, 24

**23** 12:8,16

**24** 7:10 9:17 10:2,10 58:24

**25** 58:9

**28** 29:9

## 3

**3** 11:13 12:9,13,15,19, 20 14:7 39:15,17 40:15,18 41:5,7,16

**34236** 7:7

## 4

**4** 15:3,6,11,12 25:17 27:13,22,23,24,25 39:15,17 40:19 41:5, 7 58:24

**402** 7:7 23:15

## 5

**5** 10:6 18:18,22,24,25

**50%** 27:2,17 28:3,8

**5345** 40:19

**535** 40:10

**5350** 40:12

**5353** 40:6,8,11 41:16, 19

**5354** 40:20

**54** 40:20

## 6

**6** 29:17,19,23 30:4 33:8,15,16,22

## 7

**7** 19:9,10 27:12,13,22, 23,24,25 36:7,10,11, 15 58:10

**7/13/20** 5:1 6:1 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1

**770** 7:6 23:15

## 8

**8** 39:5,8,9 58:9,10

## 9

**93** 8:9

## A

**ability** 8:12 52:21

**accept** 16:2,4,9 26:25 35:22 43:25

**acceptable** 53:20 60:19

**accompanied** 42:11

**account** 21:7,9 24:21 45:13,15 46:3, 21

**accounts** 24:7 48:12

**accurate** 10:10 13:10 15:15 16:10,18 19:4

**acknowledge** 44:13

**acknowledges** 58:16

**action** 6:13 59:6,13

**address** 7:5,6 58:3

**affirm** 5:4

**affirmed** 5:11

**age** 9:6

**agree** 42:25 43:17

**agreed** 42:23

**alleges** 13:7,19

**aloud** 27:16

**amount** 17:11,14,16, 18 20:13 26:2 28:25 29:12 44:17,19

**amounts** 43:3

**answering** 9:8

**answers** 7:17

**anticipate** 9:7

**apartment** 7:7 23:14

**appearing** 7:8

**appears** 15:14

**April** 15:5

**arguing** 59:4

**argument** 59:7

**aspects** 32:24

**assets** 47:25 52:22

**assume** 8:9 46:18

**attend** 10:19

**attention** 10:23 11:13,18 12:6,22 15:2 18:17 19:8 25:17,25 27:12 30:4 36:7 39:5 40:4

**audibly** 7:15

**August** 29:17,19,23

**automobiles** 23:18,

21

**Avenue** 7:6 23:15

**aware** 31:19

## B

**back** 14:23 28:14,16, 18 53:25 54:5 60:5

**bank** 21:6,9 24:21 39:6 45:12,15 46:3, 21 58:18

**basically** 21:13

**Bates-stamped** 41:8

**begins** 11:14 12:23

**behalf** 37:4

**belonging** 13:8

**beneficiary** 17:21 26:5 29:12

**benefits** 19:12

**bit** 21:12 48:20

**blaming** 52:10

**Bonds** 24:4

**bottom** 39:14

**break** 9:10 31:17 32:15 52:3 53:23

**breaking** 51:9

**bring** 60:5

**brought** 52:6

**Bullet** 14:8

## C

**call** 32:16 38:13 53:25 54:5

**called** 30:10,11,17

**caretaker** 55:10,24 56:3,17,23

**carrier** 17:8 25:22

**case** 35:13 52:4,5 59:23 60:18

**cash** 44:12

**character** 6:22

**charged** 52:6

**check** 20:13,16,19 21:6 37:10 40:6,7,16 41:15,20,23 42:14 43:21,22 44:7 45:16 50:10

**checkbook** 42:19

**checked** 44:11

**checks** 34:5 35:16 39:6,16,20,22,25 40:4 41:9,10 42:6,8, 10,15,18,19,24 43:2, 4,7,13,17,18,19 44:7, 14,17 45:8 46:3

**chime** 57:22

**circled** 40:5 41:10,15

**citation** 59:10

**civility** 6:18

**civilly** 53:10

**claim** 20:8,12 34:22 36:8

**claimant's** 33:9,25

**claims** 35:16

**clarify** 15:23 46:17, 20 56:25

**clear** 11:25 13:17 14:4 16:8 37:8,21 38:22 47:23 58:19

**close** 60:18

**commingle** 50:25

**commingled** 22:9 46:10,15,18 47:25

**commingling** 50:24

**committed** 52:11

**companies** 30:11,24 58:19

**company** 24:18 27:2 33:9

**complaint** 13:6,18 14:18 59:9,13

**complied** 60:16

**concluded** 59:25 61:6

**condo** 23:15 47:12

**condolences** 57:7

**condominium** 23:11 46:25

**conducted** 12:2

**conducting** 5:17

**confusing** 7:25

**consideration** 9:6

**contact** 38:5,13

**contacted** 38:24

**continue** 7:3 8:16 25:12,15 28:12 32:19,20

**continued** 14:13 33:5 54:18

**convicted** 52:24

**copy** 9:15 10:10,12, 16 15:15 16:2,3,4,7, 18 19:4 39:5 57:25 60:24

**corner** 39:14 40:6 41:16

**corporation** 48:9

**corporations** 24:17

**correct** 9:17 13:21 16:6 19:24 20:4 23:16 24:22 25:19 26:6 27:19 28:6 29:15,18,25 35:11 37:11,22,23,24,25 38:15,16,20,21 40:23,24 43:21 44:19 45:13 46:3 48:24 49:8 55:11

**counsel** 7:20,21 9:14

**couple** 20:6 32:10

**court** 7:16 9:25 10:11,18 11:8,19 12:2,18 13:4,17 15:9 16:19 18:23 32:17 36:9 39:7 45:25 49:8 52:4,5,6 53:14 54:7

57:21 58:2,9,24 59:15 60:14,17

**Court's** 10:10

**courtesy** 10:12

**crazy** 31:5

**crime** 52:11,25

**cut** 39:14 41:9

---

**D**

---

**damages** 53:10

**date** 11:22 18:4,6,7 19:24 20:24,25 21:2 28:25 29:5,17,21,22, 23

**dated** 7:9 9:16 10:10 11:2 12:16 34:4 58:9, 24

**dates** 29:24

**dating** 14:23

**dead** 52:7

**death** 18:12 20:7 22:13 27:9 28:10 54:22 59:6

**deceased** 6:15,16

**decs** 35:10

**defalcation** 13:8

**defendant** 6:14,15 59:7

**deny** 11:20

**dependent** 9:8

**deposit** 21:6

**deposited** 42:18 43:13 44:7,14 45:12, 16 46:2

**depositing** 45:4,9

**deposition** 5:17,18 7:13 9:5 10:13,19 11:22 12:2 14:13 32:3 52:21 54:17 57:10 59:24 60:9

**determined** 48:23

**died** 56:3 57:2

**difficult** 60:4

**direct** 5:13 12:22 33:5 39:4 40:4 54:18

**directly** 19:16,18 20:3 35:10

**directs** 7:22

**discovery** 15:5

**discuss** 32:22,24

**discussed** 12:24 13:2,4 35:24 46:25

**Dismiss** 18:19

**disposition** 21:13 31:20 32:13

**District** 7:9 9:15 10:24 12:7 18:20 19:5 58:9,24 59:4 60:15

**document** 33:24 36:22

**documents** 35:22 37:9,22 38:6,14

**dollars** 29:9

**double** 37:17

**drink** 31:14

**driving** 31:5

**duces** 14:12

**due** 59:6

**duly** 5:11

---

**E**

---

**E-I-L-E-E-N** 55:21

**earlier** 48:20

**early** 13:9,20 20:20 44:6

**Education** 14:12

**effective** 18:4,6 19:23

**Eileen** 55:9,13,20

**email** 57:22,25 58:3

**enclosed** 35:17

**end** 20:19 54:16 57:9

**enjoy** 60:4

**enter** 33:14 57:17

**entities** 13:7,20

**entitled** 58:20

**entitlement** 58:17

**estate** 6:12 19:13 22:7,12,16,20,22,24 23:8 30:18 48:21,23 49:4,12,15

**estimate** 51:19

**evidence** 9:19 53:8 58:16

**exact** 20:24,25 21:2 51:2

**examination** 5:13 33:5 54:18 58:18

**examined** 5:11

**examiner** 35:16

**exception** 30:13

**excess** 54:23

**exhibit** 9:18,21 10:2, 4 11:3,10,11 12:9,13, 14,15,19,20 15:3,6, 11,12 18:18,22,24,25 25:17 27:13,20,22,25 30:4 33:8,15,16,22 35:6,15 36:7,10,11, 15,18 39:5,8,9,10 58:7,12,22,23 59:2

**exhibits** 57:16

**existence** 16:6,20

**exists** 59:9

**expenses** 21:16,18 22:4 46:7

**explained** 31:21 48:19

**explaining** 44:5

**explicitly** 7:22

**extent** 59:3

**Universitas Supplemental Appendix - 138**

## F

**face** 17:11 26:2 28:25 29:11

**fair** 38:25 42:17

**familiar** 35:7

**family** 24:14

**father** 56:2,3,20,21

**feeling** 25:11

**file** 20:8 60:13

**filed** 18:19 19:5 20:12 59:13

**filed.'** 59:10

**final** 50:17

**finally** 43:4

**finds** 13:4

**fine** 34:16 36:6 37:15 45:24 50:12 55:6 56:12

**five-minute** 52:2

**flip** 19:3 36:16 39:15

**Florida** 7:7,9 9:16 10:24 12:7 16:19 18:20 19:5 23:16 56:5 57:3 60:15

**Footnote** 58:25

**foreclosed** 30:22 31:3

**foremost** 18:12

**form** 20:8,12 36:8

**forms** 34:22

**found** 52:6,12

**friends** 24:10

**front** 11:2,4 12:9 15:7 18:21 39:11

**full** 11:14 39:16,20

**funds** 13:8 24:22 50:24,25 58:21

## G

**G-R-A-N-D-E-R-S-O-N** 6:8

**garbled** 14:2 51:11 55:14

**gave** 52:21

**generally** 20:18 46:5

**gifts** 54:23

**give** 5:5 6:10 48:17 49:2 51:25 56:19 58:3

**God** 31:7 52:17

**good** 6:24 8:17 25:11,14 56:24

**Granderson** 5:1,10, 15 6:1,6,20 7:1,4 8:1, 7 9:1,2,4 10:1,5 11:1, 13,15,21,25 12:1,21 13:1 14:1,5,13,15 15:1,13 16:1,5,21 17:1 18:1,11 19:1,2 20:1 21:1 22:1 23:1 24:1 25:1,11,14 26:1 27:1 28:1 29:1 30:1 31:1,18 32:1,5,9 33:1,17 34:1 35:1 36:1 37:1 38:1,23 39:1 40:1 41:1 42:1,3 43:1 44:1,10 45:1,25 46:1,22 47:1 48:1 49:1 50:1,13 51:1 52:1,18,19 53:1,5,6, 21 54:1,14 55:1 56:1 57:1,6 58:1 59:1,4,11 60:1,3,20 61:1

**Great** 7:8 10:15,17 11:7 29:24

**guess** 20:9,22 26:13

**guilty** 52:6,12

## H

**H-E-A-T-H-I-N-G-T-O-N** 55:22

**hair** 31:6

**hang** 51:13 54:5

**heading** 19:11

**health** 8:8 9:6

**hear** 38:10 49:24 51:8,12

**hearing** 12:24 13:2,4

**Heathington** 55:9, 22 56:17

**held** 13:18 30:21

**highly** 6:20

**hold** 31:11 51:7,8 59:20

**honestly** 60:11

**hours** 9:5

## I

**idea** 26:24

**identified** 10:4 11:11 12:20 15:12 18:25 33:16 36:11 39:9 58:12 59:2

**III** 14:16,23 15:4,11 27:3

**images** 39:22,24

**impair** 8:12,19

**important** 53:11

**inaudible** 23:2

**incensed** 6:20

**included** 50:6

**information** 13:5

**informed** 15:25 16:6, 19

**informing** 60:15

**initially** 16:11

**insane** 30:17

**insolvent** 48:24

**insufficient** 58:16

**insult** 6:21

**insulting** 6:19

**insurance** 14:16,22 17:3 18:13 19:12,18

21:17,22,23 23:19 25:21 30:11,24 33:9 34:25 36:8 37:5 42:13,21 43:6 47:11 50:5,6,18,21 51:20 58:19

**interest** 27:7,17 28:4

**involved** 13:7,19,20

**issue** 7:2 14:12

**issues** 8:8 13:6

## J

**Jack** 14:14,16 15:4, 11 25:18 27:3

**Jackson** 14:23

**jail** 52:13

**January** 56:4,7

**Jeraldine** 49:25

**job** 60:6

**Joe** 5:16 12:12 31:12 53:25

**Joseph** 57:11,12

**Judge** 9:16 10:25 12:8 52:21

**judgment** 53:7,9

**July** 12:8,16 29:9

**June** 7:10 9:17 10:2, 10 18:19 19:5 58:9, 24

**jurisdiction** 59:5,8, 16

## K

**Karam** 5:14,16,25 6:2,4,9,17,25 7:4 8:21,22 9:23,25 10:5 11:7,8,12 12:15,18, 21 13:15 14:4 15:9, 13,25 16:5 17:20 18:23 19:2 22:19 23:4 25:8,10 27:22, 25 28:19 29:5,8 30:6, 7 31:8,13,16 32:20 33:3,6,14,17,23 34:4,

6,11 36:9,12 37:15, 19,21 38:2,11,12,21, 22 39:7,10,19 40:3, 13,16,22 41:2,3,7,11, 14 42:9,22 44:4,23, 25 46:16,24 47:9,22 48:4,17,19 49:2,3,7, 18,20,21,22,23,25 50:12,17 51:12,15, 17,25 52:18 53:5,14 54:2,14,19 55:15,19, 21,23 57:8,13,15,18, 21,25 59:18,23 60:23 61:5

**kind** 22:4,15,24 54:3 60:14

**kinds** 24:3

**knew** 32:6 52:16

**knowledge** 8:23 51:5,19

## L

**labeled** 9:18 17:3

**lacks** 59:5

**Ladies** 50:15

**language** 13:11 14:11,19

**lapsed** 30:12 31:2 32:7 50:8,11

**late** 23:21,24 30:25 44:5

**law** 53:2,3

**learn** 26:20

**leaving** 54:8

**left** 40:13,15,18,21

**letter** 10:12 33:25 35:6,15 60:14

**liability** 24:18

**liable** 53:10

**life** 14:15 17:3 19:12 21:22 33:9 36:8 37:5 43:6

**Lillian** 5:10 6:6 14:13,15 42:3

**Limited** 24:17

**listed** 17:6,8,21,25
25:22 26:5 29:2
30:17 32:7 37:6

**listen** 55:16

**living** 21:16,17 23:12
46:7

**LLCS** 24:17

**Logistically** 57:19

**long** 9:7

**longer** 25:12 32:4

**losing** 31:6

**loss** 57:7

**lot** 30:16,19

**M**

**made** 41:20 43:7
58:21

**Magistrate** 9:16
10:25 12:8

**mail** 42:15

**make** 5:22,23 6:5
47:3 50:16 58:19
60:8,23

**malign** 6:22

**man** 52:10

**Manson** 5:17

**March** 34:4

**mark** 10:2 11:9 12:19
15:10 18:24 36:10
39:8

**marked** 15:3 18:18
33:8

**Massachusetts**
53:8 56:5 57:4 59:5

**Massmutual** 32:12
36:7 37:5

**matches** 16:4

**matter** 59:8

**Maxine** 34:19 37:4
38:12 42:10

**measured** 59:9

**medical** 22:4

**medication** 8:10,12,
19

**memorandum** 43:5

**memories** 60:5

**mental** 44:6

**merit** 59:7

**met** 5:16

**Middle** 7:9 9:15
10:24 12:7 18:20
19:5 58:8,23 60:15

**million** 17:19 21:24,
25 26:2 28:15,25
29:8,9 30:14

**minute** 31:11 34:7

**minutes** 53:16,19
54:16

**mistake** 40:22,23
41:2

**moment** 13:24,25
30:5,8,9 55:3,5 57:11

**money** 14:15 21:10,
16 46:6,15 50:21
52:11

**month** 22:13,17,18

**mother** 17:24,25
27:18,19 28:5 30:14
56:2,3,20

**motion** 11:20 18:19
19:4 53:7 58:8

**moving** 10:22

**mute** 54:9,12

**N**

**named** 6:14 25:22

**nature** 24:4

**needed** 47:23

**negative** 38:18

**niece** 55:9,23

**NOB1399** 41:8

**non-party** 59:14

**note** 42:11 43:5

**noted** 37:19

**notice** 42:18 43:10
60:14

**Novak** 34:4,19 35:6,
15 37:4 38:5,12,24
42:10

**November** 6:16

**number** 17:2 40:6
41:6,8,16 51:2 58:8,
22,23

**numbers** 39:14

**O**

**Objection** 37:19
47:18

**objects** 7:20

**obligations** 60:16

**obtained** 14:17

**October** 11:2,9
56:13

**office** 52:14

**offshore** 24:7 48:12

**on-the-record** 47:23

**open** 6:13 54:4,9

**operation** 8:11 57:5

**operations** 31:7

**order** 7:9 9:16 10:3,7,
10,17,24,25 11:9
12:7,16 58:23

**ordered** 10:18 12:2
60:17

**owned** 14:16 27:3

**ownership** 27:7,17
28:4,9

**P**

**p.m.** 54:13 61:6

**packet** 9:19 11:3
12:9

**pages** 35:10 36:16
41:4

**paid** 19:18 20:3 35:23
36:4 41:24 50:6
56:17,18

**painless** 60:9

**Palm** 7:6 23:15

**paragraph** 11:14
12:23 13:13

**part** 15:20 37:9 38:2,
4 49:12,14

**participated** 7:12

**party** 59:12

**pass** 27:8

**past** 55:10,25

**Pause** 25:9

**payable** 43:7

**payments** 58:19,21

**payout** 43:5

**PDF** 39:13

**pending** 53:8

**periods** 14:17

**phone** 7:14 51:9,10,
13 54:4,8

**physical** 44:6

**piece** 19:17 30:20

**plaintiff** 58:11

**plan** 54:8

**point** 9:10 14:8

**points** 24:12

**policies** 14:16 17:6
24:25 25:22 30:12,25
31:23 32:6,11,23
34:25 35:24 48:5,11,
15 50:5,6 51:2

**policy** 14:22 17:8,12
18:2,5,13 19:23 20:3,
8 21:17,23 22:4 24:7,
9,13,17,25 25:2,5
26:5 28:15,22,24,25
29:4,5,11,17,19
30:14 31:24 32:12
37:6 43:6 51:20

**positive** 38:18

**possibility** 47:24

**potentially** 13:20

**preliminary** 5:22,23
6:5,10

**premium** 58:21

**preparation** 37:9
38:3,4,6,13

**prepare** 34:16 36:24
38:24

**prepared** 37:3

**preparing** 34:22

**present** 34:5

**previously** 18:18
33:8

**probate** 30:23,24
31:3,4 48:21 49:4

**problem** 9:6

**problems** 30:19

**proceeds** 18:13
19:18 20:3,13 21:3,
13,16,17,22 22:3,8
23:19 24:7,9,13,17,
21,25 32:12 37:5
43:6 46:6 47:2,3,10,
15 50:18,21 51:20

**promptly** 60:13,24

**proof** 53:4

**properties** 26:13,18,
21,23 27:2,8,18 28:5
29:14 31:19 35:24
37:4 43:20 46:7
49:12

**Properties'** 47:10

**property** 30:17,21
31:2 32:24 47:6

**prosecuted** 52:12

**prove** 58:17

**provide** 15:17 16:7

**provided** 15:5,15

**providing** 55:24

**Prudential** 17:9
19:12 21:22 24:25

30:13 45:16 46:3
50:9

**purchase** 22:7,12,
15,19,25 23:7,9,18,
21,24 24:3 47:4,11

**purchased** 22:22
46:25 47:5

**put** 53:9

**Q**

**question** 7:21,25 8:3
17:15 21:5,15 28:21,
23 29:3,21 32:4,8
37:17,18 38:7 45:2
47:8,20 50:17 51:16,
17 54:20 55:7,17,18,
19 56:16 59:8

**questioning** 32:2
53:17

**questions** 6:23 7:15
8:13,24,25 9:8 10:19
14:22 20:6 31:22
32:10 37:16 50:16
54:15 57:9 60:11

**quick** 52:3 60:9

**quickly** 33:4

**R**

**raised** 13:6

**range** 11:22

**read** 13:3 15:20 16:3
27:16

**ready** 33:2

**real** 22:7,12,15,19,22,
24 23:8

**reask** 8:3

**recall** 9:3 16:14
20:23 21:21 54:24
55:5

**receipt** 32:12

**receive** 18:12 20:13,
19 35:9 56:10

**received** 14:15 16:18
20:15,18 21:3,6,21

42:8,10,15,25 43:4
44:7,14 47:2,11
49:11 50:19

**receiving** 45:8

**recently** 8:11

**recess** 9:11 32:16
52:2 53:16 54:13

**recognize** 33:18,20,
22,23 34:6,10,12
36:20 37:22

**recollection** 20:10,
11,21 34:23 38:8,14
44:20 45:17 46:8
48:20 51:18 54:21

**record** 5:20 6:3,11
7:16 9:10 10:4 11:11
12:20 13:4 15:12
16:8,20 18:25 19:16
24:20 31:17,21
33:15,16 36:11 37:2,
8,22 38:23 39:9
50:14 53:15 58:7,12
59:2,11,19 60:2 61:5

**records** 58:18

**refer** 26:21

**referenced** 14:17

**references** 6:19

**referring** 17:9 22:18
26:18

**refers** 19:25

**regard** 48:5

**relevant** 13:5

**remain** 25:2 48:15

**remember** 20:15,18,
24 21:2 22:14 43:24
45:4,8,9,23,24 46:2,
23 54:25 55:2,3

**remind** 7:13

**repeat** 23:4 41:14

**rephrase** 37:20

**replace** 6:14

**reporter** 5:4 7:16
9:25 11:8 12:18 15:9
18:23 32:17 36:9
39:8 46:2 53:14 54:7,

11 57:22 58:2

**represent** 16:17
32:21 37:3 43:2
44:16 53:6

**representation**
16:10 26:25 35:22
38:25

**research** 48:22

**Residential** 23:10,
11

**respond** 8:4

**responsible** 13:8

**Restate** 44:22

**restatement** 13:10

**result** 49:3

**return** 53:17

**returned** 56:4 57:3

**Ridge** 26:13,18,21,22
27:2,8,17 28:4,9
29:14 31:24 34:25
35:23 36:4 37:4,11
42:12,14 43:6,10,20
44:3 46:7 47:10
49:11 50:7 52:15,16

**Robinson** 13:7,18,
19 14:16,23 15:4,11
25:18 27:3 52:22
53:10 58:14

**Robinson's** 14:14
28:3 58:18

**S**

**Sarasota** 5:16 7:7
23:16

**save** 30:16

**scheduled** 9:5

**scheduling** 10:13

**section** 17:3 19:25

**securities** 24:4

**send** 49:7 58:2 59:17
60:24

**sentence** 11:19
19:16,19 27:12

**separately** 48:14

**serve** 11:20

**served** 56:20

**services** 55:24
56:17,18,19

**Shadow** 26:13,18,
21,22 27:2,8,17 28:4,
9 29:14 31:24 34:25
35:23 36:4 37:4,10
42:12,14 43:6,10,20
44:3 46:7 47:10
49:11 50:7 52:15,16

**shock** 42:16

**short** 31:25

**show** 6:18

**shows** 40:19

**signed** 9:16 10:25
12:7

**simply** 33:23

**single** 32:22 37:17

**Sneed** 9:16 10:25
12:8

**solve** 30:19

**son** 18:12 20:8 22:13
27:3 52:5 53:10
54:22

**sorts** 8:10

**sought** 13:5

**South** 7:6 23:15

**speak** 7:15

**speaking** 46:5

**specific** 47:16 48:11

**specifically** 24:6,13,
16 25:5 48:6

**spelled** 55:21

**spending** 25:4 46:19

**spent** 21:14 51:20

**SRP** 26:6,8 27:17
28:4 29:13

**stand** 26:10

**stands** 26:8

**start** 58:15

**starting** 11:19

**starts** 58:10

**state** 5:19 6:2 42:15
43:10,24 44:6

**stated** 5:24 46:22
59:15

**statement** 5:22,23
6:10 33:10,25

**statements** 6:5 39:6

**states** 13:22 14:11
28:3,7 35:16

**stating** 59:12

**staying** 57:4

**stocks** 23:24

**stole** 52:11

**stolen** 58:21

**stopping** 30:20

**stressful** 31:9

**Strike** 45:6,7

**subject** 59:8

**subpoena** 11:21
14:12

**substantially** 32:14
53:18

**substitute** 6:14

**suffer** 52:7

**suffering** 45:10

**summary** 53:7

**Suntrust's** 39:5

**supposing** 52:10

**supposition** 52:9
53:3

**swear** 5:4

**sworn** 5:11

**T**

**taking** 8:10

**talk** 17:5 21:12

Index: talking..you-all

**talking** 34:9 36:13

**tecum** 14:12

**telephonic** 11:21

**telephonically** 12:3

**telling** 46:12

**ten** 53:19

**testament** 14:14 15:4,10 25:18 37:7 48:23

**testified** 5:12

**testify** 50:13

**testimony** 5:5

**thing** 45:21 60:13

**things** 48:22

**thought** 27:24

**time** 6:12 14:17 16:7 34:12 58:17 59:9 60:10

**today** 5:18 7:8,20

**told** 21:19 30:12,20, 25 45:3 50:4,8,11 52:20

**top** 40:12,13,14,15, 18,21 41:5 43:18,21, 22,23 44:2,3

**top-left** 40:6 41:15

**topic** 14:14

**total** 35:23 44:17

**tracked** 25:4

**Transamerica** 25:23 28:15,22,24 31:23 32:11 33:9 35:25 42:20

**transfer** 24:6,9,11, 13,16 48:6,8,11

**transferred** 28:9

**trauma** 45:10

**traumatic** 60:5

**trouble** 30:16

**true** 10:9 15:15 16:9, 17 19:4 27:5

**truth** 5:6,7 53:2

**truthfully** 8:24,25 60:12

**turn** 10:6,23 11:12 12:6 13:23 14:7 15:2 16:22 18:17 19:8 25:16,25 27:11 30:3 36:6 41:3

**U**

**Uh-hum** 14:3 57:24

**unaware** 59:14

**underlying** 13:6 59:6

**understand** 7:12,18, 23 8:2,4,5,7,8,12 10:18 14:21 15:24 31:8 35:21 43:14 44:9 46:14 50:3,14 51:24 52:19 57:6 60:3

**understanding** 26:22 28:8 49:10 55:8

**underwater** 30:21 31:2

**unfamiliar** 35:14

**Unit** 23:15

**Universitas** 10:11 11:20 13:5 14:12,21 53:11 58:15,20

**Universitas'** 13:9

**Universitas's** 11:22

**V**

**verbally** 7:16

**W**

**W1** 58:12

**W2** 59:2

**Wait** 31:11 34:7

**wanted** 8:18 42:24 46:20 56:24 59:19

**water** 31:15

**week** 56:4 57:2

**Williams** 6:4,25 10:6 31:16 32:9 53:20 54:3 57:13 59:18 60:19,25

**WILLIAMS-SHAW** 5:21 6:7,11 8:17 9:21 11:5 12:12 13:14,24 15:24 17:16,18 22:17 23:2 27:20 28:17 29:3,7 30:5,8 31:11, 14 32:18 33:2,21 34:3,7 37:14,16,24 38:9,17 39:17,24 40:9,11,14,18,21,25 41:6,13 42:12 43:22 44:2,21 46:14 47:7, 17 48:2 49:5,20,22, 24 50:2 53:22,24 54:10 55:16 57:11, 14,16,19,24 58:6,13 59:3,20 60:22 61:4

**word** 30:22

**workers** 52:14

**working** 55:9

**wrong** 45:21 54:6

**wrote** 42:14

**Y**

**year** 5:16 15:16 47:2 56:8

**years** 8:9 55:10,25

**you-all** 51:12

November 15, 2010

18-CP-91

# LAST WILL AND TESTAMENT
## OF
## <u>JACK E. ROBINSON</u>

Be it known that of my own free will and testament that **I, JACK E. ROBINSON**, of 1344 Monarch Circle, Naples, FL 34116, being of sound mind, body and legal capacity, hereby expressly revoke all prior wills, codicils, lists and addenda, and in their place intend that this instrument be my last will and testament. Neither this instrument nor any of its provisions is the product of fraud, mistake, ambiguity or undue influence.

1.    **<u>Governing Law and Domicile</u>**. Notwithstanding that I have a Massachusetts driver's license, that I vote in Florida or Massachusetts, and that I maintain residences in Massachusetts, Connecticut, Florida and Texas, my legal domicile is 1344 Monarch Circle, Naples, FL 34116. My legal domicile is evidenced by the fact that I file tax returns using that address and that I have executed a Declaration of Domicile using that address which was recorded on March 19, 2010 in the public records of Collier County, Florida, at Official Records Book 4547, Page 2568 (see www.collierclerk.com).

I am a Florida citizen and domiciliary. Thus, regardless of the place of my death and the location of any real or personal property, this will and all

1

distributions of real and personal property made hereunder shall be governed

exclusively by and construed in accordance with the laws of the State of Florida,

without regard to the conflicts of laws principles of Florida or any other

jurisdiction.

This instrument shall be admitted to probate in the 20th Judicial Circuit Court

in and for Collier County, Florida, located in Naples, Florida.

2.    **Personal Representative.**  The personal representative of my estate

shall be my mother Lillian B. Granderson of 7101 Fairway Bend Circle, Sarasota,

FL 34243 (941-355-6186, Lillgrand@aol.com) and 35 Flint Locke Drive (P.O.

Box 1343), Duxbury, MA 02332 (781-934-6827) ("Mother").

If Mother predeceases me or is unable or unwilling to serve, then the

personal representative shall be my first cousin Cecily H. Ingram of Atlanta, GA

(404-931-6404, pacrats1@bellsouth.net ) ("Cissy").

If Mother and Cissy predecease me or are unable or unwilling to serve, then

the personal representative shall be my first cousin Eileen Heathington (sister of

Cissy) of Atlanta, GA (678-779-1431) ("Eileen").

If all of the foregoing persons predecease me or are unable or unwilling to

serve, then the personal representative shall be an attorney in the Naples or Fort

Myers, FL offices of the law firm of Roetzel & Andress, L.P.A., who has at least

ten (10) years' experience in dealing with Florida probate matters.

The personal representative shall retain the services of an attorney in good standing with The Florida Bar who has at least ten (10) years' experience in dealing with Florida probate matters, and whose office is located in Naples, Fort Myers, or Sarasota, Florida.

The personal representative has an express power to sell, transfer, convey, liquidate, distribute, mortgage, lease, or otherwise encumber any estate property, real or personal, without court approval, subject only to the terms of this will.

Although pursuant to Florida law a non-resident of Florida who is not a blood relative of the decedent cannot serve as personal representative, I hereby instruct the personal representative to seek and rely on the advice and counsel of my good friend and long-time partner Daniel E. Carpenter, Esq., 100 Grist Mill Road, Simsbury, CT 06070 (860-408-7000, dcarpenter@usbgi.com) ("Dan"). Dan's sage advice and counsel will benefit the estate and its beneficiaries. Furthermore, but for Florida law precluding it, I would have named Dan as personal representative. Dan shall be provided with a copy of this instrument within ten (10) days of my death.

3.    **Books and Records**. All of my personal, business and political books, records, checks, insurance policies, tax returns (going back 20 years), and all other vital information are located in my locked fireproof filing cabinets at the offices of Benistar, 300 First Stamford Place, Suite 201, Stamford, CT 06902 (203-

3

969-6000). Benistar is the central repository for all of my books and records and there is no need to search for books and records located anywhere else. I do not have any safe deposit boxes or other storage areas.

The keys to my filing cabinets are located in my middle desk drawer in my office at Benistar (contact: Sheila O'Grady, Missy Vallerie or Samantha Frattaroli). My personal representative (or his/her attorney) is hereby authorized to take full possession, custody and control of all such books and records. Electronic records (such as Quicken) are located on my office desktop computer. My only two e-mail addresses are Robinsonesq@aol.com (password: parapcs123) and Shadowridgeprop@aol.com (password: JR6225).

My desktop computer password at Benistar is "jr*benistar" and my Quicken password is "6225" (contains all personal, business and political check registers).

All of my financial websites are saved in my "Favorites" folder on my Benistar office desktop and are described below:

| Website | Type | User Name | Password |
|---|---|---|---|
| www.chase.com | personal/business | ████████████████s | ████████████ |
| www.sovereignbank.com | personal/political | | |
| www.wellsfargo.com | business | | |
| www.fidelity.com | personal/IRA | | |
| www.optionsxpress.com | personal | | |
| www.gmacmortgage.com | mortgage | | |
| www.littonloan.com | mortgage | | |
| www.jud.ct.gov | legal | | |

All of my personal and business mail is delivered to Benistar in Stamford, CT, to the Homestead Property (as hereinafter defined), or to P.O. Box 2587, Duxbury, MA 02331 (key in my Benistar desk or my computer bag kept at Benistar). I have no other mailing addresses or P.O. Boxes.

4.      **Homestead Property**. My homestead is 1344 Monarch Circle, Naples, FL 34116 (the "Homestead Property"). My personal representative is authorized and instructed to preserve, insure, and protect the Homestead Property for my devisee hereunder. However, upon my death the devisee of the Homestead Property shall have the right to immediate and exclusive possession, custody and control of the Homestead Property.

5.    **Real Property Owned by Me Personally.**  I personally own the following real property:

(i)    1344 Monarch Circle, Naples, FL 34116 (Folio # ████████)

(ii)    531 La Peninsula Boulevard, Naples, FL 34113 (Folio ████████ and

(iii)    7064 Timberland Circle, Naples, FL 34109 (Folio # ████████)

Any real property that is personally owned by me and acquired after the date hereof is listed on an attachment hereto which is expressly incorporated herein by reference.

I hereby grant to Maxine M. Novak of 136 Shadow Ridge Road, Stamford, CT 06902 (203-322-5097, mxnovak@optonline.net) ("Maxine"), or her heirs *per stirpes*, the Homestead Property.

I hereby grant to my half-sister Sarah A. Robinson of Boston, MA (617-676-8926, saraharobin88@comcast.net), or her heirs *per stirpes*, the real property located at 531 La Peninsula Boulevard, Naples, FL 34113.

I hereby grant to my first cousin Eileen, or her heirs *per stirpes*, the real property located at 7064 Timberland Circle, Naples, FL 34113.

6.    **Real Property Owned by Shadow Ridge Properties, LLC**.  I am a fifty percent (50%) owner in, and the managing member of, Shadow Ridge

---

[1]  For general parcel information, see www.collierappraiser.com.  For parcel tax information, see www.colliertax.com.

Properties, LLC ("SRP"), a Delaware limited liability company registered to

conduct business in Connecticut and Florida.  Maxine is the other 50% owner of

SRP.  SRP owns the following real property:

    (i)    4201 22ⁿᵈ Avenue SW, Apt. 96, Naples, FL 34116 (Folio
█████████);

    (ii)    15609 Marcello Circle, Naples, FL 34110 (Folio # ██████████)

    (iii)    Golden Gate Estates Unit 65W, Naples, FL 34116 (Folio
████████)

    (iv)    1510-C Trafalgar Lane, Naples, FL 34116 (Folio ████████

    (v)    5801 Waxmyrtle Way, Naples, FL 34109 (Folio # ██████)

    (vi)    73 Lakes Road, Bethlehem, CT 06751; and

    (vii)    9547 Pagewood Lane, Houston, TX 77057.

SRP also has a claim for ownership against 1468 Monarch Circle, Naples,

FL 34116 (Folio # ████████) which is currently in litigation that is pending in

the Florida Second District Court of Appeal, Case No. 2D10-1757.

    Any real property that is owned by SRP and acquired after the date hereof is

listed on an attachment hereto which is expressly incorporated herein by reference.

    My fifty percent (50%) ownership interest in SRP shall be given to Mother,

who shall work with Maxine to equitably liquidate, distribute, transfer, sell or

convey the properties owned by SRP between themselves or to any third persons as they both unanimously agree in their sole and absolute discretion.

If Mother predeceases me, then my 50% ownership interest in SRP shall be given to Cissy, who shall cooperate and coordinate with Maxine as described above.

If and only if Mother predeceases me, then Cissy shall ensure that one of the properties owned by SRP is transferred by quit-claim deed to my first cousin Roger Byers of Sarasota, FL or his heirs, *per stirpes*, one of the properties owned by SRP is transferred by quit-claim deed to my first cousin Cassandra Brice of Sarasota, FL or her heirs, *per stirpes*, and one of the properties owned by SRP is transferred by quit-claim deed to my first cousin Beverly Byers of Sarasota, FL or her heirs, *per stirpes*.

7.    **Timeshares Owned by Shadow Ridge Properties, LLC**.  Florida has deeded timeshares, each consisting of the use of a particular unit in a particular property for a particular week of the year.  SRP owns the following timeshares:

(i)    Vanderbilt Beach & Harbour Club, Naples, FL, Unit 511VG, Week 27;

(ii)    Club Regency, Marco Island, FL, Unit E102, Week 40;

(iii)    Club Regency, Marco Island, FL, Unit E202, Week 49;

(iv)    Club Regency, Marco Island, FL, Unit E202, Week 50; and

(v)    Eagle's Nest, Marco Island, FL, Unit 807, Week 42.

Mother or Cissy, as the case may be, shall coordinate and cooperate with

Maxine to cause SRP to convey by quit-claim deed the following timeshares to the

following persons:

(i)    Vanderbilt Beach & Harbour Club – Sharon Moore (Darien, CT);

(ii)    Club Regency, Unit E102, Week 40 – Deborah Delany (Wilton, CT or

Rye, NY);

(iii) & (iv)    Club Regency, Unit E202, Weeks 49 & 50 – Deborah Delany;

and

(v)    Eagle's Nest, Unit 807, Week 42, Alyssa Capone (Stamford, CT)

(daughter of Maxine).

8.    **Dissolution of SRP**.  After all of the real properties and timeshares

owned by SRP have been liquidated, conveyed and distributed as described herein,

SRP shall be dissolved.

9.    **NatTel, LLC**.  I own fifty percent (50%) of NatTel, LLC, a Delaware

limited liability company ("NatTel").  NatTel is currently in Chapter 11

bankruptcy proceedings in the U.S. Bankruptcy Court for the District of

Connecticut, Bridgeport Division  (Case No. 06-50421).  NatTel's sole asset is 667

shares in now-defunct Oceanic Digital Communications, Inc. ("ODC") and a

lawsuit against ODC's majority shareholder SAC Capital.  The lawsuit against

SAC Capital is an adversary proceeding in NatTel's bankruptcy case (Adv. Proc. No. 07-05037).

I leave my 50% ownership interest in NatTel to Carpenter Financial Group, Inc., 100 Grist Mill Road, Simsbury, CT 06070 (860-408-7000), Attn: Daniel E. Carpenter. Dan has been a long and trustworthy friend and partner, who has expended millions of dollars to support NatTel's litigation against SAC Capital. It is only just and proper that Dan's company receive 100% of any judgment or settlement in this case.

The share certificate representing NatTel's ownership interest in ODC is contained in my files in Stamford, CT.

Upon the completion of the above-referenced litigation, either by settlement or otherwise, the NatTel bankruptcy case should be terminated and NatTel dissolved. Dan is hereby authorized to take any and all actions to manage NatTel, prosecute and settle its litigation, and wind up its affairs.

10.    **Personal Property**. My personal property consists of the following:

(i)    cash in personal & political bank accounts and small amounts of jewelry, which shall be given to Mother or, if Mother predeceases me, then to Cissy;

(ii)    clothes, which shall be given to a needy charity in Naples, Florida or Stamford, CT;

(iii)    books and artwork, which shall be given to a local library in Naples, Florida or Stamford, CT;

(iv)    the following motor vehicles:

(a)    1999 Volvo V70 station wagon, which shall be given to Mother or, if Mother predeceases me, then to Maxine.

(b)    2004 Chrysler Sebring, which shall be given to Maxine;

(c)    1995 Mercedes S500, which shall be given to Eileen;

(d)    1995 Mercedes S600, which shall be donated to any charity.

Any personal property that is acquired after the date hereof is listed on an attachment hereto which is expressly incorporated herein by reference.

11.    **Life Insurance**.  I have life insurance on my life as follows:

| Carrier | Policy # | Face Amount | Beneficiary | Policy Date |
|---|---|---|---|---|
| MassMutual | ███ | $   500,000 | Mother | Nov. 10, 2002 |
| Prudential | ███ | $1,000,000 | Mother | May 11, 2007 |
| ~~Hartford~~ | ███ | $   301,000 | Maxine | Jan. 1, 2009 |
| Prudential | ███ | $1,000,000 | Mother | Sep. 11, 2009 |
| NY Life | ███ | $1,000,000 | Mother | Dec. 1, 2009 |
| NY Life | ███ | $   100,000 | Mother | Jun. 1, 2010 |
| TransAmerica | ███ | $1,000,000 | SRP | Jul. 28, 2010 |
| TransAmerica | ███ | $   500,000 | SRP | Aug. 6, 2010 |
| **TOTAL** | | **$5,401,000** | | |

Pursuant to Florida law, the beneficiaries of the life insurance policies are as described in the valid beneficiary designation forms relating to such policies, notwithstanding anything in this will to the contrary.

12.    **Charitable Bequest.**  If, in the sole and absolute discretion of my personal representative, sufficient liquid funds remain after the payment of all burial, funeral, and memorial expenses, valid claims, bequests, and family allowance, then I hereby bequeath to Northfield Mount Hermon School in Mt. Hermon, MA ("NMH") up to One Hundred and Fifty Thousand Dollars ($150,000) to be called the "Jack E. Robinson Scholarship," to be administered by NMH in perpetuity.  The annual interest from the scholarship principal amount shall be awarded annually to a deserving NMH boarding student from Collier or Sarasota Counties in Florida, or Boston, Massachusetts, to help defray living and travel expenses.

13.    **Organ Donation.**  The personal representative shall have the right to donate any of my organs so that they may be used by a deserving recipient.

14.    **Burial**.  My wish is that I be laid to rest in Woodlawn Cemetery in Sarasota, Florida, in the area as near as possible to Mother, my grandmother and great-grandmother.  A memorial service (not to exceed one hour) may be held in Tallevast, Florida (Mt. Tabor Missionary Baptist Church), and/or Boston, Massachusetts (Charles St. AME Church).  There shall be a short prayer for the

family, reading of scripture from the Old and New Testaments by a minister, and songs. While soft music is played, my obituary shall be read by attendees. The program shall be musical, one or two songs by the choir, a solo and two or three songs by the congregation. A repast shall be served with the estate paying all expenses.

15.    **Residue.**  The rest, remainder and residue of my estate not specifically mentioned herein shall go to Mother or, if she predeceases me, then to Cissy and Eileen in equal amounts.

16.    **Self-interested Transactions; Conflict of Interest.**  The personal representative is expressly authorized to enter into self-interested transactions and/or transactions in which the personal representative has a conflict of interest, so long as such transactions are in the best interest of the estate and its beneficiaries, as determined by the personal representative in his/her sole and absolute discretion.

17.    **Source of Payment.**  The personal representative shall pay from my residuary estate all of my just debts and funeral expenses, and all estate, inheritance and succession taxes, as soon as possible after my death without inconvenience to my estate or the personal representative, without charging any specific legacy or devise therewith or with any part thereof, and without requiring

contribution from any beneficiary of any policy of insurance on my life or any part thereof.

18.    **Prosecution of Litigation.**  The personal representative has the authority to prosecute, defend and compromise any and all litigation in which I am a party in my individual capacity, which as of the date hereof is: (i) *Robinson v. Bank of New York Mellon Corp.*, No. 10-3027-CA (Collier Cir. Ct.) (damages); (ii) *Deutsche Bank Nat'l Trust Co. v. Robinson*, No. 10-1977-CA (Collier Cir.  Ct.) (foreclosure); and (iii) *Robinson v. Federal Election Comm'n*, No. 10-cv-11335 (D. Mass.) (FEC fine); which are the only legal or equitable actions to which I am a party as of the date hereof.  Any and all net amounts received from the above-referenced litigation shall be added to the residuary of my estate or, if my estate has been closed prior to the receipt of any such amounts, shall be paid to Mother or, if she predeceases me, to Cissy and Eileen in equal amounts.

19.    **Arbitration.**  Any and all disputes regarding this will, other than disputes regarding its legal validity, shall be settled exclusively by binding arbitration before a single arbitrator.  The arbitration shall be conducted according to the applicable rules of The Florida Bar and shall take place in Naples, Florida. The arbitrator shall be an attorney in good standing with The Florida Bar and one who has at least ten (10) years' experience in dealing with Florida probate matters. The decision of the arbitrator shall be final, binding, and non-appealable, and

judgment thereon shall be entered in the 20th Judicial Circuit Court in and for Collier County, Florida, located in Naples, Florida.

20.    **Statement of No Spouse or Heirs**.  I hereby state that I do not have a spouse or former spouse, natural or adopted children, step-children, descendants or heirs.

**IN WITNESS WHEREOF, I, JACK E. ROBINSON**, the undersigned testator, do hereby declare that I sign and execute this instrument as my last will and testament, that I sign it willingly in the presence of each of the undersigned witnesses, and that I execute it as my free and voluntary act and deed for the purposes herein on the date first above written.

*[signatures appear on the following page]*

TESTATOR

JACK E. ROBINSON

Dated:          November 15, 2010

STATE OF CONNECTICUT     )
                         )          ss. Stamford
COUNTY OF FAIRFIELD      )

The foregoing instrument was acknowledged before me this 15th day of November, 2010, by Jack E. Robinson, who is personally known to me.

Sheila O'Grady
NOTARY PUBLIC

MY COMMISSION EXPIRES
5/31/2012

My Commission Expires:_____

---

**Attestation Clause:  On the above date, the testator declared to us, the undersigned, that the foregoing instrument was his last will and testament. He then signed the will in our presence, we being present at the same time. We then signed the will in the testator's presence and in the presence of each other, we and each of us believing the testator to be of sound mind on the date hereof.**

Witness:_____
          Mauricio Agudelo

Witness:_____
          Samantha Frattaroli

---

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

---

|  |  |  |
|---|---|---|
| UNIVERSITAS EDUCATION, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No. 1:15-cv-11848-DPW |
| | ) | |
| v. | ) | |
| | ) | |
| JACK E. ROBINSON III, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

---

## OPPOSITION TO PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT AS TO JACK E. ROBINSON III a/k/a JACK E. ROBINSON

Lillian B. Granderson ("Granderson"), the 96-year-old mother of the late Defendant Jack E. Robinson III ("Robinson"), who died insolvent *almost five (5) years ago*, on November 23, 2017, hereby opposes Plaintiff's Motion for Default Judgment as to Jack E. Robinson III a/k/a Jack E. Robinson (Docket Entry Nos. 200 and 201) for the reasons set forth in her Opposition to Plaintiff's Motion to Substitute and to Vacate Court's Ruling Ordering her Substitution (Docket Entry No. 199), which are fully incorporated by reference herein. Granderson reserves the right to file a supplemental opposition following receipt of Plaintiff's response to Docket Entry No. 199, which the clerk, on behalf of the Court in an email dated May 15, 2023, asked the Plaintiff to submit no later than May 26, 2023.

**WHEREFORE,** for the foregoing reasons, Granderson respectfully requests that the Court deny Plaintiff's Motion.

**LILLIAN B. GRANDERSON,**
**BY HER ATTORNEY,**


/s/ Lana Sullivan
Lana Sullivan, BBO No. 649364
Law Office of Lana Sullivan
75 Second Avenue, Suite 605
Needham, MA 02494
(617) 454-1015
Dated: May 26, 2023                    lana@lanasullivanlaw.com

<u>**CERTIFICATE OF SERVICE**</u>

     I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on May 26, 2023.


/s/ Lana Sullivan
Lana Sullivan

**Universitas Supplemental Appendix - 160**

**United States District Court**
**District of Massachusetts (Boston)**
**CIVIL DOCKET FOR CASE #: 1:15-cv-11848-DPW**

| | |
|---|---|
| Universitas Education, LLC v. Robinson | Date Filed: 05/14/2015 |
| Assigned to: Judge Douglas P. Woodlock | Date Terminated: 07/12/2023 |
| Demand: $92,000 | Jury Demand: Both |
| Case in other court:  USCA - First Circuit, 23-01675 | Nature of Suit: 470 Racketeer/Corrupt Organization |
| Cause: 18:1961 Racketeering (RICO) Act | Jurisdiction: Federal Question |

**Plaintiff**

**Universitas Education, LLC**                    represented by    **Joseph L. Manson , III**
Law Offices of Joseph L. Manson III
600 Cameron Street
Alexandria, VA 22314
202-674-1450
Email: jmanson@jmansonlaw.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Leily Lashkari**
Loeb & Loeb LLP
345 Park Avenue
New York, NY 10154
(212) 407-4962
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Paul S. Samson**
Riemer & Braunstein
100 Cambridge Street
22nd Floor
Boston, MA 02114
617-880-3555
Fax: 617-880-3456
Email: psamson@riemerlaw.com
*TERMINATED: 04/12/2019*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Paula K. Colbath**
Loeb &Loeb LLP
345 Park Avenue
New York, NY 10154
(212) 407-4905
Fax: (212) 937-3189
Email: pcolbath@loeb.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Alissa L. Poynor**
Riemer & Braunstein
100 Cambridge Street
Boston, MA 02114-2527
617-880-3416
Fax: 617-880-3456
Email: apoynor@riemerlaw.com

**Universitas Supplemental Appendix - 161**

*TERMINATED: 04/12/2019*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Jack E. Robinson, III**                  represented by   **Seth L. Marcus**
                                                            The Law Offices of Seth L. Marcus
                                                            Suite 101
                                                            777 Westchester Ave.
                                                            White Plains, NY 10604
                                                            212-686-2555
                                                            Email: seth@slmarcuslaw.com
                                                            *LEAD ATTORNEY*
                                                            *PRO HAC VICE*
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Jack E. Robinson**
                                                            Leyden & Main Legal Group, P.C.
                                                            6 Main Street Extension
                                                            Plymouth, MA 02360
                                                            781-934-6755
                                                            Email: robinsonesq@aol.com
                                                            *ATTORNEY TO BE NOTICED*

**Defendant**

**Lillian Granderson**                     represented by   **Jason M. Strojny**
*as successor to Jack E. Robinson, III*                     Libby Hoopes Brooks & Mulvey, P.C.
                                                            399 Boylston Street, Suite 600
                                                            Boston, MA 02116
                                                            617-338-9300
                                                            Email: jstrojny@lhblaw.com
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Lana Sullivan**
                                                            Law Office of Lana Sullivan
                                                            75 Second Avenue, Suite 605
                                                            Needham, MA 02494
                                                            617-454-1015
                                                            Email: lana@lanasullivanlaw.com
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

**ThirdParty Plaintiff**

**Jack E. Robinson, III**                  represented by   **Seth L. Marcus**
                                                            (See above for address)
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Jack E. Robinson**
                                                            (See above for address)
                                                            *ATTORNEY TO BE NOTICED*

V.

**ThirdParty Defendant**

**Loeb & Loeb LLP**                        represented by   **Paula K. Colbath**
345 Park Avenue                                             Loeb &Loeb LLP
New York, NY 10154                                          345 Park Avenue
212.407.4000                                                New York, NY 10154
                                                            (212) 407-4905
                                                            Fax: (212) 937-3189
                                                            Email: pcolbath@loeb.com

**Universitas Supplemental Appendix - 162**

*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

| | | |
|---|---|---|
| **Jack E. Robinson, III** | represented by | **Seth L. Marcus** |
| | | (See above for address) |
| | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |
| | | |
| | | **Jack E. Robinson** |
| | | (See above for address) |
| | | *ATTORNEY TO BE NOTICED* |

V.

**Counter Defendant**

| | | |
|---|---|---|
| **Universitas Education, LLC** | represented by | **Joseph L. Manson , III** |
| | | (See above for address) |
| | | *LEAD ATTORNEY* |
| | | *PRO HAC VICE* |
| | | *ATTORNEY TO BE NOTICED* |
| | | |
| | | **Leily Lashkari** |
| | | (See above for address) |
| | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |
| | | |
| | | **Paul S. Samson** |
| | | (See above for address) |
| | | *TERMINATED: 04/12/2019* |
| | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |
| | | |
| | | **Paula K. Colbath** |
| | | (See above for address) |
| | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |
| | | |
| | | **Alissa L. Poynor** |
| | | (See above for address) |
| | | *TERMINATED: 04/12/2019* |
| | | *ATTORNEY TO BE NOTICED* |

[Email All Attorneys]

[Email All Attorneys and Additional Recipients]

| Date Filed | # | Docket Text |
|---|---|---|
| 05/14/2015 | 1 | COMPLAINT *AND JURY DEMAND* against Jack E. Robinson, III Filing fee: $ 400, receipt number 0101-5558852 (Fee Status: Filing Fee paid), filed by Universitas Education, LLC. (Attachments: # 1 Exhibit 1 through 9 to Complaint, # 2 Exhibit 10 through 11 to Complaint, # 3 Exhibit 12 to Complaint, # 4 Civil Cover Sheet, # 5 Category sheet)(Samson, Paul) (Entered: 05/14/2015) |
| 05/15/2015 | 2 | ELECTRONIC NOTICE of Case Assignment. Judge Douglas P. Woodlock assigned to case. If the trial Judge issues an Order of Reference of any matter in this case to a Magistrate Judge, the matter will be transmitted to Magistrate Judge Jennifer C. Boal. (Abaid, Kimberly) (Entered: 05/15/2015) |
| 05/15/2015 | 3 | Summons Issued as to All Defendants. **Counsel receiving this notice electronically should download this summons, complete one for each defendant and serve it in accordance with Fed.R.Civ.P. 4 and LR 4.1. Summons will be mailed to plaintiff(s) not receiving notice electronically for completion of service.** (Coppola, Katelyn) (Entered: 05/15/2015) |
| 05/15/2015 | 4 | CORPORATE DISCLOSURE STATEMENT by Universitas Education, LLC. (Samson, Paul) (Entered: 05/15/2015) |

**Universitas Supplemental Appendix - 163**

| 07/02/2015 | 5 | NOTICE of Appearance by Jack E. Robinson on behalf of Jack E. Robinson, III (Robinson, Jack) (Entered: 07/02/2015) |
| 07/02/2015 | 6 | Assented to MOTION for Leave to Appear Pro Hac Vice for admission of Seth L. Marcus Filing fee: $ 100, receipt number 0101-5639554 by Jack E. Robinson, III. (Attachments: # 1 Exhibit Certification)(Robinson, Jack) (Entered: 07/02/2015) |
| 07/07/2015 | 7 | Judge Douglas P Woodlock: ELECTRONIC ORDER entered granting 6 Assented to Motion for Leave to Appear Pro Hac Vice; Added Seth L. Marcus for Jack E. Robinson, III. **Attorneys admitted Pro Hac Vice must register for electronic filing if the attorney does not already have an ECF account in this district. To register go to the Court website at www.mad.uscourts.gov. Select Case Information, then Electronic Filing (CM/ECF) and go to the CM/ECF Registration Form.** (Lovett, Jarrett) (Entered: 07/07/2015) |
| 07/07/2015 | 8 | NOTICE of Withdrawal of Appearance by Jack E. Robinson (Robinson, Jack) (Entered: 07/07/2015) |
| 07/21/2015 | 9 | SUMMONS Returned Executed Jack E. Robinson, III served on 7/15/2015, answer due 8/5/2015. (Attachments: # 1 Certificate of Service)(Samson, Paul) (Entered: 07/21/2015) |
| 07/23/2015 | 10 | Assented to MOTION for Leave to Appear Pro Hac Vice for admission of Paula K. Colbath Filing fee: $ 100, receipt number 0101-5671817 by Universitas Education, LLC. (Attachments: # 1 Exhibit A - Declaration of Paula K. Colbath, Esquire in Support of Motion for Leave to Appear Pro Hac Vice, # 2 Certificate of Service)(Samson, Paul) (Entered: 07/23/2015) |
| 07/23/2015 | 11 | Assented to MOTION for Leave to Appear Pro Hac Vice for admission of Leily Lashkari Filing fee: $ 100, receipt number 0101-5671874 by Universitas Education, LLC. (Attachments: # 1 Exhibit A - Declaration of Leily Lashkari, Esquire in Support of Motion for Leave to Appear Pro Hac Vice, # 2 Certificate of Service)(Samson, Paul) (Entered: 07/23/2015) |
| 07/24/2015 | 12 | Judge Douglas P. Woodlock: ELECTRONIC ORDER entered granting 10 Motion for Leave to Appear Pro Hac Vice Added Paula K. Colbath. **Attorneys admitted Pro Hac Vice must register for electronic filing if the attorney does not already have an ECF account in this district. To register go to the Court website at www.mad.uscourts.gov. Select Case Information, then Electronic Filing (CM/ECF) and go to the CM/ECF Registration Form.** (Gioia, AnaMaria) (Entered: 07/24/2015) |
| 07/24/2015 | 13 | Judge Douglas P. Woodlock: ELECTRONIC ORDER entered granting 11 Motion for Leave to Appear Pro Hac Vice Added Leily Lashkari. **Attorneys admitted Pro Hac Vice must register for electronic filing if the attorney does not already have an ECF account in this district. To register go to the Court website at www.mad.uscourts.gov. Select Case Information, then Electronic Filing (CM/ECF) and go to the CM/ECF Registration Form.** (Gioia, AnaMaria) (Entered: 07/24/2015) |
| 08/03/2015 | 14 | MEMORANDUM in Support of 15 Motion to Dismiss for Failure to State a Claim, and MOTION to Dismiss for Lack of Jurisdiction, by Jack E. Robinson, III. (Attachments: # 1 Exhibit 1)(Marcus, Seth) Modified to edit event, document type, and docket text on 8/5/2015 (Gioia, AnaMaria). (Entered: 08/03/2015) |
| 08/04/2015 | 15 | First MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM , MOTION to Dismiss for Lack of Jurisdiction ( Responses due by 8/18/2015) by Jack E. Robinson, III.(Marcus, Seth) (Entered: 08/04/2015) |
| 08/18/2015 | 16 | MEMORANDUM in Opposition re 15 First MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM MOTION to Dismiss for Lack of Jurisdiction filed by Universitas Education, LLC. (Attachments: # 1 Certificate of Service)(Colbath, Paula) (Entered: 08/18/2015) |
| 08/23/2015 | 17 | MOTION for Leave to File *Reply Memorandum in connection with Defendant's Motion to Dismiss* by Jack E. Robinson, III. (Attachments: # 1 Exhibit Proposed Reply Memorandum)(Marcus, Seth) (Entered: 08/23/2015) |
| 08/24/2015 | 18 | NOTICE OF SCHEDULING INITIAL SCHEDULING CONFERENCE, ORDER FOR JOINT STATEMENT AND CERTIFICATIONS, AND ORDER FOR ELECTRONIC FILING: Initial Scheduling Conference set for 9/29/2015 03:00 PM in Courtroom 1 before Judge Douglas P. Woodlock. (Lovett, Jarrett) (Entered: 08/24/2015) |
| 09/22/2015 | 19 | NOTICE of Appearance by Alissa L. Poynor on behalf of Universitas Education, LLC (Poynor, Alissa) (Entered: 09/22/2015) |
| 09/22/2015 | 20 | REPORT of Rule 26(f) Planning Meeting. (Attachments: # 1 Exhibit Plaintiff's Cerftification, # 2 Exhibit Defendant's Certification)(Poynor, Alissa) (Entered: 09/22/2015) |
| 09/23/2015 | 21 | Judge Douglas P. Woodlock: ELECTRONIC ORDER entered granting 17 Motion for Leave to File Reply; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include - Leave to file granted on (date of order)- in the caption of the document. (Lovett, Jarrett) (Entered: 09/23/2015) |
| 09/24/2015 | 22 | REPLY to Response to 15 First MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM MOTION to Dismiss for Lack of Jurisdiction filed by Jack E. Robinson, III. (Marcus, Seth) (Entered: 09/24/2015) |

**Universitas Supplemental Appendix - 164**

| 09/29/2015 | 23 | ELECTRONIC Clerk's Notes for proceedings held before Judge Douglas P. Woodlock: Initial Scheduling Conference held on 9/29/2015; Hearing as to 15 MOTION TO DISMISS set for 11/18/2015 02:30 PM in Courtroom 1 before Judge Douglas P. Woodlock. (Court Reporter: Cheryl Dahlstrom at cheryldahlstrom@comcast.net)(Attorneys present: Samson for the pltff; Marcus for the deft) (Lovett, Jarrett) (Entered: 09/29/2015) |
|---|---|---|
| 09/30/2015 | 24 | SUR-REPLY to Motion re 15 First MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM MOTION to Dismiss for Lack of Jurisdiction filed by Universitas Education, LLC. (Attachments: # 1 Certificate of Service) (Samson, Paul) (Entered: 09/30/2015) |
| 11/13/2015 | 25 | Assented to MOTION Reschedule Motion to Dismiss Hearing Date re 15 First MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM MOTION to Dismiss for Lack of Jurisdiction by Universitas Education, LLC. (Samson, Paul) (Entered: 11/13/2015) |
| 11/16/2015 | 26 | Judge Douglas P. Woodlock: ELECTRONIC ORDER entered granting 25 Motion to Reschedule Motion to Dismiss Hearing. (Gioia, AnaMaria) (Entered: 11/16/2015) |
| 11/16/2015 | 27 | Set/Reset Hearings: Motion to Dismiss Hearing 15 set for 12/11/2015 02:00 PM in Courtroom 1 before Judge Douglas P. Woodlock. (Gioia, AnaMaria) (Entered: 11/16/2015) |
| 12/11/2015 | 31 | Electronic Clerk's Notes for proceedings held before Judge Douglas P. Woodlock: Scheduling Conference held on 12/11/2015. Court denies in substance Motion to Dismiss 15 for reasons stated during the hearing, a written Memorandum of Decision will follow. Sets schedule: Initial disclosures by 1/8/16Fact discovery closed by 9/9/16, Opening expert reports by 9/30/16, Rebuttal reports by 11/4/16, Expert discovery by 12/30/16, Dispositive motions by 9/30/16, opposition motions by 11/4/16, motion hearing: 11/30/16 at 2:30 pm. Parties should submit their understandings of the schedule by 12/15/2015. (Court Reporter: Brenda Hancock at brhancock@msn.com.) (Attorneys present: Samson, Colbath) (Hohler, Daniel) Modified on 2/4/2016 (Hohler, Daniel). (Entered: 01/08/2016) |
| 12/11/2015 | 32 | ELECTRONIC NOTICE of Hearing.Hearing set for 11/30/2016 02:30 PM in Courtroom 1 before Judge Douglas P. Woodlock. (Hohler, Daniel) (Entered: 01/08/2016) |
| 12/15/2015 | 28 | STATUS REPORT *Amended Report on Discovery Plan in accordance with Fed.R.Civ.P. 26(f)* by Universitas Education, LLC. (Poynor, Alissa) (Entered: 12/15/2015) |
| 12/28/2015 | 29 | MOTION for Reconsideration *of denial of Motion to Dismiss* by Jack E. Robinson, III.(Marcus, Seth) (Entered: 12/28/2015) |
| 12/28/2015 | 30 | MEMORANDUM in Support re 29 MOTION for Reconsideration *of denial of Motion to Dismiss* filed by Jack E. Robinson, III. (Attachments: # 1 Exhibit A - TD Bank Decision, # 2 Exhibit B - TD Bank Complaint)(Marcus, Seth) (Entered: 12/28/2015) |
| 01/11/2016 | 33 | Opposition re 29 MOTION for Reconsideration *of denial of Motion to Dismiss* filed by Universitas Education, LLC. (Samson, Paul) (Entered: 01/11/2016) |
| 01/11/2016 | 34 | AFFIDAVIT in Support re 33 Opposition to Motion *Regarding Motion for Reconsideration*. (Attachments: # 1 Exhibit 1 (Hearing Transcript), # 2 Exhibit 2 (January 5, 2016 Memorandum Opinion and Order of Southern District of New York))(Samson, Paul) (Entered: 01/11/2016) |
| 01/11/2016 | 35 | Opposition re 29 MOTION for Reconsideration *of denial of Motion to Dismiss and for Extension of Time to Answer Complaint (Limited)* filed by Universitas Education, LLC. (Samson, Paul) (Entered: 01/11/2016) |
| 01/13/2016 | 36 | Letter/request (non-motion) from Paul S. Samson Regarding Incorrect Citation . (Samson, Paul) (Entered: 01/13/2016) |
| 01/14/2016 | 37 | MOTION for Leave to File *Reply to Plaintiff's Opposition to Motion to Reconsider* by Jack E. Robinson, III. (Attachments: # 1 Exhibit Proposed Reply Brief)(Marcus, Seth) (Entered: 01/14/2016) |
| 01/14/2016 | 38 | Judge Douglas P. Woodlock: ELECTRONIC ORDER entered granting 37 Motion for Leave to File Document ; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include - Leave to file granted on (date of order)- in the caption of the document. (Hohler, Daniel) (Entered: 01/14/2016) |
| 01/14/2016 | 39 | ELECTRONIC NOTICE Setting Hearing on Motion 29 MOTION for Reconsideration *of denial of Motion to Dismiss* : Motion Hearing set for 2/3/2016 02:30 PM in Courtroom 1 before Judge Douglas P. Woodlock. (Hohler, Daniel) (Entered: 01/14/2016) |
| 01/15/2016 | 40 | REPLY to Response to 29 MOTION for Reconsideration *of denial of Motion to Dismiss* filed by Jack E. Robinson, III. (Marcus, Seth) (Entered: 01/15/2016) |
| 01/26/2016 | 41 | MOTION for Leave to File *Sur-Reply Brief Regarding Defendant's Motion for Reconsideration* by Universitas Education, LLC.(Samson, Paul) (Entered: 01/26/2016) |

**Universitas Supplemental Appendix - 165**

| 02/04/2016 | 42 | Electronic Clerk's Notes for proceedings held before Judge Douglas P. Woodlock: Motion Hearing held on 2/4/2016 re 29 MOTION for Reconsideration *of denial of Motion to Dismiss* filed by Jack E. Robinson, III. Motion for Reconsideration 29 was taken under advisement; The Defendant shall file an answer by 2/17/16 and that the parties shall brief in submissions on or before 2/17/16 various issues discussed during the hearing including: discovery regarding the defendant's residence, additional New York law regarding fraudulent concealment, whether statutes of limitation should be assessed defendant or collectively by the scheme, what effect Judge Scheinlin's decision in the TD Bank matter has on the RICO claim in this case and any other issues which may have been suggested by the argument as bearing on reconsideration.(Court Reporter: Brenda Hancock at brhancock@msn.com.) (Hohler, Daniel) (Entered: 02/04/2016) |
| 02/05/2016 | 43 | MOTION to Compel *Disclosure of Insurance Agreements pursuant to Fed.R.Civ.P.26(A)(1)(A)(IV) and for Costs* by Universitas Education, LLC.(Poynor, Alissa) (Entered: 02/05/2016) |
| 02/05/2016 | 44 | MEMORANDUM in Support re 43 MOTION to Compel *Disclosure of Insurance Agreements pursuant to Fed.R.Civ.P.26(A)(1)(A)(IV) and for Costs* filed by Universitas Education, LLC. (Poynor, Alissa) (Entered: 02/05/2016) |
| 02/05/2016 | 45 | AFFIDAVIT in Support re 43 MOTION to Compel *Disclosure of Insurance Agreements pursuant to Fed.R.Civ.P.26(A)(1)(A)(IV) and for Costs with certificate of service* filed by Universitas Education, LLC. (Attachments: # 1 Exhibit A-I)(Poynor, Alissa) (Entered: 02/05/2016) |
| 02/11/2016 | 46 | Transcript of Motion Hearing held on February 3, 2016, before Judge Douglas P. Woodlock. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Brenda Hancock at brhancock@msn.com Redaction Request due 3/3/2016. Redacted Transcript Deadline set for 3/14/2016. Release of Transcript Restriction set for 5/11/2016. (Scalfani, Deborah) (Entered: 02/11/2016) |
| 02/11/2016 | 47 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/caseinfo/transcripts.htm (Scalfani, Deborah) (Entered: 02/11/2016) |
| 02/16/2016 | 48 | Opposition re 43 MOTION to Compel *Disclosure of Insurance Agreements pursuant to Fed.R.Civ.P.26(A)(1)(A) (IV) and for Costs* filed by Jack E. Robinson, III. (Marcus, Seth) (Entered: 02/16/2016) |
| 02/17/2016 | 49 | ADDENDUM re 29 MOTION for Reconsideration *of denial of Motion to Dismiss Letter Submission with Additional Briefing as Directed at Hearing on 2/4/16* filed by Jack E. Robinson, III. (Marcus, Seth) (Entered: 02/17/2016) |
| 02/17/2016 | 50 | ANSWER to 1 Complaint, with Jury Demand , THIRD PARTY COMPLAINT against Loeb & Loeb LLP, COUNTERCLAIM against All Plaintiffs by Jack E. Robinson, III.(Marcus, Seth) (Entered: 02/17/2016) |
| 02/17/2016 | 51 | Supplemental Opposition re 29 MOTION for Reconsideration *of denial of Motion to Dismiss Plaintiff's Supplemental Memorandum of Law in Opposition to Defendant's Motion for Reconsideration* filed by Universitas Education, LLC. (Samson, Paul) (Entered: 02/17/2016) |
| 02/19/2016 | 52 | Judge Douglas P. Woodlock: ELECTRONIC ORDER entered granting 43 Motion to Compel (Beatty, Barbara) (Entered: 02/19/2016) |
| 03/01/2016 | 53 | Supplemental MOTION for Costs *Pursuant to Fed.R.Civ.P. 37* by Universitas Education, LLC. (Attachments: # 1 Affidavit in Support of Plaintiff's Supplemental Application for Costs)(Poynor, Alissa) (Entered: 03/01/2016) |
| 03/09/2016 | 54 | Assented to MOTION to Approve Stipulation Between Plaintiff and Defendant Extending Time to Respond to Counterclaim re 50 Answer to Complaint, Third Party Complaint, Counterclaim by Universitas Education, LLC. (Attachments: # 1 Exhibit A)(Samson, Paul) (Entered: 03/09/2016) |
| 03/09/2016 | 55 | Joint MOTION to Approve Stipulation Between Plaintiff and Defendant Resolving Plaintiff's Motion for Costs re 53 Supplemental MOTION for Costs *Pursuant to Fed.R.Civ.P. 37* by Universitas Education, LLC. (Attachments: # 1 Exhibit A)(Samson, Paul) (Entered: 03/09/2016) |
| 03/11/2016 | 56 | Judge Douglas P. Woodlock: ELECTRONIC ORDER entered granting 54 Assented to Motion to Approve Stipulation Between Plaintiff and Defendant Extending Time to Respond to Counterclaim. Plaintiff shall respond to Defendant's Counterclaim no later than March 16, 2016. (Beatty, Barbara) (Entered: 03/11/2016) |
| 03/11/2016 | 57 | Judge Douglas P. Woodlock: ELECTRONIC ORDER entered granting 55 Joint Motion to Approve Stipulation Resolving Plaintiff's Motion for Costs 53 . (Beatty, Barbara) (Entered: 03/11/2016) |
| 03/14/2016 | 58 | Assented to MOTION to Seal *and for Impoundment Universitas' Memorandum of Law in Support of its Motion to Dismiss, with certain supporting exhibits, and to defer filing of such documents pending ruling on this motion* by Universitas Education, LLC. (Attachments: # 1 Affidavit Affidavit of Attorney Paul Samson in support of Universitas' Motion for Impoundment and for Leave to File Under Seal)(Poynor, Alissa) (Entered: 03/14/2016) |

## Universitas Supplemental Appendix - 166

| 03/17/2016 | 59 | Judge Douglas P. Woodlock: ELECTRONIC ORDER entered granting 58 Assented to Motion for Impoundment and Leave to File Under Seal (Beatty, Barbara) (Entered: 03/17/2016) |
| 03/17/2016 | 60 | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *on the Defendant's Counterclaim* by Universitas Education, LLC.(Poynor, Alissa) (Entered: 03/17/2016) |
| 03/17/2016 | 61 | MEMORANDUM in Support re 60 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *on the Defendant's Counterclaim Redacted pursuant to Court's Order entered March 17, 2016, Docket No. 59* filed by Universitas Education, LLC. (Attachments: # 1 Affidavit with Exhibits 1-5)(Poynor, Alissa) (Entered: 03/17/2016) |
| 03/18/2016 | 62 | MOTION to Dismiss *(Special) Pursuant to M.G.L. c. 231, Section 59H* by Universitas Education, LLC.(Samson, Paul) (Entered: 03/18/2016) |
| 03/18/2016 | 63 | MEMORANDUM in Support re 62 MOTION to Dismiss *(Special) Pursuant to M.G.L. c. 231, Section 59H* filed by Universitas Education, LLC. (Samson, Paul) (Entered: 03/18/2016) |
| 03/21/2016 | 64 | WAIVER OF SERVICE Returned Executed by Jack E. Robinson, III. Loeb & Loeb LLP waiver sent on 2/18/2016, answer due 4/18/2016. (Marcus, Seth) (Entered: 03/21/2016) |
| 03/22/2016 | 65 | STIPULATION re 50 Answer to Complaint, Third Party Complaint, Counterclaim *Extending Time to Respond* by Universitas Education, LLC. (Samson, Paul) (Entered: 03/22/2016) |
| 03/22/2016 | 66 | Assented to MOTION for Extension of Time to April 15, 2016 to File Response/Reply as to 62 MOTION to Dismiss *(Special) Pursuant to M.G.L. c. 231, Section 59H*, 60 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *on the Defendant's Counterclaim* by Jack E. Robinson, III. (Attachments: # 1 Exhibit Stipulation Extending Time to Respond to Motions to Dismiss Counterclaims)(Marcus, Seth) (Entered: 03/22/2016) |
| 03/23/2016 | 67 | Judge Douglas P. Woodlock: ELECTRONIC ORDER entered granting 66 Defendant's Assented to Motion to Approve Stipulation. Defendant shall respond to both Plaintiff's Motions to Dismiss Counterclaims 60 62 , no later than 4/15/16. In addition, based upon the filing of the Stipulation Extending Time to Respond 65 , the Third-Party Defendant Loeb & Loeb shall respond to the third-party complaint no later than 5/16/16. (Beatty, Barbara) (Entered: 03/23/2016) |
| 04/01/2016 | 68 | Letter/request (non-motion) from Counsel for Defendant *notifying the Court of the withdrawal with prejudice of the appeal of the SDNY's dismissal of Universitas Education LLC v. T.D. Bank, N.A.*. (Attachments: # 1 Exhibit Stipulation Withdrawing TD Bank Appeal with Prejudice)(Marcus, Seth) (Entered: 04/01/2016) |
| 04/14/2016 | 69 | MEMORANDUM in Opposition re 62 MOTION to Dismiss *(Special) Pursuant to M.G.L. c. 231, Section 59H*, 60 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *on the Defendant's Counterclaim* filed by Jack E. Robinson, III. (Marcus, Seth) (Entered: 04/14/2016) |
| 05/05/2016 | 72 | Assented to MOTION to Appear Pro Hac Vice for admission of Paula K. Colbath on Behalf of Third-Party Defendant, Loeb & Loeb, LLP Filing fee: $ 100, receipt number 0101-6098684 by Universitas Education, LLC. (Attachments: # 1 Exhibit A, # 2 Certificate of Service)(Samson, Paul) (Entered: 05/05/2016) |
| 05/12/2016 | 73 | Assented to MOTION for Leave to File *Brief in Excess of Page Limitations* by Universitas Education, LLC. (Samson, Paul) (Entered: 05/12/2016) |
| 05/12/2016 | 74 | Assented to MOTION for Leave to File *Under Seal Loeb's Memorandum of Law in Support of its Motion to Dismiss, and to Defer Filing of Loeb's Motion to Dismiss Pending Ruling on this Motion and for Impoundment* by Universitas Education, LLC.(Samson, Paul) (Entered: 05/12/2016) |
| 05/12/2016 | 75 | DECLARATION re 74 Assented to MOTION for Leave to File *Under Seal Loeb's Memorandum of Law in Support of its Motion to Dismiss, and to Defer Filing of Loeb's Motion to Dismiss Pending Ruling on this Motion and for Impoundment* by Universitas Education, LLC. (Samson, Paul) (Entered: 05/12/2016) |
| 05/13/2016 | 76 | Judge Douglas P. Woodlock: ELECTRONIC ORDER entered granting 72 Motion for Leave to Appear Pro Hac Vice Added Paula K. Colbath. **Attorneys admitted Pro Hac Vice must register for electronic filing if the attorney does not already have an ECF account in this district. To register go to the Court website at www.mad.uscourts.gov. Select Case Information, then Electronic Filing (CM/ECF) and go to the CM/ECF Registration Form.** (Gioia, AnaMaria) (Entered: 05/13/2016) |
| 05/13/2016 | 77 | Judge Douglas P. Woodlock: ORDER granting 73 Assented to Motion by Third-Party Defendant Loeb & Loeb LLP in Support of its Motion for Leave to File Brief in Excess of Page Limitations and granting 74 Assented to Motion by Third-Party Defendant Loeb & Loeb LLP for Impoundment and for Leave to File Under Seal. Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include - Leave to file granted on (date of order)- in the caption of the document. (Beatty, Barbara) (Entered: 05/13/2016) |
| 05/16/2016 | 78 | MOTION to Dismiss *(Third-Party Defendant's Special Motion to Dismiss the Third-Party Complaint Pursuant to Mass. Gen. Laws Ch. 231, Section 59H (Anti-Slapp Statute))* by Loeb & Loeb LLP.(Colbath, Paula) (Entered: |

| 05/16/2016 | 79 | MEMORANDUM in Support re 78 MOTION to Dismiss *(Third-Party Defendant's Special Motion to Dismiss the Third-Party Complaint Pursuant to Mass. Gen. Laws Ch. 231, Section 59H (Anti-Slapp Statute))* filed by Loeb & Loeb LLP. (Colbath, Paula) (Entered: 05/16/2016) |
|---|---|---|
| 05/16/2016 | 80 | MOTION to Dismiss *the Third-Party Complaint* by Loeb & Loeb LLP.(Colbath, Paula) (Entered: 05/16/2016) |
| 05/16/2016 | 81 | MEMORANDUM in Support re 80 MOTION to Dismiss *the Third-Party Complaint (Redacted)* filed by Loeb & Loeb LLP. (Colbath, Paula) (Entered: 05/16/2016) |
| 05/16/2016 | 82 | AFFIDAVIT of Paula K. Colbath in Support re 80 MOTION to Dismiss *the Third-Party Complaint* filed by Loeb & Loeb LLP. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Colbath, Paula) (Entered: 05/16/2016) |
| 05/24/2016 | 85 | Assented to MOTION for Extension of Time to 6/15/2016 to File Response/Reply as to 80 MOTION to Dismiss *the Third-Party Complaint*, 78 MOTION to Dismiss *(Third-Party Defendant's Special Motion to Dismiss the Third-Party Complaint Pursuant to Mass. Gen. Laws Ch. 231, Section 59H (Anti-Slapp Statute))* by Jack E. Robinson, III.(Marcus, Seth) (Entered: 05/24/2016) |
| 05/31/2016 | 86 | Judge Douglas P. Woodlock: ORDER granting 85 Defendant and Third Party Plaintiff's Assented to Motion to Extend Time in Which to Respond to Motions to Dismiss. Responses due by 6/15/2016. (Beatty, Barbara) (Entered: 05/31/2016) |
| 06/02/2016 | 87 | RESPONSE to Motion re 80 MOTION to Dismiss *the Third-Party Complaint*, 78 MOTION to Dismiss *(Third-Party Defendant's Special Motion to Dismiss the Third-Party Complaint Pursuant to Mass. Gen. Laws Ch. 231, Section 59H (Anti-Slapp Statute))* filed by Jack E. Robinson, III. (Marcus, Seth) (Entered: 06/02/2016) |
| 06/09/2016 | 88 | MOTION for Leave to File *a Combined Reply Brief in Support of Motions to Dismiss* by Loeb & Loeb LLP. (Colbath, Paula) (Entered: 06/09/2016) |
| 06/10/2016 | 89 | Judge Douglas P. Woodlock: ORDER granting 88 Third Party Defendant's Motion for Leave to File a Combined Reply Brief in Support of its Motion to Dismiss. Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include - Leave to file granted on (date of order)- in the caption of the document. (Beatty, Barbara) (Entered: 06/10/2016) |
| 06/10/2016 | 90 | REPLY to Response to 80 MOTION to Dismiss *the Third-Party Complaint*, 78 MOTION to Dismiss *(Third-Party Defendant's Special Motion to Dismiss the Third-Party Complaint Pursuant to Mass. Gen. Laws Ch. 231, Section 59H (Anti-Slapp Statute))* filed by Loeb & Loeb LLP. (Colbath, Paula) (Entered: 06/10/2016) |
| 10/17/2016 | 91 | NOTICE OF MOTION HEARING: Hearing on Motions to Dismiss [ECF#60, 62, 78, 80] set for 11/30/2016 at 2:30 p.m. in Courtroom 1 before Judge Douglas P. Woodlock. (Beatty, Barbara) (Entered: 10/17/2016) |
| 11/30/2016 | 92 | Clerk's Notes for Motion Hearing held before Judge Douglas P. Woodlock: Memorandum and Order forthcoming on pending motions before the Court. Court rules as follows: Defendant's Motion to Dismiss for Failure to State a Claim 15 DENIED; Defendant's Motion for Reconsideration 29 DENIED; Plaintiff's Motion for Leave to File Sur-Reply Brief Regarding Defendant's Motion for Reconsideration 41 ALLOWED; Motion to Dismiss Defendant's Counterclaim 60 ALLOWED; Special Motion to Dismiss Pursuant to M.G.L. c. 231 §59H 62 ALLOWED; Third Party Defendant's Special Motion to Dismiss the Third Party Complaint Pursuant to the Anti-Slapp Statute 78 MOOT; and, Motion to Dismiss the Third Party Complaint filed by Loeb & Loeb LLP 80 ALLOWED. All fact discovery to be completed by 4/14/2017. Parties to file status report by 4/14/2017 addressing a schedule for filing motions for summary judgment and whether expert discovery is anticipated. (Court Reporter: Brenda Hancock at brhancock@msn.com.) (Beatty, Barbara) (Entered: 12/01/2016) |
| 12/27/2016 | 93 | Transcript of Motion Hearing held on November 30, 2016, before Judge Douglas P. Woodlock. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Brenda Hancock at brhancock@msn.com Redaction Request due 1/17/2017. Redacted Transcript Deadline set for 1/27/2017. Release of Transcript Restriction set for 3/27/2017. (Scalfani, Deborah) (Entered: 12/27/2016) |
| 12/27/2016 | 94 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/caseinfo/transcripts.htm (Scalfani, Deborah) (Entered: 12/27/2016) |
| 12/30/2016 | 95 | MOTION to Transfer Case to SDNY. by Jack E. Robinson, III.(Robinson, Jack) (Entered: 12/30/2016) |
| 12/30/2016 | 96 | MEMORANDUM in Support re 95 MOTION to Transfer Case to SDNY. filed by Jack E. Robinson, III. (Robinson, Jack) (Entered: 12/30/2016) |
| 01/09/2017 | 97 | Emergency MOTION for Extension of Time to File Response/Reply as to 95 MOTION to Transfer Case to SDNY. *with certificate of service* by Universitas Education, LLC.(Poynor, Alissa) (Entered: 01/09/2017) |

| 01/10/2017 | 98 | Judge Douglas P. Woodlock: ORDER granting 97 Plaintiff's Emergency Motion to Extend Time to Respond to Defendant's Motion to Transfer Venue 95 until 1/27/2017.(Beatty, Barbara) (Entered: 01/10/2017) |
|---|---|---|
| 01/26/2017 | 99 | Opposition re 95 MOTION to Transfer Case to SDNY. *and Memorandum in Opposition to Defendant's Motion to Transfer Venue to the Southern District of New York* filed by Universitas Education, LLC. (Samson, Paul) (Entered: 01/26/2017) |
| 03/27/2017 | 100 | NOTICE OF HEARING: Hearing on Defendant's Motion 95 to Transfer Venue to the Southern District of New York scheduled for 4/11/2017 at 2:00 p.m. in Courtroom 1 before Judge Douglas P. Woodlock. (Beatty, Barbara) (Entered: 03/27/2017) |
| 03/27/2017 | 101 | MOTION for Extension of Time to August 14, 2017 to Complete Discovery by Universitas Education, LLC. (Samson, Paul) (Entered: 03/27/2017) |
| 03/27/2017 | 102 | DECLARATION re 101 MOTION for Extension of Time to August 14, 2017 to Complete Discovery *of Paul S. Samson* by Universitas Education, LLC. (Samson, Paul) (Entered: 03/27/2017) |
| 03/27/2017 | 103 | MOTION to Expedite *Consideration of Motion to Extend Discovery Deadline* by Universitas Education, LLC. (Samson, Paul) (Entered: 03/27/2017) |
| 03/28/2017 | 104 | Judge Douglas P. Woodlock: ORDER granting 103 Motion for Expedited Consideration of Motion to Extend Discovery Deadline. Any opposition to the Motion of Plaintiff for Extension of Discovery Deadline 101 shall be filed no later than 4/4/2017. The Motion of Plaintiff for Extension of Discovery Deadline will be heard at the time of hearing scheduled for 4/11/2017 at 2:00 p.m. (Beatty, Barbara) (Entered: 03/28/2017) |
| 03/29/2017 | 105 | RESPONSE to Motion re 101 MOTION for Extension of Time to August 14, 2017 to Complete Discovery *Consenting to requested extension* filed by Jack E. Robinson, III. (Marcus, Seth) (Entered: 03/29/2017) |
| 04/05/2017 | 106 | MOTION to Continue Hearing to April 21, 2017 *Due to Conflict of Counsel* by Universitas Education, LLC. (Samson, Paul) (Entered: 04/05/2017) |
| 04/05/2017 | 107 | DECLARATION re 106 MOTION to Continue Hearing to April 21, 2017 *Due to Conflict of Counsel of Paula K. Colbath, Counsel to Universitas Education, LLC, In Support of Motion to Reschedule the April 11, 2017 Hearing Date Due to Conflict of Counsel* by Universitas Education, LLC. (Samson, Paul) (Entered: 04/05/2017) |
| 04/05/2017 | 108 | MOTION to Expedite *Consideration of Motion to Reschedule April 11, 2017 Hearing Date Due to Conflict of Counsel* by Universitas Education, LLC.(Samson, Paul) (Entered: 04/05/2017) |
| 04/05/2017 | 109 | Opposition re 106 MOTION to Continue Hearing to April 21, 2017 *Due to Conflict of Counsel* filed by Jack E. Robinson, III. (Marcus, Seth) (Entered: 04/05/2017) |
| 04/07/2017 | 110 | Judge Douglas P. Woodlock: ORDER denying 95 Defendant's Motion to Transfer Venue to the Southern District of New York. (Beatty, Barbara) (Entered: 04/07/2017) |
| 04/07/2017 | 111 | Judge Douglas P. Woodlock: ORDER granting 108 Motion for Expedited Consideration of Motion to Reschedule 4/11/2017 Hearing and finding as moot 106 Motion to Reschedule the 4/11/2017 Hearing Date, in light of the denial of the Motion to Transfer.(Beatty, Barbara) (Entered: 04/07/2017) |
| 04/07/2017 | 112 | Judge Douglas P. Woodlock: ORDER granting 101 Motion for Extension of Discovery Deadline. Discovery to be completed by 8/14/2017 and a joint status report will now be due on 8/14/2017. (Beatty, Barbara) (Entered: 04/07/2017) |
| 05/31/2017 | 113 | MOTION to Compel *Arbitration* by Jack E. Robinson, III.(Marcus, Seth) (Entered: 05/31/2017) |
| 05/31/2017 | 114 | MEMORANDUM in Support re 113 MOTION to Compel *Arbitration* filed by Jack E. Robinson, III. (Attachments: # 1 Exhibit Charter Oak Trust Declaration of Trust)(Marcus, Seth) (Entered: 05/31/2017) |
| 06/06/2017 | 115 | MOTION for Extension of Time to June 21, 2017 to File Response/Reply as to 113 MOTION to Compel *Arbitration Defendant's Motion to Dismiss for Lack of Subject Matter Jurisdiction and to Compel Arbitration* by Universitas Education, LLC.(Samson, Paul) (Entered: 06/06/2017) |
| 06/06/2017 | 116 | Opposition re 115 MOTION for Extension of Time to June 21, 2017 to File Response/Reply as to 113 MOTION to Compel *Arbitration Defendant's Motion to Dismiss for Lack of Subject Matter Jurisdiction and to Compel Arbitration* filed by Jack E. Robinson, III. (Marcus, Seth) (Entered: 06/06/2017) |
| 06/07/2017 | 117 | Judge Douglas P. Woodlock: ORDER granting 115 Plaintiff's Motion for One Week Extension to Respond to Defendant's Motion to Dismiss and to Compel Arbitration. Response due no later than 3:00 p.m. on 6/21/2017. (Beatty, Barbara) (Entered: 06/07/2017) |
| 06/21/2017 | 118 | Opposition re 113 MOTION to Compel *Arbitration and Memorandum in Opposition to Defendant's Motion to Dismiss for Lack of Subject Matter Jurisdiction and to Compel Arbitration and Stay Proceedings in Two Related Cases* filed by Universitas Education, LLC. (Samson, Paul) (Entered: 06/21/2017) |

**Universitas Supplemental Appendix - 169**

| 06/21/2017 | 119 | DECLARATION re 118 Opposition to Motion, *of Plaintiff's Counsel, Paul S. Samson, to Authenticate Documents in Support of Universitas' Opposition to Defendant's Motion to Compel Arbitration* by Universitas Education, LLC. (Samson, Paul) (Entered: 06/21/2017) |
|---|---|---|
| 06/21/2017 | 120 | MOTION for Leave to File *Reply Brief in Response to Universitas' Opposition to Motion to Compel Arbitration* by Jack E. Robinson, III. (Attachments: # 1 Exhibit Proposed Memorandum in Reply)(Marcus, Seth) (Entered: 06/21/2017) |
| 06/23/2017 | 121 | Opposition re 120 MOTION for Leave to File *Reply Brief in Response to Universitas' Opposition to Compel Arbitration and Memorandum in Opposition to Defendant's Motion to File Reply Memorandum Regarding his Arbitration Motion* filed by Universitas Education, LLC. (Samson, Paul) (Entered: 06/23/2017) |
| 06/23/2017 | 122 | DECLARATION re 121 Opposition to Motion, *of Paul S. Samson to Authenticate* by Universitas Education, LLC. (Samson, Paul) (Entered: 06/23/2017) |
| 08/04/2017 | 123 | MOTION for Sanctions *Pursuant to Rule 11 Against Defendant Jack E. Robinson and His Counsel Seth L. Marcus, Esq.* by Universitas Education, LLC.(Samson, Paul) (Entered: 08/04/2017) |
| 08/04/2017 | 124 | DECLARATION re 123 MOTION for Sanctions *Pursuant to Rule 11 Against Defendant Jack E. Robinson and His Counsel Seth L. Marcus, Esq. of Plaintiff's Counsel, Paul S. Samson, in Support of Universitas' Motion for Rule 11 Sanctions* by Universitas Education, LLC. (Samson, Paul) (Entered: 08/04/2017) |
| 08/04/2017 | 125 | MEMORANDUM in Support re 123 MOTION for Sanctions *Pursuant to Rule 11 Against Defendant Jack E. Robinson and His Counsel Seth L. Marcus, Esq.* filed by Universitas Education, LLC. (Samson, Paul) (Entered: 08/04/2017) |
| 08/11/2017 | 126 | Opposition re 123 MOTION for Sanctions *Pursuant to Rule 11 Against Defendant Jack E. Robinson and His Counsel Seth L. Marcus, Esq.* filed by Jack E. Robinson, III. (Marcus, Seth) (Entered: 08/11/2017) |
| 08/15/2017 | 127 | STATUS REPORT *of the Parties* by Universitas Education, LLC. (Samson, Paul) (Entered: 08/15/2017) |
| 08/15/2017 | 128 | MOTION for Extension of Time to December 14, 2017 to Complete Discovery by Universitas Education, LLC. (Samson, Paul) (Entered: 08/15/2017) |
| 08/16/2017 | 129 | Opposition re 128 MOTION for Extension of Time to December 14, 2017 to Complete Discovery filed by Jack E. Robinson, III. (Marcus, Seth) (Entered: 08/16/2017) |
| 10/16/2017 | 130 | NOTICE OF MOTION HEARING: Hearing on pending motions 113 , 120 , 123 and 128 is set for 12/20/2017 at 2:45 p.m. in Courtroom 1 before Judge Douglas P. Woodlock. (Beatty, Barbara) (Entered: 10/16/2017) |
| 11/28/2017 | 131 | SUGGESTION OF DEATH Upon the Record as to Defendant Jack Robinson by Jack E. Robinson, III. (Marcus, Seth) (Entered: 11/28/2017) |
| 11/28/2017 | 132 | NOTICE OF STATUS CONFERENCE: In light of the Suggestion of Death for the defendant Jack E. Robinson 131 having been filed this day, the Motion Hearing previously scheduled for 12/20/2017 at 2:45 p.m. is converted to a Status Conference. All counsel to appear for this conference in Courtroom 1 before Judge Douglas P. Woodlock. (Beatty, Barbara) (Entered: 11/28/2017) |
| 11/30/2017 | 133 | Judge Douglas P. Woodlock: PROCEDURAL ORDER - In preparation for the Status Conference now scheduled for 12/20/2017, the parties shall file a joint status report addressing the remaining issues in this case no later than 4:00 p.m. on 12/18/2017. (Beatty, Barbara) (Entered: 11/30/2017) |
| 12/18/2017 | 134 | STATUS REPORT by Universitas Education, LLC. (Samson, Paul) (Entered: 12/18/2017) |
| 12/20/2017 | 135 | Clerk's Notes for Hearing held before Judge Douglas P. Woodlock: Court has reviewed the Joint Status Report submitted by counsel. Case will be stayed pending the appointment of a personal representative for the estate of Mr. Robinson. Parties will continue to file a status report with the Court on the first day of every month starting on 2/1/2018. Third party discovery may move forward outside of the stay and plaintiff shall file the appropriate protective order. Further status conferences, when necessary, may be conducted by phone a the request of the parties. Court acts on the following motions 113 , 120 , 123 and 128 - DENIED without prejudice subject to being renewed after the stay entered herein upon the suggestion of death of the defendant is lifted. (Court Reporter: Brenda Hancock at brhancock@msn.com.) (Beatty, Barbara) (Entered: 12/21/2017) |
| 02/01/2018 | 136 | STATUS REPORT by Jack E. Robinson, III. (Marcus, Seth) (Entered: 02/01/2018) |
| 02/21/2018 | 137 | MOTION for Extension of Time to March 28, 2018 to File *Substitution PUrsuant to Fed.R.Civ.P. 25(A)(1)* by Universitas Education, LLC.(Samson, Paul) (Entered: 02/21/2018) |
| 02/21/2018 | 138 | Judge Douglas P. Woodlock: ORDER granting 137 Plaintiff's Motion to Enlarge the Time to File Motion for Substitution on 3/28/2018. (Beatty, Barbara) (Entered: 02/21/2018) |
| 03/02/2018 | 139 | STATUS REPORT by Jack E. Robinson, III. (Marcus, Seth) (Entered: 03/02/2018) |

**Universitas Supplemental Appendix - 170**

| 03/23/2018 | 140 | MOTION for Extension of Time to May 28, 2018 to File *Motion for Substitution Pursuant to Fed.R.Civ. 25(A)(1)* by Universitas Education, LLC.(Samson, Paul) (Entered: 03/23/2018) |
|---|---|---|
| 03/23/2018 | 141 | Judge Douglas P. Woodlock: ORDER granting 140 Plaintiff's Motion to Enlarge Time to May 28, 2018 to File Motion for Substitution. (Beatty, Barbara) (Entered: 03/23/2018) |
| 05/22/2018 | 142 | MOTION for Extension of Time to July 31, 2018 *to File Motion for Substitution Pursuant to Fed.R.Civ.P. 25(A)(1)* by Universitas Education, LLC.(Samson, Paul) (Entered: 05/22/2018) |
| 05/29/2018 | 143 | Judge Douglas P. Woodlock: ORDER granting 142 Motion for Extension of Time to July 31, 2018 to File Motion for Substitution Pursuant to Fed.R.Civ.P. 25(A)(1) by Universitas Education, LLC. (Beatty, Barbara) (Entered: 05/29/2018) |
| 05/29/2018 | 144 | NOTICE OF STATUS CONFERENCE: Conference scheduled for 7/23/2018 at 11:30 a.m. in Courtroom 1 before Judge Douglas P. Woodlock. (Beatty, Barbara) (Entered: 05/29/2018) |
| 06/28/2018 | 145 | MOTION for Leave to Appear Pro Hac Vice for admission of Joseph L. Manson III Filing fee: $ 100, receipt number 0101-7208579 by Universitas Education, LLC. (Attachments: # 1 Exhibit A. Certification of Joseph L. Manson III in Support of Motion for Leave to Appear Pro Hac Vice, # 2 Certificate of Service)(Poynor, Alissa) (Entered: 06/28/2018) |
| 07/02/2018 | 146 | Judge Douglas P. Woodlock: ORDER granting 145 Motion for Leave to Appear Pro Hac Vice. Added Joseph L. Manson III as counsel for plaintiff. **Attorneys admitted Pro Hac Vice must register for electronic filing if the attorney does not already have an ECF account in this district. To register go to the Court website at www.mad.uscourts.gov. Select Case Information, then Electronic Filing (CM/ECF) and go to the CM/ECF Registration Form.** (Beatty, Barbara) (Entered: 07/02/2018) |
| 07/23/2018 | 147 | Clerk's Notes for Status Conference held before Judge Douglas P. Woodlock: Court discusses status of case. Plaintiff requests an extension to file the motion for substitution for an additional 90 days to afford the time in probate court, which the Court GRANTS. Further status conference scheduled for 10/23/2018 at 2:30 p.m.(Court Reporter: Brenda Hancock at brhancock@msn.com.) (Beatty, Barbara) (Entered: 07/23/2018) |
| 10/19/2018 | 148 | STATUS REPORT *of Plaintiff Universitas Education, LLC* by Universitas Education, LLC. (Samson, Paul) (Entered: 10/19/2018) |
| 10/22/2018 | 149 | NOTICE OF RESCHEDULING CONFERENCE: In light of the Status Report filed on 10/19/2018 148 , the Status Conference is hereby RESCHEDULED until 11/19/2018 at 2:15 p.m. in Courtroom 1 before Judge Douglas P. Woodlock. (Beatty, Barbara) (Entered: 10/22/2018) |
| 11/15/2018 | 150 | STATUS REPORT *of Plaintiff Universitas Education, LLC* by Universitas Education, LLC. (Samson, Paul) (Entered: 11/15/2018) |
| 11/16/2018 | 151 | NOTICE OF RESCHEDULING CONFERENCE: Status Conference is RESCHEDULED from 11/19/2018 to 12/20/2018 at 12:00 p.m. in Courtroom 1 before Judge Douglas P. Woodlock. (Beatty, Barbara) (Entered: 11/16/2018) |
| 12/18/2018 | 152 | STATUS REPORT *of Plaintiff Universitas Education LLC* by Universitas Education, LLC. (Samson, Paul) (Entered: 12/18/2018) |
| 12/18/2018 | 153 | Judge Douglas P. Woodlock: Upon the review of the Status Report 152 filed this day, the Status Conference is RESCHEDULED until 2/5/2019 at 2:00 p.m. in Courtroom 1 before Judge Douglas P. Woodlock.(Beatty, Barbara) (Entered: 12/18/2018) |
| 01/30/2019 | 154 | NOTICE of Change of Address or Firm Name by Paul S. Samson (Samson, Paul) (Entered: 01/30/2019) |
| 02/01/2019 | 155 | STATUS REPORT by Universitas Education, LLC. (Samson, Paul) (Entered: 02/01/2019) |
| 02/05/2019 | 156 | Clerk's Notes for Status Conference held before Judge Douglas P. Woodlock: Court reviews status report 155 filed by plaintiff's counsel and discusses alternatives to address the outstanding personal representative issue. Court permits discovery until 4/5/2019 to search for administrator(s) or party of interest in the estate of the defendant. Stay for appointing a substitute party will continue until 4/5/2019. Further status conference SCHEDULED for 4/12/2019 at 12:00 p.m. Tentative date for filing motions for summary judgment set for 6/3/2019. CALL IN INSTRUCTIONS FOR COUNSEL TO APPEAR BY PHONE FOR 4/12/2019 CONFERENCE: Call USA Toll-Free: 888-675-2535 using Access Code: 9326241. Once the call is made and access code is given, the system will ask if the call is the host. Please bypass this part, as your call is being placed as a participant. The Court is the host. (Court Reporter: Linda Walsh at lwalshsteno@gmail.com.)(Attorneys present: Samson, Manson) (Beatty, Barbara) (Entered: 02/06/2019) |
| 03/01/2019 | 157 | MOTION to Withdraw as Attorney *as Counsel to Plaintiff Universitas LLC* by Universitas Education, LLC. (Samson, Paul) (Entered: 03/01/2019) |

**Universitas Supplemental Appendix - 171**

| 03/01/2019 | 158 | DECLARATION re 157 MOTION to Withdraw as Attorney *as Counsel to Plaintiff Universitas LLC* by Universitas Education, LLC. (Samson, Paul) (Entered: 03/01/2019) |
| 03/21/2019 | 159 | Transcript of Status Conference held on February 5, 2019, before Judge Douglas P. Woodlock. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Linda Walsh at lwalshsteno@gmail.com Redaction Request due 4/11/2019. Redacted Transcript Deadline set for 4/22/2019. Release of Transcript Restriction set for 6/19/2019. (Scalfani, Deborah) (Entered: 03/21/2019) |
| 03/21/2019 | 160 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/caseinfo/transcripts.htm (Scalfani, Deborah) (Entered: 03/21/2019) |
| 04/11/2019 | 161 | STATUS REPORT by Universitas Education, LLC. (Samson, Paul) (Entered: 04/11/2019) |
| 04/12/2019 | 162 | Clerk's Notes for Status Conference held before Judge Douglas P. Woodlock: Court GRANTS 157 Motion to Withdraw as Attorney on behalf of Riemer & Braunstein LLP. Attorney Alissa L. Poynor and Paul S. Samson terminated. Court GRANTS an additional 45 days to complete discovery, until 5/20/2019, and an additional 45 days to file motion for summary judgment, until 7/18/2019. (Court Reporter: Debra Joyce at joycedebra@gmail.com. (Attorneys present: Manson, Samson) (Beatty, Barbara) Modified on 4/26/2019 (Scalfani, Deborah). (Entered: 04/12/2019) |
| 04/26/2019 | 163 | Transcript of Status Conference held on April 12, 2019, before Judge Douglas P. Woodlock. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Debra Joyce at joycedebra@gmail.com Redaction Request due 5/17/2019. Redacted Transcript Deadline set for 5/28/2019. Release of Transcript Restriction set for 7/25/2019. (Scalfani, Deborah) (Entered: 04/26/2019) |
| 04/26/2019 | 164 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/caseinfo/transcripts.htm (Scalfani, Deborah) (Entered: 04/26/2019) |
| 06/28/2019 | 165 | MOTION for Extension of Time to Sept. 3, 2019 to File Motion for Summary Judgment by Universitas Education, LLC.(Manson, Joseph) (Entered: 06/28/2019) |
| 07/08/2019 | 166 | Document submitted to the court by Lillian Granderson, non-party to this civil action, in relation to civil action 8:19-mc-30-T-02JSS in the Middle District of Florida. (Attachments: # 1 Cover Letter)(Kinsella, Devan) (Entered: 07/09/2019) |
| 07/11/2019 | 167 | Judge Douglas P. Woodlock: ORDER granting 165 Plaintiff's Motion for Extension of Discovery and Summary Judgment Motion Deadlines. The discovery deadline is hereby EXTENDED until July 26, 2019 and the deadline for filing the motion for summary judgment is EXTENDED until September 3, 2019 (Beatty, Barbara) (Entered: 07/11/2019) |
| 08/22/2019 | 168 | Filing from Florida Court case. (McDonagh, Christina) (Entered: 08/22/2019) |
| 09/03/2019 | 169 | First MOTION for Leave to File *Brief in Excess of Page Limit and File Supporting Affidavit After the Filing Deadline* by Universitas Education, LLC.(Manson, Joseph) (Entered: 09/03/2019) |
| 09/03/2019 | 170 | First MOTION for Summary Judgment by Universitas Education, LLC.(Manson, Joseph) (Entered: 09/03/2019) |
| 09/03/2019 | 171 | First MEMORANDUM in Support re 170 First MOTION for Summary Judgment filed by Universitas Education, LLC. (Manson, Joseph) (Entered: 09/03/2019) |
| 09/04/2019 | 172 | First AFFIDAVIT of Benjamin Chernow in Support re 170 First MOTION for Summary Judgment filed by Universitas Education, LLC. (Attachments: # 1 Exhibit Exhibit 1, # 2 Exhibit Exhibit 2-3, # 3 Exhibit Exhibit 4-20, # 4 Exhibit Exhibit 21-35, # 5 Exhibit Exhibit 36-48, # 6 Exhibit Exhibit 49-60, # 7 Exhibit Exhibit 61-70, # 8 Exhibit Exhibit 71-82, # 9 Exhibit Exhibit 83-104, # 10 Exhibit Exhibit 105-126, # 11 Exhibit Exhibit 127-139, # 12 Exhibit Exhibit 140, # 13 Exhibit Exhibit 141-149, # 14 Exhibit Exhibit 150, # 15 Exhibit Exhibit 151-171) (Manson, Joseph) (Attachment 1 replaced on 9/10/2021) (Danieli2, Chris). (Attachment 15 replaced on 9/10/2021) (Danieli2, Chris). (Entered: 09/04/2019) |
| 09/04/2019 | 173 | Judge Douglas P. Woodlock: ORDER granting 169 Plaintiff's Unopposed Motion for Leave to File Brief in Excess of Twenty Pages and File Supporting Affidavit After the Filing Deadline. (Beatty, Barbara) (Entered: 09/04/2019) |
| 09/06/2019 | 174 | First AFFIDAVIT in Support re 170 First MOTION for Summary Judgment filed by Universitas Education, LLC. (Attachments: # 1 Exhibit Exhibit A)(Manson, Joseph) (Attachment 1 replaced on 9/9/2019) (McDonagh, Christina). (Entered: 09/06/2019) |
| 06/02/2020 | 175 | MOTION to Dismiss for Lack of Jurisdiction and Response to Plaintiff's Objection by Lillian Granderson. (Attachments: # 1 Exhibit)(McDonagh, Christina) (Entered: 06/02/2020) |

**Universitas Supplemental Appendix - 172**

| 01/26/2021 | [176](#) | Request for Entry of Default by Universitas Education, LLC. (Attachments: # 1 Affidavit Declaration of Joseph L. Manson III, # 2 Exhibit Exhibit A, # 3 Exhibit Exhibit B, # 4 Exhibit Exhibit C, # 5 Exhibit Exhibit D, # 6 Exhibit Exhibit E, # 7 Exhibit Exhibit F, # 8 Exhibit Exhibit G, # 9 Text of Proposed Order Proposed Entry of Default) (Manson, Joseph) Modified on 1/28/2021 to correct filing event type used. (McDonagh, Christina). (Entered: 01/26/2021) |
|---|---|---|
| 01/28/2021 | [177](#) | NOTICE: Clerk's ENTRY OF DEFAULT as to Jack E. Robinson, III (McDonagh, Christina) (Entered: 01/28/2021) |
| 01/28/2021 | [178](#) | Judge Douglas P. Woodlock: ORDER entered. STANDING ORDER on motions for default judgment re 177 Notice: Clerk's Entry of Default (McDonagh, Christina) (Entered: 01/28/2021) |
| 01/28/2021 | 179 | Copy re 177 Notice: Clerk's Entry of Default, 178 Standing Order re motions for default judgment mailed to Jack E. Robinson III on 1/28/2021. (McDonagh, Christina) (Entered: 01/28/2021) |
| 02/08/2021 | [180](#) | Mail Returned as Undeliverable. Mail sent to Jack E. Robinson III (McDonagh, Christina) (Entered: 02/09/2021) |
| 03/01/2021 | [181](#) | MOTION for Default Judgment as to Jack E. Robinson III, a/k/a Jack E. Robinson by Universitas Education, LLC. (Attachments: # 1 Affidavit Declaration of Joseph L. Manson III, # 2 Exhibit Exhibit A to Declaration of Joseph L. Manson III, # 3 Exhibit Exhibit B to Declaration of Joseph L. Manson III, # 4 Affidavit Affidavit of Sharon Siebert, # 5 Exhibit Exhibit A to Affidavit of Sharon Siebert, # 6 Exhibit Exhibit B to Affidavit of Sharon Siebert, # 7 Exhibit Exhibit C to Affidavit of Sharon Siebert)(Manson, Joseph) (Attachment 3 replaced on 3/26/2021) (McDonagh, Christina). (Attachment 5 replaced on 3/26/2021) (McDonagh, Christina). (Entered: 03/01/2021) |
| 03/01/2021 | [182](#) | Proposed MOTION for Order to to Enter Default Judgment *against Jack E. Robinson III* by Universitas Education, LLC.(Manson, Joseph) (Entered: 03/01/2021) |
| 03/01/2021 | [183](#) | MOTION to Seal Document 181 MOTION for Default Judgment as to Jack E. Robinson III, a/k/a Jack E. Robinson by Universitas Education, LLC. (Attachments: # 1 Exhibit A)(Manson, Joseph) (Entered: 03/01/2021) |
| 03/02/2021 | 184 | Judge Douglas P. Woodlock: ELECTRONIC ORDER entered granting 183 MOTION to Seal Document 181 MOTION for Default Judgment (McDonagh, Christina) (Entered: 03/02/2021) |
| 03/04/2021 | [185](#) | MOTION to Intervene by Lillian Granderson. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H)(Sullivan, Lana) (Entered: 03/04/2021) |
| 03/04/2021 | [186](#) | MOTION for Leave to Appear Pro Hac Vice for admission of Jeraldine Williams Filing fee: $ 100, receipt number 0101-8665393 by Lillian Granderson. (Attachments: # 1 Affidavit)(Sullivan, Lana) (Entered: 03/04/2021) |
| 03/18/2021 | [187](#) | Opposition re 185 MOTION to Intervene filed by Universitas Education, LLC. (Manson, Joseph) (Entered: 03/18/2021) |
| 12/10/2021 | 188 | Entered in error (McManus, Caetlin) (Entered: 12/10/2021) |
| 06/16/2022 | [189](#) | Letter/request (non-motion) from Joseph L. Manson, III, Counsel for Universitas Education, LLC, inquiring re. case status. (McManus, Caetlin) (Entered: 06/17/2022) |
| 06/29/2022 | [190](#) | Letter/request (non-motion) from Non-Party Lillian B. Granderson . (Sullivan, Lana) (Entered: 06/29/2022) |
| 02/07/2023 | [191](#) | Judge Douglas P. Woodlock: ORDER entered denying 170 Motion for Summary Judgment; denying 175 Motion to Dismiss for Lack of Jurisdiction; denying 181 Motion for Default Judgment; denying 182 Motion for Order; denying 185 Motion to Intervene; granting 186 Motion for Leave to Appear Pro Hac Vice<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account You must put the docket number on your form when registering or it will be rejected.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.<br><br>A Notice of Appearance must be entered on the docket by the newly admitted attorney.<br><br>(Woodlock, Douglas) (Beatty, Barbara). (Entered: 02/07/2023) |
| 02/07/2023 | 192 | NOTICE OF STATUS CONFERENCE:<br><br>This conference will be conducted by video conference. Counsel of record will receive a video conference invite at the email registered in CM/ECF. If you have technical or compatibility issues with the technology, please notify the courtroom deputy of the session as soon as possible. |

**Universitas Supplemental Appendix - 173**

| | | |
|---|---|---|
| | | Access to the conference will be made available to the media and public. In order to gain access to the conference, you must sign up at the following address: https://forms.mad.uscourts.gov/courtlist.html.<br><br>For questions regarding access to hearings, you may refer to the general orders and public notices of the Court available on www.mad.uscourts.gov or contact media@mad.uscourts.gov.<br><br>Status Conference is SCHEDULED for 4/12/2023 at 12:00 p.m. in Remote Proceeding : Boston before Judge Douglas P. Woodlock. On or before April 7, 2023, Plaintiff and any person substituted as Defendant shall file a Status Report regarding the posture of the case. (Beatty, Barbara) (Entered: 02/07/2023) |
| 03/31/2023 | 193 | STATUS REPORT REGARDING SERVICE OF PROCESS ON LILLIAN GRANDERSON by Universitas Education, LLC. (Attachments: # 1 Exhibit - Affidavit of Service)(Beatty, Barbara) (Entered: 04/01/2023) |
| 04/07/2023 | 194 | STATUS REPORT by Universitas Education, LLC. (Attachments: # 1 Exhibit Proposed Motion to Substitute) (Manson, Joseph) (Entered: 04/07/2023) |
| 04/12/2023 | 195 | Clerk's Notes for Status Conference held via Zoom before Judge Douglas P. Woodlock - Court treats participation of Attorney Jeraldine Williams in this status conference as that of an interested party since no formal appearance as counsel of record has been accepted by the Court. Court allows the plaintiffs motion for substitution of Ms. Granderson as representative of the defendants estate to be formally filed no later than 4/19/2023. Plaintiffs counsel addresses the Court on method of proceeding with the case. Plaintiff to renew its motion for default judgment no later than 5/12/2023. Court anticipates scheduling a hearing on the motion for default judgment promptly and will further address the execution of the judgment when appropriate. Attorney Lana Sullivan is not present. After the hearing, the Court instructed the Clerk to terminate Ms. Sullivans appearance as a movant in this case since no motion is pending before the Court. (Court Reporter: Debra Joyce at joycedebra@gmail.com.) (Attorneys present: Manson, Williams) (Beatty, Barbara) (Entered: 04/18/2023) |
| 04/18/2023 | 196 | MOTION to Substitute Party by Universitas Education, LLC. (Attachments: # 1 Text of Proposed Order)(Manson, Joseph) (Entered: 04/18/2023) |
| 05/08/2023 | 197 | Judge Douglas P. Woodlock: ELECTRONIC ORDER entered re 196 Motion to Substitute Party. GRANTED, No opposition having been filed. (McManus, Caetlin) (Entered: 05/08/2023) |
| 05/12/2023 | 198 | NOTICE of Appearance by Lana Sullivan on behalf of Lillian Granderson (Sullivan, Lana) (Entered: 05/12/2023) |
| 05/12/2023 | 199 | Opposition re 196 MOTION to Substitute Party filed by Lillian Granderson. (Sullivan, Lana) (Entered: 05/12/2023) |
| 05/12/2023 | 200 | MOTION for Default Judgment as to Jack E. Robinson III, a/k/a Jack E. Robinson by Universitas Education, LLC. (Attachments: # 1 Affidavit, # 2 Exhibit A to Manson Declaration, # 3 Exhibit B to Manson Declaration) (Manson, Joseph) Docket text modified on 5/15/2023 (McManus, Caetlin). (Entered: 05/12/2023) |
| 05/12/2023 | 201 | Proposed Default Judgment by Universitas Education, LLC.(Manson, Joseph) Modified on 5/15/2023 to correct filing event used and docket text (McManus, Caetlin). (Entered: 05/12/2023) |
| 05/26/2023 | 202 | Opposition re 200 MOTION for Default Judgment as to Jack E. Robinson III, a/k/a Jack E. Robinson, 201 MOTION for Order to Enter Default Judgment filed by Lillian Granderson. (Sullivan, Lana) (Entered: 05/26/2023) |
| 05/26/2023 | 203 | REPLY to Response to 196 MOTION to Substitute Party filed by Universitas Education, LLC. (Attachments: # 1 Exhibit)(Manson, Joseph) (Entered: 05/26/2023) |
| 07/12/2023 | 204 | Judge Douglas P. Woodlock: DEFAULT JUDGMENT...ORDERED, ADJUDGED AND DECREED that plaintiff recover from defendant Jack E. Robinson, III, a/k/a Jack E. Robinsons estate the sum of $92,031,830.55, with post judgment interest as provided by 28 U.S.C. §1961. (Beatty, Barbara) (Entered: 07/12/2023) |
| 07/12/2023 | 205 | Judge Douglas P. Woodlock: ELECTRONIC ORDER denying the Motion to Vacate Court's Ruling Ordering Her Subsitution 199 filed by Lillian Granderson. (Note: The Motion to Vacate portion of the filing was not docketed correctly by counsel.)(Beatty, Barbara) (Entered: 07/12/2023) |
| 08/10/2023 | 206 | NOTICE by Lillian Granderson *of of Appeal and Withdrawal of Counsel* (Sullivan, Lana) (Entered: 08/10/2023) |
| 08/10/2023 | 207 | NOTICE of Withdrawal of Appearance by Lana Sullivan (Sullivan, Lana) (Entered: 08/10/2023) |
| 08/12/2023 | 208 | NOTICE OF APPEAL as to 204 Default Judgment, 205 Order, by Lillian Granderson NOTICE TO COUNSEL: A Transcript Report/Order Form, which can be downloaded from the First Circuit Court of Appeals web site at http://www.ca1.uscourts.gov MUST be completed and submitted to the Court of Appeals. **Counsel shall register for a First Circuit CM/ECF Appellate Filer Account at http://pacer.psc.uscourts.gov/cmecf. Counsel shall also review the First Circuit requirements for electronic filing by visiting the CM/ECF Information section at http://www.ca1.uscourts.gov/cmecf.** US District Court Clerk to deliver official record to Court of Appeals by 9/1/2023. (Attachments: # 1 Exhibit A)(Paine, Matthew) (Entered: 08/12/2023) |

**Universitas Supplemental Appendix - 174**

| 08/12/2023 | 209 | **Notice of correction to docket made by Court staff. Correction: Docket Entry 206 Notice of Appeal Corrected Because: Counsel Sullivan Filed the Notice of Appeal Under the Wrong Event in CM/ECF NextGen. The Notice of Appeal Was Re-Docketed Under the Correct Appellate Event ECF No. 208** (Paine, **Matthew)** (Entered: 08/12/2023) |
| 08/14/2023 | 210 | Certified and Transmitted Abbreviated Electronic Record on Appeal to US Court of Appeals re 208 Notice of Appeal. (Paine, Matthew) (Entered: 08/14/2023) |
| 08/14/2023 | 211 | USCA Case Number 23-1675 for 208 Notice of Appeal, filed by Lillian Granderson. (Paine, Matthew) (Entered: 08/14/2023) |
| 09/05/2023 | 212 | NOTICE of Appearance by Jason M. Strojny on behalf of Lillian Granderson (Strojny, Jason) (Entered: 09/05/2023) |
| 09/05/2023 | 213 | NOTICE OF ATTORNEY PAYMENT OF FEES as to 208 Notice of Appeal,,, by Defendant Lillian Granderson. Filing fee $ 505, receipt number AMADC-10023418. Payment Type : APPEAL. (Strojny, Jason) (Entered: 09/05/2023) |
| 09/05/2023 | 214 | NOTICE by Lillian Granderson *Certifying No Transcript Will Be Ordered Pursuant to F.R.A.P. 10(b)(1)(B)* (Strojny, Jason) (Entered: 09/05/2023) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 11/22/2023 22:18:29 | | |
| **PACER Login:** | mansonjms | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:15-cv-11848-DPW |
| **Billable Pages:** | 18 | **Cost:** | 1.80 |

Universitas Supplemental Appendix - 175